## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br>1615 H Street, NW<br>Washington, D.C. 20062-2000,<br><br>                    Plaintiff,<br><br>v.<br><br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>UNITED STATES DEPARTMENT OF STATE<br>2201 C Street, NW<br>Washington, D.C. 20520;<br><br>KRISTI L. NOEM, in her official capacity as Secretary of Homeland Security<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State<br>2201 C Street, NW<br>Washington, D.C. 20520,<br><br>                    Defendants. | Case No. 25-cv-3675 |

## COMPLAINT

Plaintiff the Chamber of Commerce of the United States of America brings this action for declaratory and injunctive relief and alleges as follows:

## INTRODUCTION

1.     The United States is unique in its ability to attract the brightest talent from across the globe. For more than 70 years, what is now known as the H-1B visa program has enabled the United States to harness this magnetic draw. Tens of thousands of highly skilled people in specialized fields boost the American economy each year after obtaining H-1B status. These workers allow businesses of all sizes, in industries across the economy, to innovate and grow. The resulting innovations lead to more American jobs, higher wages, and new products and services that improve the quality of life for all Americans.

2.     The H-1B program is a creature of statute, which Congress has meticulously maintained and modified over decades. The goal, from the start, has been to maximize the benefits of the program for the American people while also ensuring that American workers do not face a competitive disadvantage in the national workforce. That is, Congress has focused on making this program available to employers seeking workers with specialized skills not available in the United States while preventing H-1B abuse and the displacement of American workers. To that end, it has struck an intricate, thoughtful balance by specifying how fees for the program should be calculated, how many visas may be issued annually, and what requirements the executive branch should enforce to ensure that H-1B workers do not displace American workers or undercut wages.

3.     The presidential proclamation at issue in this action, *Restriction on Entry of Certain Nonimmigrant Workers* (Sept. 19, 2025) (the Proclamation), upends that carefully crafted congressional balance. The centerpiece of the Proclamation is the imposition of a $100,000 fee on all new petitions filed by United States employers intending to hire foreign workers through the H-1B program. By comparison, prior to the Proclamation, most H-1B petitions cost less than $3,600.

4.     If implemented, that fee would inflict significant harm on American businesses, which would be forced to either dramatically increase their labor costs or hire fewer highly skilled employees for whom domestic replacements are not readily available. While Congress made the

program generally available for domestic employers, this new fee would make it no longer economically viable for many, primarily smaller businesses. Indeed, a fee of $100,000 would significantly reduce participation in the program, resulting in fewer employers being able to access the highly skilled workers they need to continue to innovate and create American jobs.

5.    These harms to American businesses will also be a boon to America's economic rivals, who will surely welcome the talent no longer able to accept work in the United States. That is a competitive edge that foreign employers might never cede back.

6.    The Proclamation is not only misguided policy; it is plainly unlawful. The President has significant authority over the entry of noncitizens into the United States, but that authority is bounded by statute and cannot directly contradict laws passed by Congress.

7.    The Proclamation does precisely that: It blatantly contravenes the fees Congress has set for the H-1B program and countermands Congress's judgment that the program should provide a pathway for up to 85,000 people annually to contribute their talents to the United States for the betterment of American society. As fully set forth herein, other problems abound.

8.    Because the Proclamation exceeds the President's lawful authority, it must be enjoined as to Plaintiff and its members, and any implementing agency action must be held unlawful and set aside.

**PARTIES**

9.    Plaintiff the Chamber of Commerce of the United States of America (the U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members before Congress, the executive branch, and the courts. To that end, the U.S. Chamber regularly litigates on

behalf of its members in federal court. The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

10.  Defendant the United States Department of Homeland Security is the federal department with substantial responsibility for immigration policy and enforcement. The Proclamation charges the Department of Homeland Security with certain aspects of its implementation. The Department of Homeland Security is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of Homeland Security is headquartered in Washington, D.C.

11.  Defendant the United States Department of State is the federal department charged with conducting foreign relations, including by issuing visas to noncitizens. The Proclamation charges the Department of State with certain aspects of its implementation. The Department of State is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of State is headquartered in Washington, D.C.

12.  Defendant Kristi L. Noem is the Secretary of Homeland Security. She is sued in her official capacity.

13.  Defendant Marco A. Rubio is the Secretary of State. He is sued in his official capacity.

## JURISDICTION AND VENUE

14.  Plaintiffs bring this suit under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq., the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., and this Court's inherent equitable power.

15.  It is within this Court's inherent equitable power to enjoin actions by federal officers in excess of their lawful authority, including when acting pursuant to a presidential directive. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit

seeking to enjoin the officers who attempt to enforce the President's directive.'") (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part)); *id.* ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands.") (quotation marks omitted); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

16.    This Court has jurisdiction under 28 U.S.C. § 1331, as this case arises under the laws of the United States.

17.    Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1)(A)-(C) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one defendant is located in this district, a substantial part of the events giving rise to the claim occurred in this district, and plaintiff resides in this district and no real property is involved.

18.    The U.S. Chamber has standing to bring this action under the doctrine of associational standing. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 333 (1977). Many of the U.S. Chamber's members of all sizes, and across a wide spectrum of economic sectors, use the H-1B program. They count H-1B visa holders among their valued employees, and plan to continue sponsoring future hires for visas through the H-1B process, including in the next annual H-1B visa lottery, which will occur in March 2026 and therefore is encompassed within the Proclamation's effective period. U.S. Chamber members use the H-1B program to access employees with specialized, often technical skills that are in high demand—and therefore in short supply—domestically.

19.    The imposition of a new $100,000 fee to continue using that program is thus a concrete harm suffered by the numerous U.S. Chamber members who participate in the program. Some members are unable to pay that fee and therefore must either reduce or entirely forgo their planned entries into the March 2026 lottery—thereby giving up the benefits of the program in terms of access to specialized talent and likely leaving difficult-to-fill positions empty. That creates ripple effects across the business, including forgone opportunities and loss of competitiveness.

Other members who find a way to pay a $100,000 per-employee fee will be harmed too, incurring the "classic pocketbook injury" (*Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)) of paying money to the government. And paying the fee will require members to divert resources and decrease investments in other areas.

20.    Either way, the U.S. Chamber's members who intend to sponsor H-1B employees this year are the object of the Proclamation's $100,000 fee requirement—as they are the parties now required to pay the fee—and therefore would have standing to sue in their own right. *See, e.g.*, *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. ___, 145 S. Ct. 2121, 2134 (2025) ("[I]f a plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-562 (1992))).

21.    This action is also germane to the U.S. Chamber's purpose of representing the interests of American business in court. *Hunt*, 432 U.S. at 333; *see also, e.g.*, *Healthy Gulf v. U.S. Dep't of Interior*, __ F.4th ___, 2025 WL 2486119, at *5 (D.C. Cir. Aug. 29, 2025) ("Germaneness requires 'pertinence between litigation subject and organizational purpose.'") (indirectly quoting *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)); *Hodel*, 840 F.2d at 58 (germaneness requirement is "undemanding").

22.    The U.S. Chamber frequently represents members in both advocating business-friendly policies and challenging executive actions that will negatively affect business, including agency action that imposes unreasonable costs on doing business or that impedes a company's ability to hire well-qualified employees, innovate, and create jobs. The U.S. Chamber, through its Litigation Center, "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business." *Chamber Litigation Center*, U.S. Chamber of Commerce (2025), https://perma.cc/WH3T-JXRP. And the supply of highly qualified labor is one of the fundamental

6

inputs to any business; ensuring that supply is therefore well within the U.S. Chamber's advocacy mission. *See generally* U.S. Chamber of Commerce, *Topics: Immigration* (describing the U.S. Chamber's efforts in advocating for immigration policies that allow businesses to flourish), https://perma.cc/S4TA-3ZJD; U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative* (describing the Chamber's major initiative to address the "worker shortage crisis" by "helping employers across the country develop and discover talent," including through the "related topic[]" of "immigration"), https://perma.cc/EG35-52F9.

23.    Thus, for example, the U.S. Chamber has brought several successful lawsuits (along with other business associations) on behalf of its members, challenging executive action that threatened to undermine the H-1B program. *See generally Chamber of Com. of the U.S. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-7331 (N.D. Cal. 2020); *Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-4887 (N.D. Cal. 2020). And the U.S. Chamber regularly participates in the notice-and-comment process when DHS or other agencies conduct rulemaking relating to business-relevant immigration policies in general, and to the H-1B program in particular. *See, e.g.*, U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023), https://perma.cc/FK9V-9RT2; U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), https://perma.cc/B2RV-EUA2.

24.    Finally, the participation of the U.S. Chamber's individual members is unnecessary, as this action seeks only declaratory, injunctive, and vacatur relief. *See, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" as opposed to "an action for damages to an association's members.") (quoting *Hunt* 432 U.S.

at 343); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025) ("[T]he purely injunctive and declaratory relief sought by the Center does not require the participation of individual members either to litigate or to remediate the claim.") (citation omitted).

## FACTUAL ALLEGATIONS

### A.    Legal background.

*1.    The H-1B Program.*

25.    The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 et seq. Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

26.    First enacted in 1952, what is today known as the H-1B visa program makes available a nonimmigrant visa for a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A "specialty occupation" is one that requires "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." *Id.* § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

27.    The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations.

28.    The INA provides that the "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1).

29.    An employer must also complete the labor condition application process. The employer must certify to the Department of Labor that (among other things) the company will pay its H-1B employee, at a minimum, the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20 C.F.R. part 655 (DOL regulations governing labor condition application process).

30.    The "prevailing wage" is calculated by assessing the "skill level" of the proposed H-1B worker and corresponding wages for workers in the occupation and location in which the employer is seeking to employ the H-1B worker, based on statistics compiled by the Bureau of Labor Statistics. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872, 63,875-63,876 (Oct. 8, 2020); *see* also 8 U.S.C. § 1182(p)(4).

31.    Since 1990, Congress has maintained a cap on the total number of available H-1B visas that may be issued each year. Presently (with some exemptions),[1] the statutory cap allows 65,000 noncitizens to obtain H-1B nonimmigrant status per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution. *See* 8 U.S.C. § 1184(g).

32.    Because demand for H-1B visas far outstrips the number of visas available—for fiscal year 2026, more than 336,153 people registered against a cap of 85,000—the United States Citizenship and Immigration Services (USCIS) traditionally has implemented a lottery system to

---

[1]    Universities and their affiliated nonprofit entities (such as university health systems) and nonprofit and government research organizations are exempt from the numerical cap, and may submit H-1B petitions outside of the lottery procedure discussed below. *See* 8 U.S.C. § 1184(g)(5)(A), (B).

determine which petitions would be processed. If the number of H-1B petitions filed exceeded the numerical quota for that year in the first five business days of the designated petition submission window, USCIS would select randomly among all petitions filed on those first five days. *See* 8 C.F.R. § 214.2(h)(8)(ii)(B) (prior to Apr. 1, 2019).

33.    In 2019, USCIS implemented a "registration" system that requires a U.S. employer to register electronically for each person for whom they intend to file an H-1B petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). If USCIS receives more registrations than the number of available visas, the agency runs a lottery among the registrations to determine who can file an H-1B petition. After USCIS notifies an employer that its registration has been selected, the employer has 90 days to file its H-1B petition.

34.    The lottery occurs every March. The next lottery to follow the implementation of the Proclamation will occur in March 2026.

35.    The fees associated with H-1B petitions are set by USCIS through notice-and-comment rulemaking and are governed by statutory provisions. Relevant statutory provisions include 8 U.S.C. § 1356(m), which says that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." Presently, fees that USCIS has assessed under its Section 1356(m) authority include a registration fee to enter the H-1B lottery (8 C.F.R. § 106.2(c)(11)), a filing fee for the form (I-129) used to submit an H-1B petition (*id.* § 106.2(a)(3)), and an asylum program fee (*id.* § 106.2(c)(13)). Depending on the size of the employer, these fees can add up to as much as $1,595.

36.    In addition to the fees set by USCIS through notice-and-comment rulemaking pursuant to 8 U.S.C. § 1356(m), Congress has also set multiple specific fees for H-1B petitions by

statute, including a $1,500 fee for most employers to file the petition (8 U.S.C. § 1184(c)(9)(A)-(C)) and an additional $500 fee to fund fraud prevention measures (*id.* § 1184(c)(12)(A)-(C)).

37.    Additionally, in 2010, Congress imposed by statute an additional fee of $2,000 on certain H-1B petitions. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010). The fee was increased to $4,000 in 2015. Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 40101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411).[2] Employers covered by this fee are those that employ more than 50 workers in the United States, and more than half of whose U.S. workforce is composed of H-1B or L-1 employees (a visa category used for intracompany transferees). *Id.*

38.    Congress also has provided for "premium processing" fees for immigration services—currently $2,805 for H-1B petitions—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S. § 1356(u)(3); *See USCIS Fee Schedule* (Aug. 29, 2025) at 32, https://perma.cc/U7D4-5VS9.

39.    Prior to the Proclamation, the total fees associated with filing an H-1B petition, including both USCIS-set fees and statutory fees, generally amounted to approximately $3,600 (excluding the optional premium processing fee and the additional $4,000 fee for H-1B-reliant employers). *See USCIS Fee Schedule*, *supra*, at 6, 39-40.

40.    After USCIS approves an H-1B petition, if an applicant is outside the United States, he or she must apply for an H-1B visa at a U.S. embassy or consulate abroad before traveling to the United States. If granted, an H-1B visa is good for three years and is eligible for one extension of the same duration. *See* U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(A).

---

[2]    This $4,000 additional fee was initially set to sunset in 2025, but Congress later extended the sunset date until September 30, 2027. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 30203(b), 132 Stat. 64, 126.

41.    Congress has carefully calibrated the H-1B visa system to the needs of the domestic economy. For example, as noted, the law contains labor protections designed to ensure that H-1B visas do not become a vehicle for displacing well-qualified Americans.

42.    Before hiring a noncitizen through the H-1B program, a company must make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. § 1182(n)(1)(A)-(D). An employer must attest, among other things, that the position pays prevailing wages, that the position will not adversely affect other workers, and that the employer has provided to existing employees certain forms of notice regarding the petition, including by physical posting. These certification requirements are backed up by monetary fines and bans on further visa applications. 8 U.S.C. § 1182(n)(2)(C).

43.    Employers with a history of willful certification violations or a large percentage of workers already on H-1B visas must additionally certify that the company has tried and failed to fill the position with a domestic worker, and that it has not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A); *see also* 20 C.F.R. § 655.736.

44.    For example, an employer with 51 or more U.S. employees must make these additional certifications—that U.S. workers were not available to fill the position and that it has not and will not displace U.S. workers in a 6-month period—if 15 percent or more of its employees are in H-1B status. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A)(iii).

45.    Since 1990, the law also has imposed an annual cap on the total number of new H-1B visas that can be issued each year, to prevent the American workforce from being overwhelmed with highly competitive noncitizen workers. *See* 8 U.S.C. § 1184(g).

46.    At the same time, Congress has been attuned to "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R.

Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990). It enacted the modern H-1B statute based on the con-viction "that immigration can and should be incorporated into an overall strategy that promotes the creation of the type of workforce needed in an increasingly competitive global economy with-out adversely impacting on the wages and working conditions of American workers." *Id.*

47.      In other words, the relevant statutory provisions struck an intentional balance be-tween the hiring needs of businesses and protections for American workers. Indeed, the govern-ment itself has recognized that "the broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers." *Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706- 11,707 (Mar. 20, 1991).

48.      Congress's repeated statutory amendments adjusting the H-1B program—without changing its essential nature—reaffirm this fundamental principle.

49.      In making one such statutory adjustment—instituting a temporary increase in the cap on H-1B visas—the Senate Report accompanying the American Competitiveness in the Twenty-First Century Act expressly noted that H-1B visas are essential to growing the number of American jobs:

> Critics of H-1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H-1B ceiling is what will deprive Americans of jobs. This is because artificially limiting compa-nies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs. . . . Many of the con-cerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will ''take'' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.]

S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

50.    In 2004, Congress specifically addressed appropriate limitations on the H-1B visa category via the H-1B Visa Reform Act of 2004. 118 Stat. 2809, 3353-61 §§ 421-430. This Act, among other things, revised prevailing wage requirements, adjusted the number of visas available by adding a set-aside for individuals completing U.S. graduate degrees, and otherwise calibrated the program to meet the needs of the domestic economy.

51.    Most recently, as noted, Congress in 2010 and again in 2015 responded to the potential for H-1B visa abuse by imposing a temporary surcharge fee of $4,000 on certain employers with a high proportion of H-1B visa holders as employees. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010); Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015).

52.    These recent and ongoing congressionally enacted adjustments to the program reflect Congress's active and engaged decisionmaking about how the program is designed and ought to operate, as well as Congress's reaffirmation of the program's fundamental goals and purpose.

2.    *The President's authority under the INA.*

53.    Congress, in the INA, provided the President certain authority. Under Section 212(f) of the INA:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

54.    And Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 85 U.S. 667, 693 n.1 (2018).

B.     **Factual Background.**

  1.   *Importance of H-1B workers.*

55.     H-1B visas are critical to the success and growth of American businesses.

56.     It is estimated that as many as 730,000 H-1B visa holders currently work in specialized fields across the American economy. These workers contribute enormously to American productivity, prosperity, and innovation.

57.     Meanwhile, the United States suffers from a well-documented labor shortage. As recent research by the U.S. Chamber has shown, "[n]early every state is facing an unprecedented challenge finding workers to fill open jobs." *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (Dec. 13, 2024), https://perma.cc/ZMJ6-BNF5. In the most-affected states, for example, the number of job openings is more than double the number of unemployed workers. *Id.*; *see also, e.g.,* Arturo Castellanos Canales, *America's Labor Shortage: How Low Immigration Levels Accentuated the Problem and How Immigration Can Fix It*, National Immigration Forum (February 28, 2022), https://perma.cc/B9UA-KA3M.

58.     The skilled labor shortage is even more acute in certain industries. For example, the United States faces a serious shortage of doctors: One report estimated that the United States will face a shortage of between 54,100 and 139,000 physicians by 2033. *See* Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), https://perma.cc/36P9-PS2R). The H-1B program helps fill that gap. *See, e.g.,* Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) (noting that there are roughly 10,000 H-1B approvals annually for physicians), https://perma.cc/3FN5-FLE9.

59.     Individuals entering the United States via H-1B visas also are integral to the landscape of higher education. In 2020, more than 28,000 H-1B-related labor condition applications

were filed for higher education, confirming the central importance of these programs. Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), https://perma.cc/SMW4-UUJT; *see* ¶¶ 29-30, *supra* (describing labor condition application process).

60.     American firms, particularly in manufacturing and certain STEM (science, technology, engineering, and mathematics) fields, also face a shortage of domestic workers qualified and available to fill the roles needed for the companies to perform. For example, in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them." New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://perma.cc/4BZR-ED9S.[3]

61.     And "having the workers to fill such jobs" through nonimmigrant visa programs like H-1B "allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support them." Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* 1-2 (2015), https://perma.cc/C6T2-6TKZ.

62.     One comprehensive study evaluating the productivity impacts from H-1B visas in 219 American cities showed that an increased number of H-1B visa holders in a city resulted in

---

[3]     *See also, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), https://perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade.").

productivity gains. Specifically, "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" between 1990 to 2010. Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015), https://perma.cc/N4GV-YJJ6.

63.     Those productivity gains translate into jobs created. A recent study demonstrated that, at the individual firm level, each H-1B lottery win resulted not just in increased noncitizen employment, but a corresponding increase in native-born employment at the lottery-winning firm as well. Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* 25 (May 2025) ("H-1B hires seem to crowd-in other workers, such as non-college workers of all nativities, as lottery-winning firms *expand* their usage of workers outside of the immigrant college group."), https://perma.cc/F9AE-BEJC.

64.     H-1B visa petitions are associated with higher rates of new product innovation. Gaurav Khanna & Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC. Across the country, H-1B workers "directly increase the production of knowledge through patents, innovation, and entrepreneurship."  Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020), https://perma.cc/SMW4-UUJT.

65.     That innovation is a boon to the American economy, and ultimately American workers. One 2019 study found that between 2000 and 2015, the foreign-born share of STEM professionals in the United States—many of them attributable to the H-1B program—created an estimated benefit of $103 billion for American workers, largely due to the development of new technologies that increase the productivity and wages of U.S.-born workers. Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), https://perma.cc/U39W-P2SZ.

66.     As a result, the H-1B program has empowered tremendous growth and value creation in American firms. Indeed, a 2025 analysis of H-1B data from 2008 to 2020 showed that "H-1B workers contribute to firm value creation" through forces including "innovation" and "enhancing operational efficiency." Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation*, working paper at 22 (February, 19, 2025), https://perma.cc/9VWK-592B. Accordingly, after 12 years, "the nominal value of a dollar invested in [firms with high H-1B applications]" had grown by 1000%, three times the value created by firms with no H-1B applications. *Id.*

67.     The H-1B program is vital to the success of American manufacturing—the largest workforce sector in the United States. A 2021 analysis focusing on the manufacturing industry concluded that the H-1B program, by promoting a "qualified educated labor force," is critical for the manufacturing sector to "be competitive on the global stage." Eron Gjoci, *Empirical evidence against U.S. H1-B visa restrictions, the case of employment in the manufacturing industry*, working paper at 21 (Nov. 16, 2021), https://perma.cc/7356-6W44.

68.     Relatedly, research shows that "participation of foreign-born workers in the American labor market has a positive effect on American trade with foreign nations." Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative 1 (September 11, 2023) https://perma.cc/RUY2-GER6. That is attributable to, among other factors, the "language skills, cultural competency, and transnational personal networks of foreign-born high skilled workers," which are a "boon for businesses operating in fast-moving and competitive industries like technology," as well as the ability of high-skilled foreign-born workers to "facilitate the international flow of knowledge." *Id.*

69.     Research shows that at least three factors explain the link between robust high-skilled immigration and economic growth—*first*, individuals likely to be hired under an H-1B visa have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel

growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies. Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*, U.C. Davis Global Migration Center Policy Brief 2 (July 2020), https://perma.cc/3B6B-25YU.

70.    For precisely these reasons, many of the U.S. Chamber's members rely on the H-1B program and have benefited enormously from the program in ways that have allowed those companies to create better well-paying jobs for American workers.

*2.    The Proclamation.*

71.    The President issued the Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, on September 19, 2025.

72.    The preamble of the Proclamation cites an alleged "large-scale replacement of American workers through systemic abuse of the [H-1B] program." It alleges that certain employers "have abused the H-1B statute and its regulations to artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields."

73.    The Proclamation points to a doubling of "foreign STEM workers," the "key facilitator" of which, it claims, has been "abuse of the H-1B visa." In particular, the Proclamation accuses "Information Technology (IT) firms" of "manipulat[ing] the H-1B system, significantly harming American workers in computer-related fields."

74.    Citing rising unemployment rates of IT workers overall, the Proclamation asserts that H-1B visas "are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States." Instead, the Proclamation charges H-1B employers with "undercut[ting] the integrity of the program" to the "detriment[] [of] American workers' wages and labor opportunities," "prevent[ing] American employers in other industries from utilizing the

H-1B program in the manner in which it was intended," and creating "a national security threat" by encouraging fraud and discouraging Americans from pursuing STEM careers.

75.    The preamble concludes that it is "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers."

76.    Section 1(a) of the Proclamation, citing Sections 212(f) and 215(a) of the INA, states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," subject to certain exceptions.

77.    Section 1(b) states that "[t]he Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers," and further directs the Secretary to "issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026."

78.    Section 1(c) states that the $100,000 fee requirement "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

79.    Section 2(b) of the Proclamation requires the Secretary of State to "verify receipt" of the $100,000 fee and "approve only those visa petitions for which the filing employer has made the payment."

80.    Section 2(c) states that "[t]he Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this

proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation."

81.    The effective date of the Proclamation was September 21, 2025, and it expires 12 months thereafter. Within 30 days of the upcoming March 2026 H-1B lottery, however, Section 3(b) of the Proclamation directs the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security to jointly submit to the President a recommendation on whether to extend the $100,000 fee.

3.  *The Proclamation's devastating effect on businesses using the H-1B program.*

82.    Moments after the announcement of the Proclamation, panic rippled through the United States economy. With the Proclamation set to take effect days later, H-1B visa-holders traveling abroad scrambled to make emergency trips back to the United States for fear of losing their legal status. Companies employing H-1B workers sought to understand the far-ranging implications for their present and future workforces.

83.    Though the White House eventually clarified that the Proclamation's imposition of a $100,000 fee applies only to future petitions for *new* H-1B visas, and thus does not affect current visa-holders or petitions for H-1B renewal, the thunderbolt of the Proclamation had already had its effect: The American business community was on notice that soon one of the best tools at its disposal for recruiting high-skilled workers when American workers are not readily available would be prohibitively expensive.

84.    For many members of the U.S. Chamber, the Proclamation will have far-reaching effects.

85.    American businesses use programs like the H-1B program because the domestic supply of highly skilled workers is not large enough to keep apace with the demands of innovation. Certainly, the United States is home to many high-skilled workers. But it is also home to much of

the world's innovation and knowledge generation. And as a result, the domestic supply of high-skilled workers is frequently insufficient to meet employers' needs. *See, e.g.*, ¶ 60 & n.3, *supra*.

86.    U.S.-based employers turn to the H-1B visa to make up the difference.

87.    With prohibitive limitations on such workers, employers in STEM-focused industries will be hit especially hard. Many of the largest tech companies in the United States currently have thousands of H-1B employees and hire new employees through the program each year. Meanwhile, highly innovative start-ups and small businesses are particularly reliant on the program and will be especially hard-pressed to afford a $100,000 fee.

88.    In an interview after the Proclamation's announcement, one Silicon Valley-based tech startup founder offered this somber assessment:

> It diminishes our innovative capacity in the United States. It tells other brilliant people around the world that we are not open for innovation.
>
> I can say that as long as this is in place, we're not going to be able to afford to do it anymore. It's a catastrophe. This additional fee is a non-starter for start-ups and small- and medium-sized businesses.

*Bay Area Tech Leaders Warn New $100,000 H-1B Visa Fee Could Impact Innovation,* KPIX (Sept. 21, 2025) https://perma.cc/2SMX-RF3S.

89.    A prominent venture capitalist investing in start-ups offered a similar assessment: "There is not a single company that I have invested in the last 10 years that could afford to pay this." Madeline Ngo et al., *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, New York Times (Sept. 20, 2025), https://perma.cc/6F9G-NUS4.

90.    That sentiment is widespread. Indeed, many members of the U.S. Chamber are bracing for the need to scale back or entirely walk away from the H-1B program, to the detriment of their investors, customers, and their own existing employees.

91.     That is to say nothing of the many universities, health systems, and other non-profit research-driven institutions that also rely on H-1B visas and certainly cannot afford a new $100,000 fee per H-1B employee.

92.     Employers that do continue to use the program will do so at a steep cost that sharply increases the price of labor and correspondingly reduces the company's ability to invest resources elsewhere, including in new innovations.

93.     Ultimately, Americans would pay the heaviest price. Shuttered or scaled-back domestic innovation means far fewer U.S.-based jobs, less demand for American workers, and, as a result, lower wages. It also means fewer ground-breaking innovations available to improve the lives of U.S. consumers.

## DISCUSSION

### A.     The Proclamation exceeds the President's authority.

94.     The Proclamation intends to radically alter the H-1B program. Though purporting to impose a mere "payment," the new $100,000 fee for employers will dramatically reduce the number of H-1B petitions being filed: It drastically increases prospective labor costs, and basic economics dictates that companies will therefore hire fewer H-1B workers. Indeed, that is the stated intent of the Proclamation, which is aimed at reducing the pool of H-1B applicants to "the best of the best," as measured by the imperfect analogue of their employers' ability and willingness to pay the government a six-figure sum.

95.     That result—and the means taken to implement it—is flatly contrary to Congress's directives, as stated throughout the INA. Congress has created, long maintained, and periodically modified the H-1B program based on its judgment that bringing highly skilled noncitizen workers to the United States benefits the Nation by driving innovation and creating jobs. That has proven undoubtedly true. *See* ¶¶ 55-70, *supra*.

96.    Congress has meticulously defined how the H-1B program is to be implemented. For instance, it has detailed the principles USCIS should use to set fees associated with H-1B petitions, and just recently amended the law to impose a fee on the *heaviest* users of the H-1B program that is *twenty-five times* smaller than the blanket fee the President now aims to impose.

97.    Congress also has defined by statute how many people should be able to enter the United States under the program via cap-subject visas: in total, 85,000 annually—a carefully calibrated statutory cap calculated to maximize the program's benefits for the American people while ensuring that highly skilled U.S.-based workers remain competitive in the workforce. *See* 8 U.S.C. § 1184(g). Congress arrived at this figure through titration over multiple pieces of legislation, against the background knowledge that demand for visas vastly exceeds that amount. Most recently, Congress temporarily increased the cap to 195,000 annually for fiscal years 2001-2003 via the American Competitiveness in the Twenty-First Century Act. Pub. L. 106-313, § 102(a), 114 Stat. 1251 (2000); *see* 8 U.S.C. § 1184(g)(1)(A).[4] And Congress did so knowing that demand for H-1B visas exceeds supply. *See* S. Rep. 106-260, at 2 ("Despite the increase in the H-1B ceiling in 1998, a tight labor market, increasing globalization and a burgeoning economy have combined to increase demand for skilled workers even beyond what was forecast at that time. As a result, the 1998 bill has proven to be insufficient to meet the current demand for skilled professionals."). *Cf., e.g.*, *United States v. Wilson*, 290 F.3d 347, 354 (D.C. Cir. 2002) (considering "the contextual background against which Congress was legislating" as an interpretive aide).

98.    Relatedly, Congress established elaborate standards to protect American workers, such as the statutory cap and the labor condition application process, designed to ensure that H-1B

---

[4]    This law also established that universities and their nonprofit affiliates are exempt from the cap. Pub. L. 106-313, § 103, 114 Stat. at 1252.

visas do not become a means to undercut wages or put Americans at a competitive disadvantage. *See* ¶¶ 29-31, 41-45, *supra*.

99.     The Proclamation upends that careful balancing. It fundamentally alters the H-1B program by tacking on a plainly disproportional fee that expressly contradicts the more modest fees Congress has sought to impose, which are aimed explicitly at recovery of costs. And it replaces Congress's determination of the optimal annual number of new noncitizen workers (85,000, plus additional cap-exempt workers) with an onerous fee that will cause a significant reduction in participation in the program and may leave many H-1B spots unclaimed.

100.     Although the President has authority under the INA, that authority does not, and cannot, empower him to override existing statutory provisions and programs. Nor does it authorize the President to create new visa conditions in general—nor new fees in particular—under the guise of a restriction on "entry" under Section 212(f).

1.  *The Proclamation expressly overrides provisions of the INA that govern the H-1B program.*

101.     The President's authority under Section 212 of the INA to restrict noncitizens from entering the United States, while broad, is not unlimited. Specifically, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Trump v. Hawaii,* 585 U.S. 667, 689 (2018). And other courts have extended that assumption into an express holding: A Section 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020).

102.     In other words, Section 212(f) "cannot plausibly be read to authorize the President … to supplant" the express provisions of the INA. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *20 (D.D.C. 2025). The President lacks "authority to alter the rules" created by Congress or render other INA provisions "dead letters." *Id.* at 32, 35. Indeed,

25

even Congress cannot provide the President authority to override prior statutory enactments. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 447 (1998) (Line Item Veto Act was unconstitutional because it "g[ave] the President the unilateral power to change the text of duly enacted statutes."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("[V]esting in the President a dispensing power"—that is, "clothing the President with a power to control the legislation of congress"—"has no countenance for its support in any part of the constitution.").

103.    At bottom, the President may not use his control over entry into the United States to supplant or nullify Congress's statutorily enacted immigration policy. Doing so is an *ultra vires* act, and one over which courts have inherent authority to order injunctive relief. *See, e.g., Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 189-190 (D.C. Cir. 2006); *Fleming v. Moberly Milk Prods. Co.*, 160 F.2d 259, 264 (D.C. Cir. 1947); *Youngstown*, 343 U.S. at 585.

104.    The H-1B program is the product of careful congressional balancing, reflecting several core policy determinations by Congress. Most obviously, Congress itself has set what it felt were the appropriate fees for the H-1B program and has delegated authority to the executive branch to impose additional fees only under certain conditions, including a cost-recovery principle and a requirement of notice-and-comment rulemaking. Plainly, the Proclamation's new $100,000 per-petition fee meets neither condition.

105.    Second, and perhaps more fundamentally, Congress has concluded that the program should exist, and in the robust form it prescribed. Congress statutorily created the H-1B program *in order* to allow employers to bring a certain number of highly skilled, specialized noncitizen workers to the country. That is good for American business, and it is good for American workers, who benefit from the well-paying jobs that result from economic growth and productivity. And the program's maximum benefit is realized when enough specialized workers can enter the United States to deliver those economic benefits but sufficient protections exist to ensure that Americans are not disadvantaged by the hiring of those workers.

106.    The Proclamation overrides that balance. It replaces Congress's design—expressed in duly enacted statutory text—with an altogether different approach that undercuts the very existence of the program.

107.    These clashes between the statutory design of the H-1B program and the Proclamation are reflected in the Proclamation's direct contradiction of the fees authorized by Congress, as well as its conflict with other aspects of the program.

**a.  Explicit fee provisions.**

108.    To begin, the Proclamation directly contradicts express provisions of the INA—most obviously, the specific fees that Congress deemed to be appropriate and therefore set for the H-1B program.

109.    Congress has set a clear baseline rule governing fees for immigration programs: The executive may charge fees for visas and related services sufficient to fund its activities related to those services, but no more than that. *See* 8 U.S.C. § 1356(m) (also known as INA § 286(m)).

110.    Prior to 1988, the immigration functions of the Department of Justice, carried out by the former Immigration and Naturalization Service, were funded from appropriations. *See generally U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 58,962, 58,966 (Sept. 24, 2010). That year, Congress enacted Section 1356(m) "to provide an alternative to appropriations." *Id.*; *see* Pub L. No. 101-459 § 209(a), 102 Stat. 2186 (1988).

111.    The statute therefore empowers the agency to impose "adjudication fees" by "regulation[.]" 8 U.S.C. § 1356(m). And as Congress shortly thereafter clarified in a 1990 amendment, those "fees for providing adjudication and naturalization services ***may be set at a level that will ensure recovery of the full costs of providing all such services***, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* (emphasis added); *see* Pub. L. No. 101-515 § 210(d), 104 Stat. 2101 (1990) (adding this provision).

112.    In other words, the fee for filing an H-1B petition or other request for an immigration benefit "may" be set at an amount that allows USCIS to recover its costs for processing H-1B petitions and similar services related to programs that cannot generate user fees in their own right. By clear implication, the fee may *not* be set at a level that bears no relationship whatsoever to those costs and indeed would dwarf them. *See, e.g.*, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority[,] it necessarily, or at least reasonably, implies the preclusion of alternatives.") (quotation marks omitted; alterations incorporated); *cf. Bowles v. Russell*, 551 U.S. 205, 208-209 (2007) (statute and federal rule providing that a district court "may" reopen the time for filing a notice of appeal "for a period of 14 days" created a jurisdictional bar on reopenings lasting longer than 14 days).

113.    The legislative history is in accord. As the conference report on the bill that first established Section 1356 provided, "[t]he conferees expect that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs." H.R. Rep. No. 100-979, at 38 (1988); *see also Depts. of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for 1991, Hearings Before the Subcommittee of the Committee on Appropriations*, 101st Cong., at 74 (1990) ("The resources to be made available will be used to adjudicate applications and petitions for benefits under the Immigration and Nationality Act and to provide necessary support to adjudications and naturalization programs."). And the conference report accompanying the 1990 amendment makes plain that the bolded language above (*see* ¶ 111, *supra*) clarified that the fees are to be set at a level that allows USCIS to recoup all of its costs (as opposed to being strictly tied to the benefit provided to each individual petitioner)— *not* that the "may" in the clause makes the connection between fee levels and USCIS's actual costs somehow optional. *See* H.R. Rep. No. 101-909 (1990) (the provision "allows the Department to

establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program.").

114.    The government has agreed. Even while resisting the notion that USCIS's fee receipts for a given year must precisely match its costs for that year, the government recently affirmatively argued that Section 1356(m) "afforded USCIS flexibility to set fees at a level that bears 'some relationship' to its costs such that USCIS can carry out its statutory mandate to recover its full costs. That this flexibility encompasses the possibility that USCIS's fees collected might, from time to time, exceed its costs spent, makes sense where USCIS must set fees prospectively to *guarantee* future recovery of its yet-to-be-determined full costs." Reply Mem. of Law in Supp. of Mot. to Dismiss at 10, *Tang v. United States*, No. 23-cv-9885 (S.D.N.Y. Oct 3, 2024), Dkt. 65. In other words, the government took the position that, although Section 1356(m) permits current fee receipts to exceed current costs "from time to time" in order to make the program administrable, the statute requires fees to at least "bear[] a "'relationship' to [USCIS's] costs" in carrying out its statutory functions.

115.    Elsewhere, the government has interpreted its authority even less flexibly: DHS recognized in a recent fee rulemaking that "INA section 286(m), 8 U.S.C. § 1356(m) *requires USCIS fees to be based on total costs* for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024); *see also id.* at 6,287 (stating that a particular fee collected under separate statutory authority "will . . . effectively supersede section 286(m)" by "go[ing] beyond normal cost recovery").

116.    In sum, Section 1356(m) provides that fees for benefit applications like H-1B petitions may be set only at the level necessary for USCIS to adjudicate those applications and perform its other functions.

117.    Pursuant to that congressional command, until now, H-1B fees have been set by USCIS through notice and comment rulemaking, with close attention paid to justifying the fee based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (recognizing that an "increase from $10 to $215" in the lottery registration fee "may appear to be exorbitant" but arguing that it is necessary to "cover the expenses of the H-1B registration program").

118.    The Proclamation offers no such justification. It baldly conditions H-1B petitions on a $100,000 payment.

119.    Where the most recent H-1B petition fee of $780 was tied to administrative costs (*see USCIS Fee Schedule*, *supra*, at 39), the new $100,000 figure cannot bear any such relationship to costs. Rather, it is a punitively high exaction meant to deter use of the H-1B program.

120.    Moreover, Congress explicitly determined that notice-and-comment rulemaking— with the attendant protection for the public via arbitrary-and-capricious review—is requisite to set the appropriate fee. 8 U.S.C. § 1356(m). The President cannot disregard these requirements and change the mechanism by which fees are set, drastically reducing protections for the regulated public.

121.    In addition to the baseline requirement under Section 1356(m) that visa fee levels must be tied to the cost of administering visa and related programs, Congress itself has explicitly set additional fees for the H-1B program. The imposition of these fees demonstrates that Congress knows how to depart from the cost-recovery principle of Section 1356(m) when it wishes to do so.

122.    First, Congress has specified that the fee for the H-1B "petition" (either an initial petition, a renewal, or a request for an H-1B visa-holder to change employers) "shall be $1,500 for each such petition." 8 U.S.C. §§ 1184(c)(9)(A)-(C); *see also id.* § 1184(c)(9)(B) (fee is halved for smaller employers).

123.    Second, Congress has required payment of a $500 "fraud prevention and detection fee" from all employers filing an initial H-1B petition or seeking authorization for an H-1B visa-holder to change employers. 8 U.S.C. §§ 1184(c)(12)(A), (C); *see* Pub. L. No. 104-447 § 426, 188 Stat. 2809, 3357 (2004) (enacting this requirement).

124.    Third, Congress has imposed an additional $4,000 fee on certain employers. *See* Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 10101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411). This additional fee applies to employers with more than 50 employees, over half of whom are foreign, nonimmigrant workers. *Id.*; *see also* Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010) (earlier imposing a smaller $2,000 fee on these same employers).

125.    And fourth, Congress provided for "premium processing" fees for immigration benefits—currently $2,805 for H-1B applicants—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S.C. § 1356(u)(3). The statute specifically limits the circumstances in which premium processing can be suspended. *Id.* § 1356(u)(5). Congress thus determined that, if employers are willing to pay extra, they should receive an expedited decision, contrary to the Proclamation's determination that employers cannot submit a petition *at all* unless they pay a vastly greater fee.

126.    In sum, Congress itself has set—and repeatedly adjusted—the appropriate fees for H-1B petitions, and the fees set by Congress reflect its policy judgment concerning the design of the H-1B program. Congress structured the fees for visa programs generally to be tied to administrative costs (and to be determined by notice and comment rulemaking), with additional flat fees ($1,500 and $500) imposed on H-1B petitioners in particular to fund specific initiatives, and another flat fee ($4,000) on those employers who are most reliant on nonimmigrant workers.

127.    The $100,000 fee, imposed with no procedure whatsoever, dramatically upends Congress's deliberate decisions about how much a visa (and in particular, an H-1B visa) should

cost and flouts the cost-recovery principle of Section 1356(m). It also distorts which businesses can afford to participate in the program. Whereas Congress set fees that are attainable by companies large and small, the imposition of a $100,000 fee is likely prohibitive to many businesses, particularly small businesses across the country that hire H-1B workers.

128.    Put differently, the INA permits the executive branch to charge immigration fees in two circumstances: (a) where the fee is adopted via notice and comment rulemaking and set at a level necessary to recoup USCIS's costs (8 U.S.C. § 1356(m)), or (b) where Congress itself has expressly authorized the fee through statute. The Proclamation's exorbitant $100,000 application fee falls into neither category.

129.    Because the Proclamation "expressly override[s] particular provisions of the INA" (*Hawaii*, 585 U.S. at 689), it is not a lawful exercise of Section 212(f) power.

**b.  Other INA provisions.**

130.    The Proclamation also sits uneasily with other specific congressional determinations regarding the H-1B program.

131.    For one, the imposition of a $100,000 fee—which is intended to, and surely will, reduce the number of petitions received—will result in significantly fewer H-1B visas. This dramatic change cannot be squared with Congress's expectation that the high demand for H-1B visas would warrant imposing a statutory cap on the number of new H-1B visas.

132.    Congress decided that employers should be able to sponsor up to 85,000 people— 65,000 plus up to 20,000 more who must have advanced degrees from American universities—on H-1B visas. 8 U.S.C. § 1184(g). Although Congress's goal in imposing a cap was, in part, to assure that *no more* than this number of noncitizens could obtain visas under this pathway, its imposition of a cap also reflects Congress's considered policy view of roughly the right number of people to be able to obtain visas through the H-1B program each year.

133.    That is, Congress legislated the 85,000-person annual cap against the background knowledge that demand for visas under the program vastly exceeded that amount. It was well aware that by imposing an 85,000-person annual cap, it also was deciding that approximately 85,000 people would obtain non-cap-exempt H-1B visas annually.

134.    Congress arrived at this number by weighing the clear benefits and possible drawbacks of the program. It wanted to ensure that employers were able to bring enough workers into the United States for the Nation to reap the benefits of innovation and economic growth stimulated by the H-1B program, while ensuring that the workforce was not overwhelmed by new, highly skilled foreign workers. For Congress, 85,000 new visas each year reflected the proper balance.

135.    For reasons explained above, the Proclamation upsets that balance by surely causing the number of new H-1B visas to plummet and making the program accessible only to a subset of employers. Most companies that rely on H-1B visas will reduce the number of petitions they submit. Employers who submit few petitions to begin with, or entities like small businesses and nonprofits that cannot possibly afford a $100,000 fee, will be unable to participate at all.

136.    Moreover, insofar as the Proclamation suggests that the purpose of imposing a $100,000 fee is to protect American workers, the use of such a blunt tool to achieve those ends contravenes the intricate labor protections that Congress established and instructed the executive to use instead to achieve that goal.

137.    Congress has established a carefully reticulated regime to ensure that American workers are not harmed by the H-1B program. The centerpiece of this scheme is the Labor Condition Application, which requires any company seeking to hire an H-1B worker to make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. §§ 1182(n)(1)(A)-(D).

138.    Among other requirements, employers must certify that the position pays prevailing wages (or higher), that the position will not adversely impact other workers, and that the employer

has provided certain forms of notice to existing employees in the same occupational classification regarding the position. These provisions are designed to ensure that (a) H-1B workers are not hired at a rate that undercuts the wages American workers are willing to accept; (b) the creation of an H-1B position does not directly result in the elimination of a job held by an American worker; and (c) American jobseekers have the ability to compete for and obtain positions that might ultimately be filled by H-1B workers.

139.    The executive is not toothless in enforcing these requirements. Employers who violate them are subject to monetary fines and bans on filing future H-1B petitions. 8 U.S.C. § 1182(n)(2)(C). And certain employers—including those who have violated the certification requirement in the past or have a high percentage of H-1B workers already—must specifically certify that they tried and failed to fill the position with an American worker and that the employer has not and will not displace any American worker within 180 days before or after the date of the application. *See* 8 U.S.C. §§ 1182(n)(1)(E), (n)(1)(G), (n)(3)(A).

140.    The predominant concern expressed in the Proclamation is that certain employers are abusing the H-1B system to undercut American workers. That is, no doubt, a serious issue, which is why Congress carefully considered that problem and equipped the executive with various measures both to prevent such abuse from occurring—such as the labor condition application process—and to penalize employers who do abuse the system.

141.    In other words, when Congress created the H-1B program—and in its continued maintenance of and modifications to that program—it was aware of the potential for abuse and authorized the executive to take certain measures to prevent and remediate abuse. What Congress did not authorize is disincentivizing the use of the program by imposing a fee many times the amount of fees set by Congress.

### c. **Practical availability of the H-1B program.**

142.    At bottom, the Proclamation and its practical impact are difficult to square with Congress's basic determination that domestic employers *should* be able to access a program for admitting highly skilled nonimmigrant workers from specialized fields.

143.    Indeed, calling what the Proclamation institutes a "payment" is something of a misnomer. Contrary to the Proclamation's preamble, instituting a new $100,000 price tag on H-1B petitions does not merely impose "higher costs on companies seeking to use the H-1B program while still permitting companies to hire the best of the best temporary foreign workers." Rather, the fee renders the H-1B program practically unavailable for many companies, particularly small businesses, depriving them of a talent pipeline that is critical to innovation and productivity.

144.    Although the Proclamation suggests that employers still may hire "the best of the best," it fails to appreciate the economic reality that many employers, particularly small businesses, simply cannot pay the $100,000 fee, regardless of how talented a prospective employee may be. For example, innovative startups typically compensate even their highest performing employees largely with equity compensation rather than cash precisely because cash is scarce, making a $100,000 per-hire outlay impracticable. The filter imposed by the new fee is therefore less about the quality and promise of the prospective employee, and more about the financial circumstances of the employer.

145.    Moreover, even to the extent the Proclamation could be successful in admitting only "the best of the best," it distorts Congress's design for the H-1B program. There are already separate provisions in the INA enabling companies to sponsor visas for prospective employees with "exceptional ability," "extraordinary ability," or other comparable qualities, and those noncitizens are eligible for *immigrant* visas. 8 U.S.C. §§ 1153(b)(1)(A), (b)(2)(A). The H-1B program is different. By congressional design, employers need not show that their prospective workers are

the best of the best, but merely highly skilled. The statutory tradeoff is that workers on H-1B status are only eligible for a temporary stay in this country.

146.    Thus, even assuming that employers willing and able to pay a $100,000 fee correlated precisely with the "best of the best" talent, the imposition of such a "best of the best" requirement on the H-1B program would trample Congress's duly enacted policy choices.

147.    Although the President has broad authority to ensure that those entering the United States under the H-1B program align with the national interest, the President cannot nullify the program altogether by making it infeasible for a subset of employers to use, nor fundamentally amend the program Congress crafted. So long as the Proclamation is in effect, that is the result.

*2.    The Proclamation exceeds the President's authority by misapplying or failing to fulfill statutory requirements.*

148.    The Proclamation also exceeds the scope of the President's statutory authority in several other respects.

**a.    The $100,000 payment is not an entry restriction.**

149.    First, the Proclamation relies on a statute that permits the President to "suspend" or "restrict[]" "entry" (8 U.S.C. § 1182(f)), but the Proclamation relates to entry only tangentially. *Cf. Hawaii*, 585 U.S. at 694-695 & n.4 (discussing "the basic distinction" between "the concepts of entry and admission," on the one hand, and "issuance of a visa," on the other). A true entry suspension, such as the proclamation at issue in *Hawaii*, flatly bars the entry of all nationals from certain countries or restricts the entry of other countries' citizens to certain statuses or certain classes. *See id.* at 679-680. Here, by contrast, the Proclamation seeks to change the terms of an existing visa program under the INA while continuing to admit the very same noncitizens, so long as they comply with the new terms.

150.    That is a "restriction" on "entry" (8 U.S.C. § 1182(f)) only in the most superficial sense. Taken to its extreme, the same logic would permit the President to promulgate an entirely

new shadow-INA—that is, an entirely new extra-statutory system setting the terms and conditions of immigration to the United States—giving the President blanket authority to create completely different classifications, rules, and procedures, and deny "entry" to any noncitizen who did not comply with them. Section 212(f)'s delegation of entry-suspension power to the President should not be read so broadly, for a whole host of reasons: It would find the proverbial elephant in a textual mousehole, given the lack of any text naturally read as empowering the President to create new immigration programs (*see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); it runs afoul of the major questions doctrine for similar reasons (*see W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme") (quotation marks omitted)); and it raises serious constitutional questions about Congress's ability to empower the President to disregard or override "duly enacted statutes" (*Clinton*, 524 U.S. at 447; *see, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (citation omitted)).

151.    Instead, the text is best read as permitting the President to either "suspend the entry" of a "class of aliens" or to "impose on the entry of aliens" a "*restriction[]*" (8 U.S.C. § 1182(f) (emphasis added)) in the natural, negative sense of that word. *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Restrict, *Oxford English Dictionary* (Rev. 2010) ("To limit (a person or thing); to confine to or within certain limits. . . . To prohibit or prevent from."). It does not empower the executive to *condition* a noncitizen's entry on the noncitizen's compliance with affirmative, non-statutory mandates. By doing so, the Proclamation exceeds the power conferred by Section 212(f).

152.    Elsewhere in the statute, by contrast, Congress expressly used the language of "conditions," not restrictions, when that is what it meant to authorize. *See, e.g.*, 8 U.S.C. § 1184(a)(1)

("The admission to the United States of any alien as a nonimmigrant shall be for such time and *under such conditions* as the Attorney General may by regulations prescribe, including when he deems necessary *the giving of a bond*.") (emphases added); Pub. L. 82-414, § 214, 66 Stat. 163, 189 (enacting this language, like Section 212(f), in the original 1952 INA). *That* language, unlike "restrictions" in Section 212(f), naturally *does* encompass requiring affirmative action from a noncitizen in order to enter. *See* Condition, *Webster's New International Dictionary* 557 (2d ed. 1947) ("Something established or agreed upon as a requisite to the doing or taking effect of something else."). "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2064 (2025). If "Congress had wanted" to authorize the President to impose conditions, rather than restrictions, "it knew exactly how to do so—it could have simply borrowed from the statute next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

153.    Additionally, whatever authority Section 212(f) may confer, it certainly does not authorize the President to institute new *payments* as conditions of entry. After all, because raising revenue is a core power reserved for Congress (*see, e.g.*, U.S. Const. art. I § 7, cl. 1; *id.* § 8, cl. 1), "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to" impose "'fees' or 'taxes'" (*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) (quoting *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 n.10 (1976))); *see also Youngstown*, 343 U.S. at 631 ("The President has no power to raise revenues. That power is in the Congress by Article I, Section 8 of the Constitution.").

154.    Section 212(f) contains no such "clear[]" "indicat[ion]." *Skinner*, 490 U.S. at 224. Yet, as discussed, elsewhere in the INA, Congress *has* been clear in enumerating certain specific H-1B fees, and it has provided a limited, well-defined "delegat[ion]" (*id.*) of fee-setting power under Section 1356(m) for USCIS to recover its costs. Courts have not hesitated to block executive action that strains the text of Section 212(f) in similar ways. *See, e.g.*, *Refugee & Immigrant Ctr.*,

2025 WL 1825431, at *4 (rejecting the use of Section 212(f) to create a non-statutory repatriation system), *stay denied in part and granted in part by* No. 25-5243 (D.C. Cir. Aug. 1, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Homeland Sec.*, 2025 WL 1737493, at *1, *9-10 (D. Mass. June 23, 2025) (rejecting use of Section 212(f) to bar noncitizens from entering the country to study at a particular institution).

155.    Moreover, certain of the Proclamation's provisions go beyond any possible conception of an entry restriction. Section 1(b) of the Proclamation orders the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment." Though in some sense related, the concept of "entry" is separate from the H-1B petitioning and "visa issuance" process. *Hawaii*, 585 U.S. at 694-695 & n.3. Section 212(f) does not provide authority to categorically deem certain *petitions* acceptable or unacceptable. *Cf. Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32, 33 ("[T]he authority to 'impose on the *entry* of aliens any restrictions he may deem to be appropriate' does not mean that the President has the authority to alter the rules that apply to those who have already entered," and "statutory grants of authority to the executive branch do not carry with them a sweeping, implied authority analogous to Congress's power under the Necessary and Proper Clause.") (citation omitted) (quoting 8 U.S.C. § 1182(f)).

156.    Likewise, Section 2(b) of the Proclamation orders the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment." Again, the President has broad authority concerning *entry* into the United States but does not have authority to singlehandedly direct the issuance or non-issuance of visas created by statute. *Hawaii*, 585 U.S. at 694-695 & n.3; *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32. Indeed, as courts in this district have held, the State Department has a nondiscretionary duty to process visa applications presented to it, even if the visa applicant is currently barred from *entry* by a Section 212(f) proclamation. *See Filazapovich v. Department of State*, 60 F. Supp. 3d 203, 235 (D.D.C. 2021)

(rejecting the argument that a Proclamation banning an immigrant from entry renders her ineligible for a visa,") *rev'd on other grounds sub nom. Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024).

157.    Sections 1(b) and 2(b), in directing federal agencies to take actions that lie outside the President's purview under Section 212(f), are therefore plainly beyond the power conferred by the statute.

### b.  The Proclamation lacks the statutorily required finding necessary to proclaim a restriction on entry.

158.    As a prerequisite to instituting any restriction on entry, the INA requires that the President "find[] that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But, while the Proclamation purports to follow this "find[ing]" requirement, the findings within the Proclamation are seriously deficient.

159.    For one thing, much of the data underlying the preamble's conclusions is misleading. For instance, the preamble cites a supposed "36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers." But that figure pits the prevailing wage of *entry-level* H-1B workers—that is, workers with specialized skills primarily due to their academic training, yet with few years of professional experience—against the median wage for *all* workers in the pertinent industry and region. It is entirely unsurprising that entry-level workers—who by definition lack experience and skills gained on the job—would command a lower wage than the median of all employees in the relevant industry, quite apart from their immigration status.

160.    Likewise, the Proclamation references an unnamed "2017 study" showing that "wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001." The Proclamation notably does not cite the actual study. It is clear why: notwithstanding that specific finding, the study broadly concludes that "immigration increased the

40

overall welfare of US natives." *See* Bound et al., *Understanding the Economic Impact of the H-1B Program on the U.S.*, National Bureau of Economic Research Working Paper 23153, https://perma.cc/N9KF-XH3Y.

161.    Additionally, the Proclamation makes no finding about the putative "class of aliens" (8 U.S.C. § 1182(f)) that is ultimately the subject of the restriction implemented. *See Hawaii*, 585 U.S. at 687-688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)).

162.    The class of noncitizens identified in the Proclamation whose entry would be detrimental to the United States is noncitizens "whose petitions are [not] accompanied or supplemented by a payment of $100,000." For one thing, this curious grouping strains the statutory term "class" beyond recognition. *See, e.g.*, Class, *Black's Law Dictionary* (12th ed. 2024) ("A group of people . . . that have common characteristics or attributes."); *cf. Hawaii*, 585 U.S. at 688 (holding that "the word 'class' comfortably encompasses a group of people linked by nationality").

163.    Indeed, historically speaking, this grouping includes *all* H-1B applicants. Going forward their petitions will either include a $100,000 fee or exclude it, but the presence or absence of that fee will have nothing to do with the noncitizens themselves. It will not, for example, bear any relationship to their respective qualifications for employment in the United States, the economic value they might generate by working in the United States, the implications on national security or foreign policy of their entry into the United States, the industry in which they work, and so on.

164.    In fact, the presence or absence of the $100,000 payment will have nothing to do with the noncitizen at all, since it will be the employer filing the petition who either agrees or refuses to include a $100,000 payment.

165.    In any event, the Proclamation makes no findings about any noncitizens, let alone the specific class of noncitizens whose petitions are not accompanied or supplemented by a

payment of $100,000. The preamble is directed entirely at *employers* who purportedly abuse the H-1B system, particularly in the IT field, and the concomitant impact on workers in that industry from that alleged abuse. It says nothing at all about the *noncitizens* actually targeted by the restriction nor why noncitizens whose H-1B petitions include a $100,000 payment are any less detrimental to workers than noncitizens whose petitions do not.

166.    There is, by the same token, no connection between the findings made in the Proclamation, the class of noncitizens identified for exclusion, and the specific restriction adopted. For instance, the Proclamation draws no connections between the broad trends it identifies—a rising proportion of foreign-born workers in the IT industry and rising unemployment for Americans graduating with degrees in that field—and the existence of a class of noncitizens whose H-1B visas lack a $100,000 fee.

167.    The Proclamation does not include any findings that noncitizens within the class are less likely to be hired by companies in the IT industry or by employers who abuse the H-1B system. There is also no connection drawn between the imposition of a $100,000 fee and the curtailing of H-1B abuse. Nor is there any mention of why the existing statutory tools for preventing and penalizing abuse are inadequate to accomplish that goal.

168.    In all, the Proclamation exceeds the President's statutory authority. It directly conflicts with the INA multiple times over, it extends to areas beyond the scope of the President's authority to restrict entry, and it fails to make the threshold findings required by law.

169.    As an act exceeding the President's lawful authority, the Proclamation must be declared unlawful and its enforcement must be enjoined as to the U.S. Chamber and its members. *See Reich*, 74 F.3d at 1328 ("[R]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.") (quotation marks omitted).

**B.    Agency action implementing the Proclamation must be declared unlawful and set aside under the APA.**

170.    For many of the reasons described above, implementation of the Proclamation by any agency of the United States will also violate the Administrative Procedure Act (APA).

171.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

172.    Agency action taken to implement a presidential proclamation or executive order is subject to review under the APA. *See Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (agency action based on an executive order is not "insulate[d]" from "judicial review under the APA, even if the validity of the [executive order] [is] thereby drawn into question").

173.    Many aspects of the Proclamation are not self-executing but, rather, require implementation by executive branch agencies. For example, Section 1(b) of the Proclamation expressly directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment," but Section 1(c) authorizes the Secretary to waive that requirement, for a single noncitizen or a class, on grounds of "the national interest." Likewise, Section 2(b) directs the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment."

174.    In accordance with these commands, immediately after the Proclamation, USCIS issued a memorandum, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, which states that, effective September 21, 2025, "[t]he entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under the H-1B program "is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000." The memorandum further provides that it "applies to H-1B employment-based

petitions filed after" the effective date. The document also directs "[a]ll officers of United States Citizenship and Immigration Services" to "ensure that their decisions are consistent with this guidance." *Id*. U.S. Customs and Border Protection has issued a memorandum to similar effect. And the Department of State "has posted guidance to all consulate offices, consistent with" the other agencies' memoranda.[5]

175.    As fully described above, agency actions taken to implement the Proclamation are substantively invalid and must be set aside under the APA, for numerous reasons.

176.    *First,* the $100,000 payment called for in the Proclamation was not set by notice-and-comment rulemaking, but by presidential fiat—violating both Section 1356(m)'s express requirement of such rulemaking and the fundamental rule that existing notice-and-comment regulations (such as DHS's existing fee schedule, *see* 8 C.F.R. §§ 106.1(a), 106.2) may be amended or rescinded only through additional notice-and-comment rulemaking. *See, e.g.*, *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) ("It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule [using notice and comment] must use the same procedure to revoke that rule."). Indeed, the government previously has taken the position that "[a]fter the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice-and-comment rulemaking." *USCIS Fee Schedule*, 88 Fed. Reg. at 447.  Notice-and-comment rulemaking both "helps to prevent mistakes" and "also helps ensure that regulated parties receive fair treatment, a value basic to American administrative law." *Ivy Sports Med., LLC v. Burwell*, 767

---

[5]    The informality of these documents does not detract from their finality. *See, e.g.*, *Nat'l Ev'tl Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006-1007 (D.C. Cir. 2014) (document was final agency action where it "provides firm guidance to enforcement officials about how to handle permitting decisions"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (same, where purported guidance document "reads like a ukase. It commands, it requires, it orders, it dictates.").

F.3d 81, 87-88 (D.C. Cir. 2014). The failure to follow that process here was both unlawful and arbitrary and capricious.

177.    *Second,* agency action implementing the Proclamation will not be done pursuant to a valid exercise of the President's authority to exclude noncitizens from the United States under Section 212(f). Specifically, Section 212(f) is limited to restrictions on entry and does not authorize the President, the Secretary of Homeland Security, or the Secretary of State to direct approvals or disapprovals of H-1B petitions or H-1B visas.  Despite instructions in the Proclamation to restrict decisions on petitions and the issuance of visas to applicants who have paid the $100,000 fee, the President has no statutory authority under Section 212(f) to direct USCIS's action on any H-1B petition or the State Department's issuance of visas. These subjects are not committed to the President's discretion by law. Rather, the President's authority under Section 212 is limited to *entry* into the United States by a noncitizen or class of noncitizens. *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32-33. And in any event, the President's restriction-of-entry authority depends on the President making findings that he has not made.

178.    *Third*, such actions directly conflict with other elements of the INA, supplanting carefully considered congressional judgments regarding the H-1B program. Specifically, imposing a $100,000 fee on H-1B petitions will conflict with other provisions in the law relating to the appropriate fees for the H-1B program; Congress's decision to make the program available to a wide cross-section of employers; and the law's carefully reticulated scheme of labor protections.

179.    *Finally*, such actions are, and will be, arbitrary and capricious. The imposition of a $100,000 fee on H-1B petitions has nothing to do with the stated goals of that action, as expressed in the Proclamation, and the Proclamation rests on arguments and data referred to in the preamble that are conclusory, directly contradicted by the underlying sources quoted, and fail to consider all aspects of the problem, among other fundamental procedural defects.

180.    Because agency action implementing the Proclamation will be done in violation of the APA, the court must set aside any such action and declare it unlawful.

### CLAIMS FOR RELIEF

### COUNT I
### THE PROCLAMATION AND ANY IMPLEMENTING ACTION UNDER IT ARE IN EXCESS OF EXECUTIVE BRANCH AUTHORITY UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES

181.    The U.S. Chamber incorporates and realleges the foregoing paragraphs as though fully set forth herein.

182.    Federal courts possess inherent authority to enjoin executive action that is in excess of lawful authority.

183.    For the reasons set forth in the foregoing paragraphs, the Proclamation is in excess of the President's authority under Sections 212(f) and 215(a) of the INA, and any executive action implementing it is therefore in excess of executive branch authority under the Constitution and laws of the United States.

184.    Specifically, among other things, the imposition of a $100,000 fee for H-1B petitions directly contravenes Congress's statutory enactments related to the H-1B visa programs. These enactments include the much lower fees that Congress deemed appropriate—largely related to the direct costs USCIS incurs in reviewing H-1B petitions and providing similar services. The enactments also include the statutory cap on the number of visas that may be issued under the H-1B program each year and the labor protections incorporated into the law.

185.    Moreover, the imposition of a $100,000 fee for H-1B petitions will fundamentally alter the program, diminishing a program that Congress has said *should* exist, and *should* provide a pathway for employers to bring highly skilled noncitizens to work in the United States.

186.    The Proclamation also exceeds the President's authority under Section 212(f) by directing agency action that is beyond the scope of the President's authority to restrict entry into

the United States; is not rationally related to a "class" of noncitizens targeted for restriction on entry; and does not contain "find[ings]" pertaining to that class of noncitizens required by law.

187.    Accordingly, the Proclamation and any implementing actions under it (including any not subject to review under the Administrative Procedure Act) are *ultra vires* executive action, for which there is no adequate remedy other than an injunction pursuant to this Court's inherent equitable power. The implementation of the Proclamation must be enjoined.

### COUNT II
### THE PROCLAMATION'S IMPLEMENTATION VIOLATES
### THE ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)

188.    The U.S. Chamber incorporates and realleges the foregoing paragraphs as though full set forth herein.

189.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

190.    Final agency action implementing the Proclamation is subject to review under the APA. *See Chamber of Commerce*, 74 F.3d at 1327.

191.    The Proclamation is not entirely self-executing but requires independent implementation by agencies and authorizes agencies to make independent judgments. Indeed, it expressly directs agency action.

192.    As fully described in the foregoing paragraphs, agency action implementing the Proclamation is, and will be, contrary to law and arbitrary and capricious.

193.    Specifically, among other things, agency action implementing the Proclamation would impose an unlawful $100,000 fee for H-1B petitions, in direct contravention of Congress's statutory enactments related to the H-1B visa program, including the fees set by law, the statutory

cap on H-1B visas, and the labor protections existing in the law, all of which reflect careful congressional balancing aimed to implement a robust and active H-1B program while protecting American workers.

194.    Agency action taken to implement the Proclamation also would be unlawful because it would be taken pursuant to directions from the President made in excess of his lawful authority under Section 212(f).

195.    Action implementing the Proclamation also would be procedurally arbitrary and capricious, as the imposition of a fee on H-1B petitions by the executive branch must be done via notice-and-comment rulemaking.

196.    Additionally, such action would be unlawful and arbitrary and capricious because there are no "find[ings]" related to the targeted class of noncitizens, as required under Section 212(f), and the Proclamation rests on arguments and data citations that are conclusory, manifestly inaccurate, and fail to consider important aspects of the problem.

197.    Because agency action implementing the Proclamation violates the APA, it must be vacated and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and that the Court:

1. Declare that the Proclamation and any implementing agency action exceed the executive branch's lawful authority;

2. Enjoin defendants from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiff and each of its members;

3. Vacate and set aside, under the APA, any agency actions taken to implement the Proclamation;

4. Award Plaintiff reasonable attorney's fees and costs;

5. Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: October 16, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*

| | |
|---|---|
| Daryl L. Joseffer (Bar No. 457185) | Paul W. Hughes (Bar No. 997235) |
| U.S. CHAMBER LITIGATION CENTER | Sarah P. Hogarth (Bar No. 1033884) |
| 1615 H Street NW | Mary H. Schnoor (Bar No. 1740370) |
| Washington, DC 20062 | Alex C. Boota (Bar No. 90001014)* |
| (202) 463-5337 | Grace Wallack (Bar No. 1719385) |
| djoseffer@uschamber.com | Emmett Witkovsky-Eldred (Bar No. 90012725)* |
| | MCDERMOTT WILL & SCHULTE LLP |
| | 500 North Capitol Street NW |
| | Washington, DC 20001 |
| | (202) 756-8000 |
| | phughes@mwe.com |

\* *pro hac vice to be filed*

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

49