**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>              Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>              Defendants. | Case No. 1:25-cv-3675-BAH |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of
American Universities*

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... ii

Index of Exhibits ...................................................................................................... vii

Introduction ................................................................................................................ 1

Background ................................................................................................................. 2

    A.    Legal and Regulatory Background .................................................................. 2

        1.    The INA ................................................................................................ 2

        2.    The H-1B Program .............................................................................. 3

            a.    The H-1B application process ................................................. 3

            b.    H-1B Fees ................................................................................ 4

            c.    H-1B abuse prevention measures ............................................ 5

        3.    Section 212(f) ..................................................................................... 7

    B.    Factual Background ......................................................................................... 8

        1.    The importance of H-1B workers to the national economy ................ 8

        2.    The Proclamation .............................................................................. 11

        3.    Impacts of the Proclamation for American employers ..................... 12

Argument ................................................................................................................. 14

I.    Plaintiffs are likely to succeed on the merits. ................................................... 14

    A.    The Proclamation exceeds the President's authority. .................................. 14

        1.    The Proclamation conflicts with express provisions of the INA. ......... 15

            a.    Statutory fee provisions. ........................................................ 16

            b.    Other statutory provisions ensuring the practical availability of the H-1B program. .... 20

        2.    The Proclamation violates Section 212's textual limitations. ............ 22

            a.    The Proclamation does not suspend or restrict entry. ................ 23

            b.    The Proclamation does not satisfy Section 212(f)'s other requirements. .... 28

    B.    Plaintiffs' claims are justiciable. ................................................................. 30

        1.    Plaintiffs have associational standing. .............................................. 30

            a.    U.S. Chamber ........................................................................ 30

            b.    AAU ....................................................................................... 33

        2.    The Court has authority to enjoin implementation of the Proclamation. ........... 34

II.    Plaintiffs will be irreparably harmed absent relief. ........................................... 36

    A.    Recruiting talent. .......................................................................................... 39

    B.    Diversion of resources and loss of productivity ........................................... 41

III.    The remaining equities favor relief. .................................................................. 44

Conclusion ............................................................................................................... 45

# TABLE OF AUTHORITIES†

**Cases**

*Am. Hosp. Ass'n v. Dep't of Health & Human Servs.*,
2018 WL 5777397 (D.D.C. Nov. 2, 2018) .......................................................................14

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962) .......................................................................................43

*Bowles v. Russell*,
551 U.S. 205 (2007) .......................................................................................................16

*Brady v. Nat'l Football League*,
640 F.3d 785 (8th Cir. 2011) .........................................................................................41

*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ..................................................................................34, 35

*Citizens Bank of Md. v. Strumpf*,
516 U.S. 16 (1995) .........................................................................................................27

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
901 F.2d 107 (D.C. Cir. 1990) .......................................................................................32

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) ................................................................................33, 34

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
145 S. Ct. 2121 (2025) ...............................................................................................31, 33

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .......................................................................................15

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) .................................................................................37

*FBME Bank Ltd. v. Lew*,
125 F. Supp. 3d 109 (D.D.C. 2015) ...............................................................................42

*Filazapovich v. Department of State*,
560 F. Supp. 3d 203 (D.D.C. 2021) ...............................................................................28

*Giri v. Nat'l Bd. of Med. Examiners*,
718 F. Supp. 3d 30 (D.D.C. 2024) .................................................................................44

*Harris v. Bessent*,
775 F. Supp. 3d 86 (D.D.C. 2025) .................................................................................44

*Healthy Gulf v. U.S. Dep't of Interior*,
2025 WL 2486119 (D.C. Cir. Aug. 25, 2025) ................................................................32

---

†    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*,
    71 F.4th 59 (D.C. Cir. 2023) ........................................................................16

*Hill v. U.S. Dep't of Interior*,
    2025 WL 2394169 (D.C. Cir. Aug. 19, 2025) ...............................................36

*Humane Soc'y of U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) .......................................................................32

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ......................................................................................30

*Ivy Sports Med., LLC v. Burwell*,
    767 F.3d 81 (D.C. Cir. 2014) .......................................................................20

*Jama v. ICE*,
    543 U.S. 335 (2005) ......................................................................................21

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) .............................................................30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................31

*Luokung Tech. Corp. v. Dep't of Def.*,
    538 F. Supp. 3d 174 (D.D.C. 2021) .............................................................39

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ...................................................................20

*Nalco Co. v. U.S. E.P.A.*,
    786 F. Supp. 2d 177 (D.D.C. 2011) .............................................................43

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
    949 F.3d 8 (D.C. Cir. 2020) .........................................................................32

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*,
    491 F. Supp. 3d 549 (N.D. Cal. 2020) .........................................................35

*Nat'l Cable Tel. Ass'n v. United States*,
    415 U.S. 336 (1974) ......................................................................................25

*Nat'l Ev'tl Dev. Ass'n's Clean Air Proj. v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) .....................................................................36

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) .............................................................................40, 44

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................14, 44

*Parker v. Hoglander*,
    2016 WL 3527014 (D.D.C. June 23, 2016) .................................................14

**Cases—continued**

*President and Fellows of Harvard Coll. v. DHS*,
    785 F. Supp. 3d (D. Mass. June 23, 2025) ................................................................23, 27

*RAICES v. Noem*,
    No. 25-5243, slip op. (D.C. Cir. Aug. 1, 2025) ...........................................................15, 24

*\*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    2025 WL 1825431 (D.D.C. 2025) ..........................................................15, 23, 26, 27

*Rest. Law Ctr. v. U.S. Dep't of Lab.*,
    66 F.4th 593 (5th Cir. 2023) ..............................................................................40

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) .............................................................................................26

*Rural Cellular Ass'n v. FCC*,
    685 F.3d 1083 (D.C. Cir. 2012) ..........................................................................25

*S. Educ. Found. v. U.S. Dep't of Educ.*,
    784 F. Supp. 3d 50 (D.D.C. 2025) ......................................................................14

*Skinner v. Mid-Am. Pipeline Co.*,
    490 U.S. 212 (1989) .........................................................................................25

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .........................................................................................26

*SSM Litig. Grp. v. EPA*,
    150 F.4th 593 (D.C. Cir. 2025) ..........................................................................31

*Stanley v. City of Sanford*,
    145 S. Ct. 2058 (2025) ......................................................................................24

*Tanner-Brown v. Haaland*,
    105 F.4th 437 (D.C. Cir. 2024) ......................................................................31, 34

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ......................................................................24

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ...........................................................................34

*\*Trump v. Hawaii*,
    585 U.S. 667 (2018).................................................................................. *passim*

*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001) ...........................................................................................17

*Tyler v. Hennepin Cnty.*,
    598 U.S. 631 (2023) ..........................................................................................31

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) .....................................................................................33, 34

**Cases—continued**

*West Virginia v. EPA,*
    597 U.S. 697 (2022)...........................................................................................26, 27

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001).................................................................................................27

*Whitman-Walker Clinic, Inc. v. HHS,*
    485 F. Supp. 3d 1 (D.D.C. 2020)...........................................................................43

*Xiaomi Corp. v. Dep't of Def.,*
    2021 WL 950144 (D.D.C. Mar. 12, 2021)..............................................................39

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952).................................................................................................25

**Constitutional Provisions, Statutes and Rules**

U.S. Const. art. I § 8, cl. 1............................................................................................25

8 U.S.C.
    § 1101(a)(15)(H)(i)(b) .....................................................................................3, 21
    § 1153(b)(1)(A).......................................................................................................21
    *§ 1182(f).........................................................................................................*passim*
    § 1182(n)(1)(A)(i).....................................................................................................5
    § 1182(n)(1)(E).........................................................................................................6
    § 1184.........................................................................................................................3
    § 1184(c)(1)........................................................................................................3, 28
    § 1184(c)(9)(A)...................................................................................................5, 18
    § 1184(f)...................................................................................................................24
    § 1184(g)...................................................................................................3, 4, 6, 21
    § 1184(g)(4)...............................................................................................................4
    § 1185(a)(1)..........................................................................................................7, 23
    § 1202(d).................................................................................................................28
    *§ 1356(m)......................................................................................................*passim*
    § 1356(u)(3)........................................................................................................5, 19

Pub. L. 82-414, 66 Stat. 163 ...............................................................................3, 21, 24

Pub. L. 101-515, 104 Stat. 2101 .....................................................................................16

Pub. L. 101–649, 104 Stat. 4978.................................................................................3, 21

Pub. L. 111-230, 124 Stat. 2485.................................................................................5, 19

Pub. L. 114-113, 129 Stat. 2242.............................................................................5, 7, 19

Fed. R. Civ. P. 56(a) ......................................................................................................14

Fed. R. Civ. P. 56(b) ......................................................................................................14

Fed. R. Civ. P. 65 ..........................................................................................................14

**Rules and Rgulations**

2 C.F.R § 200.463(d) ...........................................................................................43

8 C.F.R.
    § 106.2(c)(11) ...........................................................................................4
    § 214.2(h)(8)(iii)(A)(1) ...........................................................................4
    § 214.2(h)(13)(iii)(A) ..............................................................................4

55 Fed. Reg. 2606 (Jan. 26, 1990) ...................................................................21

88 Fed. Reg. 402 (January 4, 2023) .................................................................20

89 Fed. Reg. 6,194 (Jan. 31, 2024) ..................................................................17

89 Fed. Reg. 81,156 (Oct. 7, 2024) ....................................................................7

*90 Fed. Reg. 46,027 (Sept. 19, 2025) ...................................................... *passim*

**Legislative Materials**

H.R. Rep. No. 100-979 (1988) ..........................................................................17

H.R. Rep. No, 101-723, (Sept. 19, 1990) .....................................................6, 21

H.R. Rep. No. 101-909 (1990) ..........................................................................17

S. Rep. 106-260 (Apr. 11, 2000) ......................................................7, 9, 11, 45

**Dictionaries**

*Black's Law Dictionary* (4th ed. 1951) ............................................................24

*Black's Law Dictionary* (12th ed. 2024) ..........................................................29

Oxford English Dictionary (Rev. 2010) ............................................................24

Webster's New International Dictionary (2d ed. 1947) ..................................24, 29

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Shen Decl. | Declaration of Patrick Shen |
| Daniels Decl. | Declaration of Condrad Daniels |
| Poser Decl. | Declaration of Torie Poser |
| Snyder Decl. | Declaration of Barbara Snyder, Association of American Universities |
| CMU Decl. | Declaration of James H. Garrett, Carnegie Mellon University |
| UIUC Decl. | Declaration of Charles L. Isbell, Jr., University of Illinois Urbana-Champaign |
| JHU Decl. | Declaration of Stephen J. Gange, Johns Hopkins University |
| Michigan Decl. | Declaration of Arthur Lupia and Judith Pennywell, University of Michigan |
| Minnesota Decl. | Declaration of Gretchen Ritter, University of Minnesota |
| Pitt. Decl. | Declaration of Anantha Shekhar, University of Pittsburgh |
| Utah Decl. | Declaration of Phyllis Vetter, University of Utah |
| WashU Decl. | Declaration of Paul J. Scheel, Washington University in St. Louis |
| UW-Madison Decl. | Declaration of Frances Vavrus, University of Wisconsin-Madison |
| Gonzales Decl. | Declaration of Nancy A. Gonzales |
| Hughes Decl. | Declaration of Paul W. Hughes |
| Exhibit 1 | Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 19, 2025) |
| Exhibit 2 | U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sept. 20, 2025) |
| Exhibit 3 | U.S. Customs and Border Protection, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]* (Sept. 20, 2025) |
| Exhibit 4 | U.S. Department of State, *H-1B FAQ* (Sept. 21, 2025) |
| Exhibit 5 | U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations* |
| Exhibit 6 | U.S. Citizenship and Immigration Services, *USCIS Fee Schedule* (Aug. 29, 2025) |
| Exhibit 7 | *The H-1B Visa Program*, FWD.us (Jan. 27, 2025) |
| Exhibit 8 | *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce |
| Exhibit 9 | *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033,* Association of American Medical Colleges (June 2020) |
| Exhibit 10 | Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) |

| Exhibit 11 | *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis,* American Immigration Council (Mar. 29, 2017) |
| --- | --- |
| Exhibit 12 | Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015) |
| Exhibit 13 | Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* (May 2025) |
| Exhibit 14 | Hao Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation* (February 19, 2025) |
| Exhibit 15 | Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025) |
| Exhibit 16 | Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, Labour Economics (2019) |
| Exhibit 17 | *Chamber Litigation Center*, U.S. Chamber of Commerce |
| Exhibit 18 | *Topics: Immigration*, U.S. Chamber of Commerce |
| Exhibit 19 | Comment, *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers*, U.S. Chamber of Commerce (Dec. 22, 2023) |
| Exhibit 20 | Comment, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media,* U.S. Chamber of Commerce (Sept. 26, 2025) |
| Exhibit 21 | Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative (September 11, 2023) |
| Exhibit 22 | National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press (2017) |
| Exhibit 23 | Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation, Cato at Liberty* (May 14, 2020) |
| Exhibit 24 | Cat Zakrzewski et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025) |
| Exhibit 25 | *Major Initiatives: America Works Initiative*, U.S. Chamber of Commerce |
| Exhibit 26 | U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process* |
| Exhibit 27 | Stephen Dimmock et al., *Give Me Your Tired, Your Poor, Your High-Skilled Labor: H-1B Lottery Outcomes and Entrepreneurial Success* 68 Management Science 6950 (2021) |
| Exhibit 28 | Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024) |

## INTRODUCTION

Congress has enacted a comprehensive scheme governing how highly skilled workers can receive visas to enter and work in the United States, what fees should accompany visa petitions, and how abuse of that system should be remedied. Rejecting Congress's judgment, the President has unilaterally imposed a massive, extra-statutory fee on the same visas, based on the view that adhering to Congress's statutes would be "detrimental to the interests of the United States." This fee is unlawful. Although the President has significant authority over the entry of noncitizens into the United States, that authority is bounded by statute and cannot directly contradict laws passed by Congress.

Congress enacted the H-1B visa program to ensure businesses and organizations across the American economy have access to highly skilled, specialized workers. American businesses and institutions of higher education need such workers to drive the innovation and dynamism that make the United States economy the envy of the world—to the ultimate benefit of all Americans. That talent occasionally is difficult to find domestically. As a result, a wide range of American institutions—from small, family-owned businesses, to the largest of blue-chip corporations, to institutions of higher education engaged in cutting-edge research and educating the next generation of scientists and innovators—turn to the H-1B visa to fill their hiring needs to innovate, build, and compete. To that end, Congress specifically designed a process that is attainable for all employers, imposing modest fees and enabling, with specific exceptions, up to 85,000 noncitizens per year to attain H-1B status and contribute their talents, energies, and tax dollars to the United States. And Congress expressly balanced the hiring needs of employers with provisions designed to protect American workers and punish employers who abuse the system.

On September 19, 2025, however, the President issued a proclamation that overrides Congress's judgments regarding the contours and availability of the H-1B program. Invoking his authority under Sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), the

1

President announced that the sponsoring employer must pay the government $100,000 for each H-1B beneficiary. *See* Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 19, 2025) (the Proclamation) (Hughes Decl. Ex. 1). The Proclamation explicitly aims to fundamentally transform the H-1B program from a broad-based skilled worker program into one that admits only "the best of the best"—a standard based not on an employee's qualifications, but on an employer's ability and willingness to pay $100,000.

Congress did not confer on the President authority to dramatically reshape the H-1B program in this manner. With the Proclamation, the President supplants Congress's statutorily enacted policy choices and attaches affirmative, substantive, non-statutory requirements to a visa category under the guise of an "entry" ban. Both actions will cause immediate, irreparable harm to businesses and organizations across the American economy. The Court should preliminarily enjoin Defendants from applying the Proclamation, and any actions implementing it, against Plaintiffs the Chamber of Commerce of the United States of America (the U.S. Chamber) and the Association of American Universities (AAU) and their respective members. Alternatively, it should grant summary judgment and issue permanent relief.

## BACKGROUND

### A.    Legal and Regulatory Background

#### 1.    *The INA*

The INA governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 et seq. It provides for, among other things, various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily, for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

U.S. Citizenship and Immigration Services (USCIS), an agency within the Department of Homeland Security (DHS), is the agency responsible for processing immigration and

naturalization applications and establishing policies regarding immigration services. For instance, USCIS has the authority to set—by notice-and-comment rulemaking—the fees required to file various immigration forms, which by statute "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants" and to "recover any additional costs associated with the administration of the fees collected." *See* 8 U.S.C. § 1356(m).

### 2.    The H-1B Program

Named for its subsection in the U.S. Code, the H-1B visa is available to noncitizens "coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A "specialty occupation" is one that requires "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." *Id.* § 1184(i)(1). Congress first created a nonimmigrant visa for temporary specialty workers in 1952, in the original INA. *See* Pub. L. 82-414, § 101(a)(15)(H)(1), 66 Stat. 163, 168 (1952). The H-1B program was codified in essentially its current form in 1990. *See* Pub. L. 101–649, 104 Stat. 4978 (1990).

### a.    The H-1B application process

The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations. An "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1). This petition must be "made and approved before the visa is granted." *Id.*

Since 1990, Congress has imposed a statutory cap limiting the number of H-1B visas that may be issued in a single year. Currently, the cap is 65,000 visas available to any H-1B worker, plus an additional 20,000 visas available only to individuals with an advanced degree from a U.S. institution of higher education. *See* 8 U.S.C. § 1184(g). Universities and their affiliated nonprofit entities (such as university health systems) and nonprofit and government research organizations

are exempt from the numerical cap. *See* 8 U.S.C. § 1184(g)(5)(A), (B).

Because demand for H-1B visas vastly outpaces the cap-limited supply, USCIS traditionally has maintained a "lottery" process to determine which cap-subject H-1B employees would be able to obtain visas. An employer "registers" for the lottery, and, if selected, may then submit a petition within 90 days. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). The lottery occurs every March. Cap-exempt employers are not subject to the lottery and thus may file H-1B petitions at any time.

Once USCIS approves an H-1B petition, if an applicant is outside the United States, he or she must apply for and be issued an H-1B visa at a U.S. embassy or consulate abroad before traveling to the United States. If granted, an H-1B visa is good for three years and is eligible for one extension of the same duration. *See* U.S.C. § 1184(g)(4), 8 C.F.R. § 214.2(h)(13)(iii)(A).

### b.    *H-1B Fees*

Congress has enumerated certain fees that apply to H-1B petitions at the time of filing.

*First*, pursuant to the agency's general fee-setting authority under 8 U.S.C. § 1356(m), Congress authorized USCIS to promulgate—through notice-and-comment rulemaking—fees associated with registering for the H-1B lottery or submitting an H-1B petition. The agency may assess "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.*

Pursuant to its authority under Section 1356(m), USCIS has, through notice-and-comment rulemaking, promulgated several fees pertaining to the H-1B registration and petitioning process. First, there is a fee that cap-subject employers must pay to register a prospective H-1B worker for the annual lottery. *See* 8 C.F.R. § 106.2(c)(11). There is also a filing fee for form I-129, the actual form an H-1B petitioner submits. *Id.* 106.2 (a)(3). Finally, there is an "asylum program fee." *Id.* § 106.2(c)(13). Depending on the size of the employer, these fees can add up to as much as $1,595.

Congress also has enumerated several H-1B-specific fees. To file an H-1B petition, most

employers must pay a $1,500 filing fee (8 U.S.C. § 1184(c)(9)(A)-(C)) and an additional $500 to fund fraud prevention measures (*id.* § 1184(c)(12)(A)-(C)). Congress also has established fees that apply to specific high-volume H-1B employers. It first did so in 2010 (Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010)), and increased the fee to $4,000 in 2015. Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 10101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411). Employers must pay this fee if they employ 50 workers or more, more than half of whom are H-1B or L-1 employees. *Id.* Congress also has provided for "premium processing" fees that entitle sponsoring employers to a speedier decision on their petitions. 8 U.S.C. § 1356(u)(3).

Altogether, prior to the Proclamation, the total fees associated with filing an H-1B petition, including both USCIS-set fees and statutory fees (but excluding the optional premium processing fee and the fee for H-1B reliant employers), amounted to approximately $3,600. *See USCIS Fee Schedule* (Aug. 29, 2025) at 6, 39–40, https://perma.cc/U39L-CRRA (Hughes Decl. Ex. 6).

### c.    H-1B abuse prevention measures

In designing the H-1B program, Congress built in protections to ensure that the program aligns with the needs of the domestic economy. For example, in addition to completing an H-1B petition, an employer intending to hire an H-1B worker must complete a labor condition application (LCA) with the Secretary of Labor certifying (among other things) that the employer will offer to H-1B workers "wages that are at least" the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question" or the "prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i). The employer also must certify that it "will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed." *Id.* § 1182(n)(1)(A)(ii). An incorrect certification may result in monetary fines and a ban on having petitions granted, the amount and length of which

5

depend on the severity of the offense. *Id.* § 1182(n)(2)(C).

Employers with a history of willful certification violations or a large percentage of workers already on H-1B visas must additionally certify that the company has tried and failed to fill the position with a domestic worker and that it has not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A). For example, an employer with 51 or more U.S. employees must make these additional certifications if 15 percent or more of its employees are in H-1B status. *Id.* § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A)(iii). In addition, specific protections apply when one employer hires an H-1B employee to perform duties at the worksite of a different employer. *Id.* § 1182(n)(1)(F), (2)(E).

Congress also has imposed an annual cap on the total number of new H-1B visas that may be issued each year, with limited exceptions. *See* 8 U.S.C. § 1184(g); pages 3–4, *supra.*

Through these protections, Congress has balanced the goal of preserving well-paying, high-skilled jobs for U.S. citizens with "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found." H.R. Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990). Congress judged that immigration can and should be incorporated into an overall strategy that promotes the workforce needed in an increasingly competitive global economy without adversely impacting the wages and working conditions of Americans. *Id.*; *see also Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706–11,707 (Mar. 20, 1991). ("[T]he broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers.").

Over the years, Congress repeatedly has amended and adjusted the H-1B program to calibrate that balance, by, for example: imposing the statutory cap in 1990; instituting a temporary cap increase to support "companies' ability to hire skilled foreign professionals" to spur the

"country's economic growth" and support the "creation of new jobs" (S. Rep. 106-260, at 11–12 (Apr. 11, 2000)); and, most recently, imposing a surcharge of $4,000 on employers with a high proportion of H-1B visa holders as employees. Pub. L. No. 114-113 § 402(g), 129 Stat. at 3006.

### 3.    *Section 212(f)*

Section 212(f) of the INA dates from 1952. It authorizes the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f); *see Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (Section 212(f) "enabl[es] the President to supplement the other grounds of inadmissibility in the INA"); *id.* at 695 (Section 212(f) "operate[s] in [the] sphere[]" of "defin[ing] the universe of aliens who are admissible into the United States"). The President exercises this authority upon making a "find[ing]" that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States" and making a "proclamation" to that effect. 8 U.S.C. § 1182(f) (Section 212(f) of the INA).

As of early 2024, Presidents had invoked Section 212(f) 90 times since it was enacted in 1952, always focused on barring the entry of discrete groups of noncitizens whose entry was deemed detrimental to the interests of the United States, and never to impose fees tied to domestic conduct. *See* Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*, at 22 (2024) (Hughes Decl. Ex. 28); *accord* 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024) (discussing history of Executive Branch interpretation).

Section 215(a) of the INA similarly makes it unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from Section 215(a) "substantially overlap[s]" with the President's authority under Section 212(f). *Hawaii*, 585 U.S. at 683 n.1.

**B.    Factual Background**

**1.    *The importance of H-1B workers to the national economy***

Recent estimates indicate that there are as many as 730,000 H-1B visa-holders working in the United States today, in specialized fields in every sector of the American economy. *The H-1B Visa Program*, FWD.us (Jan. 27, 2025), https://perma.cc/KN4A-9Y39 (Hughes Decl. Ex. 7). Years of research confirms that these workers make invaluable contributions to the Nation, boosting productivity, sparking advancements across the domestic economy, creating jobs, and helping to train the next generation of American scientists and innovators.

A well-documented, nationwide labor shortage underscores the critical importance of the H-1B visa program. "Nearly every state is facing an unprecedented challenge finding workers to fill open jobs." *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (Dec. 13, 2024), https://perma.cc/ZMJ6-BNF5 (Hughes Decl. Ex. 8). In some states, there are twice as many job openings as unemployed workers. *Id.* That need is particularly acute in specialized fields requiring advanced education and training. For example, the United States faces a serious shortage of doctors: One report estimated a domestic shortage of between 54,100 and 139,000 physicians by 2033. *See* Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), https://perma.cc/36P9-PS2R (Hughes Decl. Ex. 9). The H-1B program helps fill that gap. *See, e.g.,* Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017), https://perma.cc/3FN5-FLE9 (Hughes Decl. Ex. 10) (noting that there are roughly 10,000 H-1B approvals annually for physicians).

STEM (science, technology, engineering, and mathematics) fields likewise contain longstanding and well-documented labor shortages. As one recent study found, "13 STEM jobs were posted online for each unemployed worker [in 2016]—or roughly 3 million more jobs than

the number of available, trained professionals who could potentially fill them." Am. Immigration Council, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://perma.cc/SQG7-3Q4K (Hughes Decl. Ex. 12). H-1B workers help fill those gaps.

H-1B workers also perform invaluable roles at institutions of higher education, educating and training American students to fill highly skilled positions in the future and driving research and scientific advancement that in turn spurs innovation and leads to more and greater opportunities for American students and workers. *E.g.*, Michigan Decl. ¶ 8, 14; Minnesota Decl. ¶ 12; Pitt Decl. ¶¶ 9, 11; WashU Decl. ¶ 6. Congress recognized as much in exempting universities from the statutory cap for H-1B visas: It emphasized the important contributions of such H-1B workers in "educating Americans," and concluded that "[t]he more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completion of their education." S. Rep. 106-260, at 21–22 (Apr. 11, 2000). Without access to H-1B visa holders, universities cannot offer the same training to their students, services to their communities, or innovations to the American people. *E.g.*, Minnesota Decl. ¶ 13; Pitt Decl. ¶ 10; UW-Madison Decl. ¶ 10.

Research demonstrates that H-1B workers increase productivity and innovation at their U.S. employers, ultimately resulting in more jobs created for American workers. One study demonstrated that the presence of H-1B workers "spu[rred] economic growth by increasing productivity, especially that of college-educated workers." Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics S252 (July 2015), https://perma.cc/N4GV-YJJ6 (Hughes Decl. Ex. 12). Indeed, by one metric, foreign-born STEM workers created "between one-third and one-half" of productivity gains between 1990 and 2010. *Id.* at S250. And those contributions translated into material gains for American workers: The study found that "a 1 percentage point increase in the foreign STEM share of a city's total employment increased the wage growth of native college-educated labor by about

9

7–8 percentage points and the wage growth of non-college-educated natives by 3-4 percent." *Id.* at S252.

Other research has focused on job creation for citizens and noncitizens alike resulting from the H-1B program. One study concluded that H-1B lottery wins—which allow a firm to hire additional noncitizen workers—lead to a corresponding increase in native-born employment as well. Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* 25 (May 2025) ("H-1B hires seem to crowd-in other workers, such as non-college workers of all nativities, as lottery-winning firms *expand* their usage of workers outside of the immigrant college group."), https://perma.cc/B7KN-288T (Hughes Decl. Ex. 13).

That growth in job creation is attributable in part to the gains in productivity and innovation that firms experience when they hire H-1B workers. For example, a 2025 analysis of H-1B data from 2008–2020 showed that "H-1B workers contribute to firm value creation" so much that "the nominal value of a dollar invested in [firms with high H-1B applications]" had grown by 1000%— three times the value created by firms with no H-1B applications. Hao Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation*, working paper at 22 (February 19, 2025), https://perma.cc/9VWK-592B (Hughes Decl. Ex. 14). Similarly, "the workers hired by universities and research institutes often play an outsized role in advancing innovation and academic research"—underscoring both the importance of the H-1B program and that curtailing universities' ability to hire H-1B workers "could . . . have ripple effects well beyond the nonprofit sector." Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025), https://perma.cc/PWE5-25CU (Hughes Decl. Ex. 15).

This innovation is a boon to the American economy, and, ultimately, American workers. Between 2000 and 2015, the foreign-born share of STEM professionals in the United States— many of them H-1B visa holders—created an estimated benefit of $103 billion for American workers. This was almost all "attributed to the generation of ideas associated with high-skilled

STEM" immigration which promotes the development of new technologies that increase the productivity and wages of U.S.-born workers. Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), https://perma.cc/U39W-P2SZ (Hughes Decl. Ex. 16).

Congress itself has recognized this dynamic. As one Senate Report states:

> Critics of H-1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H-1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs. . . .

> Many of the concerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will "take" a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.]

S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

### 2. The Proclamation

The President issued the Proclamation on September 19, 2025. *See* Ex. 1. It cites an alleged "large-scale replacement of American workers through systemic abuse of the [H-1B] program" that has purportedly allowed employers—particularly IT firms—to "artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers." *Id.* at 46,027. The preamble of the Proclamation concludes that it is "necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.* at 46,028.

The Proclamation then proceeds in several sections to establish, in effect, a new $100,000 filing fee for H-1B petitions, and to instruct various agencies and officials to implement this new fee. Section 1(a) of the Proclamation invokes the President's authority under INA Sections 212(f)

11

and 215(a) and declares that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," subject to certain exceptions. Ex. 1, 90 Fed. Reg. at 46,028.[1]

Section 1(b) directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers." Ex. 1, 90 Fed. Reg. at 46,028.[2] Section 2(b) requires the Secretary of State to "verify receipt" of the $100,000 fee and "approve only those visa petitions for which the filing employer has made the payment." *Id.* at 46,029. And Section 2(c) states that both agencies "shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the [$100,000] payment." *Id.*

The effective date of the Proclamation was September 21, 2025, and it expires 12 months thereafter. Ex. 1, 90 Fed. Reg. at 46,028. Section 3(b) directs certain officers to recommend to the President within 30 days of the next H-1B lottery whether to extend the $100,000 fee. *Id.* at 46,029.

### 3.    *Impacts of the Proclamation for American employers*

For employers that regularly use H-1B visas, including many of Plaintiffs' members, the

---

[1]    Although unstated in the Proclamation itself, the government clarified a month later that the $100,000 fee applies only to future petitions for *new* H-1B visas, and does not affect current H-1B visa-holders, renewals, or successful petitions for a change of status from another visa category to H-1B. Ex. 5; *see also* U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sept. 20, 2025) (Hughes Decl. Ex. 2).

[2]    Section 1(c) states that the $100,000 fee requirement "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." Ex. 1, 90 Fed. Reg. at 46,029. On October 20, 2025, more than a month after the Proclamation was issued, the government released guidance clarifying that such national-interest exceptions will be "extraordinarily rare" and will be granted only with respect to particular individuals, rather than, for example, a particular industry or employer. U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations*, available at https://perma.cc/39JB-994C (Hughes Decl. Ex. 5).

impacts of the Proclamation will be far-reaching. As recounted above (*supra* 8–12), employers turn to H-1B workers to fill workforce gaps when there are not enough highly skilled and specially trained U.S.-based workers to fill needed positions. The $100,000 fee to submit H-1B petitions will undoubtedly cause—and already has caused—many firms and institutions of higher education to rethink their participation in the H-1B program. Employers now face a Hobson's choice: either scale back use of H-1B workers or absorb a massive new labor cost that necessarily will reduce—in some cases drastically—important and productive expenditures elsewhere.

Ahead of the upcoming March 2026 lottery, when most U.S. Chamber members that use the H-1B program learn whether and how many H-1B workers they will be able to hire, many members are bracing for impact, faced with the prospect of reducing the number of H-1B positions created or adjusting to a new enormous cost. Dozens of specific members historically have hired workers through the H-1B program and were planning to do so again in the coming year. As a result of the Proclamation, however, they are planning either to suspend their participation in the program or to significantly reduce the number of H-1B workers they hire. Shen Decl. ¶ 14. For example, one large company that typically seeks to sponsor more than 100 H-1B employees per year is planning to scale back H-1B hiring to only the highest-level and most mission-critical roles. *Id.* ¶ 20. That means that it will be forced to relocate certain mid-level roles away from the United States to its other global locations, leading to a decline in its U.S.-based research and development. Other members that typically hire only a few H-1B workers have determined the fee is simply impracticable—they are unable to pay to sponsor *any* new H-1B workers. *Id.* ¶ 17.

For institutions of higher education, those consequences are occurring now. AAU's members, like all universities, are cap-exempt and thus do not have to wait for the lottery: Many were planning to submit petitions in the coming weeks and months, including for positions starting in the upcoming winter and spring semesters. *E.g.* Michigan Decl. ¶ 13; WashU Decl. ¶ 9–10; Utah Decl. ¶¶ 7–8. The Proclamation thus has forced immediate changes to planning, budgets, and

staffing to adjust for the reality that institutions may no longer be able to employ the H-1B workers on whom they have long relied. *Infra* Part II. Those consequences are irreparable and will proliferate as time goes on.

## ARGUMENT

A preliminary injunction will be granted upon a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 69 (D.D.C. 2025) (quotation marks omitted); *see also* Fed. R. Civ. P. 65. In cases against the government, the last two elements merge. *See, e.g.*, *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Here, each element is satisfied: the imposition of an extra-statutory $100,000 filing fee for H-1B visas is unlawful. Plaintiffs' members are irreparably harmed by either paying the massive fee, losing revenue directly associated with hiring H-1B workers, and/or losing access to the H-1B labor pool and, as a result, are suffering irremediable losses in their ability to do business, teach, provide healthcare, conduct research, and innovate. And the remaining equities favor relief, given the enormous benefits of the H-1B program to American workers and the entire economy.[3]

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The Proclamation exceeds the President's authority.

The Proclamation is fundamentally at odds with the INA: It improperly attempts to

---

[3]    In the alternative, the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party "may file a motion for summary judgment at any time until 30 days after the close of all discovery" (*id.* Rule 56(b)); thus, "[a] motion for summary judgment can . . . be too late, but not too early; 'at any time' does in fact mean 'at any time.'" *Parker v. Hoglander*, 2016 WL 3527014, at *3 (D.D.C. June 23, 2016). And "early summary judgment motions are often appropriate" in cases challenging government action, since—as here—they typically present purely legal issues with the facts not in dispute. *Am. Hosp. Ass'n v. Dep't of Health & Human Servs.*, 2018 WL 5777397, at *2 (D.D.C. Nov. 2, 2018).

supplant other provisions of the statute governing the H-1B program and exceeds the textual limitations of Section 212(f). Congress did not delegate to the President authority to impose payment obligations on U.S. employers, particularly when those fees directly contradict the INA's comprehensive scheme for the H-1B visa program. The Proclamation is therefore *ultra vires* and cannot lawfully be enforced against the U.S. Chamber's or AAU's members.

### 1.    The Proclamation conflicts with express provisions of the INA.

The President's authority under Section 212 of the INA to "suspend" or "restrict[]" noncitizens' "entry" into the United States, while broad, is not unlimited. To begin, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Hawaii,* 585 U.S. at 689. Other courts have extended that assumption into a holding: A Section 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020). As a judge of this Court recently explained, Section 212(f) "cannot plausibly be read to authorize the President . . . to supplant" express provisions of the INA. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431 at *32 (D.D.C. 2025) (*RAICES*), *stay denied in part and granted in part*, No. 25-5243 (D.C. Cir. Aug. 1, 2025).[4] The President thus lacks "authority to alter the rules" created by Congress or render INA provisions "dead letters." *Id.*

But that is precisely what the Proclamation does. It replaces Congress's design—expressed in enacted statutory text—with an altogether different approach that fundamentally reshapes the program. Most obviously, the Proclamation directly contradicts the specific provisions of the INA setting forth the fees that Congress deemed appropriate for the H-1B program. And it also conflicts

---

[4]    The partial stay of district court's order in *RAICES* permitted the executive to enforce an aspect of a Section 212(f) proclamation and accompanying guidance barring asylum for certain noncitizens at the southern border, based on the discretionary nature of the ultimate asylum determination. Although the stay order generated three separate opinions, all three judges agreed that the President could not use Section 212(f) to override duly enacted statutes. *See id.*

with other congressional determinations about the contours and availability of H-1B status.

### a. *Statutory fee provisions.*

In three ways, the Proclamation contradicts the specific provisions of the INA that specify the fees for the H-1B program. First, the $100,000 fee flouts the statutory requirement that any fee imposed by the executive must be grounded in USCIS's administrative costs. 8 U.S.C. 1356(m). Second, it conflicts with statutory provisions setting forth specific fees for the H-1B program. Third, the fee is procedurally unlawful because it circumvents Congress's directive that the executive must follow notice-and-comment rulemaking procedures when imposing new visa fees.

*1.* Congress has set a clear baseline rule governing fees for immigration programs: The executive may charge fees for visas and related services sufficient to fund its activities related to those services, but no more than that. *See* 8 U.S.C. § 1356(m) (also known as INA § 286(m)). That statute empowers the agency to impose "adjudication fees" by "regulation[]." *Id.* And as Congress clarified in a 1990 amendment shortly after the provision was enacted, those "fees for providing adjudication and naturalization services *may be set at a level that will ensure recovery of the full costs of providing all such services*, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* (emphasis added); *see* Pub. L. No. 101-515 § 210(d), 104 Stat. 2101 (1990) (adding this provision).

This cost-recovery principle underscores that fees may *not* be set at a level that bears no relationship whatsoever to relevant costs—much less dwarfs them. *See, e.g.*, *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority[,] it necessarily, or at least reasonably, implies the preclusion of alternatives." (cleaned up)); *cf. Bowles v. Russell*, 551 U.S. 205, 208–209 (2007) (statute and federal rule providing that a district court "may" reopen the time for filing a notice of appeal "for a period of 14 days" created a jurisdictional bar on reopenings lasting longer than 14 days). Moreover, Congress specified the only cost not directly associated with

administering the visa program that the executive may consider—that of providing similar services without charge to asylum applicants or other immigrants. That Congress specified that addition—and no others—confirms the limited authority delegated to the executive. *See, e.g.*, *TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied.") (quotation marks omitted).

The legislative history is in accord. As the conference report on the bill that first established Section 1356 provided, "[t]he conferees expect that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs." H.R. Rep. No. 100-979, at 38 (1988). And the conference report accompanying the 1990 amendment explains that when the statute directs that fees "may be set at a level that will ensure recovery of . . . full costs" (8 U.S.C. § 1356(m)), it means simply that USCIS is empowered to recoup all of its costs and need not strictly tie its fees to the benefit provided to each individual petitioner—*not* that the connection between fee levels and USCIS's actual costs is optional. *See* H.R. Rep. No. 101-909 (1990) (the provision "allows the Department to establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program").

The government has agreed with that interpretation: In a recent fee rulemaking, DHS recognized that Section 1356(m) "*requires* USCIS fees to be based on total costs for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024) (emphasis added); *see also id.* at 6,287 (stating that a particular fee collected under separate statutory authority "will . . . effectively supersede section 286(m)" by "go[ing] beyond normal cost recovery"). And the government has affirmatively argued in recent litigation that, although Section 1356(m) permits current fee receipts to exceed current costs "from time to time" in order to make the program administrable, the statute requires fees to at least "bear[]" a "'relationship' to [USCIS's] costs" in carrying out its statutory functions. Reply Mem. of Law in Supp. of Mot. to

17

Dismiss at 10, *Tang v. United States*, No. 23-cv-9885 (S.D.N.Y. Oct. 3, 2024), Dkt. 65.

That view is correct: Section 1356(m) provides that the executive may set fees for benefit applications like H-1B petitions only at the level necessary for USCIS to adjudicate those applications and perform its other functions. Pursuant to that congressional command, until now, USCIS has set H-1B fees through regulation, with scrupulous attention to the requirement that they be justified based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (recognizing "increase [in fee] from $10 to $215 may appear to be exorbitant" but is necessary to "cover the expenses of the H-1B registration program").

Here, the $100,000 fee is fundamentally inconsistent with Section 1356(m). The Proclamation offers no pretense that the fee has any relationship whatsoever to USCIS's costs for processing H-1B petitions (or any other function of the agency). The most-recent fee tied to those costs was $780. *See* Ex. 6 at 39. The $100,000 fee, by contrast, is meant to price out many employers and to deter use of the H-1B program for anyone other than "the best of the best temporary foreign workers" (Ex. 1, 90 Fed. Reg. at 46,028)—assuming that the prospective employers of those very best workers even can pay. *But see* pages 36–43, *infra*. In its purpose and effect, that fee flouts Congress's decision that fees set by the executive for the H-1B program should relate to the administrative costs of the program, nothing more.

*2.* The Proclamation's $100,000 fee also conflicts with Congress's deliberate decisions about how much a visa (in particular, an H-1B visa) should cost overall.

First, Congress specified that the fee for the H-1B "petition" itself "shall be $1,500 for each such petition." 8 U.S.C. § 1184(c)(9)(A)–(C). Second, Congress required payment of a $500 "fraud prevention and detection fee" from all employers filing an initial H-1B petition or seeking authorization for an H-1B visa-holder to change employers. 8 U.S.C. § 1184(c)(12)(A), (C). Third, Congress imposed an additional $4,000 fee on employers with more than 50 employees, over half

of whom are foreign, nonimmigrant workers. *See* Pub. L. No. 114-113 § 402(g), 129 Stat. at 3006 (codified at 49 U.S.C. § 10101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411); *see also* Pub. L. No. 111-230, § 402(b), 124 Stat. at 2487 (earlier imposing a smaller fee on these same employers). And fourth*,* Congress provided "premium processing" fees for immigration services—currently $2,805 for H-1B petitions—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S.C. § 1356(u)(3); *see* Ex. 6 at 32.

The Proclamation disrupts Congress's carefully calibrated scheme. By setting an additional $100,000 fee, the Proclamation "expressly override[s]" the "particular provisions of the INA" (*Hawaii*, 585 U.S. at 689) that provide how much an H-1B visa should cost a U.S. employer and when an employer is entitled to a decision on a visa application. Accordingly, it is not a lawful exercise of Section 212(f) power.

This conflict is especially stark because of the magnitude of the additional $100,000 fee— more than *twenty-five* times the approximately $3,600 a typical H-1B petitioner would pay otherwise. And it is roughly ten times the maximum fees *any* petitioner (one subject to the $4,000 surcharge who chooses to also pay for premium processing) would otherwise conceivably pay. In that way, the Proclamation distorts which businesses can afford to participate in the program. Whereas Congress set fees that are attainable by large businesses, small businesses, and nonprofits alike, the imposition of a $100,000 fee would make future participation by many small businesses and nonprofits difficult, if not impossible, to maintain. *See* pages 36–43, *infra*. More, it does so intentionally: The Proclamation is explicit in its intent to price out employers and the majority of prospective H-1B employees. *See* Ex. 1, 90 Fed. Reg. at 46,028 ("It is therefore necessary to impose higher costs on companies seeking to use the H-1B program . . . .").

*3.* The Proclamation's fee is also procedurally unlawful because it conflicts with Congress's explicit determination that the executive should set fees for visas pursuant to notice-and-comment rulemaking, with the attendant protection for the public via arbitrary-and-capricious

19

review. 8 U.S.C. § 1356(m) (providing for "adjudication fees . . . designated by the Attorney General in regulations."); *cf. Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) (notice-and-comment rulemaking required where statute said "Secretary of Labor shall issue regulations" establishing relevant substantive standard). For that reason, in the past, UCSIS has set the relevant fees only after engaging in the notice-and-comment process. *See USCIS Fee Schedule*, 88 Fed. Reg. at 447 ("After the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice-and-comment rulemaking."). The Proclamation rewrites the INA by overriding the congressionally mandated fee-setting mechanism, drastically reducing protections for the regulated public in the process. *See, e.g.*, *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 87–88 (D.C. Cir. 2014) (notice and comment both "helps to prevent mistakes" and "also helps ensure that regulated parties receive fair treatment, a value basic to American administrative law.").

### b.    Other statutory provisions ensuring the practical availability of the H-1B program.

The Proclamation, in its practical application, also conflicts fundamentally with Congress's determination in establishing the H-1B visa program—memorialized in the text itself—that employers of all sizes *should* have a reasonable pathway to admitting a wide range of highly skilled nonimmigrant workers from specialized fields.

*1.* First, the Proclamation's intent to limit H-1B visas to only "the best of the best" foreign workers contradicts the INA, which imposes no such requirement on the H-1B program.

As an initial matter, the assumption that the Proclamation paves the way for employers to hire "the best of the best" is simply mistaken. Many employers, particularly small businesses, cannot pay the $100,000 fee, regardless of how talented a prospective employee may be. Many nonprofit institutions, too, will be priced out of the market, despite Congress's judgment that such institutions should not even be subject to a cap on their H-1B petitions. The $100,000 fee therefore imposes a filter based on the financial circumstances of the employer, not the quality and promise of the prospective employee. In doing so, the Proclamation renders the H-1B program practically

unavailable for many employers, particularly small businesses and nonprofits, depriving them of a talent pipeline that is critical to innovation and productivity.

In any event, Congress chose not to include a "best of the best" requirement for H-1B visas. Separate provisions in the INA enable employers to sponsor visas for prospective employees with "exceptional ability," "extraordinary ability," or other comparable qualities, and those noncitizens are eligible for *immigrant*, not nonimmigrant, visas. 8 U.S.C. § 1153(b)(1)(A), (b)(2)(A). The H-1B program is different: Employers need not show that their prospective workers are the best of the best—"exceptional," or "extraordinary," in the words of the INA. Instead, the only ability-based qualification for an H-1B visa is that the worker is in a "specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b); *see id.* § 1184(i) (defining "specialty occupation"). The statutory tradeoff is that H-1B workers are eligible for only a temporary stay in this country. By purporting to impose a "best of the best" requirement on the H-1B program where Congress has imposed a "specialty occupation" requirement instead, the Proclamation tramples Congress's duly enacted policy choices.[5] *See, e.g.*, *Jama v. ICE*, 543 U.S. 335, 341 (2005) (Courts should "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

*2.* Congress also decided that, with specified exceptions, up to 85,000 people should be able to obtain H-1B visas each year. 8 U.S.C. § 1184(g). Although the purpose of the cap was, in part, to assure that no more than this number of noncitizens could obtain visas under this pathway, the cap also reflects Congress's considered policy view of roughly the right number of new H-1B

---

[5]    Indeed, the H-1B predecessor provision in the 1952 INA *did* require noncitizens to be "of distinguished merit and ability," and to enter "to perform temporary services of an exceptional nature." *See* Pub. L. No. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952). While the government long took the position that even entry-level professionals could qualify (*see, e.g.*, 55 Fed. Reg. 2606, 2608–2609 (Jan. 26, 1990)), Congress removed any doubt by enacting the current language, which has no such qualifications, in 1990. Immigration Act of 1990, Pub. L. No. 101-649, § 205(c)(1), (2); *see* H.R. Rep. 101-723(I), at 67 (Sept. 19, 1990) (report on a bill that included the "specialty occupation" language ultimately enacted in the Immigration Act of 1990: "The bill recognizes that certain entry-level workers with highly specialized knowledge are needed in the United States and that sufficient U.S. workers are sometimes not available.").

visa holders each year—a number indicating that Congress intended for the program to be widely available to employers of all sizes and financial circumstances. Given the high demand for H-1B visas, Congress understood that its cap on H-1B visas would effectively function as both a ceiling *and* a floor. *See, e.g.*, U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process*, available at https://perma.cc/P449-JGSY (Hughes Decl. Ex. 26) (showing that, in recent years, several hundred thousand people have registered for each annual H-1B lottery).

The Proclamation contravenes that congressional judgment because the $100,000 fee is meant to, and surely will, reduce the number of petitions far below what Congress provided. Under simple principles of supply and demand, imposing a new $100,000 fee on a benefit that previously cost less than $4,000 will cause the number of new H-1B visas to plummet. Most employers that rely on H-1B visas will reduce the number of petitions they submit. Employers who submit few petitions to begin with, or entities like small-and-medium-sized businesses and nonprofits that cannot afford a $100,000 fee, will be unable to participate at all. In this way, too, the Proclamation "expressly override[s] particular provisions of the INA." *Hawaii*, 585 U.S. at 689.

## 2. *The Proclamation violates Section 212's textual limitations.*

Even setting aside the explicit conflicts with other provisions of the INA, the Proclamation's reliance on Section 212(f) fails on its own terms. *See Hawaii*, 585 U.S. at 685–688 (acknowledging that Section 212(f) contains "textual limits" on the President's power). That section provides, in relevant part, "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any

restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).[6] Courts have not hesitated to block executive actions that strain the text of Section 212(f). *See, e.g.*, *RAICES*, 2025 WL 1825431, at \*4, \*32 (rejecting use of Section 212(f) to create a non-statutory repatriation system); *President and Fellows of Harvard Coll. v. DHS*, 785 F. Supp. 3d at 195–97 (D. Mass. June 23, 2025) (rejecting use of Section 212(f) to bar entry to study at a particular institution).

This Court should do the same. First, the Proclamation's $100,000 fee on employers exceeds Section 212(f)'s authority to "suspend" entry or impose "entry" "restrictions." Second, the Proclamation does not operate on a valid "class of aliens" or make the required findings.

**a.**    ***The Proclamation does not suspend or restrict entry.***

The Proclamation does not "suspend . . . entry" or impose "restrictions" "on the entry of aliens." 8 U.S.C. § 1182(f). The dozens of invocations of Section 212(f) in the statute's first seven decades, including in *Hawaii*, show what a true suspension or restriction on entry looks like: Those proclamations have barred the entry of certain noncitizens and restricted the entry of others to certain statuses or certain classes (*see id.* at 679–680). The Proclamation is nothing like that. Instead, it regulates the H-1B visa program, conditioning H-1B visas solely on whether an employer is willing and able to pay a $100,000 fee. Section 212(f) does not empower the President to fundamentally transform an existing visa program under the guise of restricting entry. *Cf. Hawaii*, 585 U.S. at 694–695 & n.3 (discussing "the basic distinction" between "the concepts of entry and admission," on the one hand, and "issuance of a visa," on the other). And it certainly does not permit the President to do so by imposing *fees* in connection with petitions U.S. employers must file—a revenue-raising power courts will not lightly infer.

*1.* To start, the Proclamation does not "suspend" entry (and, indeed, does not even purport

---

[6] INA Section 215(a)(1) (8 U.S.C. § 1185(a)(1)), upon which the Proclamation also relies, "substantially overlaps with" Section 212(f). *Hawaii*, 585 U.S. at 683 n.1. It thus does not convey any authority that Section 212(f) does not.

23

to do so). Any noncitizen remains free to enter, consistent with other admission requirements, so long as he or she does not require an H-1B visa, or if a U.S. employer pays the $100,000 fee.

Nor does the Proclamation fall within Section 212(f)'s grant of authority to (1) "impose . . . restrictions" on (2) "the entry" (3) "of aliens." 8 U.S.C. § 1184(f). Taking these elements in turn, "to restrict" has meant—both in 1952 and today—to "limit" or "confine." *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Restrict, *Black's Law Dictionary* 1478 (4th ed. 1951) (same); Restriction, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("That which restricts; a limitation."); Restrict, *Oxford English Dictionary* (Rev. 2010) ("To limit (a person or thing) . . . To prohibit or prevent from."). A "restriction" is thus a negative or prohibitory limit.[7]

Next, when Section 212(f) was enacted, Congress defined "entry" to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. at 167. Section 212(f) thus "empowers the President to control who may cross the Nation's borders." *RAICES v. Noem*, No. 25-5243, slip op. at 28 (D.C. Cir. Aug. 1, 2025) (Millett, J., concurring). Finally, Section 212(f) conveys authority over the entry "of aliens" (*i.e.*, noncitizens). 8 U.S.C. § 1182(f); *cf. TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103–04 (D.D.C. 2020) (explaining that the words "regulate" and "prohibit" "are transitive and require an object" and analyzing their permissible "intended objects").

Taken together, Section 212(f) thus authorizes the President to impose *prohibitions* that

---

[7]    Section 212(f)'s entry-"restriction[]" power is notably different from other provisions of the INA in which Congress described affirmative requirements on noncitizens. *See, e.g.*, Pub. L. 82-414, § 312(1), 66 Stat. at 240 ("[N]o extraordinary or unreasonable *condition* shall be placed on the applicant."); *id.* § 321(a), 66 Stat. at 245 (child born outside the United States "becomes a citizen of the United States upon fulfillment of the following *conditions*."); *id.* § 351(a) ("[E]xpatriation shall result from . . . the fulfillment of any of the *conditions* specified in this chapter.") (emphases added). As always, "[t]hat Congress used different language in these . . . provisions strongly suggests that it meant for them to work differently." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2064 (2025).

24

operate *at the border* on *noncitizens*. But the Proclamation does not impose a negative or prohibitory limit at the border. Rather, it leverages Section 212(f) to require U.S. employers to comply with affirmative, non-statutory mandates. It is therefore unauthorized by the statutory text.

That conclusion is particularly clear because the Proclamation's non-statutory mandate is a *payment* requirement. Raising revenue is a core power reserved by the Constitution for Congress: "*The Congress* shall have Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I § 8, cl. 1 (emphasis added); *see also id.* § 7, cl. 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643 (1952) (Jackson, J., concurring) ("Congress alone controls the raising of revenues."); *Nat'l Cable Tel. Ass'n v. United States*, 415 U.S. 336, 340 (1974) ("Congress . . . is the sole organ for levying taxes."). As a result, "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority" to impose payment requirements on regulated parties, "whether characterized as 'fees' or 'taxes.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989); *see also Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012) (same, quoting *Skinner*); *Nat'l Cable Tel. Ass'n*, 415 U.S. at 341 ("read[ing]" a statutory grant of power "narrowly" because "[i]t would be a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power").[8]

Section 212(f) contains no such "clear[]" "indicat[ion]." *Skinner*, 490 U.S. at 224. To the contrary, Section 212(f) says nothing whatsoever about fees, taxes, surcharges, or any other form of payment, in stark contrast to the many other provisions of the INA that *do* expressly empower the executive to impose fees, collect bond payments from noncitizens, and the like. *See, e.g.*, 8

---

[8]    The only potential exception to this principle—where a fee "inur[es] directly to the benefit of [the] regulated parties" from whom it is collected (*Skinner*, 490 U.S. at 224)—is plainly inapplicable. Not only is there no indication in the Proclamation that the revenue raised would be used to benefit H-1B petitioners, but upon signing the Proclamation, the President stated precisely the opposite. *See* Cat Zakrzewski et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), https://perma.cc/6QHY-CGA5 (Hughes Decl. Ex. 24) (quoting the President: "We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt.").

U.S.C. §§ 1356(m), 1184(a)(1). "When the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004); *see also, e.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation [of a statute] is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). When Congress wanted to empower the executive to impose fees in connection with visas, it knew how to do so—by legislating expressly as Supreme Court has required. Section 212(f), which includes no such language, does not empower the President to raise revenues by conditioning entry of noncitizen workers on the payment of money by their American employers.

Practice reinforces the same conclusion: No President in Section 212(f)'s first seven decades used the statute to impose an additional fee on a visa program, and certainly not a fee plainly disproportionate to the costs of administering the program and the fees Congress specifically prescribed. And "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (citation omitted).

Finally, adhering to this settled understanding of Section 212(f) is especially important because the Proclamation's unprecedented invocation of Section 212(f) knows no limiting principle. The same logic would permit the President to promulgate an entire new shadow-INA— that is, an extra-statutory system setting the terms and conditions of immigration to the United States—with completely different classifications, rules, and procedures, and to deny "entry" to any noncitizen who did not comply with them. *Cf. RAICES*, 2025 WL 1825431, at *4 ("[N]either the INA nor the Constitution grants the President or the Agency Defendants authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals from the United

States."). More: If Section 212(f) permitted conditioning entry of noncitizens on compliance with particular rules in their dealings with U.S. persons, it would confer on the President a formidable lever to regulate the U.S. conduct of U.S. persons. *See Harvard*, 785 F. Supp. 3d at 195–97.

Section 212(f)'s delegation should not be read so broadly. Among other reasons, it would find the proverbial elephant in a textual mousehole (*see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) and would run afoul of the major questions doctrine (*see West Virginia* 597 U.S. at 723 (Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme") (quotation marks omitted)).

That is all the more true because of the breadth of the authority that Section 212(f), where applicable, conveys. The Supreme Court in *Hawaii* emphasized that Section 212(f) "exudes deference to the President in every clause" and "entrusts to the President the decisions whether and when to suspend entry" and "for how long." 585 U.S. at 684. Section 212(f) also authorizes the President to act by proclamation, generally free from the safeguards (such as notice-and-comment rulemaking) that typically limit agencies. If this broad authority were also *substantively* unconstrained, the INA (and, indeed, Congress's careful limits on the President's authority in the domestic realm) would contain the seeds of its own destruction—a construction to be avoided. *Cf. Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) ("It is an elementary rule of construction that the act cannot be held to destroy itself.") (quotation marks omitted).

*2.* In addition, certain of the Proclamation's provisions go beyond any possible conception of an entry restriction. Section 2(b) orders the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment." Ex. 1, 90 Fed. Reg. at 46,029. The concept of "entry" is separate from the "visa issuance" process. *Hawaii*, 585 U.S. at 694–695 & n.3; *cf. RAICES*, 2025 WL 1825431, at *32 ("[S]tatutory grants of authority to the Executive Branch do not carry with them a sweeping, implied authority analogous to Congress's power under the Necessary and Proper Clause.") (citation omitted). Thus, as courts in this district

have held, the State Department "ha[s] a specific and nondiscretionary obligation" to process visa applications presented to it, even if the visa applicant is currently barred from *entry* by a Section 212(f) proclamation. *Filazapovich v. Department of State*, 560 F. Supp. 3d 203, 234 (D.D.C. 2021) (rejecting government's argument "that a Proclamation banning an immigrant from entry renders her ineligible for a visa"), *rev'd on other grounds*, 104 F.4th 920 (D.C. Cir. 2024).[9]

Likewise, Section 1(b) orders the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment." Ex. 1, 90 Fed. Reg. at 46,028. Again, the President has broad authority concerning *entry* into the United States, but Section 212(f) does not provide authority to direct the Executive Branch to stop *deciding* visa petitions. And like the State Department's nondiscretionary duty to process visa applications, the INA mandates that DHS "*shall* determine[]" "[t]he question of importing any alien as a nonimmigrant under" the H-1B category "upon petition of the importing employer." 8 U.S.C. § 1184(c)(1) (emphasis added). More, H-1B applicants "*shall* be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status" (*id.* § 1184(g)(3) (emphasis added))— meaning that DHS is statutorily prohibited from prioritizing petitions accompanied by the $100,000 fee over other petitions that are otherwise proper.

These specific provisions, which go beyond the Proclamation's alleged entry restriction, are therefore plainly beyond the Section 212(f) power—and any action by Defendants to implement them are also contrary to law.

> **b.    *The Proclamation does not satisfy Section 212(f)'s other requirements.***

In two other ways, the Proclamation fails to satisfy Section 212(f)'s requirements.

*1.* First, the Proclamation does not operate on a valid "class of aliens." 8 U.S.C. § 1182(f);

---

[9]    The court found this duty in a statute specific to immigrant visas, but the neighboring provision contains identical language applicable to nonimmigrant visas like H-1B. *See* 8 U.S.C. § 1202(d).

*see Hawaii*, 585 U.S. at 687–688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)).

The class of noncitizens identified in the Proclamation is all those seeking to enter on H-1B status "whose petitions are [not] accompanied or supplemented by a payment of $100,000." But this curious grouping strains the statutory term "class" beyond recognition. The Supreme Court in *Hawaii* held that "the word 'class' comfortably encompasses a group of people *linked by nationality.*" *Hawaii*, 585 U.S. at 688 (emphasis added); *accord, e.g.*, Class, *Webster's New International Dictionary* 496 (2d ed. 1947) ("A group of individuals ranked together as possessing common characteristics," or "[a] group of persons, things, qualities, or activities, having common characteristics or attributes."); Class, *Black's Law Dictionary* (12th ed. 2024) ("A group of people . . . that have common characteristics or attributes.").

Even assuming Section 212(f) permits classes having nothing to do with nationality, the purported class excluded by the Proclamation is not "linked by" any common feature of the *noncitizens*. *Hawaii*, 585 U.S. at 688. The class could include any noncitizen at all and is linked only by the circumstance that their U.S. employers are either unwilling or unable to pay $100,000 to the government to sponsor their immigration status. That is not a "common characteristic[] or attribute[]" (*Webster's New International Dictionary*, *supra*) of the noncitizens themselves. Again, this textual limitation underscores that the Proclamation is not really an entry restriction at all. Rather, it is a regulation of the H-1B visa program and an attempt to bootstrap the Section 212(f) entry-suspension power into the creation of a new, non-statutory visa category.

*2.* Second, the Proclamation does not make the findings that Section 212(f) requires as a predicate—namely, "that the entry of any [noncitizen] or class of [noncitizens] as immigrants or nonimmigrants would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Proclamation, in fact, does not make any findings about *any* noncitizens. It makes findings about U.S. *employers*, describing alleged "abuse of the H-1B visa program" by certain employers. Ex.

29

1, 90 Fed. Reg. at 46,027. But even assuming such abuse exists, Section 212(f) does not empower the President to impose entry restrictions *as a penalty* for domestic employers' alleged misconduct; the detriment to the interests of the United States must instead arise from "the entry" of a "class of aliens" into the United States. 8 U.S.C. § 1182(f). Again, the Proclamation does not aim at entry at all but rather seeks to reshape a visa program created by Congress.

* * *

In all, the Proclamation (and any implementation of it) both attempts to supplant the INA and contravenes the textual limits of Section 212(f). It is *ultra vires*.[10]

**B.    Plaintiffs' claims are justiciable.**

*1.    Plaintiffs have associational standing.*

Plaintiffs each have associational standing to challenge the Proclamation and its implementation on behalf of their members. *See, e.g.*, *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977). Associational standing exists when three criteria are satisfied: at least one member would have standing to sue in its own right; the litigation is germane to the association's purpose; and the relief requested does not require the participation of the association's individual members. *Id.* All three criteria are easily satisfied here.

*a.    U.S. Chamber*

"To satisfy the first prong of the associational-standing analysis, an organization 'must show, for each of its claims, that at least one of its members has standing.'" *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 181 (D.D.C. 2025) (quotation marks omitted). That is, a member who has (or will) "suffer an injury in fact fairly traceable to the challenged conduct of the defendant that can likely be redressed by a favorable judicial decision."

---

[10]    For substantially the same reasons, final agency action implementing those aspects of the Proclamation that require administrative implementation (*see infra* at 35–36) are contrary to law and thus must be set aside under the Administrative Procedure Act.

*Tanner-Brown v. Haaland*, 105 F.4th 437, 443 (D.C. Cir. 2024); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The U.S. Chamber is the world's largest business federation, representing approximately 300,000 members of all sizes, in every sector, and from across the Nation. Shen Decl. ¶ 2. Here, the U.S. Chamber has pointed to several members who are "an object of the action . . . at issue," meaning there is "little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. ___, 145 S. Ct. 2121, 2134 (2025) (quotation marks omitted). Specifically, HJI Supply Chains Solutions, a member of the U.S. Chamber, intended to recruit H-1B candidates to fill a critical role but cannot if it must pay a $100,000 fee. Daniels Decl. ¶¶ 6–13. Additionally, the U.S. Chamber has pointed to numerous specific members who anticipated hiring H-1B workers in the coming 2026 lottery but must now pay the $100,000 fee to do so, causing some to discontinue their participation in the program entirely and others to scale back. Shen Decl. ¶¶ 7-21.[11] The Proclamation's imposition of a $100,000 fee is a concrete harm to these members, who either must pay the fee—a "classic pocketbook injury" (*Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023))— or will be priced out of the program and unable to access its benefits. Either way, they have suffered a concrete injury, directly caused by the challenged action. Another U.S. Chamber member, GoRural, a recruiting and staffing agency assisting rural healthcare facilities, frequently helps its clients hire H-1B candidates, a service that accounts for 50% of its revenue. Poser Decl. ¶¶ 1, 3, 6-10. With the Proclamation, that revenue stream has run dry. Another Chamber member, Arizona State University, is a cap-exempt employer and thus can petition for H-1B visas outside of the

---

[11]    As the D.C. Circuit has repeatedly reaffirmed, the fact that these specific members are unnamed "is no barrier to standing," because these members "are 'directly regulated by the rule' and naming them would 'add no essential information bearing on the injury component of standing.'" *SSM Litig. Grp. v. EPA*, 150 F.4th 593, 598 (D.C. Cir. 2025) (quoting *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022)).

annual lottery system, and expects that it would petition for approximately a dozen new H-1B petitions but for the Proclamation's $100,000 fee. Gonzales Decl. ¶¶ 7, 8.

The relief Plaintiffs request—blocking the imposition of the $100,000 fee—would also redress that injury by restoring the economic feasibility of the program for prospective H-1B employers. Although a non-exempt employer intending to hire an H-1B employee must still win the lottery, plaintiffs challenging government action "need not prove that granting the requested relief is *certain* to redress their injury, especially where some uncertainty is inevitable." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 118 (D.C. Cir. 1990) (emphasis added); *see also, e.g.*, *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (where plaintiff asserts procedural injury, the "redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor; the petitioner need not go further and show that it *would* effect such a change.").

Just so here: The U.S. Chamber's members are denied the procedural right to enter the H-1B lottery, and restoring that right "*could*" result in a lottery win and the issuance of a visa, even though that substantive outcome is not guaranteed in any individual case. More, because hundreds of U.S. Chamber members hire thousands of H-1B workers in a typical year (Shen Decl. ¶ 23) and the U.S. Chamber is directly aware of dozens of members who ordinarily hire numerous H-1B workers and plan to suspend or dramatically limit their participation due to the Proclamation, there is no doubt, as a practical matter, both that the U.S. Chamber's members will lose out on the opportunity to participate in the H-1B lottery because of the $100,000 fee, and that this will translate into lost opportunities to hire H-1B workers.

The litigation is also germane to the U.S. Chamber's purpose. The germaneness requirement is "undemanding" (*Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 59 (D.C. Cir. 1988)) and only "requires 'pertinence between litigation subject and organizational purpose.'" *Healthy*

*Gulf v. U.S. Dep't of Interior*, __ F.4th ___, 2025 WL 2486119, at *5 (D.C. Cir. Aug. 25, 2025) (indirectly quoting *Hodel*, 840 F.3d at 58). Through its Litigation Center, the U.S. Chamber "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business." *Chamber Litigation Center*, U.S. Chamber of Commerce (2025), https://perma.cc/WH3T-JXRP (Hughes Decl. Ex. 17); *see* Shen Decl. ¶ 4. That purpose undoubtedly extends to litigation involving nonimmigrant labor programs such as the H-1B visa program. The supply of qualified labor is a fundamental input for any business. Ensuring that supply exists—and does not cost hundreds of thousands of dollars per worker to access—is well within the U.S. Chamber's advocacy and representation mission. *See* Shen Decl. ¶¶ 3, 5. Indeed, the U.S. Chamber has brought several lawsuits on behalf of its members in recent years challenging executive branch action that threatened to undermine the H-1B program, and it regularly participates in the rulemaking process for business-relevant immigration regulations. *Id.* ¶ 4.

Finally, the participation of any individual U.S. Chamber member as a named plaintiff is unnecessary, as this action seeks only declaratory, injunctive, and vacatur relief. *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" as opposed to "an action for damages to an association's members.") (quoting *Hunt* 432 U.S. at 343); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025) ("[T]he purely injunctive and declaratory relief sought by the Center does not require the participation of individual members either to litigate or to remediate the claim.") (citation omitted). Standing is amply satisfied.

b.   ***AAU***

AAU likewise satisfies all three prongs for associational standing. First, as the "objects" of the Proclamation, AAU's members would have standing to sue in their own right. *See Diamond Alternative Energy*, 145 S. Ct. at 2134. AAU's members face immediate harm from the

Proclamation. *Tanner-Brown*, 105 F.4th at 443; Snyder Decl. ¶ 7; *see also, e.g.*, Minnesota Decl. ¶ 11–13; Utah Decl. ¶ 7–9; WashU Decl. ¶ 9–10; UW-Madison Decl. ¶ 15–16. AAU members use—and plan to continue using—the H-1B program to hire employees with highly specialized skills that are in short domestic supply, including scientific and technical research, engineering, and medical services. *E.g.*, Michigan Decl. ¶ 11; Minnesota Decl. ¶ 14–15; WashU Decl. ¶ 6; UW-Madison Decl. ¶ 9–10. The Proclamation's $100,000 fee is a concrete harm to these members, who must either pay an exorbitant fee for every H-1B petition, or face the consequences of forgoing H-1B employees, and in the meantime are already taking steps to adapt to this new reality. *Infra* Part II. Either way, they have suffered a concrete injury directly caused by the Proclamation, and that injury would be redressed by the relief sought here.

Second, the litigation is not just germane to AAU but intrinsically tied to its mission: ensuring that universities can continue to transform lives through education, research, and innovation. Snyder Decl ¶ 4. For AAU's members, losing out on H-1B workers means losing access to specialized expertise essential to educating students, conducting critical research, and driving innovation. And finally, individual members' participation is not required for the declaratory and injunctive relief sought here. *See*, *e.g.*, *United Food & Com. Workers Union*, 517 U.S. at 546; *Ctr. for Biological Diversity*, 146 F.4th at 1157.

### 2.    The Court has authority to enjoin implementation of the Proclamation.

The Court is also competent to provide the relief that Plaintiffs seek.

First, a federal district court has the inherent authority to enjoin an *ultra vires* act of the executive. *See, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.") (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)); *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 189–190 (D.C. Cir. 2006) ("[J]udicial review is available when an agency acts *ultra vires*, even if a statutory cause of action is lacking.") (quotation marks omitted).

Moreover, "[t]hat the 'executive's' action here is essentially that of the President does not insulate the entire executive branch from judicial review." *Reich*, 74 F.3d at 1328. To the contrary, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part)). Just so here.[12]

Separately, APA review is also available for some of the agencies' implementing actions. Though the $100,000 fee originated in a presidential proclamation, it requires implementation and enforcement by the named defendant officials and agencies. Specifically, Section 1(b) of the Proclamation requires DHS and its Secretary to "restrict decisions on [H-1B] petitions not accompanied by a $100,000 payment," Section 2(b) requires the Secretary of State to "approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation," and Section 2(c) instructs DHS and the State Department to "coordinate to take all necessary and appropriate action to implement this proclamation." Ex. 1, 90 Fed. Reg. at 46,028–46,029. Moreover, Section 2(c) also broadly authorizes the DHS Secretary to grant exemptions based on her judgment that hiring will be in the "national interest"—underscoring that the Proclamation depends on administrative implementation. *Id.* at 46,029.

The agencies have begun to do so, and some of their efforts constitute final agency action. For instance, USCIS has issued a memorandum stating that "[t]he entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under the H-1B program "is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," and that "[t]his guidance applies to H-1B employment-based petitions filed

---

[12]  There is also no adequate alternative avenue for review, other than *ultra vires* review, of the President's core action in making the Proclamation. For that reason, courts have frequently exercised their inherent authority to review presidential Proclamations made under Section 212(f). *See, e.g.*, *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 558 (N.D. Cal. 2020) (issuing preliminary injunction against *ultra vires* Section 212(f) proclamation).

after" the effective date. Ex. 2. The memorandum directs "[a]ll officers" of USCIS to "ensure that their decisions are consistent with this guidance." *Id.*[13]

"For purposes of the APA, agency action is final when it 'mark[s] the consummation of the agency's decisionmaking process' and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hill v. U.S. Dep't of Interior*, ___ F.4th ___, 2025 WL 2394169, at *3 (D.C. Cir. Aug. 19, 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). As reflected in the agency defendants' memoranda, it is settled policy that H-1B petitions must be accompanied by a $100,000 fee to be accepted and for a visa to issue. The agency's "decisionmaking process" (*id.*) is done. The fee is set. And from that decision "flow[s]" clear "legal consequences." *Id.* An H-1B petition without a $100,000 payment will be rejected and any visa connected to that petition denied.

Plaintiffs therefore have both standing and multiple valid causes of action through which to enjoin implementation of aspects of the Proclamation. The Proclamation and any implementing actions that are not subject to review under the APA are subject to injunction as *ultra vires*, and the implementing actions that are subject to review under the APA should be held unlawful under that statute. Under either route, Plaintiffs are likely to succeed on the merits.

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT RELIEF.

Members of the U.S. Chamber and AAU will also suffer irreparable harm in the absence of a preliminary injunction. Irreparable injury is established when the plaintiff "is suffering, or will suffer, a harm that is both certain and great, actual and not theoretical, and of such imminence that

---

[13]    Other final agency actions to similar effect include a U.S. Customs and Border Protection memorandum (Ex. 3), the Department of State's Frequently Asked Questions page (Ex. 4), and USCIS's statement regarding who is subject to the $100,000 payment, how to pay it, and national interest exceptions (Ex. 5). The informality of these documents does not detract from their finality. *See, e.g.*, *Nat'l Ev'tl Dev. Ass'n's Clean Air Proj. v. EPA*, 752 F.3d 999, 1006–1007 (D.C. Cir. 2014) (document was final agency action where it "provides firm guidance to enforcement officials about how to handle permitting decisions").

there is a clear and present need for equitable relief to prevent irreparable harm." *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025) (quotation marks omitted). If the Proclamation is allowed to remain in effect, Plaintiffs' members will suffer immediate and irreparable harm to their missions and basic functions that cannot later be remediated.

As the U.S. Chamber has detailed, dozens of its members anticipated using the H-1B program in the coming year but will instead be forced to eliminate or dramatically curtail such use because of the Proclamation. *See generally* Shen Decl. ¶¶ 11-21. As a result, many will be unable to fill positions for highly skilled workers. *Id.* ¶ 24. Without critical personnel, they will be forced to shutter or scale back planned projects, or to reorganize their staffing models and relocate positions to other countries where they are able to access the talent they need. Such structural changes, which are already underway for many members, cannot easily be unwound. Nor can members recover the losses in productivity, innovation, and competition for top talent that will result from the Proclamation.

AAU's members, likewise, are hit hard by the Proclamation. Because they are not required to wait for the lottery, AAU members planned to submit petitions in the coming weeks and months on behalf of new H-1B workers to perform critical research, teaching, and other roles, including at medical centers. *See, e.g.*, CMU Decl. ¶ 13; Michigan Decl. ¶ 13; Minnesota Decl. ¶ 11; Pitt Decl. ¶ 13; Utah Decl. ¶¶ 7–8; WashU Decl. ¶¶ 9–10; UW-Madison Decl. ¶ 8. Universities are now in an impossible position: On the one hand, it would be difficult or impossible to forgo these workers, many of whom were supposed to fill jobs in 2026, including as early as the upcoming winter and/or spring semesters. *Id.* Depending on the roles H-1B workers are expected to fill, losing them would harm students, patients who rely on university hospitals for medical care, and both local communities and the American public, who would no longer benefit from innovative research driven by those individuals. For example, Washington University in St. Louis relies on clinical anesthesiologists from outside the United States due to a severe domestic anesthesiologist

shortage; because of the Proclamation, the university is currently holding on three H-1B petitions for such physicians. WashU Decl. ¶ 10; *see also* UW-Madison Decl. ¶ 10; Michigan Decl. ¶ 14. If the university cannot hire those physicians, it will mean longer wait times for patients and a "drastic[]" decrease in performed surgeries. WashU Decl. ¶¶ 10–11. And more broadly, the American public loses the benefit of the innovative research that would have been driven by H-1B workers at AAU member institutions, including in critical fields like nuclear engineering, robotics, and artificial intelligence. *E.g.*, Michigan Decl. ¶ 9; Pitt Decl. ¶ 8; Utah Decl. ¶ 8; UW-Madison Decl. ¶¶ 11, 16–17.

Yet on the other hand, AAU's members also cannot cobble together funding to pay the Proclamation's exorbitant fee, particularly not on a timeline that would avoid significant disruption and especially given the limits they face as non-profits. *E.g.*, WashU Decl. ¶ 11; Minnesota Decl. ¶ 19. To the extent universities could come up with the funds, it would come at an expense— requiring, for example, that they revamp existing budgets or reduce spending on other projects and goals critical to their missions. *See. E.g.*, UW-Madison Decl. ¶¶ 13–14; UIUC Decl. ¶¶ 17, 21–23. And relief later would not repair the damage inflicted. Even a one-year gap in filling H-1B positions would set back critical work: For example, at the University of Pittsburgh, it would compromise clinical-trial integrity and stall the development of potential life-saving medical therapies, Pitt Decl. ¶ 14; at the University of Michigan, it would undermine "core priorities" like "educational programs and financial aid support," Michigan Decl. ¶ 16; and at the University of Wisconsin-Madison, it would significantly hamper the school's research enterprise, UW-Madison Decl. ¶ 17.

It is thus no answer to say that universities and companies can simply pay the $100,000 fee to avoid irreparable harm. The Proclamation's stated purpose is to leverage the fee to change who U.S. employers hire. Having set out to deter employers from using the H-1B program, the government cannot now deny that the Proclamation will have its intended effect: United States

employers will seek fewer H-1B visas, incurring irreparable harm from the loss of all the benefits that H-1B visa holders bring. In particular, the Proclamation immediately damages members' ability to recruit talent, requires members to devote time and attention away from fulfilling their missions and towards reorienting to new staffing realities, and inhibits the innovation and gains to productivity that motivate members to participate in the H-1B program in the first place.

### A.    Recruiting talent.

The $100,000 fee will make it difficult to "recruit and retain employees," a well-recognized form of irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (quoting *TikTok Inc. v. Trump*, 490 F.Supp.3d 73, 83–85 (D.D.C. 2020); *see also, e.g.*, *Xiaomi Corp. v. Dep't of Def.,* 2021 WL 950144, at *12 (D.D.C. Mar. 12, 2021) (finding irreparable harm where employer "now faces difficulty recruiting and retaining top talent . . . an outcome with the potential to seriously harm its business"). The *entire purpose* of the program is to enable employers to recruit the employees they need, so that those employees can fill otherwise unfilled positions and help American companies and institutions of higher education continue to innovate, build, and serve their communities and the American public.

A $100,000 fee for H-1B workers will significantly hamper the ability of the U.S. Chamber's members to use the program to recruit and hire foreign talent. Many of the U.S. Chamber's members anticipate eliminating their use of the H-1B program entirely. *See* Shen Decl. ¶ 11; *see also id.* at ¶¶ 14-17. For example, U.S. Chamber member HJI Supply Chain Solutions, which had anticipated using the H-1B program this year to fill a critical role, can no longer do so if the Proclamation remains in effect. Daniels Decl. ¶¶ 8–10. Many others will sharply curtail use of the program relative to prior years. Shen Decl. ¶ 14; *see also id.* at ¶¶ 17, 19–20. For example, one member that ordinarily hires scores of H-1B workers in a normal year plans to hire only a handful. *Id.* ¶ 19. Another, which typically hires over 100 H-1B workers in a normal year, will now consider sponsoring H-1B petitions for only a small number of very senior roles, leaving it

unable to use the H-1B program to fill critical mid-level roles as planned. *Id.* ¶ 20.

These members compete in industries where there is a global marketplace for highly specialized skills, and thus they not only lose out on the employees they need to support their programs and missions but they will lose competitive ground to foreign competitors who do not have the same recruiting obstacle. Shen Decl. ¶ 19. Additionally, multiple U.S. Chamber members already have undertaken massive, resource-intensive workforce planning operations in an effort to triage anticipated H-1B positions, determine which few to continue filling under the program, and what to do with the rest (move overseas, leave unfilled, or eliminate). *Id.* ¶¶ 19-20; *see, e.g.*, *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.") (quotation marks omitted); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (affirming that "the loss of money" constitutes irreparable harm "if the funds cannot be recouped and are thus irrevocably expended.") (quotation marks omitted).

These effects of the Proclamation are immediate and ongoing. Although most members of the U.S. Chamber are subject to the H-1B cap and thus participate in the H-1B lottery, many already had begun their H-1B hiring and recruitment and have had to pause those efforts. Shen Decl. ¶ 16. Companies must start H-1B recruiting months ahead of the lottery because they cannot simply apply for a certain number of visas to be used at their discretion. *Id.* ¶ 8. Rather, the lottery requires a company to identify a specific individual for sponsorship—which, in turn, requires the company to recruit, screen, interview, and select the individual for the role it is attempting to fill. *Id.* Many more members expected to begin recruiting imminently but now are in limbo. *Id.* ¶ 16.

AAU's members suffer all these same harms when it comes to being forced to forgo H-1B recruitment and hiring—and the harm to recruitment is even more immediate because universities are not limited to the lottery. *See, e.g.*, JHU Decl. ¶ 9 (recruiting is "continual[]"); UIUC Decl. ¶ 14 (faculty recruitment begins a year in advance); Michigan Decl. ¶¶ 12–13 (international

recruiting happens outside lottery timeline). Absent the Proclamation, AAU's members would be filing H-1B petitions this fall to fill open positions as early as January and February 2026. Michigan Decl. ¶ 13; WashU Decl. ¶¶ 9-10; CMU Decl. ¶ 9. But now, in light of the Proclamation, many AAU members are "in a holding pattern" when it comes to their recruiting efforts. JHU Decl. ¶ 9; *see also* Utah Decl. ¶¶ 7–8. At the University of Utah, for example, the Proclamation has thrown recruiting and hiring across the university into "disarray." Utah Decl. ¶ 10. Because, for example, "[r]ecruiting international physician candidates can take several years from the initial contact," WashU Decl. ¶ 14, and "it can take more than one year to get a research laboratory ready for a new faculty member," UW-Madison Decl. ¶ 15, the setbacks from the Proclamation will have lasting effects that cannot be remedied by money damages in the future.

Moreover, even if Plaintiffs' members can fill some positions with domestic employees, the loss of the ability to fill them with the best candidates, as determined through the members' rigorous hiring processes, is itself irreparable harm. As one court explained in the context of an NFL labor dispute, "player transactions that will occur [absent equitable relief]—trades, free agent signings, and roster cuts of players under contract—will cause irreparable harm to the League . . . because it will be impossible to restore the status quo." *Brady v. Nat'l Football League*, 640 F.3d 785, 793 (8th Cir. 2011); *see also id.* (relying on "the harm that would be caused to the League by player transactions that would occur only" without a stay). Even if the Proclamation is later held unlawful, it will be impossible to unscramble that egg.

## B.    Diversion of resources and loss of productivity.

In addition, the imposition of a $100,000 H-1B visa fee will cause losses in innovation and scientific advancement. H-1B workers produce well-documented gains for companies in terms of innovation and efficiency, as measured by outputs like "patents" issued and "patent citations" made, as well as the ability to capitalize on business opportunities and "secure funding" from investors. Stephen Dimmock et al., *Give Me Your Tired, Your Poor, Your High-Skilled Labor: H-*

*1B Lottery Outcomes and Entrepreneurial Success* 68 Management Science 6950, 6970 (2021), https://perma.cc/X5D9-JYF8 (Hughes Decl. Ex. 27). H-1B workers are a "boon for businesses operating in fast-moving and competitive industries," bringing "language skills, cultural competency, and transnational personal networks" that foster international trade and "facilitate the international flow of knowledge." Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative 1 (Sept. 11, 2023), available at https://perma.cc/RUY2-GER6 (Hughes Decl. Ex. 21).

Plaintiffs' members who rely on the H-1B program face precisely these sorts of impending harm. For example, one U.S. Chamber member, GoRural, is a small company of only four employees that performs an essential public service by helping desperately understaffed rural healthcare facilities in Montana, Wyoming, and Idaho recruit workers in a variety of fields. Poser Decl. ¶¶ 1–2, 4. Recruiting essential personnel through the H-1B program is the "bread and butter" of GoRural's business model and accounts for approximately 50% of the company's revenue, which promises to dry up as a result of the Proclamation. *Id.* ¶ 9. Where "'the very existence of [a] business' is 'threatened,'" courts routinely find irreparable harm. *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Another U.S. Chamber member anticipates needing to cancel or downsize planned projects and will, at the very least, experience a significant slowdown in hiring and training and a corresponding diversion of management resources that will drag on productivity. Shen Decl. ¶ 17. Another U.S. Chamber member might need to leave dozens of positions unfilled (or move them overseas) causing reductions in productivity. *Id.* ¶ 19. These members are not just faced with imminent talent shortages that will diminish their operating capacity; rather, they already have felt the drag on productivity necessitated by needing to prepare for making massive, irreparable changes in their workforce strategy. *Id.* ¶¶ 20-21, 23-27.

AAU's members, likewise, will experience direct operational deficits as a result of the

Proclamation. Even if the Proclamation remains in place for only a year, its fee requirement will set back important teaching, research, and medical initiatives, with spillover effects on Americans who benefit from the work of H-1B visa holders.[14] *See, e.g.*, UW-Madison Decl. ¶ 17; Pitt Decl. ¶ 15; UIUC Decl. ¶¶ 17, 23. Those effects are starting to accrue now, as universities delay filing H-1B petitions due to the Proclamation. *E.g.*, Michigan Decl. ¶¶ 13–14; Utah Decl. ¶ 7–8.

These harms to a university's or business's ability to innovate, develop international trading relationships, and otherwise perform its work—and to a university's ability to fulfill its educational mission and pursue research advancements—further constitute irreparable harm. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57 (D.D.C. 2020) (collecting examples of "irreparable harm where agency action threatened to 'frustrate[]' organization's mission").

Additionally, even economic harms are irreparable where "a  plaintiff 'cannot recover damages from the defendant due to the defendants' sovereign immunity," making "'any loss of income . . . irreparable *per se*.'" *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (quoting *Feinerman v. Bernardi*, 558 F.Supp.2d 36, 50–51 (D.D.C.2008)); *see also, e.g., Whitman-Walker Clinic*, 485 F. Supp. 3d at 57 (collecting examples where the "economic injury at issue is unrecoverable" such "as in a case against a Government defendant where sovereign immunity will bar recovery") (quoting *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019)); *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that "loss of profits which could never be recaptured" constituted irreparable harm sufficient for

---

[14] Some H-1B workers perform research under federal grants. Although federal grantees are entitled by regulation to recover certain "allowable cost[s]" related to "[s]hort term visas," 2 CFR § 200.463(d), whether that would extend to the fees levied by the Proclamation is speculative at best. That is especially so because the Proclamation's $100,000 fee exists entirely outside the usual statutory and regulatory scheme for H-1B visa fees. Even if such costs could be sought in connection with a federal grant, seeking them could prejudice grant applications by artificially inflating costs and would decrease the amount of funding available for research. As such, reimbursable or not, the fee represents a major barrier to the recruitment of H-1B workers.

equitable relief). The Supreme Court recently ended any debate on this question, holding in no uncertain terms that "funds" that "'cannot be recouped' and are thus 'irrevocably expended'" constitute irreparable harm, full stop. *Nat'l Insts. of Health*, 145 S. Ct. at 2659.

All these harms are exacerbated for the Chamber by the fact that the ability to hire H-1B workers for many of its members is tightly limited by the lottery process. Most of the U.S. Chamber's members have *one* chance *per year*, through the lottery, to take advantage of the program. If they are unable to participate, or must scale back participation, they have no opportunity to hire those lost H-1B workers until the next year. That represents a lost year of employee recruitment and retention, and a lost, unrecoverable year of innovation and business opportunity, compounding the harms listed above—even if relief eventually does come in the future vacatur of the $100,000 fee. *Cf. Giri v. Nat'l Bd. of Med. Examiners*, 718 F. Supp. 3d 30, 44 (D.D.C. 2024) (ability to participate in future years' medical resident match program did not ameliorate harm of being unable to participate in that year's program).

## III.    THE REMAINING EQUITIES FAVOR RELIEF.

Finally, the remaining equities of harm to the government and the public interest—factors which in this context "merge" (*see Nken,* 556 U.S. at 435)—strongly weigh in favor of relief.

For one thing, the public interest always favors the executive acting within its statutory authority rather than straying beyond it, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Harris v. Bessent*, 775 F. Supp. 3d 86, 99 (D.D.C. 2025) (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); *see also id.* ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

Indeed, Congress has been very clear about how it views the balance of public interests with respect to the H-1B program: "Many of the concerns about H-1B visas revolve around the

fear that individuals entering on H-1B visas will 'take' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed." S. Rep. 106-260, at 11–12. Congress already made a considered judgment about the risks versus rewards of creating nonimmigrant visas and calibrated the program to maximize the public benefit.

And, as detailed above (*see* 8–12, *supra*), those congressional findings are amply supported by decades of research on the H-1B program, which has found, time and again, that the presence of H-1B workers creates better-paying jobs for native workers,[15] sparks innovation that fuels economic growth and creates tremendous value for American companies,[16] and improves the Nation's trading relationship with the rest of the world,[17] among many other documented benefits. Plaintiffs' members experience this on a daily basis. To preserve all that H-1B workers contribute to the national economy, preliminary injunctive relief is vital.

## CONCLUSION

The Court should preliminarily enjoin enforcement of the Proclamation against Plaintiffs and their members. Alternatively, it should grant summary judgment and issue permanent relief.

---

[15]  Ex. 13 at 25 ("H-1B hires seem to crowd-in other workers, such as non-college workers of all nativities, as lottery-winning firms *expand* their usage of workers outside of the immigrant college group.").

[16]  *See, e.g.,* Nat'l Acads. of Sci., Eng'ng, and Med., *The Economic and Fiscal Consequences of Immigration*, The National Academies Press 6–7 (2017), https://perma.cc/JU7U-LVJ2 (Hughes Decl. Ex. 22) ("[I]mmigrants raise patenting per capita, which ultimately contributes to productivity growth. The prospects for long-run economic growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants."); Ex. 14 at 22 (documenting how "H-1B workers contribute to firm value creation" through forces including "innovation" and "enhancing operational efficiency"). Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation, Cato at Liberty* (May 14, 2020), https://perma.cc/SMW4-UUJT (Hughes Decl. Ex. 23) ("H-1B workers have an especially big impact on American innovation. . . . Highly skilled migrants on H-1B visa[s] . . . directly increase the production of knowledge through patents, innovation, and entrepreneurship.").

[17]  Ex. 21 at 1 ("[P]articipation of foreign-born workers in the American labor market has a positive effect on American trade with foreign nations.").

Dated:  October 24, 2025

Respectfully submitted,

/s/ *Lindsay C. Harrison*
Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of*
*American Universities*

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)*
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)*
Emmett Witkovsky-Eldred (Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce*
*of the United States of America*

*\* pro hac vice to be filed*