IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>                  Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>                  Defendants. | Case No. 1:25-cv-3675-BAH |

**DECLARATION OF CONDRAD DANIELS**

I, Condrad Daniels, declare as follows:

1.　I am the President of HJI Supply Chain Solutions (HJI). I have worked at HJI since 2001. HJI is a member of Plaintiff organization the Chamber of Commerce of the United States of America (U.S. Chamber). I make this declaration based on my own personal knowledge. If called as a witness, I could and would testify competently to the matters set forth herein.

2.　HJI is based in Louisville, Kentucky and has provided supply chain logistics services to leading corporations since 1994. HJI regularly employs between 300 and 400 workers and is recognized as one of the largest woman/minority-owned third-party logistics companies in Kentucky. Nonetheless, HJI remains smaller than some other competitors, requiring it to stay nimble and perform certain engineering tasks in-house to compete. HJI provides services as a Tier 1 and Tier 2 supplier (meaning that it supplies end-user companies both directly and indirectly), supply chain warehousing, and logistics expertise to clients in a variety of industries, including

automative, food & beverage, consumer goods, and healthcare, all while integrating seamlessly across diverse supply chains. Our company prizes and depends on innovation to remain competitive in a global marketplace.

3. Some of HJI's core service areas include ecommerce order fulfillment, subassembly, and manufacturing services, which our corporate clients use HJI as the third-party service provider to complete. This work depends on technical expertise, particularly in the fields of engineering and automation. Our large and diverse workforce includes many key roles whose responsibilities require advanced scientific and technical knowledge.

4. During my tenure at HJI, the company has previously hired at least one H-1B employee in our corporate office, and we have sponsored the H-1B application of another. In my experience, the H-1B program has been helpful for allowing HJI to identify and recruit qualified candidates who allow the company to perform its work and serve its clients. We have been willing to pay existing H-1B visa fees, and undergo the H-1B lottery and petition process, because the benefits we receive from the program in terms of being able to hire a qualified labor force have been worth the time and expense.

5. I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation). I understand that the Proclamation would restrict from entry into the United States in H-1B status any noncitizen whose initial H-1B petition, filed after the effective date of the Proclamation, is not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions.

6. HJI has an open Integrations Engineer position that we have advertised for several months and have tried to fill with U.S.-based workers, without success. This position is located in Louisville, Kentucky and falls within our growing information technology (IT) team. Core responsibilities for the role include, among many others, developing integrations between our internal and third-party systems, working across departments to implement new systems and enhancements

that improve our productivity and service, and serving as a liaison between internal users and external vendors to ensure smooth data flow and system performance. Required qualifications for this role include a bachelor's degree in computer science, information systems, or a related technical field, 1-3 years of experience in a similar role, and familiarity with the various system communication protocols, database and scripting/query tools, and business applications that the IT team regularly uses. Filling this position with an experienced, well-qualified individual is very important to our company's success and ability to remain competitive within the industry.

7. After months of searching through the typical channels, we have been unable to locate a qualified candidate for the Integrations Engineer position. Most applicants lack the right skill, experience, talent, and education to be successful in this role.

8. Prior to the issuance of the Proclamation, we could have more specifically tailored our search and advertised explicitly our willingness to sponsor H-1B candidates for the role, which we understand would have exposed the role to additional H-1B candidates. Given the unique training, skills, and experience necessary to perform the job, H-1B workers are an important extension of the labor pool for this engineering role.

9. Despite our interest in considering H-1B workers for the Integrations Engineer role, that will not be possible if there is a $100,000 fee for completing an H-1B petition. If there were a financial investment of a few thousand dollars in H-1B filing fees, we would pursue an H-1B worker. But it would be impossible for a company of our size and resources to invest $100,000 in a single engineer position.

10. The imposition of a $100,000 fee puts HJI in a very difficult position. If we could use the H-1B program, then we would immediately begin recruiting from that pool of prospective candidates. But it is no longer possible to consider H-1B candidates if we must pay $100,000 to access a single engineer. As long as the $100,000 fee remains in place, we are deprived of the opportunity to recruit from this pool of candidates and will miss out on top talent. Moreover, even

3

if we were to make an offer conditional on the invalidation of the $100,000 fee, many employees would be unwilling to accept a job offer on these terms, given the risk that the $100,000 fee will remain in effect and we will be unable to sponsor their visa

11.     As our experience has shown, however, we are unable to fill this position with a well-qualified U.S.-based worker. If the $100,000 fee remains in effect, it is likely this role will simply go unfilled or, at best, we will have to hire a less experienced, less specialized candidate who is not optimally suited for the role.

12.     Either result will be damaging to HJI. Leaving the position unfilled will mean suffering a serious talent gap that will disrupt our operational approach. That disruption will mean direct losses in productivity, delays in program implementation, and drags on other portions of our workforce and operations as we expend additional time, effort, and company resources to reorganize in light of having to forgo an anticipated position. This vacancy exists for a reason: The company has an identified staffing need, and filling that role with a qualified candidate is important to executing on our operational vision.

13.     Without the H-1B program, the only alternative to leaving the role unfilled—and encountering the harms described above—is to fill the position with a candidate who is less experienced or less specialized. We are seeking to use the H-1B program because, despite attempting to hire for this role domestically, we have been unable to identify a qualified candidate. Having to settle for a candidate who is not well-suited for this role directly dilutes the quality of our labor force. It will mean encountering much greater ramp-up burdens and, accordingly, a longer time to achieve the productivity we anticipate gaining from filling this role. It will, likewise, result in an unanticipated diversion of additional staff resources to train this new employee, and, accordingly, a delay in overall effectiveness and slower timelines all around. Even then, bringing in a less qualified candidate increases the risk that the candidate will be unable to perform to expectations, such that we would need to begin the job search from scratch.

14. As a small-to-midsize company, we depend on speed to compete in our industry. The direct productivity losses suffered by either leaving the position unfilled or filling it with a candidate lacking the proper skills and expertise will mean losing ground to our competitors. These harms are a direct, foreseeable consequence of the $100,000 fee imposed by the Proclamation. We want to use the H-1B program, but because of the fee that is not a viable option, and we will forgo use of the program for that reason alone. If the $100,000 fee is eliminated, HJI will pursue hiring an H-1B employee to fill the Integrations Engineer role. As things currently stand, however, HJI is unable to participate in the program.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 10/22/2025 | 11:55:38 PM CDT
Louisville, Kentucky

Signed by:
*Condrad Daniels*
BE33AE38FE9D424...

Condrad Daniels