# EXHIBIT 19



U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

December 22, 2023

Chief Charles L. Nimick
Business and Foreign Workers Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
5900 Capital Gateway Drive
Camp Springs, MD 20746

Re:     Notice of Proposed Rulemaking, U.S. Citizenship and Immigration Services;
Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and
Program Improvements Affecting Other Nonimmigrant Workers (88 Fed. Reg.
72,870-72,963, October 23, 2023)

Dear Chief Nimick:

The U.S. Chamber of Commerce submits the following comments on the above-referenced notice of proposed rulemaking ("NPRM" or "proposal").  The Chamber appreciates the opportunity to comment on this proposal as U.S. Citizenship and Immigration Services ("USCIS") seeks to address several issues in this rulemaking effort. While the proposal would make several changes that companies welcome, there are many problematic provisions that would cause significant harm to American businesses should they be finalized in their current form.

Given the varied and disparate issues that USCIS is seeking to address in this proposal, we urge the agency to either bifurcate or issue multiple final rules to implement the contents of this NPRM.  Of critical importance to our members is the promulgation of a final rule regarding the proposed changes to the agency's H-1B registration process. This is very important to our members, as the H-1B cap season is set to begin in a little over two months.  Employers must know what is to be expected of them regarding the registering of their prospective employees into the USCIS' registration system. We urge the agency to address this issue separately and expeditiously to provide all potential companies that are seeking cap-subject H-1B employees with the information they need to make the best workforce planning decisions for their businesses in the weeks to come.

The proposal contains many positive developments. USCIS' desire to provide additional certainty to international students that are seeking H-1B visas in the U.S.

would be a welcome policy change. Similarly, businesses support the proposed flexibility for worker start dates, the codification of deference policies, and allowing entrepreneurs and start-ups to seek H-1B visas for individuals with ownership interests in the petitioning employer.

Unfortunately, many Chamber members view the beneficial provisions in the NPRM as being greatly overshadowed by many others that will cause significant disruptions to their operations. These concerns are shared by many U.S. companies across a host of industries. The problematic issues our members raised concern the provisions that arbitrarily narrow the definition of "specialty occupation," the text that revives the prior administration's unlawful "non-speculative employment" requirement for H-1B workers, the profound and arbitrary changes to the compliance burdens associated with the third-party placement of H-1B workers, expanded site visit authorities, and the broadening of USCIS' authority to review Labor Condition Applications ("LCAs") when that responsibility belongs to the U.S. Department of Labor.

These provisions are unlawful and should they be finalized in their current form, USCIS would fall far short of meeting its stated goals of streamlining the H-1B program, making the H-1B program more efficient, or providing greater benefits to petitioners and beneficiaries.[1] To that end, these provisions would also hinder the administration from pursuing its goals on attracting the type of talent needed to further safe, secure, and trustworthy development of Artificial Intelligence capabilities in the U.S.[2] As such, we strongly urge USCIS to issue supplemental Federal Register notices that will either withdraw the consideration of these specific provisions or, alternatively, propose substantial changes to these provisions that cure the various legal deficiencies with them and provide the public with an opportunity to provide further comments on the revisions made to these revised regulatory proposals.

## Comments on Proposed Changes to H-1B Registration Process

The U.S. Chamber is encouraged by USCIS' desire to craft changes to the H-1B registration system that place more focus on the H-1B beneficiaries. Given the issues that arose earlier this calendar year for the FY24 H-1B registration process, we understand the agency's desire to prevent the opportunity for stakeholders to unfairly "game" the registration process. While many employers appreciate the agency's approach to the issue of H-1B registration, they have been adamant with us that this proposal could benefit from further refinements. We urge the agency to consider including the types of changes below into a finalized rule that focuses solely on updates to the registration process, with the idea being that such a rule becomes

---

[1] 88 Fed. Reg 72870, 72871 (Oct. 23, 2023).
[2] Exec. Order 14410, 88 Fed. Reg. 75191, 75204 (Nov. 1, 2023).

effective in time for the forthcoming registration period that is set to begin in March 2024.

*Modifications on Typographical Errors and Payment Processing Requirements Can Provide Additional Certainty for Employers*

Current H-1B regulations provide USCIS with the ability to deny and revoke an H-1B petition for statements that are "inaccurate, fraudulent, or misrepresented a material fact."[3] USCIS intends to apply similar requirements and the concomitant penalties of denial and revocation into its registration process through this NPRM.[4] No company takes issue with the idea that the commission of fraud or the willful misrepresentation of material facts would warrant a denial or revocation. However, the manner in which USCIS has constructed these new requirements provides no flexibility in instances where a petitioning employer makes a harmless, unintentional error in the filing of the registration on behalf of the beneficiary, let alone provide the employer with an opportunity to cure the defect in the registration.

Given that USCIS is trying to import the same requirements for employers into the registration process that it imposes upon employers during the filing of the formal H-1B petition, it stands to reason that USCIS would be wise to provide the types of opportunities that it gives employers to correct typographical errors (e.g. misspelling of a beneficiary's name, omitting or adding an extra digit in a putative beneficiary's passport number) that it gives to employers when the agency issues a Request for Evidence ("RFE") or when an employer requests to amend the petition while it is pending before the agency. In proposing to give USCIS the authority to automatically deny or revoke an H-1B petition due to inaccuracies contained within a registration, USCIS is not allowing the petitioner the same opportunity to correct these sorts of typographical errors. As such, we urge USCIS to amend its proposal and provide petitioning employers with the ability to ameliorate these types of problems when it provides the correct information to the agency and the employer satisfactorily shows that the inaccuracy in the registration was unintentional. This could be accomplished either through providing employers with the ability to cure these issues in the registration itself or when the petitioner files the formal petition.

Similarly, companies have informed us of difficulties that they have encountered when using the U.S. Treasury Department's "pay.gov" website to pay the required H-1B registration fees. During the FY24 registration period, this website crashed multiple times due to the significant user demand to complete the H-1B registration process. Given that the "pay.gov" website does not currently provide petitioning employers with a receipt notice on whether the payment has transferred to

---

[3] 8 CFR §§ 214.2(h)(10)(ii), (h)(11)(iii)(A)(2).
[4] See proposed 8 CFR § 214.2(h)(8)(iii)(D)(i), 88 Fed. Reg. at 72961 (Oct. 23, 2023).

the federal government, it leaves the employer and their potential workers with no clarity on whether their registration has been properly completed.

The proposed regulatory text regarding registration fee payments only provides USCIS with the authority to deny and revoke H-1B petitions when the fee payments are not effectively made and sets forth that the fee itself is due at the time the registration application is submitted.[5] There are many legitimate reasons as to why an H-1B registration payment might not be timely processed outside the context of the website crashing; credit card numbers can be improperly entered into the system, the credit card company may place a hold on the account for security reasons, among others. For those reasons, USCIS should provide some flexibility to petitioning employers to rectify any potential problems that might occur with the processing of these payments. The types of changes the agency should incorporate into these provisions include:

- USCIS providing some form of notification to the petitioning employer alerting them of the payment's status, whether it has been completed, it remains pending, or if it has been rejected;
- In the event of a rejected payment, providing the employer a reasonable amount of time (10 business days) to address any issues regarding the payment of the registration fee.

*Unworkable "Legitimate Business Need" Requirements Should be Abandoned*

The proposed text concerning "related entities" has the potential to create significant problems for both employers and prospective H-1B workers and should be abandoned. Specifically, these provisions would require USCIS adjudicators who suspect that the "related entities" (including, but not limited to, a parent company, subsidiary, or affiliate) may not have a "legitimate business need" to file more than one H–1B petition on behalf of the same alien. If an adjudicator reaches that conclusion, he or she is authorized to deny/revoke **all** the petitions for that beneficiary and invalidate **all** the corresponding registrations on behalf of the beneficiary, not just those filed by the petitioning employer.

In our view, USCIS' beneficiary-centric approach in the NRPM makes these proposed changes unnecessary. By grouping all the registrations that a putative beneficiary may have filed on their behalf, that measure is sufficient to avoid the type of alleged "gaming" that USCIS found abhorrent in last year's registration period. To that end, the proposal poorly defines the terms "related entities" and "legitimate business need," thus providing very little in the way of clear standards for employers to adequately understand the requirements being imposed upon them.

---

[5] See proposed 8 CFR §214.2(h)(8)(iii)(D)(ii), 88 Fed. Reg. at 72961 (Oct. 23, 2023).

Relatedly, these poorly defined terms provide very little in the way of guidance to USCIS adjudicators who are charged with enforcing these terms. The lack of clarity provides adjudicators with significant latitude to determine whether a) two companies are "related entities" and b) if either of those firms has shown a "legitimate business need" to hire the potential H-1B beneficiary. Mind you, the relevant text included in the proposal says that if an individual who has multiple registrations/petitions filed on their behalf and one of the related entities has not provided sufficient proof to establish a "legitimate business need" to hire the individual, all the registrations and petitions can be revoked by USCIS.[6]

If an individual has three registrations filed on their behalf and one of the potential petitioners fails to meet the threshold of showing a "legitimate business need" for the worker, it does not stand to reason why the other two registrations that can illustrate such a need must be at risk of denial and revocation. The mere possibility of USCIS exercising government power in such an arbitrary manner is very concerning to many Chamber members, particularly given that the term "related entity" is so poorly defined that the agency could interpret this term in a manner that is broader than the explicitly stated understanding of a "parent company, subsidiary, or affiliate."[7] Given these concerns, we urge USCIS to delete all of the language contained within the proposed changes to 8 CFR § 214.2(h)(2)(i)(G) that concerns related entities.

*USCIS Can Better Balance the Interests of Employers and Employees During the Newly-Configured Registration Process While Still Achieving its Stated Goals*

One of USCIS' stated goals in implementing a more beneficiary-centric H-1B registration system is to provide the putative beneficiary with greater bargaining power over the employers that are seeking to employ him/her.[8] We agree with the agency insofar as the proposed changes to the registration system would provide greater leverage for the beneficiary regarding potential contract negotiations. However, in seeking to provide further bargaining power for beneficiaries, the structure of the new registration system has significant shortcomings that will limit the overall efficiency of the H-1B registration process. These shortcomings will not only harm employers by imploring to them file many H-1B petitions for workers they will likely not be able to hire, but will also force USCIS into a situation where they are voluntarily choosing to expend scarce agency resources to process several petitions for many job opportunities that the foreign national will never take. We urge USCIS to

---

[6] 88 Fed. Reg. at 72938 (Oct. 23, 2023).
[7] *Id.*, at 72958.
[8] 88 Fed. Reg. at 72899 (Oct. 23, 2023).

consider the ideas listed below to prevent these suboptimal outcomes from becoming a reality.

One key shortcoming associated with the newly structured registration system is the lack of any means to alert employers when a putative H-1B beneficiary has multiple registrations filed on his/her behalf. In this manner, the reforms proposed to the registration system puts good faith employers into a situation where they have made significant investments into these individuals, oftentimes employing for a period of time on an F-1 student visa with Optional Practical Training (OPT). At the very least, employers in these situations should be provided with some form of notification that the individual they are seeking to employ has other companies that have similar interests in hiring that individual.

To the extent that USCIS wants to promote the interests of the workers in these circumstances, employers with the knowledge that their desired workers are considering other options are employers that are more likely to engage in the types of activities needed to compete and win over that individual to accept their job offer. USCIS should amend its proposal to provide employers in these situations with timely notice of whether the beneficiary has more than one employer that filed a registration for him or her. In this regard, no company is seeking to undermine the ability of the beneficiary to negotiate between multiple job offers available to them. All businesses are asking for in these circumstances is to be provided with the requisite knowledge needed to make informed decisions in these situations. This could be provided to the employer through the selection notification that is sent to them following the close of the registration period.

The need for employers to be provided with this type of knowledge becomes incredibly important when one considers that the agency's proposed changes will allow multiple companies to file a formal H-1B petition on behalf of the same individual. There are various potential fact patterns one can contemplate where USCIS will have approved multiple petitions on behalf of a single individual, which may vary both in terms of the approval dates of the petitions, as well as the date upon which employment will commence.

This state of affairs will likely confuse employers if USCIS declined to clarify and codify that each approved H-1B petition is valid, and that the date of filing, the date of adjudication (benefiting those filing with premium processing), or the requested start date (for those chosen in later selections) will not negatively impact the validity of an approved H-1B petition. In addition, the agency should acknowledge that beneficiaries in these situations may commence work under any of the approved petitions, even if another petition in the same H-1B filing period is subsequently approved.  These suggestions will not only provide more certainty to businesses, but

they will also fulfill the agency's stated desire to provide H-1B beneficiaries with more negotiating power over the terms of their employment in the U.S.

## Businesses Appreciate Additional Flexibility for International Students

Chamber members greatly appreciate USCIS' proposal to increase the level of certainty for F-1 students regarding their work-authorized status as they undergo the process of obtaining an H-1B visa. Historically, international students have experienced gaps in their status and work authorization due to circumstances outside their control, including agency processing delays, unforeseen family issues that have required them to leave the U.S. while their petitions are pending, and multiple registration lotteries pushing H-1B cap adjudications past the start of the fiscal year. USCIS' decision to automatically extend the employment authorization for an additional six months, from October 1 to April 1 of the following calendar year,[9] will minimize the potential for business disruptions caused by the previously cited issues. Given the significant workforce challenges that many H-1B employers are facing today, companies will benefit from the additional operational certainty that employers will obtain as their employees change status from F-1 to H-1B.

## New Options for H-1B Entrepreneurs are a Welcome Development

The Chamber thanks USCIS for including an explicit regulatory authorization for entrepreneurs to obtain H-1B visas through petitions filed by their start-up businesses. The Chamber has repeatedly called upon USCIS to craft these types of policies in the past and the agency's actions will provide start-up businesses across a host of industries with more certainty regarding their U.S.-based operations. However, we believe the agency's sensitivity to potential fraud within the system being perpetrated by beneficiary-owned businesses is overblown and the proposed treatment to these specific stakeholders is unwarranted.

To address alleged integrity concerns, USCIS proposes to cut the validity period in half for both the initial approval of the H-1B petition, as well as the first extension of the beneficiary's H-1B status. These actions needlessly pick on smaller businesses that, in most cases, will have less resources at their disposal to comply with the H-1B program's requirements.[10] Put another way, these companies will have to apply for twice as many petitions in the beneficiary's initial 3-year period of stay, whereas competing firms that have no beneficiary ownership will only need to apply for an H-1B worker once during the same period. The tools USCIS has available to review the petition, including the I-129 and the accompanying supplemental forms, as well as the ability to request RFEs from the petitioning employer, are more than adequate

---

[9] 88 Fed. Reg. at 72886.
[10] See Proposed 8 CFR §214.2(h)(9)(iii)(E); 88 Fed. Reg. at 72962 (Oct. 23, 2023).

guardrails to prevent potential fraud being committed by either the individual foreign national entrepreneurs or the businesses they own. There is no compelling reason for USCIS to impose this type of disparate treatment upon certain employers simply because they have H-1B beneficiaries that have an ownership stake in the petitioning company. The Chamber urges USCIS to withdraw these limitations and provide equal treatment to entrepreneurs and start-ups with regard to the temporal limitations that are being proposed the initial grant and the first extension of H-1B status for individuals in these situations.

### The Codification of Deference Policies Represents a Positive Step, but Further Action is Needed to Realize the Full Benefit of This Policy Change

In the NPRM, DHS proposes to codify the "deference" policy, under which USCIS gives deference to its prior determination of eligibility when adjudicating a Form I-129 involving the same parties and underlying facts. The Chamber welcomes this development, as this deference policy had long been a facet of U.S. immigration law. Its lack of codification in the Code of Federal Regulations caused significant business disruptions to many companies when this policy was temporarily rescinded in 2017, thus there is a clear need to bolster this policy through the promulgation of regulations.

The concerns that many Chamber members have expressed over the utility of codifying this agency deference to prior decisions is the interplay it will have with any changes that USCIS is proposing to fundamentally change the definition of the term "specialty occupation." For the many reasons stated below, the Chamber is incredibly worried about the substantial business disruptions that will occur if USCIS moves forward in restricting the specialty occupation definition and we hope the agency rethinks instituting those changes regulatorily. With specific regard to the interplay of the specialty occupation definition and these deference policies, there is a natural tension between the two. The agency cannot simply defer to a prior decision if their job no longer qualifies as a specialty occupation.

The deference policy codification will not promote certainty and efficiency in USCIS' decision-making process if the agency changes the rules for tens of thousands of individuals who have been caught up in the immigration process for years. This will cause serious harm to our member companies, their employees, and the employees' family members, all of whom have relied upon these long-standing definitions. Many businesses across a host of industries are worried about the chaotic situation that would arise if the deference policies do not provide protections for their long-term workers that have been on their payrolls for years.

Outside of abandoning the specialty occupation changes altogether, which we suggest below, it is imperative that any deference policy codification does not apply any new H-1B eligibility criteria upon individuals and their families who have been living and working in the U.S. prior to the promulgation of those new standards. The new standards and their interplay with any codified deference policies should only apply to foreign nationals on a going-forward basis. Put another way, any new H-1B eligibility criteria should only apply to individuals whose initial H-1B petition was filed after the promulgation of a final rule and given that individuals will be relying upon current program requirements between now and then, it would behoove the agency to delay the implementation of those requirements by at least six months. This will provide stakeholders with time to get accustomed to the new requirements and adjust their business practices accordingly.

We also respectfully request that USCIS clarifies how a codified deference policy would apply to scenarios involving more than one immigration agency. Many Chamber members raised this concern in the context of the blanket L-1 visa application process.  When an employee receives an L-1 approval at a U.S. consulate abroad, the employee and their employer experience major disruptions if USCIS issues a Request for Additional Evidence (RFE) on their extension application.  Additional clarity in this area regarding how USCIS evaluates applications involving the same parties and facts could reduce burdens on employers and their employees.

## Start Date Flexibility Increases Business Certainty

The Chamber welcomes the additional flexibility that this proposal would create for an H-1B worker's start date. Processing delays and a registration selection process that stretches past October 1 have oftentimes created challenges with H-1B employees' start dates.  The Chamber has heard from many members that have dealt with petitions that USCIS failed to adjudicate until after the requested October 1 start date, which leaves both the company and the beneficiary short-changed as their validity period is not for the full period that was sought in the petition. As USCIS considers its options for finalizing these provisions in the rule, we ask that the agency explicitly provide start date flexibility in situations where a requested validity period ends before the petitioner receives the approval notice.

## Redefining the "Specialty Occupation" Definition is Unwise, Unlawful, and Will Cause Significant Business Disruptions for U.S. Companies

*The INA Does Not Provide USCIS with the Authority to Impose Its "Directly Related" Degree Requirement*

USCIS' proposed changes to the specialty occupation definition contains two incredibly troubling provisions that will have a profoundly negative impact upon H-1B employers across a host of industries.  First, the NPRM would upend the longstanding definition and agency practice of determining what is a "specialty occupation," specifically that the degree that a putative beneficiary has "must be directly related to the position" for which he or she will be hired.[11] Secondly, USCIS will limit what types of employment opportunities will qualify as a specialty occupation if the job only requires the attainment "of a general degree" to perform the job duties.[12] USCIS cited degrees in fields such as business administration or liberal arts, that, without further specialization, would be insufficient for that position to qualify as a "specialty occupation.[13]

The new requirement that an H-1B applicant's degree "must be directly related to the position" takes the longstanding restriction on "general degrees" to new heights that are completely detached from the statutory text of the Immigration and Nationality Act ("INA"). The proposed rule would effectively require that a petition in fact identify a "subspeciality" within a broader field of study to qualify for an H-1B visa, which, if such a change were to be implemented, would be tantamount to USCIS rewriting the INA through a regulation. The statutory text does not impose such a requirement upon employers.

The INA's degree requirement is clear—a position qualifies as a specialty occupation if it requires "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)."[14] A "specialty" is "[a] special subject of study or research; the branch of scholarly, scientific, or professional work in which one is a specialist."[15] This definition is sufficiently expansive to capture degrees in, for example, engineering, physics, and mathematics without further sub-specialization, but to the exclusion of generalized degrees like "liberal arts."

The specialty-occupation provision evolved directly out of the INA's definition for "profession." Under the H-1B visa classification's predecessor, which covered "aliens of distinguished merit and ability," "members of the professions within the meaning of [8 U.S.C. § 1101(a)(32)] [were] classifiable as aliens of distinguished merit and ability."[16] When Congress amended the INA, replacing the "distinguished merit

---

[11] *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers*, 88 Fed. Reg. at 72,870 72,959 (Oct. 23, 2023) (proposed 8 C.F.R. §214.2(h)(4)(i)(B)(iii)).

[12] *Id.*

[13] *Id.*

[14] 8 U.S.C. § 1184(i)(1)(B).

[15] *Specialty*, Oxford English Dictionary.

[16] 51 Fed. Reg. 28,576, 28,578 (Aug. 8, 1986).

and ability" category with the "specialty occupation" classification, legacy Immigration and Naturalization Service made clear that "[t]he definition and standards for an alien in a specialty occupation mirror the Service's current requirements for aliens who are members of the professions," and its rule would merely "change all references to 'profession' to 'specialty occupation' and . . . specify the same standards for qualifying as an alien in a specialty occupation that were indicated for an alien who is a member of the professions under existing regulations."[17] Thus, the history of "profession's" meaning directly informs that of "specialty occupation" under the INA today.

The understanding of the federal government's view on the term "professions" include "architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries."[18] Like USCIS's definition for "specialty occupation," the Service further defined "profession" as

> an occupation which requires theoretical and practical application of a body of highly specialized knowledge to fully perform the occupation in such fields of human endeavor as: architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts. . .. [and] requires completion of a specific course of education at an accredited college or university, culminating in a baccalaureate or higher degree in a specific occupational specialty, where attainment of such degree or its equivalent is the minimum requirement for entry into the profession in the United States.[19]

In response to a commenter's request that the Service remove the phrase "in a specific occupational specialty" (as well as the word "specific" from "specific course of education"), the Service clarified how the phrase constrained the definition of "profession." It said,

> Acceptance of this recommendation would be a significant change in the Service's definition of a profession. Such a change would mean that any field in which a college or university grants a degree would become a profession. From the examples listed in the statute, the Service does not believe that Congress ever intended such a broad interpretation of the term "profession."[20]

Thus, "specific occupational specialty" referred to the fields listed under the statutory definition for "profession," including (among others) architecture, engineering,

---

[17] 56 Fed. Reg. 31553-01, 31,554 (July 11, 1991).
[18] 8 U.S.C. § 1101(32); *see also* Act of Oct. 3, 1965, Pub. L .89-236, 79 Stat. 911, 917 (setting out the same definition).
[19] 55 Fed. Reg. 2,606-01, 2,634 (Jan. 26, 1990).
[20] *Id.* at 2,609.

mathematics, education, and similarly "specialized" fields. What it precluded was the sort of general knowledge one would acquire through a "liberal arts" degree.[21]

It is incredibly important to acknowledge this foundation for the definition of "specialty occupation" because the new proposed limitations that would require a beneficiary's degree to be directly related to the position imposes a restriction that does not exist within the statutory text of the INA. In this proposal, USCIS seeks to leverage its historic position of precluding "general" degrees to shoehorn in other types of positions, particularly those that the agency has long held as both "professions" and "specialty occupations" that will now be precluded from qualifying as a specialty occupation like engineering. Under this proposed construct, a position must expressly require a degree in a further "subspecialty" like "chemical engineering" in order for an individual to qualify for an H-1B visa.[22] The proposal provides other examples where degrees in business administration would be insufficient to prove that the job position a prospective H-1B worker is seeking is a specialty occupation because that type of degree does not provide the specialized knowledge needed to perform the job.[23]

These new restrictions are vast changes to the H-1B program that courts have found to be inconsistent with the statutory text of the INA. In *InspectionXpert Corp. v. Cuccinelli*, the court considered whether to set aside USCIS's denial of an H-1B visa petition because the petitioner had not proven that the position—a "Software Quality Assurance (QA) Engineer"—normally required a degree in a specific specialty. In that case, USCIS sought to impose the same "specialty occupation" definition changes being proposed in this NPRM, albeit through implementing these stricter standards through individual adjudications. The court held that "the Decision require[d] a subspecialized degree," which was "contrary to the governing statute and the Agency's past practices."[24]

As the court explained, "the INA defines professions—the basis of the H-1B Regulation's specialty occupation requirement—at the categorical level (e.g., 'lawyers' and 'teachers,' rather than 'tax lawyer' or 'college English professor') and specifically includes 'engineers.' . . . [I]n contrast to a liberal arts degree, which the Service deemed 'an [in]appropriate degree in a profession' because of its 'broad[ness],' an engineering degree requirement meets the specialty occupation degree requirement."[25] USCIS appears content to double down on this flawed reasoning, as

---

[21] *See id.* (refusing to broaden the definition of "profession" to recognize a liberal arts degree "for the same reasons that it oppose[d] deletion of the requirement of a degree in a specific occupational specialty").

[22] 88 Fed. Reg. at 72,876; *see also id.* at 72,876 n.24

[23] *Id.* at 72,875.

[24] *InspectionXpert Crop. v. Cuccinelli,* 2020 WL 1062821,at 26.

[25] *Id.* (quoting 55 Fed. Reg. 2,606, 2,609 (Jan. 26, 1990)).

its proposed rule repeats the very same error it made a few short years ago regarding its misplaced treatment of engineering degrees.[26] The agency cannot propose regulatory changes that clearly conflict with the INA, which is exactly what this "directly related" requirement does.

*USCIS' proposed changes to "specialty occupation" definition are arbitrary and capricious*

The proposed changes to the "specialty occupation" definition are arbitrary and capricious. The proposal fails to consider the likely harmful impacts these changes will have on many types of American employers, their H-1B employees, and the family members of the H-1B workers that are living in the U.S. To that end, the proposal does not even attempt to account for the reliance interests that H-1B employers, H-1B workers, and the immediate family members of the H-1B visa holder have formed over many years.

The proposal would not only significantly curtail the ability of many foreign nationals from obtaining H-1B visas to come into the U.S. in the future; it would also put a shot clock on tens of thousands of long-term residents in the U.S. from being able to continue living and working in the U.S. By neglecting this issue entirely, USCIS failed to consider the negative impacts that all sorts of businesses will face should this policy be effectuated in a final rule. The Chamber heard from several accounting and financial services who would suffer greatly when thousands of workers who perform company functions related to tax, consulting, auditing, and researching who have a degree in business administration who would likely no longer qualify under the proposed rubric. Similarly, many companies involved in technology, semiconductor manufacturing, and AI have many critical employees that may be engineers at their respective firms, but the degrees they hold might be in fields such as computer science or mathematics.

In failing to offer a reasoned explanation as to why USCIS would want to make it more difficult for U.S. businesses to meet their workforce needs with the national unemployment rate standing at 3.7%, the agency ignored any of the reliance interests of affected stakeholders. This includes tens of thousands of current H-1B workers in the U.S. (many of whom have likely are the beneficiaries of approved employment-based petitions for permanent residency), their families, and their employers. When an agency is "not writing on a blank slate, it [is] required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such

---

[26] 88 Fed. Reg. at 72,876; *see also id.* at 72,876 n.24 ("The requirement of any engineering degree could include, for example, a chemical engineering degree, marine engineering degree, mining engineering degree, or any other engineering degree in a multitude of seemingly unrelated fields.").

interests against competing policy concerns."[27] To that end, the agency considered no alternatives to redefining the definition, nor did the agency provide any explanation as to why it seeks to reclassify all sorts of job opportunities that were in specialty occupations for the several decades prior and now views them as no longer worthy of that type of classification anymore.

Of critical importance is how this policy change runs counter to the Biden Administration's stated goal of attracting the world's "AI talent to our shores—not just to study, but to stay—so that companies and technologies of the future are made in America."[28] Experts have found that primary degrees required for *core* AI job duties are business administration, computer science, engineering, mathematics, and statistics.[29] In order for companies in various industries to integrate AI into their respective businesses, they need to hire people with field-relevant expertise, rather than just the core jobs which create the AI application itself. In fact, 89 percent of new hiring in AI is for the positions that integrate AI into *other* adjacent fields that may or may not be presumed to be "directly related" by a USCIS adjudicator.[30] These changes will make it more difficult to bring the world's AI talent to the U.S.

In summation, the proposed changes to the specialty occupation definition are bad policy, they are inconsistent with the INA, and they are arbitrary and capricious. We implore USCIS to abandon its plan to restrict access to H-1B visas in this fashion, as it will have a profoundly negative impact on many American companies, their employees, and the economy as a whole.

## USCIS' Plan to Resurrect "Nonspeculative Employment" Requirement is Unlawful, Arbitrary, and Capricious

USCIS seeks to impose a "nonspeculative employment" requirement that not only lacks any basis in the INA and is arbitrary and capricious, but also mirrors similar efforts taken by the agency in 2018 that were also ruled unlawful. The proposal specifically creates a new requirement that at the time of filing the petition, "the petitioner must establish that it has a non-speculative position in a specialty

---

[27] *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quotation omitted); *see also Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2126 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (quotation omitted)

[28] 88 Fed. Reg at 75192.

[29] Autumn Toney and Melissa Flagg, U.S. Demand for AI-Related Talent Part II: Degree Majors and Skill Assessment (September 2020), Center for Security and Emerging Technology, p. 3.

[30] Autumn Toney and Melissa Flagg, U.S. Demand for AI-Related Talent (August 2020), Center for Security and Emerging Technology, p. 3.

occupation available for the beneficiary as of the start date of the validity period as requested on the petition."[31]

The Chamber acknowledges that the H-1B program is not designed to allow companies to recruit foreign workers based on entirely speculative expansion plans or workforce needs.[32] However, the Department's guidance has long recognized that employment with a contracting firm may satisfy these requirements—even without predetermined assignments to third-party client sites for the entire duration of the visa period. In fact, to impose such a requirement upon employers at the time of filing the petition would require all sorts of U.S. businesses to have a crystal ball that tells them exactly what their business needs will be over a three-year period. Even the most conscientious employers do not possess that level of clairvoyance that USCIS seeks to require of them under this proposal, which departs from historical agency practices and functionally reinstates the prior administration's invalidated policy guidance that requires evidence of nonspeculative work assignments for the duration of an H-1B visa holder's stay in the U.S.

For an employer petitioning for an H-1B worker, the INA requires the company to show that "the purported employment is actually likely to exist for the beneficiary."[33] Courts have recently invalidated demanding nonspeculative-work requirements like the one the Department proposes here, which go far beyond whether the employment opportunity is likely to exist.

In *ITServe Alliance, Inc. v. Cissna*,[34] the court addressed dozens of consolidated challenges to the prior administration's 2018 Policy Memorandum titled "Contracts and Itineraries Requirements for H-1B Petitions Involving Third-Party Worksites"[35] (2018 Policy Memo). Among other things, the plaintiffs—IT-industry employers— challenged the memo's guidance that being "employed in a specialty occupation . . . means that the petitioner has *specific and non-speculative qualifying assignments* in a specialty occupation for the beneficiary *for the entire time requested in the petition*."[36] The Policy Memo asserted that "H-1B petitions do not establish a worker's eligibility for H-1B classification if they are based on speculative employment or do not establish the actual work," and "uncorroborated statements describing the [beneficiary's] role" at a third-party worksite "are often insufficient."[37] The memo

---

[31] 88 Fed. Reg. at 72,960 (proposed 8 C.F.R. § 214.2(h)(4)(iii)(F)).

[32] *See* 88 Fed. Reg. at 72,901 (citing "Petitioning Requirements for the H Nonimmigrant Classification," 63 Fed. Reg. 30,419, 30,419-30,420 (June 4, 1998) (proposed rule to be codified at 8 CFR part 214)).

[33] *Serenity Info Tech., Inc. v. Cuccinelli*, 461 F. Supp. 3d 1271, 1286 (N.D. Ga. 2020).

[34] 443 F. Supp. 3d 14 (D.D.C. 2020).

[35] PM-602-0157 (Feb. 22, 2018)

[36] *ITServe Alliance, Inc.*, 443 F. Supp. 3d at 25 (quoting 2018 Policy Memo at 3 (emphasis added)).

[37] PM-602-0157 (Feb. 22, 2018) at 4.

further emphasized the petitioner's obligation to provide "contracts and work orders," or they risk having USCIS deny the petition.[38]

Of particular importance, the *ITServe Alliance* court found the 2018 Policy Memo's interpretation of "specialty occupation," which required proof of nonspeculative work assignments for the duration of the visa, to be contrary to the INA. The court emphasized the significance of Congress's decision to use the term "occupation" instead of "job," noting an occupation "would likely encompass a host of jobs . . . with concomitant but differing personal job duties."[39] In addition, the court found "[n]othing in [the INA's] definition requires specific and non-speculative qualifying day-to-day assignments for the entire time requested in the petition."[40] Rather, "[w]hat the law requires, and employers can demonstrate, is the nature of the specialty occupation and the individual qualifications of foreign workers."[41]

Relatedly, the court further concluded that " it [was] irrational, that is, arbitrary and capricious, to . . . requir[e] contracts or other corroborated evidence of states and locations of temporary work assignments for three future years."[42] The court recognized that such a requirement was in fact "a total contradiction of the Plaintiffs' business model of providing temporary IT expertise to U.S. businesses," and imposing it "would effectively destroy a long-standing business resource without congressional action."[43]

At bottom, the proposal's nonspeculative-employment requirement amounts to USCIS reviving the prior administration's substantively unlawful policy guidance through the formal rulemaking process under the Administrative Procedure Act. USCIS attempts to distinguish its proposal from the policy guidance at issue in *ITServe Alliance*. The proposal acknowledges that "non-speculative employment does not mean demonstrating non-speculative daily work assignments through the duration of the requested validity period."[44] However, the proposal provides very little in terms of guidance for employers who must comply with these requirements. In fact, the only meaningful insight that can be gleaned from the proposal is that for business arrangements involving third party placement of H-1B workers at a client's worksite, the NPRM would codify "USCIS' authority to request contracts, work orders, or similar evidence" as evidence of bona fide employment, including from "end-client

---

[38] *Id.*

[39] *ITServe Alliance, Inc.,*. at 39.

[40] *Id.*

[41] *Id.*; *see also Serenity Info Tech., Inc.*, 461 F. Supp. 3d at 1286 (agreeing with *ITServe Alliance* and holding that the INA and the regulations required "[d]emonstrating [only] that the purported employment is *actually likely to exist* for the beneficiary").

[42] *Id.*

[43] *Id.*

[44] 88 Fed. Reg. at 72,902.

compan[ies] for which the beneficiary will perform work."[45] This is merely a restatement of the policy memorandum that was ruled unlawful a few years ago; USCIS is proposing distinctions that don't have any meaningful differences in terms of their impact upon employers.

In some ways, this proposal creates new problems for employers. USCIS proposes to include a new element into the framework for third-party business relationships involving H-1B workers. Specifically, the treatment of both the petitioning employer and the third-party end-user depends upon whether USCIS decides that the H-1B worker is "staffed" to "fill a position in the third party's organization and become a part of the third party's organizational hierarchy."[46] Historically, in these third-party arrangements, the petitioning employer was the party whose representations mattered to USCIS in determining H-1B eligibility. However, under this new "staffing" regime, it would be the requirements of the third-party end user, not the petitioning employer, whose representations before the agency would determine whether that worker is eligible to receive the H-1B visa. The proposal offers no guidance on how USCIS would adjudicate applications in these situations, let alone how the agency would go about determining whether the petitioning employer's workers are in fact "staffed" with the end-user.

Given all these unknowns regarding the compliance burdens associated with the nonspeculative-employment requirement, it invites the risk that adjudicators will impose the same standards of proof the *ITServe Alliance* court held unlawful. Similarly, the lack of insight into how this requirement would be implemented by the agency does not properly apprise regulated stakeholders of what these new provisions would entail for their companies. That raises significant questions as to whether the public has been properly apprised of this rule change and more importantly, whether they are able to provide meaningful comments on these aspects of the proposal. Lastly, but certainly not least, employers and their H-1B workers that have relied upon the basic structure of the H-1B program in devising their business plans. The H-1B program has not been the subject of meaningful statutory reforms in over three decades. USCIS fails to consider, let alone assess, the reliance interests of any of these stakeholders. When one considers all of these issues, the implementation of these provisions would likely be held as unlawful, arbitrary and capricious.[47]

## Many Companies are Concerned Over USCIS' Third-Party Placement Proposals

As was alluded to in the prior section, the proposal's third-party placement provisions are confusing and pose a significant risk of exposure to arbitrary and

---

[45] 88 Fed. Reg. at 72,901.

[46] 88 Fed. Reg. at 72,959.

[47] *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913; *Encino Motorcars, LLC*, 136 S. Ct. at 2126.

inconsistent enforcement against both petitioning employers and third-party end user companies. Additionally, it is arbitrary and capricious because it disregards established departmental policy without explanation and lacks evidentiary support.

The proposed rule states that "[i]n certain circumstances where an H-1B worker provides services for a third party, USCIS would look to that third party's requirements for the beneficiary's position, rather than the petitioner's stated requirements, in assessing whether the proffered position qualifies as a specialty occupation."[48] To determine when USCIS should elevate a third party's position requirements over those of the petitioning employer, the proposal distinguishes between when a beneficiary will be "staffed" to a third party as opposed to merely "providing services."[49]

The "staffing" versus "providing services" distinction is a matter of first impression. It is a significant departure from the current regulatory framework, and it lacks any foundation in the statutory text, as well as the agency's historical practices. More importantly, USCIS fails to provide stakeholders with any clear standards against which USCIS may base its determinations. Chamber members are very concerned that this aspect of the proposal will lead to inconsistent and arbitrary results. The confusion caused by this policy change will prompt extensive and burdensome requests for document production, saddling petitioning employers and their third-party clients alike with needless expenses.

This new state of affairs would be bad enough if these additional costs only impacted the petitioning employers in these situations, whether they're providing IT or accounting services for their clients. Those companies possess the institutional knowledge and expertise with regard to navigating the H-1B visa process and they are better equipped to handle RFEs and other requests from the government. What is brand new here is that now their clients find themselves in a position where they may be subject to all the requirements of the program where they must attest to matters which they may know little about because they're relying on the petitioning employer for those purposes. Not only do the end-user clients lack the institutional knowledge and experience with these aspects of the H-1B program, but they also do not have the expertise over the services that the petitioning employer is providing to them under their contractual agreements. Relying on companies who do not possess that kind of knowledge to produce responsive documents to RFEs from the government is a recipe

---

[48] 88 Fed. Reg. at 72,908.

[49] *Id.*; *see also* 88 Fed. Reg. at 72,959 ("If the beneficiary will be staffed to a third party, meaning they will be contracted to fill a position in a third party's organization and becomes part of that third party's organizational hierarchy by filling a position in that hierarchy (and not merely providing services to the third party), the actual work to be performed by the beneficiary must be in a specialty occupation. When staffed to a third party, it is the requirements of that third party, and not the petitioner, that are most relevant when determining whether the position is a specialty occupation." Proposed 8 C.F.R. § 214.2(h)(4)(i)(B)(3)).

for disaster and will not further the agency's interests in increasing the efficiency of the H-1B program's operations.

This confusion further generates the risk of improper visa denials if the USCIS adjudicator conflates the third-party employer's general employee qualifications with those for the specific roles H-1B visa holders will fill. The problem is that this forgets "that the H-1B professional may be performing a very different role on a distinct project from what the 3rd party company normally performs."[50] For example, adjudicators might mistakenly conclude that the third party does not "normally require[] a degree or its equivalent for the [visa holder's] position"[51] simply because it does not so require from less-skilled employees within its own workforce, relying on foreign talent on H-1B visas to satisfy its needs for higher-skilled labor.

USCIS claim that it is merely codifying the *Defensor v. Meissner*[62] court case, but that does adequately address the issues that concern our members. In that case, the Fifth Circuit considered whether nurses were employed in specialty occupations. The court held that the Service properly considered the degree requirements imposed by both the staffing agency (petitioner) *and* the hospitals to which they were staffed. The court regarded the nurse-staffing agency as "at best a token employer" and explained that "even if [the agency] is an employer, the hospital is also an employer of the nurses and a more relevant employer at that."[53] Thus, the court held that "it was not an abuse of discretion to interpret the statute and regulations so as to require [the agency] to adduce evidence that the entities actually employing the nurses' services required the nurses to have degrees, which [the agency] could not do."[54]

However, the *Defensor* court's analysis depended on its view that the hospital was a common-law "employer" under the regulations. USCIS' proposal removes that issue from the equation.[55] As such, unlike the adjudicators that have been relying on *Defensor* for more than two decades, the NPRM offers no guidance on how USCIS should decide whether a consulting firm is "staffing" visa beneficiaries to third parties or merely "providing their services" to a client. This is a much different question from the existence of an employment relationship under common law, which was at issue in *Defensor*. From our members' perspective, it remains an open question as to whether USCIS will understand the distinction between the staffing nurses at issue in

---

[50] *Id.*
[51] *See* 8 C.F.R. § 214.2(h)(4)(ii) (defining standards for a specialty occupation position)
[52] 201 F.3d 384 (5th Cir. 2000).
[53] *Id.* at 388.
[54] *Id.*
[55] *See Defensor*, 201 F.3d at 388; 88 Fed. Reg. at 72,903-72,904 (proposing "to remove from the definition of U.S. employer the reference to an employer-employee relationship, which, in the past, was interpreted using common law principles and was a significant barrier to the H-1B program for certain petitioners").

*Defensor* and the software engineers or accountants providing services to their client where there is no "staffing" relationship between the petitioner and the end-user being staffed at the client."

The third-party provisions in the NPRM significantly depart from the latest policy guidance on the subject without acknowledgment or explanation. Longstanding guidance differs from this proposal in that, under the NPRM, adjudicators will be required to decide in *every case* involving third-party placements whether the visa beneficiary will be "staffed" to or merely "provide services" to a third party. That analysis will necessarily involve scrutinizing the petitioning employer's contracts with any prospective third-party placements—regardless of the ultimate decision.

The burdensome third-party placement rule is also arbitrary and capricious for the additional reason that it lacks adequate justification. According to the Department, the "proposal would ensure that petitioners are not circumventing specialty occupation requirements by imposing token requirements or requirements that are not normal to the third party."[56] As far as the Department shows, this concern is rank speculation. The Department offers no explanation as to why its concerned that some employers might "impos[e] token requirements"—a concern it does not substantiate with any evidence that this is a widespread problem—justifies the massive administrative burden this provision imposes on all contractors who utilize the H-1B visa program and their clients, or the uncertainty it injects into the long-standing business model on which they have come to rely.[57]

For these reasons, the Department should wholly rescind the provision on third-party placements, allowing USCIS to rely on the petitioning employer's requirements to govern H-1B visa determinations in most circumstances absent an articulable need for additional documentation from a third party. At the very least, USCIS must issue an additional notice in the Federal Register that provides clear standards on how the agency will determine whether a beneficiary will be "staffed" to or "provide services" to a third party.

## USCIS Review of Labor Condition Applications Impermissibly Usurps the Labor Department's Authority over the H-1B Petition Process

As a prerequisite to filing an H-1B petition, an employer must file a labor condition application ("LCA").[58] The LCA principally calls for the employer to certify that it will pay the H-1B beneficiary the greater of "the actual wage level paid by the

---

[56] 88 Fed. Reg. at 72,908.
[57] *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").
[58] See 8 USC § 1182(n)(1).

employer to all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment," in order to ensure that companies are not using H-1B workers to undercut domestic wages.[59] The INA expressly assigns the responsibility to certify an LCA to the Secretary of Labor.[60]

Congress purposely limited the review of an LCA by design. Generally, DOL will certify an LCA so long as it is "complete[] and "not obviously inaccurate" and then enforce the agreement's terms through a post-hoc complaint process.[61] In that way, DOL recognized "that Congress . . . intended to provide greater protection than under prior law for U.S. and foreign workers *without interfering with an employer's ability to obtain the H-1B workers it needs on a timely basis.*"[62] (emphasis added)

DOL's own regulations recognize that other agencies have discrete obligations with respect to the LCA. Among them, "DHS accepts the employer's petition (DHS Form I–129) with the DOL–certified LCA attached. DHS determines whether the petition is supported by an LCA which corresponds with the petition."[63] The DOL regulations further reiterate the Labor Department's general authority to determine whether the occupation listed on the form and the nonimmigrant's qualifications satisfy the statutory requirements to obtain an H-1B visa.[64] Under a plain reading of the regulation, and consistent with the INA's delegation of authority over LCA adjudications to DOL rather than with USCIS and the Department of Homeland Security, USCIS' role is limited to ensuring the petition (1) is predicated on—or "is supported by"[65]—a certified LCA; and (2) the LCA "corresponds with" the petition.

In this proposal, USCIS seeks to scrap this long-established history of DOL's authority over matters concerning LCAs. Specifically, USCIS claims the "authority and obligation to determine whether [a] certified LCA *properly supports* and *corresponds* with the H-1B petition," separate and apart from the Department of Labor's power to certify the LCA in the first place.[66] USCIS claims this would "align DHS regulations with existing DOL regulations, which provide that DHS has the authority to determine whether the LCA supports and corresponds with the petition."[67] However, USCIS

---

[59] *Id.*; *see generally* 20 C.F.R. part 655 (DOL regulations governing Labor Condition Application process).
[60] *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b1); 8 U.S.C. § 1182(n)(1).
[61] *See* 20 C.F.R. §§ 655.740; 655.710; 655.800.
[62] 56 Fed. Reg. 54,720, 54,721 (Oct. 27, 1991).
[63] 20 C.F.R. § 655.705(b).
[64] *See id.*
[65] In this context, "support" means to "serve as a foundation or prop." *Support*, Merriam-Webster, https://www.merriam-webster.com/dictionary/support (last accessed Dec. 17, 2023).
[66] 88 Fed. Reg. at 72,902 (emphasis added); *see also id.* at 72,959 ("USCIS will determine whether the labor condition application involves a specialty occupation as defined in section 214(i)(1) of the Act and properly corresponds with the petition." (proposed 8 C.F.R. § 214.2(h)(4)(i)(B)(1)(ii)).
[67] *Id.* at 72,902.

distorts the DOL regulations and inserts a substantive component that exceeds the limited authority that the agency has over LCAs. In short, USCIS claiming this ability to review the LCA is another means for USCIS adjudicators to impose a functionally identical "itinerary" requirement to the one the *ITServe Alliance* court declared unlawful.

This novel, substantive review component of USCIS's review authority over DOL-certified LCAs is not contemplated in the DOL regulations referenced in the NPRM. Furthermore, it is contrary to the language of the statute. The rule explains that "USCIS would evaluate whether [the] information sufficiently aligns with the offered position" by "compar[ing] the information contained in the LCA against the information contained in the petition and supporting evidence."[68]

This explanation alone suggests—or at least does not foreclose—that adjudicators may treat LCA review just like the itinerary requirement the rule itself eliminates. But looking behind the LCA in this way would be contrary to the INA and arbitrary and capricious, particularly as applied to IT consulting firms, just like the 2018 Contracts and Itineraries Policy Memorandum.[69]

The LCA requirements, as set out by Congress in the INA and implemented by the DOL, were not designed to serve such a purpose. The LCA is intended only to protect U.S. and foreign workers, offering grounds for recourse in case, for example, the petitioning employer pays the beneficiary below the prevailing wage.[70] Congress did not create the LCA requirement to offer substantive proof of whether a petitioning employer properly demonstrates a bona fide position in a specialty occupation.[71] Enlarging its purpose to suit the agency's prerogatives in this proposal exceeds the INA's statutory mandate.

Moreover, relying on the LCA as substantive proof of whether a petitioner has adequately identified a position in a specialty occupation marks a departure from the Department's historical practice, as reflected in the existing regulations and policy memoranda, which the Department fails to acknowledge or explain. The existing regulations do not authorize the Department to review an LCA *at all* beyond verifying that it exists and identifies a specialty occupation.[72] The first suggestion that USCIS

---

[68] 88 Fed. Reg. at 72,903.

[69] *ITServe Alliance*, 443 F. Supp. 3d at 41-42.

[70] *See* 56 Fed. Reg. at 54,721.

[71] *See* 8 U.S.C. § 1182(n)(1).

[72] *See* 8 C.F.R. § 214.2(4)(i)(B)(2) ("The director shall determine if the application involves a specialty occupation."); *id.* § 214.2(iii)(B)(1)-(2) ("The petitioner shall submit the following with an H-1B petition involving a specialty occupation: (1) A certification from the Secretary of Labor that the petitioner has filed a labor condition application with the Secretary, (2) A statement that it will comply with the terms of the labor condition application for the duration of the alien's authorized period of stay.").

would treat the LCA as an itinerary to verify whether it "supports" the position described in the H-1B petition did not appear until the unlawful—and now rescinded—2018 Policy Memo.[73] The Department's failure to explain the shift in its treatment of LCAs alone renders the provision arbitrary and capricious.[74]

Thus, consistent with the INA and DOL regulation, the Department must reissue its notice clarifying that USCIS can do no more regarding the LCA than simply confirm that it corresponds to the position described in the H-1B petition.

## Employer Concerns Regarding Site Visit Provisions

The Chamber has held that the Homeland Security Act of 2022 confined USCIS' authority to the federal government's responsibilities to adjudicate immigration benefit requests. As such, the federal government's interests in investigating wrongdoing and punishing violators of the law belonged to U.S. immigration and Customs Enforcement and U.S. Customs and Border Protection. Individual Chamber members have divergent views regarding USCIS' investigatory authorities, but there is unanimity with regard to their concerns over the proposed site visit provisions contained in the NPRM.

In relevant part, the proposal states "If USCIS is unable to verify facts, including due to the failure or refusal of the petitioner or a third party to cooperate in an inspection or other compliance review, then such inability to verify facts, including due to failure or refusal to cooperate, may result in denial or revocation of any H-1B petition for H-1B workers performing services at the location or locations that are a subject of inspection or compliance review, including any third party worksites."[75] This proposed regulatory text fails to provide adequate due process protections for H-1B beneficiaries and their employers and could create unnecessary disruptions for the company and the workers alike. It would behoove USCIS to include a mechanism to notify the petitioner and their attorney of record in advance of a site visit and provide them with the opportunity to respond to FDNS' request. DHS should not proceed directly to a denial or revocation without affording an opportunity to provide additional information to the government.

We also ask USCIS to evaluate these provisions in the context of third-party contractual relationships for H-1B workers. Typically, the end user companies in these arrangements are not as familiar as the petitioning employer with the operation of the H-1B program. In some cases, the end user's place of business has strict limitations on facility access. Companies are concerned about the potential for

---

[73] *See* 2018 Policy Memo at 4.
[74] *See Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644-645 (Apr. 21, 2020).
[75] See proposed 8 CFR §214.2(h)(4)(i)(B)(2)(ii), 88 Fed. Reg. at 72,959 (Oct. 23, 2023).

misunderstandings that could jeopardize the ability of their workers to maintain their work authorized status.

Additionally, our members have grave concerns regarding beneficiaries potentially being subject to government site visits in their homes. If a beneficiary is not comfortable allowing a government officer into their home for safety or privacy reasons, this should not lead to a denial or revocation. To mitigate these safety and privacy concerns, we ask that USCIS require the government officer to provide advance notice and allow visits with beneficiaries to take place at a designated time at their employer's place of business.

Similarly, we urge USCIS to provide in the final rule that the beneficiary may have a representative from their employer or an attorney present during any interview with a government officer.  Our members are committed to complying with all legal requirements of the H-1B program, and we respectfully request that the government not place an undue burden on our employees or create unnecessary stress within our workforces.

## Companies Worry About Novel Maintenance of Status Requirements

The NPRM proposes to delete 8 CFR § 214.2(h)(14) which provides that in the case of a request for an H-1B petition extension, "[s]upporting evidence is not required unless requested by the director." In its place, the NPRM proposes to require evidence to be submitted by the *current* petitioning employer when requesting an amendment, extension, or change of status that an H-1B beneficiary has maintained status in the United States. It further proposes to require evidence that status had been maintained when a U.S. employer petitions to amend, extend or change a beneficiary's nonimmigrant status in *every other* employment-based nonimmigrant category as well.[76]

Although the NPRM purports to require proof that status had been maintained "before the extension of stay request was filed," the NPRM does not provide a specific temporal reference that clarifies how far back an employer must go to procure evidence establishing that the individual worker's nonimmigrant status has been maintained. The NPRM implies, however, by referring to the I-129 form instructions, that evidence covering two pay periods may be long enough.[77] Elsewhere, the NPRM

---

[76] See 88 Fed. Reg. at 72880: "These changes would impact the population of nonimmigrants named in 8 CFR 214.1(c)(1): E–1, E–2, E–3, H–1B, H–1B1, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–2, P–3, Q–1, R–1, and TN nonimmigrants."

[77] 88 Fed. Reg. at 72880: "The form instructions further state that if the beneficiary is employed in the United States, the petitioner may submit copies of the beneficiary's last two pay stubs, Form W–2, and other relevant evidence, as well as a copy of the beneficiary's Form I–94, passport, travel document, or

offers the example that "evidence pertaining to the beneficiary's continued employment (*e.g.,* paystubs) may help USCIS to determine whether the beneficiary was being employed consistent with the prior petition approval or whether there might have been material changes in the beneficiary's employment (*e.g.,* a material change in the place of employment)." (Emphasis added.)

These references suggest that the time range required of the current petitioning employer is only during the period when the present petitioner has employed the beneficiary. This temporal limit would be reasonable, given that the current employer is likely to possess, or is capable of readily acquiring, evidence to establish that nonimmigrant status has been maintained while in the petitioner's employ.  If, however, the final rule is finalized as proposed in the NPRM, then the current petitioning employer might be asked by an adjudicator in an RFE or NOID to submit foreseeably unattainable evidence in the possession of a beneficiary's prior employers, or in the worst-case scenario, that prior employer is no longer operating in the market and it is impossible to obtain that information.

By requiring the present petitioner to submit only evidence of a beneficiary's status maintenance that is already possessed by or readily accessible to that party, or available from the beneficiary since last entry to the U.S., the final rule that USCIS might publish would also be consistent with 8 CFR § 214.1(c)(4), which provides in relevant part that an "extension of stay may not be approved for an applicant who failed to maintain the previously accorded status." (Emphasis added.)  By using the article "the" rather than the more general article "a," this regulation makes clear that the previously accorded status is solely the status granted when the beneficiary was admitted by CBP upon last entry to the United States.

For the aforementioned reasons, the Chamber urges USCIS to publish a final rule which expressly states that the present petitioner will only be required to present evidence that the beneficiary maintained his or her status during the last two pay periods while in the employ of this petitioner.

## USCIS Should Provide Additional Relief on Amended Petition Requirements

---

Form I–797." (Footnote omitted.)  The reference to "two pay stubs" does not appear in the text of the proposed regulation.  We are therefore concerned that this suggested temporal limitation will be disregarded, and that adjudicators will issue RFEs or NOIDs if a petitioning employer – in line with Form I-129 instructions – submits proof of salary payments for only two pay periods. Such a wholly foreseeable outcome calls into question the NPRM's assertions that deleting the current rule at 8 CFR § 214.2(h)(14) – which dispenses with the need to proactively submit evidence that status had been maintained – "should reduce the need for RFEs or NOIDs...and would not add an additional burden on the petitioner or applicant." (88 Fed. Reg. at 72881.)

For many years, the Chamber has consistently called upon USCIS to reevaluate the definition of "material change." Current policy under the *Matter of Simeio* decision imposes significant cost burdens upon companies, as this paper-based process must be completed every time a company merely moves an employee from one worksite to another. USCIS' proposal to simply codify the suboptimal existing policies with no change would be a missed opportunity to meet the agency's goal of making its adjudicatory processes more efficient. To that end, it would allow the agency to better allocate its limited resources. As such, we urge the agency to change its policies such that going forward, a worksite change for an H-1B worker will no longer constitute a "material change" where a new LCA must be obtained on behalf of the worker.

## Conclusion

There are several welcome developments put forward by USCIS in its proposal. At the same time, there are many significant changes contained in the NPRM that are very concerning to the Chamber and its members. Our members view several of the provisions discussed above to be unlawful, arbitrary, and capricious and we ask that USCIS not move those regulatory ideas forward. Given the agency's desire to address its concerns with the H-1B registration system, we hope USCIS addresses those issues separately and expeditiously such that any changes made the agency incorporate our suggestions above and that those changes to the registration are in place and operation by the time that the FY25 H-1B cap season begins in the coming months.

We urge USCIS to engage in additional listening sessions with stakeholders and to publish additional notices in the Federal Register that provide needed details so that the Chamber and other stakeholders can properly provide the agency with meaningful comments on those provisions.

Thank you for considering our views.

Sincerely,

Jonathan Baselice
Vice President, Immigration Policy
U.S. Chamber of Commerce