# EXHIBIT 20

# CHAMBER OF COMMERCE
### OF THE
# UNITED STATES OF AMERICA

**PATRICK SHEN**
VICE PRESIDENT, IMMIGRATION POLICY
EMPLOYMENT POLICY DIVISION

1615 H STREET, N.W.
WASHINGTON, D.C.  20062
202/463-5769

September 26, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street S.W.
Washington, DC 20536

**Re:    Establishing a Fixed Time Period of Admission and an Extension of Stay
Procedure for Nonimmigrant Academic Students, Exchange Visitors, and
Representatives of Foreign Information Media.
ICEB-2025-0001, RIN 1653-AA95, 90 Fed. Reg. 42070 (Aug. 28, 2025).**

Dear Director:

The U.S. Chamber of Commerce ("U.S. Chamber"), the world's largest business organization representing employers of every size and in sector, respectfully submits the following comment in response to the above-captioned Notice of Proposed Rulemaking ("NPRM" or "proposed regulation"), published by the Department of Homeland Security ("the Department" or "DHS"), Immigration and Customs Enforcement ("ICE"), on August 28, 2025. According to the NPRM, comments from the public are due to ICE 30 days from the date of publication.

As a threshold matter, the U.S. Chamber supports the Department's objectives to protect the national security of the United States and restore integrity to our immigration system.  Just as the Trump Administration's efforts have led to a secure border, integrity to our immigration and visa system is also possible through vigilant but reasonable enforcement policies.

For reasons stated below, the proposed changes to the current student and exchange visitor programs, under the F and J visa categories, are unduly restrictive and overly broad.[1]  In addition, the proposed regulation does not explain sufficiently the justification for deviating so drastically from well-settled regulatory adjudication standards.

Therefore, the U.S. Chamber asks that the NPRM be withdrawn.  The Department and ICE must consider first the input from the stakeholders and subject matter experts before making such sweeping changes to current law.  In the alternative, the U.S. Chamber asks for an additional 30

---

[1] The NPRM also affects the I visa category for foreign media representatives.  The U.S. Chamber's comment is limited to the F and J visas only.

days for the business community to gather more data and submit more robust analyses that would help the Department achieve its policy goals while minimizing the collateral harm.

*Discussion*

## I.  The Proposal Regulation Harms American Businesses.

The proposed changes would impose a fixed period of admission for individuals entering the United States with an F student visa or a J exchange visitor visa. Specifically, the period of admission allowed for these individuals would be either two or four years, dependent upon several factors considered in the proposal.  90 Fed. Reg. 42109.  After these initial periods of admission, the individual must seek an extension of stay ("EOS") to remain in the United States and either continue the academic/exchange program or pursue employment with U.S. companies through optional practical training ("OPT").  *Id.*

The Department acknowledges that "[t]he global market for nonimmigrant students is competitive and many U.S. schools hold an advantage over foreign institutions due to the quality of the programs they offer[.]"  However, the Department also says that "the proposed rule may have a marginal impact on nonimmigrant student enrollment[,]" and "would not have a significant impact on participation of other J exchange visitors . . . ." 90 Fed. Reg. 42109.

The U.S. Chamber respectfully but vehemently disagrees with the Department's assessment of the proposed regulation's "marginal" impact.  Furthermore, as the Department itself acknowledged when it proposed a similar rule in 2020, these changes would ". . . adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation[.]" 85 Fed. Reg. 60526, 60573 (Sept. 25, 2020).  It should be noted that the business impact stems from not only the regulatory change on the duration of admission for the F and J visa holders, but also the administrative delay, which—when considered with all the other changes at DHS and the Department of State—can cause disruption to academic schedules and employer recruitment.

### A.  The proposed regulation is disruptive to academic schedule and employer recruitment.

DHS' view on the American higher education system, which is inferred by the structure of this proposal, is overly simplified.  The proposed changes are premised on an incorrect assumption that the allocation of status in two-year or four-year increments will be sufficient because most academic programs offered in the U.S. are two or four years in duration.  In fact, this rigid assumption of the U.S. higher education system does not reflect reality.

According to data compiled by the National Institute of Heath, the average time to complete a bachelor's degree in the science, technology, engineering, and mathematics

("STEM") fields is five years, with only 22% of college students completing a STEM degree in four years. *See* Barriers and Opportunities for 2-Year and 4-Year STEM Degrees: Systemic Change to Support Students' Diverse Pathways. National Library of Medicine, available at https://www.ncbi.nlm.nih.gov/books/NBK368175/. This is especially true for many students who are drawn to U.S. institutions that offer multiple degree programs (*e.g.* a B.S./M.B.A program), which generally take a minimum of 5 years to complete.

The disconnect between the proposed regulation and higher education realities is even more pronounced, and more detrimental to the interests of the U.S. business community, at the graduate school level. Master's and doctoral degree programs can be very lengthy. Moreover, individuals seeking these degrees in the United States are drawn here, at least in part, by the prospect of a career in this country. Many of these graduates are highly sought after once they complete their programs because they help alleviate a skills shortage, particularly in the STEM fields.

The program that allows foreign-born students to remain and work after graduation is OPT. Through anecdotal evidence received from some of the most prominent U.S. technology companies and manufacturers, the U.S. Chamber learned that OPT is critical to U.S. companies' cutting-edge research and development ("R&D"). A very important clarification is that U.S. companies do not look for foreign students *per se*. Instead, they recruit the most qualified graduates, many of whom are U.S. students, but a significant number of whom are foreign students, especially in science and engineering. Data from the Center for Strategic and International Studies ("CSIS") show that foreign-born students earned the majority of doctorates awarded in engineering (56%) and in mathematics and computer sciences (57.6%). *See Innovation Lightbulb: Foreign-born Share of U.S. STEM Workforce*, CSIS (Apr. 5, 2024), available at https://www.csis.org/analysis/innovation-lightbulb-foreign-born-share-us-stem-workforce. Companies in various industries, including chemical manufacturers, technology companies, semiconductor producers, and pharmaceutical companies, among many others, rely heavily upon this talent pipeline to innovate and compete in the 21st Century's global economy.

### B. Changes to the J visa programs also impacts the American public's access to critical services.

The J visa program was created in 1961 through the Mutual Educational and Cultural Exchange Act, or the "Fulbright-Hays Act." Pub. L. 87-256, 75 Stat. 527 (Sept. 21, 1961). It encompasses many programs, all of which are designed to promote the exchange of values and ideas, and foster understanding between Americans and people of other nations. According to the State Department's website, the J visa program " . . . furthers foreign policy interests of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchange experiences." *See* Department of State BridgeUSA webpage, available at https://j1visa.state.gov/about-us/.

3

Among the many members of the U.S. Chamber who rely on the J programs, the medical field will be the most adversely affected by the proposed regulation. According to the American Association of Medical Colleges, 750 teaching hospitals across the United States employ more than 12,000 foreign-national physicians participating on J-1 visa status. *See* New Findings Confirm Predictions on Physician Shortage, AAMC (Apr. 23, 2019), available at https://www.aamc.org/news/press-releases/new-findings-confirm-predictions-physician-shortage. These J-1 trainees provide essential medical care to American patients across the country. The proposed regulation limits J visa admission to no more than four years, but the medical training programs can last as long as seven years. Imposing a time limit on these physicians and adding to it the uncertainty of EOS processing delays can increase the risk of disruption to vital health care delivery. Indeed, the EOS process not only drains on the resources of the J-1 sponsors and the foreign medical graduates, but it can be detrimental to the American patients who need access to healthcare, especially in underserved areas.

Finally, the proposed regulation conflicts with existing statute and State Department Regulations. The Fulbright Hays Act delegates to the Secretary of State the duties and responsibilities of promoting international exchange and created the State Department's Bureau of Educational and Cultural Affairs ("ECA") to carry out such duties and responsibilities. 22 U.S.C. §§ 2452, 2460. In the case of foreign medical graduates pursuing further training in the United States, the terms are covered in State Department regulations. 22 CFR § 62.27. For example, the State Department sets the time limit for foreign physician's participation at a maximum period of 7 years. 22 CFR § 62.27(e)(1) and 22 CFR § 62.27(e)(2). Nothing in these State Department regulations gives DHS a role in creating policy for these programs.

### C. The EOS process will cause undue disruption to education and employment.

Under the current system, designated school officials ("DSO") at the universities and J visa exchange program's responsible officers ("RO") have the delegated authority to determine whether an F or J visa holders have maintained status and may continue with their programs. The proposed regulation would remove them from that process. The DSO and RO have the best insight into whether a particular student or exchange visitor is complying with the terms of the visa, and whether the time spent working in the program or pursuing the degree is justified. This proposed regulation puts that judgement in the hands of a DHS immigration officer who has never met the student or exchange visitor, and who most likely has no expertise in the academic or cultural exchange program to judge whether an extension is "reasonable." *See* 90 Fed. Reg. 42085, 42092-93.

The second concern is with the processing delay. Given USCIS's existing significant backlog, many of the U.S. Chamber's member companies are concerned about the impact of a surge of F and J visa EOS requests on an already resource-strapped agency. According to the U.S. Citizenship and Immigration Service's own

website, the current nationwide average processing time is three and a half months – and that is without the surge of EOS requests expected from the proposed regulation's implementation.  If every F and J visa holder would have to apply for EOS to complete a program, the delay and disruptions would be overwhelming.

## II. DHS Should Utilize SEVIS to Promote Program Integrity and National Interests.

The preamble states that "[r]eplacing admissions for [duration of status] with admissions for a fixed time period of authorized stay is consistent with most other nonimmigrant classifications."  90 Fed. Reg. 42072.  What the proposed regulation fails to acknowledge is that the F and J visas are not like other nonimmigrant visas.  One significant difference is that F and J visa holders already are tracked through the Student and Exchange Visitor Information System (SEVIS), which is administered by ICE.  The ECA also uses SEVIS to monitor exchange visitors.  U.S. Immigration and Customs Enforcement's SEVIS website, available at http://www.ice.gov/sevis/overview.

The preamble suggests without explanation that SEVIS is not effective in monitoring F and J visa holders' progress, and that an EOS scheme would be necessary. 90 Fed. Reg. 42103.  The preamble further states that "nearly 29,000 F-1 students who, since SEVIS was implemented in 2003, have spent more than 10 years in student status," including students "who enrolled in programs at the same educational level as many as 19 times, as well as students who have completed graduate programs followed by enrolling in undergraduate programs, including associate's degrees."  90 Fed. Reg. 42087.  The fact that DHS had access to those data confirms that SEVIS can be an effective monitoring tool.  It also should be noted that a Government Accountability Office ("GAO") report from 2014 made several recommendations to improve SEVIS's capability to identity and assess risk, and ICE has never offered any explanation for not implementing these recommendations.  *See* Government Accountability Office. Student and Exchange Visitor Program: DHS Needs to Assess Risks and Strengthen Oversight of Foreign Students with Employment Authorization at 31 (Feb. 2024).

F and J visa holders are the only nonimmigrants being monitored continuously in the United States.  We urge ICE and ECA to consider the GAO's recommendations and strengthen SEVIS's capabilities first rather than imposing new EOS obligations onto an already overburdened immigration adjudication system. .

## III. DHS May Not Change Regulatory Adjudication Standards without Proper Notice.

DHS characterizes as a "technical" change, without explanation, the striking of all references to Form I-129 (nonimmigrant visa petition) and Form I-539 (change of status request) from 8 C.F.R § 214.1(c)(5).  The result of this amendment is the repeal of the

current regulatory mandate for USCIS adjudicators to give "deference" to the agency prior determinations involving the same employer and employee when there are no material factual changes.  8 C.F.R. § 214.1(c)(5) (2025).  This amendment represents a fundamental shift in adjudication standards because it reverses a regulatory mandate that also reflects decades-long practice by U.S. immigration officers.

Contrary to what the preamble says, repealing the "deference" standard is a substantive shift, not a mere technical update.  It is substantive, because the amendment: i) increases burdens (costs, paperwork, adjudication delays); ii) narrows flexibility that Congress arguably delegated to institutions/program sponsors; and iii) creates risks of inconsistent adjudications.

Furthermore, the proposed regulation, whether inadvertently or by design, references a prior version of Section 214.1(c)(5) so that, to the casual reader, it would be as if the current mandate to defer to prior agency finding never existed.[2]

---

[2] The preamble says without any indication of a repeal of an adjudication standard:

> Like the _technical updates_ to strike the specific form name from 8 CFR 214.1(c)(2), DHS is proposing to strike the references to Forms "I–129" and "I–539" in 8 CFR 214.1(c)(5), replacing those specific form numbers with the aforementioned general language. See proposed 8 CFR 214.1(c)(5). The substance of that provision, including the language that does not allow an alien to appeal an 8 CFR 214.1(c)(5).

90 Fed. Reg. 42083 (emphasis added).

The current Section 214.1(c)(5) reads as follows:

> (5) Deference to prior USCIS determinations of eligibility. When adjudicating a request _filed on Form I-129_ involving the same parties and the same underlying facts, USCIS gives deference to its prior determination of the petitioner's, applicant's, or beneficiary's eligibility. However, USCIS need not give deference to a prior approval if: there was a material error involved with a prior approval; there has been a material change in circumstances or eligibility requirements; or there is new, material information that adversely impacts the petitioner's, applicant's, or beneficiary's eligibility.

8 C.F.R. § 214.1(c)(5) (2025) (Emphasis added)

The proposed regulation, however, appears to amend a prior version of Section 214.1(c)(5), which said:

> (5) Decision in Form I-129 or I-539 extension proceedings. Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of the Service. There is no appeal from the denial of an application for extension of stay filed on Form I-129 or I-539.

_See_ 8 C.F.R. § 214.1(c)(5) (2020).

As amended by the proposed regulation, Section 214.1(c)(5) would say the following:

> (5) ~~Decision in Form I-129 or I-539 extension proceedings~~ _Decisions for extension of stay applications_. Where an applicant or petitioner demonstrates eligibility for a requested extension,

The Department's failure to acknowledge, let alone explain, this substantive change is arbitrary and capricious, and deprives stakeholders of the opportunity for notice-and-comment.

### *Conclusion*

For the foregoing reasons, the U.S. Chamber requests that the Department rescind the proposed regulation. The Department can address its concerns by working together collaboratively with the public and private sectors' stakeholders, without compromising our nation's interest or burdening the academic and business communities unnecessarily.

Respectfully submitted

Patrick Shen
Vice President, Immigration Policy

---

*it may be granted at ~~the~~ <u>USCIS's</u> discretion ~~of the Service. There is no appeal from the denial of an application for extension of stay filed on Form I-129 or I-539~~ <u>The denial of an application for extension of stay may not be appealed</u>.*

*See* 90 Fed. Reg. 42107.

*Had the proposed regulation referenced the correct version of Section 214.1(c)(5), the change can, arguably be deemed "technical." However, as presented in the proposed regulation, this is a significant departure from current law.*