# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

        *Defendants*.

Case No. 1:25-cv-3675

## DEFENDANTS' RESPONSE AND CROSS MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

INTRODUCTION............................................................................................................... 1

BACKGROUND................................................................................................................. 3

I.      The Executive's Broad Authority.................................................................... 3

II.     H-1B Nonimmigrant Classification................................................................ 4

III.    Presidential Proclamation 10973.................................................................... 7

IV.     Agency Guidance and Memoranda ................................................................ 9

V.      Procedural History ....................................................................................... 10

STANDARD OF REVIEW .............................................................................................. 11

ARGUMENT .................................................................................................................... 11

I.      Plaintiffs' Challenges to the Proclamation are not Justiciable....................... 11

II.     Plaintiffs Lack a Cause of Action................................................................. 14

        A.      Plaintiffs cannot challenge the Proclamation or its implementation under the APA................................................................................................ 15

                1.      Merely implementing a Presidential Proclamation is not reviewable...... 15

                2.      There is no final agency action otherwise............................................... 17

                3.      Any agency action would be committed to agency discretion................. 18

        B.      The Plaintiff Cannot Assert an Ultra Vires Claim to Challenge the Proclamation ....................................................................................... 19

III.    The Proclamation satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with the INA............................................. 24

        A.      The Proclamation satisfies the statutory prerequisites of 8 U.S.C. § 1182(f) and 1185(a)(1). ...................................................................................... 25

                1.      The Proclamation satisfies the "sole prerequisite."................................ 26

                2.      The Proclamation clearly applies to a class of aliens.............................. 29

3.    The Proclamation does suspend or restrict entry.................................. 31

B.    The Proclamation Does Not Conflict with the INA........................................... 35

IV.    Relief and Stay.................................................................................................... 42

CONCLUSION..................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASE LAW

*Abourezk v. Reagan*,
   785 F.2d 1043 (D.C. Cir. 1986)................................................................. 13, 31

*Adams v. Vance*,
   570 F.2d 950 (D.C. Cir. 1978)........................................................................ 44

*Al Makaaseb Gen. Trading Co. v. Christopher*,
   1995 WL 110117 (S.D.N.Y. Mar. 13, 1995) ................................................. 14

*Allen v. Milas*,
   896 F.3d 1094 (9th Cir. 2018) ........................................................................ 18

*Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020)...................................................................... 20

*Am. Foreign Serv. Ass'n v. Trump*,
   2025 WL 1742853 (D.C. Cir. June 20, 2025)................................. 19, 20, 24, 42

*Ancient Coin Collectors Guild v. CBP*,
   801 F. Supp. 2d 383 (D. Md. 2011) ............................................................... 16

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................... 11

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991)........................................................................ 15

*Bailey v. Drexel Furniture Co.*,
   259 U.S. 20 (1922)............................................................................................ 32

*Barahona v. Napolitano*,
   2011 U.S. Dist. LEXIS 117536 (S.D.N.Y. Oct. 11, 2011)......................... 37, 38

*Bautista-Rosario v. Mnuchin*,
   568 F. Supp. 3d 1 (D.D.C. 2021).................................................................... 13

*Bennett v. Spear*,
   520 U.S. 177 (1997).......................................................................................... 17

*Caremax Inc. v. Holder*,
   40 F. Supp. 3d 1182 (N.D. Cal. 2014)............................................................. 4

*Castaneira v. Noem*,
  138 F.4th 540 (D.C. Cir. 2025) ................................................................ 34

*Cboe Futures Exch., LLC v. SEC*,
  77 F.4th 971 (D.C. Cir. 2023) .................................................................. 45

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................. 23

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ................................................................................. 17

*Coney Island Prep v. HHS*,
  506 F. Supp. 3d 203 (S.D.N.Y. 2020) ...................................................... 43

*Dakota Central Telephone Co. v. South Dakota ex rel. Payne*,
  250 U.S. 163 (1919) ........................................................................... 21, 22

*Dalton v. Specter*,
  511 U.S. 462 (1994) ....................................................... 15, 19, 20, 21

*Department of State v. Muñoz*,
  144 S. Ct. 1812 (2024) ........................................................................ 11, 12

*Detroit Int'l Bridge Co. v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ...................................................... 17, 19

*Doan v. INS*,
  160 F.3d 508 (8th Cir. 1998) .............................................................. 13, 34

*Doe #1 v. Biden*,
  2 F.4th 1284 (9th Cir. 2021) ............................................................... 28, 35

*Doe #1 v. Trump*,
  984 F.3d 848 (9th Cir. 2020) .............................................................. 28, 35

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) ................................................................. 35

*Doe Co. v. Cordray*,
  849 F. 3d 1129 (D.C. Cir. 2017) .............................................................. 43

*Doshi v. Blinken*,
  No. 23-cv-3613, 2024 WL 3509486 (D.D.C. July 22, 2024) ................... 14

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................................................................. 15

*Enters., Inc. v. Dep't of Homeland Sec.,*
    467 F. Supp. 2d 728 (E.D. Mich. 2006) ............................................................................. 5

*Feds for Med. Freedom v. Biden,*
    2022 WL 188329 & n.6 (S.D. Tex. Jan. 21, 2022) ............................................................ 39

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ..................................................................................................... 12, 21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................................................ 15

*Glob. Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) .............................................................................................. 22

*Goodluck v. Biden,*
    104 F.4th 920 (2024) .......................................................................................................... 42

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................................................ 22

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ............................................................................................................ 22

*Holder v. Humanitarian Law Project,*
    561 U. S. 1 (2010) ............................................................................................................... 28

*Intel Corp. Inv. Policy Comm. v. Sulyma,*
    140 S. Ct. 768 (2020) .......................................................................................................... 40

*Kerry v. Din,*
    576 U.S. 86 (2015) .............................................................................................................. 34

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ...................................................................................................... 13, 25

*Loper Bright v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................................................ 38

*Malyutin v. Rice,*
    677 F. Supp. 2d 43 (D.D.C. 2009), *aff'd,* 2010 WL 2710451 (D.C. Cir. July 6, 2010) ........... 14

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892)..........................................................................................33

*Maryland v. King,*
   567 U.S. 1301 (2012)........................................................................................44

*Mass. Coal. for Immigr. Ref. v. DHS,*
   698 F. Supp. 3d 10 (D.D.C. 2023).................................................................11

*Matushkina v. Nielsen,*
   877 F.3d 289 (7th Cir. 2017)....................................................................13, 14

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014)....................................................................40

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010).......................................................................................42

*Nken v. Holder,*
   556 U.S. 418 (2009)..................................................................................44, 45

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004).........................................................................................18

*\*Nuclear Regul. Comm'n (NRC) v. Texas,*
   145 S. Ct. 1762 (2025)......................................................................20, 22, 24

*Nyunt v. Chairman, Broad. Bd. of Govs.,*
   589 F.3d 445 (D.C. Cir. 2009).......................................................................20

*Pacito v. Trump,*
   152 F.4th 1082 (9th Cir. 2025)................................................................32, 42

*Patel v. Garland,*
   596 U.S. 328 (2022).......................................................................................30

*President and Fellow of Harvard College v. DHS,*
   788 F. Supp. 3d 182 (D. Mass. 2025)...........................................................33

*Rahmani v. Yellen,*
   2024 WL 2024 WL 1701681 (D.D.C. Apr. 19, 2024).................................13

*Refugee and Immigrant Center for Education and Legal Services v. Noem,*
   793 F. Supp. 3d 19 (D.D.C. 2025).................................................................33

*Royal Siam Corp. v. Chertoff,*
484 F.3d 139 (1st Cir. 2007) .................................................................. 4

*Saavedra Bruno v. Albright,*
197 F.3d 1153 (D.C. Cir. 1999) ............................................................ 18

*Sale v. Haitian Centers Council, Inc.,*
509 U.S. 155 (1993) ..................................................................... 29, 32

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) .......................................................................... 15

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 206 (1953) .......................................................................... 21

*Sierra Club v. Env't Prot. Agency,*
955 F.3d 56 (D.C. Cir. 2020) ............................................................. 18

*Tao Han v. Tarango,*
2024 WL 3186556 (N.D. Cal. June 25, 2024) ..................................... 14

*Texas v. Biden,*
597 U.S. 785 (2022) ..................................................................... 17, 36

*Thatikonda v. DHS,*
2022 WL 425013 (D.D.C. Feb. 11, 2022) ........................................... 14

*Trump v. CASA, Inc.,*
606 U.S. 831, 145 S. Ct. 2540 (2025) ................................................ 44

*\*Trump v. Hawaii,*
585 U.S. 667 (2018) .................................................................. *passim*

*\*Tulare County v. Bush,*
185 F. Supp. 2d 18 (D.D.C. 2001) ................................................ 16, 39

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ..................................................................... 12, 23

*United States v. George S. Bush & Co., Inc.,*
310 U.S. 371 (1940) .......................................................................... 29

*United States v. Ju Toy,*
198 U.S. 253 (1905) ..................................................................... 13, 34

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................................................. 44, 45

*W. Virginia ex rel. Morrisey v. United States Dep't of Health & Hum. Servs.,*
    2014 WL 12803229 (D.D.C. Nov. 3, 2014) ....................................... 18

*\*Webster v. Doe,*
    486 U.S. 592 (1988) ............................................................................. 21

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ........................................................... 43

*Yafai v. Pompeo,*
    912 F.3d 1018 (7th Cir. 2019) ........................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................. 13

*Zemel v. Rusk,*
    381 U.S. 1 (1965) ................................................................................. 33

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ............................................................................. 22

## STATUTES

5 U.S.C. § 701(a)(2) .................................................................................. 18

5 U.S.C. § 702(1) ....................................................................................... 18

5 U.S.C. § 704 ....................................................................................... 15, 17

8 U.S.C. § 1101 ............................................................................................ 3,

8 U.S.C. § 1101(a)(4) ................................................................................... 3

8 U.S.C. § 1101(a)(15)(F) .......................................................................... 30

8 U.S.C. § 1101(a)(15)(H) .......................................................................... 30

8 U.S.C. § 1101(a)(15)(H)(i)(b) ........................................................... 1, 4, 6

8 U.S.C. § 1101(a)(15)(L) .......................................................................... 30

8 U.S.C. § 1103(a)(1) ................................................................................... 4

8 U.S.C. § 1181 ............................................................................................................... 3

8 U.S.C. § 1181(a)(7)(A)(i) ............................................................................................. 3

8 U.S.C. § 1181(B)(i)(II) ................................................................................................. 3

8 U.S.C. § 1182(a) ........................................................................................................... 3

8 U.S.C. § 1182(f) ..................................................................................................... *passim*

8 U.S.C. § 1184(a)(1) ................................................................................................. 4, 32

8 U.S.C. § 1184(c) .......................................................................................................... 38

8 U.S.C. § 1184(c)(1) ............................................................................................ 4, 7, 34

8 U.S.C. § 1184(c)(9) ................................................................................................ 38, 39

8 U.S.C. § 1184(c)(12) .............................................................................................. 37, 39

8 U.S.C. § 1184(g)(1)(A) ................................................................................................. 5

8 U.S.C. § 1184(g)(5)(A) ............................................................................................. 5, 6

8 U.S.C. § 1184(g)(5)(C) ................................................................................................. 5

8 U.S.C. § 1184(g)(7) ...................................................................................................... 5

8 U.S.C. § 1184(i)(1) ....................................................................................................... 5

8 U.S.C. § 1185(a) .................................................................................................... *passim*

8 U.S.C. § 1185(a)(1) ................................................................................................. 1, 20

8 U.S.C. § 1185(d) ........................................................................................................... 3

8 U.S.C. § 1201(g) ........................................................................................................... 3

8 U.S.C. § 1201(h) ........................................................................................................... 3

8 U.S.C. § 1203 ............................................................................................................... 3

8 U.S.C. § 1225(a) ........................................................................................................... 3

8 U.S.C. § 1356 ............................................................................................................. 40

8 U.S.C. § 1356(e)(3) .................................................................................................... 37

8 U.S.C. § 1356(j) ................................................................................................... 40, 41

8 U.S.C. § 1356(m) ...................................................................................... 32, 36, 39, 41

8 U.S.C. § 1356(u)(1) ................................................................................................... 37

8 U.S.C. § 1356(u)(3) ................................................................................................... 38

8 U.S.C. § 1356(u)(3)(B) .............................................................................................. 40

8 U.S.C. § 1361 ............................................................................................................. 34

40 U.S.C. § 486(a) ........................................................................................................ 23

49 U.S.C. § 10101 ........................................................................................................ 38

## FEDERAL REGULATIONS

8 C.F.R. § 214.2(h)(2)(i)(A) ........................................................................................ 34

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) .................................................................................... 6

8 C.F.R. § 214.2(h)(4)(C)(iii) ...................................................................................... 34

8 C.F.R. § 214.2(h)(8)(iii)(A)(1) .................................................................................... 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)-(6) ............................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(5)(ii) .............................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(A)(6)(ii) .............................................................................. 6

8 C.F.R. § 214.2(h)(8)(iii)(C) ......................................................................................... 6

8 C.F.R. § 214.2(h)(8)(iii)(D) ........................................................................................ 6

8 C.F.R. § 214.2(h)(9)(i) ................................................................................................ 6

8 C.F.R. § 214.2(h)(10)(ii) ............................................................................................. 6

8 C.F.R. § 214.2(h)(11) .................................................................................................. 6

8 C.F.R. § 214.2(h)(13)(iii)(D) ...................................................................................... 5

x

8 C.F.R. § 214.2(h)(13)(iii)(E) ................................................................................5

8 C.F.R. § 248.3(f) ...............................................................................................7

## FEDERAL REGISTER

85 Fed. Reg. 34,353 ....................................................................................30, 32

85 Fed. Reg. 36,139 ...........................................................................................30

90 Fed. Reg. 46,027 ...............................................................................1, 26, 41

90 Fed. Reg. 46,028 ...................................................................................1, 26

90 Fed. Reg. 46,028-29 ......................................................................................24

90 Fed. Reg. 46,029 ...........................................................................................17

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ..........................................................................................11

## PUBLIC LAW

Pub. L. 104–208 ................................................................................................32

## MISCELLANEOUS

U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process*, Available at https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process (Last visited Dec. 1, 2025) .......................42

U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations*, Available at www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (Last visited Dec. 1, 2025) ...........................................................................................9

U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, Available at https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf (Last visited Dec. 1, 2025) ........................................................................................9

U.S. Customs and Border Protection, *Proclamation, Restrictions on Entry of Certain Nonimmigrant Workers [H-1B]*, Available at www.cbp.gov/sites/default/files/2025-09/2025_09_20_-_memo_-_h1b_restriction_on_entry_1_redacted.pdf (Last visited Dec. 1, 2025) ............................................................................................................... 9

U.S. Dept. of Labor, Available at *H-1B Program*, www.dol.gov/agencies/whd/immigration/h1b1 (Last visited Dec. 1, 2025) ............................................................................................... 4

U.S. Dept. of State, *H-1B FAQ*, Available at www. https://www.state.gov/h-1b-faq/ (Last visited Dec. 1, 2025) ..................................................................................................... 10

## INTRODUCTION

For decades companies have exploited the H-1B nonimmigrant worker visa program by importing lower-paid, lower-skilled alien workers—thereby artificially depressing wages and employment opportunities for skilled U.S. citizens. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation"). In the Proclamation, the President determined that "[t]he large-scale replacement of American workers through systemic abuse of the [H-1B] program has undermined both [the United States'] economic and national security." *Id*. The President explained that "[t]he high numbers of relatively low-wage workers in the H-1B program" undercuts the program's integrity and "are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated." *Id*. at 46,028. And "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." *Id*. As a result, the President found that "the unrestricted entry" into the country of certain H-1B temporary workers "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages[.]" *Id*.

Based on these finding, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to adopt temporarily "reasonable rules, regulations, and orders" and/or to restrict temporarily "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under 8 U.S.C. § 1101(a)(15)(H)(i)(b) "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000—subject to the exceptions set forth" in the Proclamation. 90 Fed. Reg. at 46,028.

Section 1182(f) vests the President with extraordinarily broad discretion to suspend the entry of aliens whenever he finds their admission "detrimental to the interests of the United States." Section 1185(a)(1) permits the President to adopt "reasonable rules, regulations, and orders… as the President may prescribe" with no prerequisites. The Supreme Court has repeatedly confirmed that this authority is "sweeping," subject only to the requirement that the President identify a class of aliens and articulate a facially legitimate reason for their exclusion. *Trump v. Hawaii*, 585 U.S. 667, 684–88 (2018). The Proclamation here readily satisfies that standard.

The H-1B system was ruthlessly and shamelessly exploited by bad actors. The flip side of the economic losers was that some companies and aliens were winners who enjoyed the lucrative spoils of the system. Hence this suit. Here, Plaintiffs Chamber of Commerce and the American Association of Universities, both associations that do not directly petition U.S. Citizenship and Immigration Services ("USCIS") for H-1B temporary workers, have moved for summary judgment and ask this Court to disregard the President's inherent authority to restrict the entry of aliens into the country and override his judgment. The Court should deny Plaintiffs' motion and instead enter judgment for Defendants.

First, Plaintiffs' claims are foreclosed by the longstanding doctrine of nonreviewability, which bars judicial review of the Executive's discretionary determination under the Immigration and Nationality Act ("INA") to restrict the entry of aliens into the United States. Second, Plaintiffs have no cause of action under the Administrative Procedure Act ("APA"), and their *ultra vires* claim fails as a matter of law. This is because it is well-settled that (1) the President is not subject to suit under the APA and (2) his statutory authority to regulate or restrict the entry of aliens into the United States derives explicitly from 8 U.S.C. §§ 1182(f) and 1185(a). Moreover, that authority is entirely discretionary, and judicial review to challenge such discretionary actions is unavailable

via an *ultra vires* claim or the APA. Third, the Proclamation readily satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with any provision of the INA. The Proclamation simply adds an additional restriction on the entry of a class of aliens to further a key national interest: protecting American workers and national security. Finally, any claim by Plaintiffs that implementation of the Proclamation is procedurally deficient because it did not go through APA notice-and-comment rulemaking fails because Defendants have merely implemented what the Proclamation requires.

The Proclamation is a lawful exercise of the President's authority to restrict the admission of aliens into the United States. The Court should therefore deny Plaintiffs' summary judgment motion in its entirety and enter summary judgment for Defendants.

## BACKGROUND

### I. The Executive's Broad Authority

Under INA, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. A visa is typically necessary, but not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4).

The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause."

*Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

## II.    H-1B Nonimmigrant Classification

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"); *see also Royal Siam Corp. v. Chertoff,* 484 F.3d 139, 144 (1st Cir. 2007) (discussing the eligibility requirements). The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General (and, since the Homeland Security Act of 2002, the Secretary of Homeland Security) may by regulations prescribe. 8 U.S.C. §§ 1184(a)(1), 1103(a)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b; *see also Caremax Inc. v. Holder*, 40 F. Supp. 3d 1182, 1187 (N.D. Cal. 2014) ("Fundamentally, an H–1B visa allows an employer … to fill a temporary position because of a special need, presumably one that cannot be easily fulfilled within the U.S.").

Consistent with that intent, with certain exceptions for models and Department of Defense, most H-1B jobs and applicants must meet the "specialty occupation" requirement as a minimum

qualification for eligibility. A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum qualification for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see, e.g.*, *EG Enters., Inc. v. Dep't of Homeland Sec.*, 467 F. Supp. 2d 728, 735 (E.D. Mich. 2006) (explaining that issue is not simply whether a particular beneficiary qualifies as a member of a specialty occupation, but whether the proffered position constitutes a specialty occupation).

By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-exempt petitions. Cap-subject petitions are counted against the strict numerical limitations created by Congress, which for any fiscal year after 2003 is 65,000 ("Regular Cap"), with an additional 20,000 for individuals who have earned a master's or higher degree from a United States institution of higher education ("Master's Cap"), for a total annual allocation of 85,000 initial H-1B visas or initial grants of H-1B status. *See* 8 U.S.C. § 1184(g)(1)(A) (Regular Cap); § 1184(g)(5)(C) (Master's Cap). Once a beneficiary has been counted towards the numerical allocations, the beneficiary may be cap-exempt for a 6-year period of H-1B admission, with the potential for exemption from the 6-year limitation if pursuing lawful permanent resident status. *See* 8 U.S.C. § 1184(g)(7); 8 CFR § 214.2(h)(13)(iii)(D) and (E). Other H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location. *See* 8 U.S.C. § 1184(g)(5)(A) and (B). The demand for initial H-1B status invariably exceeds the Congressionally imposed numerical limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap selection process, commonly referred to as a "lottery." *See* 8 C.F.R. § 214.2(h)(8)(iii).

Before a petitioning employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject

to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must register for the H-1B cap lottery through the USCIS website. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1) (discussing the registration requirement). Once the registration period closes, USCIS then determines whether it has received registrations for a sufficient number of unique beneficiaries projected as needed to meet the Regular and Master's caps. *See* 8 C.F.R. §§ 214.2(h)(8)(iii)(A)(5)-(6). When USCIS determines that it has received sufficient registrations, it closes the registration period and randomly selects, through a computer-generated program, the number of unique beneficiaries deemed necessary to meet the cap among the registrations properly submitted. *See id.* at §§ 214.2(h)(8)(iii)(A)(5)(ii); 214.2(h)(8)(iii)(A)(6)(ii). If a beneficiary is selected, USCIS sends a notification to the online account of each prospective petitioner who submitted a registration for the selected beneficiary along with petition filing instructions. 8 C.F.R § 214.2(h)(8)(iii)(C); *see also id.* § 214.2(h)(8)(iii)(D).

The employer must then file a Form I-129 to request the classification of the alien as an H-1B nonimmigrant worker (known as an "H-1B petition") and obtain authorization to employ the beneficiary. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). Under the applicable regulations, USCIS shall notify the petitioner of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. § 214.2(h)(9)(i), (h)(10)(ii), (h)(11). If the petition is approved and the alien beneficiary is outside the United States, is inside the United States and requested consulate notification, or inside the United States and the alien's associated status request was denied, the alien beneficiary of the approved H-1B petition, unless visa exempt, must apply for a visa at a U.S. consulate abroad before applying for admission as an H-1B nonimmigrant. See 8 U.S.C. § 1184(c)(1) (providing that an H-1B petition "shall be made and approved before the visa is granted."). If the alien is in the United States, and for which a

requested change of status was granted, the change to H-1B status is generally effective upon the petition validity start date. 8 C.F.R. § 248.3(f).

### III.    Presidential Proclamation 10973

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." *Id.* at 46,027. H-1B workers account for an outsized share of the labor market in Science, Technology, Engineering, and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions at a 36% discount over American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, the unemployment rate for recent college graduates in those fields has also increased, and companies have at times laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

Not only are H-1B program abuses detrimental to American workers, the Proclamation also explains that such abuses are a national security threat because they reduce American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an

immediate response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed entry restrictions on H-1B workers pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a). In particular, it restricted entry to only petitions accompanied by or supplemented by a payment of $100,000. *Id.* It created an exception for individuals, companies, or industries that the Secretary of Homeland Security determines, in her discretion, are "in the national interest and do not pose a threat to the security or welfare of the United States." *Id.* at 46,029.

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on H-1B petitions not accompanied by the $100,000 payment, and it instructed the Secretary of State to confirm payment of the $100,000 before addressing any visa application. *Id.* at 46,028-29. It also instructed the Department of State and the Department of Homeland Security to take all necessary steps to implement the Proclamation and deny entry to the United States of any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and the Department of Homeland Security to engage in rulemaking on issues relating to the prevailing wage and the H-1B lottery. *Id.* Such rulemaking is not complete and is not challenged in this litigation.

The restrictions are set to expire after 12 months, absent an extension. *Id.* at 46,028.

IV.    **Agency Guidance and Memoranda**

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. *See* Plaintiffs' Exhibit 2.[1] USCIS explained that the Proclamation applied prospectively, to those petitions not yet filed and did not impact the ability of any current visa holder to travel to or from the United States. *Id.* USCIS also updated its website to explain that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." Plaintiffs' Exhibit 5.[2] It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS", that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver, and that [p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection ("CBP") also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiary of approved petitions or who hold a valid H-1B visa. *See* Plaintiffs' Exhibit 3.[3] It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States" and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." *Id.*

The State Department issued two paragraphs of guidance on its website explaining that the

---

[1] Available at https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf
[2] Available at /www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations
[3] Available at www.cbp.gov/sites/default/files/2025-09/2025_09_20_-_memo_-_h1b_restriction_on_entry_1_redacted.pdf

Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." McTague Exhibit 1.[4] The State Department unequivocally stated that "No visas have been revoked pursuant to the Proclamation." *Id.* In FAQs, the State Department referenced the USCIS and CBP guidance and stated that it had "posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance." Plaintiffs' Ex. 4.[5]

## V.    Procedural History

Nearly a month after the Proclamation issued, the Chamber of Commerce filed this action challenging that Proclamation and the payment it requires. ECF 1 (Oct. 16, 2025). On October 24, 2025, Chamber of Commerce, with new plaintiff Association of American Universities, filed an Amended Complaint, which was served on Defendants on Saturday October 25, 2025. Plaintiffs assert that they have associational standing. Am. Compl. ¶¶ 19, 26. The Amended Complaint asserts two causes of action. Count I alleges a non-statutory claim in equity that the Proclamation is *ultra vires*. *Id.* ¶ 196. It seeks to enjoin implementation of the Proclamation and enforcement of the Proclamation against the Plaintiffs and their members by the agencies. Am. Compl. ¶ 196; *see also id.* Prayer ¶ 2. Count II alleges that any agency action implementing the Proclamation would be contrary to law and arbitrary and capricious, in violation of the APA. *Id.* ¶¶ 201-206. It seeks to have any such actions vacated and set aside. *Id.; see also id.* Prayer ¶ 3.

---

[4] Available at travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html
[5] Available at www.state.gov/h-1b-faq/

Plaintiffs also served Defendants with a motion for a preliminary injunction on Saturday, October 25, 2025, which sought summary judgment in the alternative. ECF 18 ("Br."). After expedited briefing in which the government sought a stay during the lapse in appropriations in part because the Plaintiffs could not establish irreparable harm (ECF 22-27), the court on October 29, 2025, converted Plaintiffs' motion to summary judgment and ordered the Defendants to provide their opposition by the Friday after Thanksgiving, November 28, 2025 (Minute Order), which was then extended to Monday, December 1, 2025 (Minute Order).

## STANDARD OF REVIEW

The Court must grant summary judgment to a party when "there is no genuine dispute as to any material fact" and that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether there is a "genuine dispute as to any material fact," the Court must ask itself whether any reasonable jury could find for the nonmoving party at trial. *Id.; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This serves the core function of summary judgment: to "avoid the expense of trial where a trial would be a useless formality because no factfinder could find for the nonmoving party." *Mass. Coal. for Immigr. Ref. v. DHS*, 698 F. Supp. 3d 10, 21 (D.D.C. 2023) (cleaned up).

## ARGUMENT

## I.    Plaintiffs' Challenges to the Proclamation are not Justiciable.

The Proclamation is not reviewable under principles of consular nonreviewability. The Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) (quotations omitted). In particular, the Supreme Court has held that "[t]he conditions of entry for every alien, the particular classes of aliens that

shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (citation omitted). Indeed, the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see also Hawaii*, 585 U.S. at 702 (quoting *Fiallo*, 430 U.S. at 792 for same reasoning). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Id.* On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted).

Plaintiffs' claims challenging the President's Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of entry decisions. *Ex rel. Knauff v. Shaughnessy*, 338 U.S. at 543. Since "[t]he Immigration and Nationality Act (INA) does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions" under the "doctrine of consular nonreviewability." *Muñoz*, 144 S. Ct. at 1820 (quotations omitted). Instead, Congress has delegated sweeping "discretionary authority" over whether to admit aliens. *Id.* Congress made a policy choice in 8 U.S.C. §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the

decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability). So, whereas here, "the President acts pursuant to an express or implied authorization of Congress"—e.g., 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Nor does it matter which agency is enforcing the President's Proclamation in the first instance. Over a century of caselaw shows that principles of nonreviewability apply regardless of who decides to deny entry to a foreign national. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come into this country, and to have its declared policy in that regard *enforced exclusively through executive officers, without judicial intervention*, is settled by our previous adjudications." (emphasis added) (quotations omitted)). By way of historical review, the doctrine has been applied to executive officers like the President, *Hawaii*, 585 U.S. at 703–04, the Attorney General, *Mandel*, 408 U.S. at 766, the Secretary of the Treasury, *Rahmani v. Yellen*, 2024 WL 2024 WL 1701681, at *14–15 (D.D.C. Apr. 19, 2024); *Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1, 6–7 (D.D.C. 2021), the "Secretary of Commerce and Labor," *United States v. Ju Toy*, 198 U.S. 253, 261 (1905) (decision is "conclusive"), CBP determinations, *Matushkina v. Nielsen*, 877 F.3d 289, 295-96 (7th Cir. 2017), and legacy INS determinations, *Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998).

*All* of these cases involved non-"consular" officers and discussed the deference owed to the Executive Branch's visa determinations more generally. *See Tao Han v. Tarango*, 2024 WL

3186556, at *2 (N.D. Cal. June 25, 2024) ("The doctrine of consular nonreviewability applies whether Mr. Han is challenging the consular office's visa denial, the USCIS fraud finding underpinning the visa denial, or the USCIS refusal to waive Mr. Han's inadmissibility."); *Thatikonda v. DHS*, 2022 WL 425013, at *6 (D.D.C. Feb. 11, 2022) ("[The plaintiff]'s suit is barred by the doctrine of consular nonreviewability. Just as it made no difference that Matushkina challenged the CBP finding of inadmissibility, it makes no difference here that [the plaintiff] purports to attack a USCIS finding.").[6] The bottom line is that while courts have often characterized the doctrine in the context of consular officials' decisions, the same separation-of-powers principles apply to determinations by other executive officials. *See also Doshi v. Blinken*, No. 23-cv-3613, 2024 WL 3509486, at *5 (D.D.C. July 22, 2024) (holding that Plaintiffs' challenge to their Section 7031(c) designation is not reviewable under the APA); *Yafai v. Pompeo*, 912 F.3d 1018, 1020–21 (7th Cir. 2019) (applying principles of nonreviewability) (quoting *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017)). Since Plaintiffs are challenging the Executive's admission decisions, such claims are nonreviewable.

## II.    Plaintiffs Lack a Cause of Action.

Plaintiffs raise their only claims under the APA or as equitable *ultra vires* claims. Neither works. Thus, Plaintiffs lack a cause of action and summary judgment must be granted for the

---

[6] *See also Al Makaaseb Gen. Trading Co. v. Christopher*, 1995 WL 110117, at *2–3 (S.D.N.Y. Mar. 13, 1995) ("Plaintiffs attempt to circumvent the doctrine of nonreviewability by alleging in their opposition to the motion to dismiss that the State Department, not the consulate, denied the visa applications by virtue of its inclusion of Al Makaaseb on the so-called Automated Visa Lookout System. Even assuming those facts to be true, plaintiffs' claim is still barred from judicial review."); *Malyutin v. Rice*, 677 F. Supp. 2d 43, 46 (D.D.C. 2009) (noting how "the doctrine also applies where a plaintiff attempts to circumvent the doctrine by claiming [that] he is not seeking a review of the consular officer's decision, but is challenging some other, related aspect of the decision"), *aff'd*, 2010 WL 2710451 (D.C. Cir. July 6, 2010).

Defendants.

**A.    Plaintiffs cannot challenge the Proclamation or its implementation under the APA.**

**1.    Merely implementing a Presidential Proclamation is not reviewable.**

The APA does not provide a cause of action for judicial review of the President's Proclamation. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994). As the Ninth Circuit has explained, "[t]he scope of our review [under the APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *Id.* at 770; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (refusing to hold that the President is an "agency" within the meaning of the APA). Plaintiffs' request to enjoin the Proclamation thus cannot be based in the APA or its standards. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

Plaintiffs also cannot pursue an APA claim against DHS or any of the other agency Defendants, Br. 34-36, because they have not identified any final agency action distinct from the Proclamation. *See* 5 U.S.C. § 704. Indeed, Plaintiffs have not identified an "agency action" at all, much less a final one. To start, it is true that agencies must implement the Proclamation. But that is always true, as the President cannot deny each entry on his own. *Cf. Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020) ("[N]o single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."). If the fact that an agency is simply enacting the President's Proclamation allowed for an APA challenge, this would effectively nullify the President's exemption from the APA.

Realizing this, courts have found no APA review is available where the agency's action (if any) is an "extension of the President's action" and "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*,

306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President."). Here, Plaintiffs only challenge short explanatory memoranda as the necessary final agency actions. Any argument that the agency memoranda "is agency action would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare County*, 185 F. Supp. 2d at 21. This is not to say any implementation of a presidential directive is unreviewable; rather, there is no reviewable action when the agency is merely carrying out the President's proclamation and has no independent decision-making as here. *Id.* That is doubly true here given the broad discretionary nature of the statute and the intersection of foreign affairs, national security, and immigrations issues.

Plaintiffs mainly focus on a two-paragraph Memorandum issued by USCIS that simply explains the Proclamation and clarifies that it only applies prospectively. Br. 35-36; Plaintiffs' Exhibit 2. USCIS's website was also updated to explain how the $100,000 could be paid and that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver. Plaintiffs' Exhibit 5. Similarly, CBP issued a two-paragraph memorandum explaining the Proclamation, clarifying that it was prospective, and stating that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." Plaintiffs' Exhibit 3. Finally, the State Department posted two paragraphs on its website explaining the Proclamation, that its prospective, and that USCIS and CBP had issued similar guidance. McTague Ex. 1.

None of these explanations reflect an agency decision or rulemaking. The Supreme Court

has held that courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that decision." *Texas v. Biden*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)). At most the memoranda are implementing the President's Proclamation and thus do not constitute final agency action on their own. *See Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). Nor are Plaintiffs injured by these memoranda, as they only explain the existing Proclamation, which is what restricts entry subject to the $100,000 payment. Indeed, the Proclamation itself dictates how employers must comply. 90 Fed. Reg. 46029 § 2. Absent the memoranda, Plaintiffs would face the same harms but clearly have nothing to challenge other than the Proclamation itself. At most, the memoranda clarify that the Proclamation is only prospective, which does not harm Plaintiffs.

### 2. There is no final agency action otherwise.

For similar reasons, even if implementing a Presidential Proclamation did not preclude APA review by itself, the agency memoranda cannot constitute "final agency action." Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. To be final (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

Plaintiffs' claims fail both prongs. None of the memoranda reflect any decision-making by the agencies. The agencies simply explained the Proclamation and have otherwise been implementing it. No decision apart from the President's Proclamation was made. Similarly, no rights or consequences flow from the memoranda themselves. *See Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62-65 (D.C. Cir. 2020). Any impact on rights stems instead from the Proclamation itself, which restricts entry subject to a $100,000 payment. The memoranda merely

explain this and clarify that the restriction is prospective, which cannot harm Plaintiffs. Even if the memoranda were vacated, the Proclamation would still exist and have the exact same impact on Plaintiffs.[7]

### 3. Any agency action would be committed to agency discretion.

Even if APA review were generally available for Presidential actions, it would still be unavailable here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* § I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

There is no statute or other law to gauge the agency action against, only the President's Proclamation under Sections 1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Section 1182(f) allows the President to suspend entry of a class of aliens "[w]henever the President finds that the entry… would be detrimental to the interests of the United States." And in doing so the President can impose "any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Section 1185(a)(1) authorizes the President to set "reasonable rules, regulations, and orders" for entry or departure as "the President may prescribe." These sections grant the President sweeping discretion to determine when to issue a Proclamation and what restrictions to impose. The Supreme Court has thus "observed that § 1182(f) vests the

---

[7] Because of Defendants' position that there is no final agency action, there is no administrative record to produce. Plaintiffs, however, have insisted that Defendants produce an administrative record under Local Rule 7(n). If Plaintiffs believe an administrative record is necessary, then their motion for summary judgment was premature and may be denied on that ground. *See W. Virginia ex rel. Morrisey v. United States Dep't of Health & Hum. Servs.*, 2014 WL 12803229, at *2 (D.D.C. Nov. 3, 2014) (staying briefing as premature).

President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Thus, the President's determination of whether and how to suspend or regulate entry is inherently committed to his discretion and is therefore unreviewable under the APA. By transitive property, that discretion is carried over to the agencies that implement the Proclamation. The agencies' implementation of the proclamation is thus also committed to agency discretion as well. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's decision since that was also committed to agency discretion).

Thus, the Proclamation is the relevant source of law for the agencies, foreclosing judicial review. Proclamations under Sections 1182(f) and 1885(a)(1) are simply not reviewable under the APA. Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in 8 U.S.C. §§ 1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. 462, at 476.

### B.    The Plaintiff Cannot Assert an *Ultra* Vires Claim to Challenge the Proclamation.

Otherwise lacking a cause of action, Plaintiffs seek to challenge the Proclamation and its implementation as *ultra vires*. Am. Compl. ¶ 192. To start, it is doubtful that *ultra vires* review is available to challenge presidential actions at all. *See Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). Regardless, "longstanding authority holds" that *ultra vires* review of executive action is "not available" when, as here, "the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474; *see also Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *2 (per curiam). And even if such review is available generally, the Supreme Court has made clear that an *ultra vires* challenge based on a statute "applies only when an agency has taken action entirely in excess of its delegated powers," and

"contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n (NRC) v. Texas*, 145 S. Ct. 1762, 1776 (2025) (internal quotation marks omitted). At most, even a broader view of *ultra vires* claims requires the statutory violation to be "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). Plaintiffs' claims certainly do not here.

Section 1182(f) is the quintessential statute that "commits the decision to the discretion of the President" and thus precludes an *ultra vires* cause of action. *Dalton*, 511 U.S. at 474. Section 1182(f) provides a grant of broad, unreviewable discretion to the President to exercise powers to suspend or restrict the entry into the United States of any aliens or class of aliens "[w]henever the *President finds*" that entry of such aliens or class of aliens "would be *detrimental to the interests of the United States*." 8 U.S.C. § 1182(f) (emphasis added). As the Supreme Court has held, "[b]y its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii,* 585 U.S. at 684. The discretion in section 1185(a)(1) is even clearer, as it allows the President to set "reasonable rules, regulations, and orders, and subject to such limitations and exceptions as *the President may* prescribe." 8 U.S.C. § 1185(a)(1) (emphasis added). The Supreme Court previously addressed parallel language in § 102(c) of the Foreign Services Act which allowed termination of a CIA employee whenever the Director "shall *deem* such termination necessary or *advisable in the interests of the United States*" finding that language, too, "fairly exudes deference" to the President. *Webster v. Doe,* 486 U.S. 592, 600 (1988) (emphasis added). As a result, the Court found that the provision in *Webster* "appears … to foreclose the application of any meaningful judicial standard of review." *Id*. It also foreclosed a discharged employee from "complain[ing] that

his termination was not 'necessary or advisable in the interests of the United States,' since that assessment is the Director's alone." *Id.* at 603.

Sections 1182(f) and 1185(a)(1) likewise provides no meaningful standard of review and foreclose any inquiry into the President's reasoning because the provisions do not require evidence that such entry *is* detrimental to the interests of the United States, only that the President finds that it would be. *Id.* at 600. "How the President chooses to exercise the discretion Congress has granted him" in Sections 1182(f) and 1185(a)(1) of the INA is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476. That prohibition on review extends to any claim that "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power" because "the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion." *Id.* at 474 (quoting *Dakota Central Telephone Co.* v. *South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). Thus, the Proclamation, which was made pursuant to a broad grant of discretionary authority in sections 1182(f) and 1185(a)(1), is not subject to review via an *ultra vires* claim.

Judicial review of the President's discretionary determination in this area is particularly inappropriate because that determination includes both immigration and national security issues. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). It is "wholly outside the power of this Court to control" the power to expel or exclude aliens, including "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based"

21

are "wholly outside the power of this Court to control." *Id*. at 796 (citation omitted). Likewise, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Dakota Central Telephone Co.*, 250 U.S. at 184 (refusing to consider claim that President abused discretion based upon statutory provision giving President power to control telephone lines if he "deem[ed] it necessary for the national security or defense"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and an *ultra vires* claim like Plaintiffs assert here necessarily lacks congressional authorization.

This leads to the next point. Even if there could be *ultra vires* review, there is certainly no "specific prohibition in a statute" that would render the Proclamation "entirely in excess of [the President's] delegated powers." *NRC*, 145 S. Ct. at 1776. Plaintiffs can "point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). Rather, the statute "exudes deference" and this Proclamation falls well within its scope. *Hawaii*, 585 U.S. at 684. Plaintiffs' claims are thus doomed.

Plaintiffs' reliance on *Chamber of Commerce v. Reich* is also misplaced. There, the

President had relied on a provision in the Procurement Act to issue a proclamation regarding hiring of permanent workers during a strike. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996). While the court acknowledged that the provision gave discretion to the President, it also noted that the discretion was circumscribed, including by "wage and price standards and likely savings to the government." *Id.* at 1330-31 (citation omitted). Indeed, § 486(a) stated that "[t]he President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder." 40 U.S.C. § 486(a) (1986).

That statute was by no means as broad a grant of discretion as Sections 1182(f) and 1185(a)(1), which grants the President authority to restrict entry if he "finds that the entry ... would be detrimental to the interests of the United States" and set "reasonable rules, regulations, and orders… as the President may prescribe." Further, the court in *Reich* distinguished *Dalton* because the proclamation at issue took away an express right granted by statute to employers during a strike. *Id.* at 1332. Here, there is no allegation that an express right has been rescinded via the Proclamation; nor could there be. Aliens outside of the United States do not have any right to enter the United States, let alone an express right. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe."). Indeed, for that reason, consular nonreviewability also bars Plaintiff's claims. *See id.*; *see also Hawaii*, 585 U.S. at 682 (noting that consular non-reviewability is a difficult question in the context of § 1182(f), but because it did not go to the court's jurisdiction, it did not

need to consider it). Moreover, Plaintiffs certainly do not have a right to H-1B visas, which are capped and heavily regulated. And the Proclamation does not eliminate the ability to obtain an H-1B, but rather merely adds a restriction in the form of a payment.

Similarly, the agency memoranda and guidance discussing the Proclamation are likewise unreviewable through an *ultra vires* claim. Those documents do little more than quote and explain the Proclamation. 90 Fed. Reg. 46028-29. To allow review of such documents via an *ultra vires* claim, when the Proclamation itself is unreviewable, would result in the absurd notion that any agency statement or action about, or in accordance with, a Presidential Proclamation somehow renders the Proclamation itself subject to an *ultra vires* challenge. And, once again, there is no "specific prohibition" on the agency actions. *NRC*, 145 S. Ct. at 1776. Absent this "hail Mary" *ultra vires* claim, Plaintiffs lack a cause if action to challenge the Proclamation. *Id.*

## III.    The Proclamation satisfies the statutory prerequisites of 8 U.S.C. §§ 1182(f) and 1185(a)(1) and does not conflict with the INA.

Even if Plaintiffs' claims are justiciable, this court's review of the Proclamation "must be exceedingly deferential" because the delegation of Sections 1182(f) and 1185(a)(1) "invokes the President's discretion in exercising core Article II responsibilities" addressing immigration, foreign affairs, and national security. *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3. "Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive." *Hawaii*, 585 U.S. at 702 (quotations omitted). And when the Executive Branch provides "a facially legitimate and bona fide reason" for denying a visa, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification." *Mandel*, 408 U.S. at 770. The Proclamation

readily passes muster under the deferential review afforded to the President or under any other standard.

### A.    The Proclamation satisfies the statutory prerequisites of 8 U.S.C. § 1182(f) and 1185(a)(1).

Section 1182(f) provides that whenever the President finds that the entry of "any class of aliens into the United States would be detrimental to the interests of the United States," he may suspend their entry or impose on their entry "any restrictions he may deem to be appropriate." Section 1185(a)(1) authorizes the President to establish "reasonable rules, regulations, and orders" for entry and departure "as the President may prescribe." Sections 1182(f) and 1185(a)(1) "exude[] deference to the President in every clause," as it "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 585 U.S. at 684. The "*sole prerequisite*" to the President's exercise of authority under this "comprehensive delegation" is the determination that entry of the covered aliens into the United States "would be detrimental to the interests of the United States." *Id.* at 685 (emphasis added).

Notably, Section 1185(a)(1) requires no finding of detriment, does not have to apply to a class of aliens, and can simply be a regulation on entry rather than a suspension. That authority alone validates the Proclamation. Yet Plaintiffs do not address it other than to say the section "does not convey any authority that Section 212(f) does not," Br. 23 n.6, because the Supreme Court said they "substantially overlap[]," *Hawaii*, 585 U.S. at 683 n.1. But the Court simply noted that given the overlap "we need not resolve ... the precise relationship between the two statutes" based on the Government's argument that any distinction was irrelevant for that proclamation. *Id.* Here, the $100,000 payment can easily be supported as a reasonable regulation on entry under Section 1185(a)(1) alone. Regardless, the Proclamation also satisfies Section 1182(f)'s prerequisites and can be upheld on that basis.

1. **The Proclamation satisfies the "sole prerequisite."**

The President more than satisfied this "sole prerequisite" of Section 1182(f) with a detailed Proclamation. The President expressly found "that the unrestricted entry into the United States of certain foreign workers" described in the Proclamation "would be detrimental to the interests of the United States[.]" 90 Fed. Reg. at 46,028. That alone would suffice, as the Supreme Court has upheld a Proclamation saying only that. *See Hawaii*, 585 U.S. at 686 (upholding single sentence proclamation).

The President, however, explained his decision in detail. The President found that "[t]he H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor." 90 Fed. Reg. at 46,027. The President made clear that the "systematic abuse of the program" has led to "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id.* The President provided specific facts about the increase in foreign tech workers, reduction in American tech workers, Americans workers training their foreign replacements, entry-level jobs being taken by foreigners rather than American college graduates, and major companies laying off American workers just to replace them with H-1B workers. *Id.* at 46,027-28. In addition, the President found that these abuses threaten national security because it "discourage[es] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and it is "therefore necessary to impose higher costs on companies seeking to use the H–1B program in

order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.* The President determined that a $100,000 payment was required to make sponsors choose between paying American workers more or paying for H-1B workers they truly need to address these serious economic and national security concerns. *Id.*

These findings easily satisfy the deferential standard laid out in *Hawaii*, because they set forth the basis for the President's conclusion that entry of the enumerated workers "would be detrimental to the national interest." *Hawaii*, 585 U.S. at 685. And those findings are far more detailed than many prior Proclamations. *Id.* at 686 (noting that President Clinton gave a one-sentence explanation for a Proclamation under § 1182(f) in 1996, and President Reagan gave a five-sentence explanation for a proclamation under § 1182(f) in 1981). In addition, the Proclamation is limited in time and allows for individual exemptions, features that reinforced the legality and carefully considered nature of the Proclamation in *Hawaii*, 585 U.S. at 707-09.

Despite the President's detailed findings, Plaintiffs argue that the required finding was improperly premised on abuses by employers, not the aliens. Br. 29-30. This is misguided. To start, Section 1182(f) does not require the aliens to be inherently detrimental; rather, it is the "entry of any aliens" that "would be detrimental to the interests of the United States." The fact that employers are engaged in the abuse is of no moment. The Proclamation is also not limited to employers who previously engaged in fraud. Instead, the Proclamation is attempting to fix the problem of aliens *entering* and taking opportunities from American workers, especially in national security sensitive industries. *Id.* Abuse is a core part of the Proclamation, but it is not the only thing being addressed. "[W]hen the President adopts 'a preventive measure . . . in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions.'" *Hawaii*, 585 U.S. at

686-87 (quoting *Holder v. Humanitarian Law Project*, 561 U. S. 1, 35 (2010)). Even so, when companies abuse the H-1B program they are making the *entry* of H-1B aliens detrimental to America's interest because their entry is reducing wages and employment opportunities for Americans and threatening national security in key sectors. And the aliens are not wholly separate from the abuse at issue. Their participation allows for the abuse. It is their entry that is ultimately detrimental.

Plaintiffs also claim the Proclamation impermissibly regulates and targets domestic companies. Br. 30. Not so. The Proclamation bans the entry of aliens absent a payment, regardless of who the sponsor is. And for H-1B visas, where the employer is a necessary sponsor, regulation of the alien is inherently bound up in the employer. That does not categorically exempt H-1B visas from the scope of Section 1182(f)—nor does it transform the Proclamation into a purely domestic regulation. Moreover, it is inaccurate to claim that the purpose of the statute (and thus its scope) is limited to foreign concerns. The text has no such limit. Instead, it permits the President to determine when entry would be detrimental to the interests of the United States for any reason. Indeed, the proclamation upheld in *Hawaii* stemmed from concerns about unvetted migrants raising "national security" and "public-safety threats" within the United States. 585 U.S. at 677-80. The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under § 212(f) based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting examples). So the domestic impact or even intent of the Proclamation is irrelevant.

In any event, Section 1182(f) does not permit litigants to "challenge" a Presidential entry-

suspension order "based on their perception of its effectiveness and wisdom," because Congress did not permit courts to substitute their own assessments "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Hawaii*, 585 U.S. at 708 (citations and quotations omitted). Whether the President's chosen method of addressing a perceived risk to the national interest "is justified from a policy perspective" is irrelevant, because he need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Id*. at 686-87 (citations omitted). Yet that is all Plaintiffs' argument amounts to; a challenge to the President's reasoning and chosen remedy. Such judicial second guessing "would amount to a clear invasion of the legislative and executive domains." *United States v. George S. Bush & Co., Inc*., 310 U.S. 371, 380 (1940); *see Sale v. Haitian Centers Council, Inc*., 509 U.S. 155, 165 (1993) ("[t]he wisdom of the policy choices" reflected in Presidential Proclamations are not "matter[s] for our consideration").

### 2. The Proclamation clearly applies to a class of aliens

Section 1182(f) does not define a "class of aliens." Classes are inherently abstract concepts that are subject to countless permutations. Clearly aliens seeking H-1B visas for the purpose of entering the United States to perform a "specialty occupation" constitute a class. Yet Plaintiffs argue that a "class" requires some common link, namely nationality. Br. 28-29.

But there is no basis in the statute's text or otherwise to limit the President's broad discretion to determine the relevant class of aliens under the statute. The Supreme Court rejected a similar argument that a class of aliens could not be "overbroad" because it "simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but 'all aliens.'" *Hawaii*, 585 U.S. at 688. The Supreme Court thus rebuffed a claim that the class "must refer to a well-defined group of individuals who share a

common 'characteristic' apart from nationality" as atextual. *Id*. The Supreme Court did not hold, however, that the only possible class must be defined by nationality. *Id*. Indeed, the Supreme Court held that Section 1182(f) "entrusts to the president" the question of "whose entry to suspend." *Id.* at 683. That breadth and deference is supported by the use of the term "any," which is expansive. *See Patel v. Garland*, 596 U.S. 328, 338 (2022).

In any event, the Proclamation does define the relevant "class of aliens" based on a "common link:" the purpose of the alien's entry. That is a proper class. Indeed, the proclamation in *Hawaii* was also based on the purpose of entry, as the same immigrant barred for business or tourism could enter as a permanent resident or an asylee. 585 U.S. at 680, 685. Visas are inherently based on the purpose of entry, such as to pursue a full-time course of study for F-1 students, to temporarily transfer to another branch of a company as a manager or executive for L-1 employees or, as here to temporarily perform services in a specialty occupation as H-1B nonimmigrants. *See* 8 U.S.C. § 1101(a)(15)(F), (H), (L). The aliens seeking H-1B visas are connected by the common purpose of that visa. That is more than sufficient. Other Proclamations have been based on visas. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, but they could enter other ways). And many Proclamations have been based on things other than nationality. *See* 85 Fed. Reg. 36,139 (June 15, 2020) (suspending entry for connection with ICC). The fact that some aliens can enter if the petition filed on their behalf includes evidence that the $100,000 payment has been made does not alter the class. That is a "restriction[]" on entry, which is explicitly permitted by Sections 1182(f) and certainly 1185(a)(1). The class the restriction on entry applies to is still those seeking H-1B visas. Such a class of aliens is no different from the class in *Hawaii*, which "restrict[ed] entry of aliens who could not be vetted with adequate information" because such information was not supplied by their countries of origin. 585 U.S. at

685. In both instances, the grouping is based upon the national security concern and is derived from information related to an entity other than the alien. And in both instances, exemptions could be made and the aliens could enter for other purposes. *Id*. The class here is clearly permissible.

  3. **The Proclamation does suspend or restrict entry.**

Under the Proclamation aliens seeking to enter with new H-1B visas cannot *enter* the country for that purpose unless evidence is provided showing that the additional $100,000 payment has been made, when applicable. 90 Fed. Reg. at 46028. So the Proclamation literally "suspend[s] … entry" or imposes "restrictions … on the entry of aliens." 8 U.S.C. § 1182(f). This is underscored by the fact that aliens already *within* the United States may be able to seek an H-1B visa without the $100,000 payment. The restriction is solely upon *entrance—i.e.*, precisely what § 1182(f) permits. And, once again, this is obviously a "regulation" on entry under § 1185(a)(1).

  1. Plaintiffs nonetheless argue that a required payment is not an "entry restriction" but instead is an attempt to "fundamentally transform" the H-1B program. Br. 23. This is wrong. The Supreme Court has held that § 1182(f)'s use of the language "any restrictions he may deem to be appropriate" "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Thus § 1182(f) delegates authority to the President to "supplement the other grounds of inadmissibility in the INA." *Id*. That holding is consistent with the longstanding D.C. Circuit precedent that the "sweeping proclamation power" in §1182(f) permits the President to supplement the grounds of inadmissibility in the INA. *Abourezk*, 785 F. 2d at 1049 n.2. The $100,000 payment is simply another restriction on entrance that the President deemed appropriate to address the serious national interest concerns.

Furthermore, such entry restrictions may take whatever form the President chooses, and may take place before an alien reaches the border or a port of entry. *See Sale*, 509 U.S. at 187 (finding it "perfectly clear" that the President could "establish a naval blockade" to prevent illegal

migrants from entering the United States). Plaintiffs' citations to the 1952 definition of "entry" to limit any restrictions to the border is thus unpersuasive. That definition was deleted in 1996. Pub. L. 104–208, §301(a). And even in 1993, while that definition was still in the INA, the Supreme Court found that a naval blockade on the high seas was permissible. *See Sale*, 509 U.S. at 158. In any event, the payment is a negative or prohibitory limit: an alien cannot enter unless that restriction is satisfied. Who chooses to satisfy that restriction with a payment is irrelevant.[8]

> **2.**     Nothing in Section 1182(f) suggests that a restriction on entry cannot be monetary in nature, nor do Plaintiffs cite anything in support. Instead, Plaintiffs rely on Congress' taxing power to argue a restriction cannot effectively be a tax. Br. 25 (citing U.S. Const. Art. I, sec. 8, cl. 1). First, not every payment requirement is akin to a tax, as the payment here operates as a "regulation" rather than "revenue production." *Bailey v. Drexel Furniture Co*., 259 U.S. 20, 38 (1922). The point of the payment is to increase employment and wages of Americans, especially in national security related industries. While it may raise revenue, that is not the purpose and the effect might not raise revenue. Second, Plaintiffs acknowledge that Defendants have the ability to adjust fees for visas, including for H-1B. 8 U.S.C. §§ 1356(m), 1184(a)(1). If that is not an intrusion on Congress' taxing power, then neither is imposing a limited payment as a restriction on aliens entering the country.

> Plaintiffs argue (at 34) that the delegation in those provisions is express while here it is not. But to the extent this is a delegation, it occurs at the intersection of foreign affairs and immigration

---

[8] Plaintiffs also briefly argue the Proclamation is not a suspension on entry because the same aliens can enter other ways. That is irrelevant, as the Proclamation restricts entry for a particular purpose. As noted, the Proclamation in *Hawaii* allowed the same aliens to enter for other purposes. 585 U.S. at 685, 680. This is often true for proclamations; the same aliens can have entry restricted for one visa but not others. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for Chinese students, but they could enter other ways); *Pacito v. Trump*, 152 F.4th 1082, 1087 (9th Cir. 2025) (proclamation suspending refugees likely to succeed even though aliens could enter other ways).

where the President wields significant "authority," so Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Accordingly, Congress may "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892). The same is true here, where Congress delegated sweeping discretion to impose "*any restrictions he may deem to be appropriate*" in the realm of "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708 (quoting § 1182(f)) (emphasis added). Given this foreign affairs and immigration context—and that Proclamations are limited in time, to entry, and classes of aliens—this power does not raise a major question either. Indeed, Congress expressly delegated this "sweeping authority," and the Proclamation falls well within that broad delegation. *Hawaii*, 585 U.S. at 639.[9]

    **3.**    Plaintiffs also claim that the Proclamation is *ultra vires* because the Executive does not have the power to "stop deciding visa petitions." Br. 28. But the entire point of a visa is to provide a mechanism to enter the country. So if a petitioner has not paid $100,000 and thus the alien beneficiary cannot enter, there is no purpose in processing those petitions. And, as noted before, consular non-reviewability can apply to decisions other than the State Department's ultimate award or denial of a visa. *See Ju Toy*, 198 U.S. at 261 (Labor and Commerce); *Doan*, 160 F.3d at 509 (INS).

    Plaintiffs' attempt to disentangle the petition from entry is also disingenuous because

---

[9] Plaintiffs cite *Refugee and Immigrant Center for Education and Legal Services v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) for the proposition that courts enjoin proclamations that exceed the authority of § 1182(f). But the D.C. Circuit stayed that opinion regarding the Proclamation's impact on the entry of those seeking asylum and only denied the stay for removals, which is irrelevant here. *RAICES v. Noem*, 25-5243, (D.C. Cir. Aug. 1, 2025). Plaintiffs also (incorrectly) cite *President and Fellow of Harvard College v. DHS*, but the court did not decide the statutory issue. 788 F. Supp. 3d 182, 197 (D. Mass. 2025). In any event, neither case is binding nor correct.

although the visa is the entry document presented at the port, the INA specifically requires that other documents are required for entry. The INA requires that "[w]henever any person makes application for a visa *or any other document required for entry*, or makes application for admission, *or otherwise attempts to enter the United States*, the burden of proof shall be upon such person to establish that he is eligible to receive such visa *or such document,* or is not inadmissible under any provision of this chapter, *and*, if an alien, *that he is entitled to the nonimmigrant*, immigrant, special immigrant, immediate relative, or refugee *status claimed*, as the case may be." 8 U.S.C. § 1361 (emphasis added); s*ee also Castaneira v. Noem*, 138 F.4th 540, 543 (D.C. Cir. 2025) (applying § 1361 to petitions before USCIS). The H-1B petition is a statutorily required step in the process to enter the United States as an H-1B beneficiary: "Such petition [to import[] any alien as a nonimmigrant under subparagraph (H) shall be made and approved before the visa is granted." 8 U.S.C. § 1184(c)(1); *see also* 8 C.F.R. § 214.2(h)(2)(i)(A) (requiring a petition in the form required by USCIS); *id.* § 214.2(h)(4)(C)(iii) (beneficiary qualifications). Moreover, the INA contemplates that to receive such entry documents the alien must be both admissible and eligible for the status claimed. *Id.* § 1361. The alien cannot be inadmissible under "any provision of the INA." *Kerry v. Din*, 576 U.S. 86, 89 (2015) (citing 8 U.S.C. § 1361). That includes § 1182(f), which "enabl[es] the President to supplement the other grounds of inadmissibility in the INA." *Hawaii*, 585 US. at 684. And, the petition must be submitted in the form required by USCIS, 8 C.F.R. § 214.2(h)(2)(i)(A), which here includes proof of payment. Plaintiff Ex. 5 (ECF 18-23). Thus, there can be no legitimate argument that the Proclamation payment is not a restriction on entry.

But even if Plaintiffs were correct, that would not justify enjoining or vacating the entire implementation of the Proclamation. It would merely require the processing of visas, which would

not redress Plaintiffs' injuries since their H-1B sponsored workers could still not enter the country. Indeed, proceeding in such a manner could harm petitioners willing to pay the fee who may not be selected in the lottery despite their willingness to pay.

### B.    The Proclamation Does Not Conflict with the INA.

Provisions in the INA do not override the President's Sections 1182(f) and 1185(a)(1) authority. Congress layered the President's Sections 1182(f) and 1185(a)(1) authority on top of his authority under the INA to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions *in addition* to those elsewhere enumerated in the INA." 585 U.S. at 684 (emphasis added). The Supreme Court rebuked the plaintiffs there for adopting a "cramped" reading of the President's authority, one that regarded the sections as conferring on the President "only a residual authority to address emergency situations." *Id.* at 691 (emphasis added). An unduly "cramped" reading is precisely what Plaintiffs offer with their primary argument that the Proclamation unlawfully conflicts with the INA and H-1B program. Br. 15-22. The Proclamation does not conflict with any statutory provision, at most the payment "impose[s] [an] entry restriction[] in addition to those elsewhere" in the H-1B program. *Hawaii*, 585 U.S. at 684.[10]

1.    Plaintiffs characterize the payment required as a restriction on entry as an H-1B program "fee" and argue that fees are statutorily limited to USCIS's adjudication costs under 8 U.S.C. § 1356(m). Br. 16-18. This argument fails.

As an initial matter, the Proclamation's payment restriction is not a "fee" that would fall

---

[10] Plaintiffs rely on *Doe #1 v. Trump* to argue that the Proclamation cannot conflict with the INA. Br. 15 (citing 957 F.3d 1050 (9th Cir. 2020)). But that was a stay decision. And the merits panel disagreed, holding that there was no conflict and the Proclamation satisfied section 1182(f) despite domestic impacts. *Doe #1*, 984 F.3d at 868, 870. That opinion was vacated in the denial of en banc because administrations changed, mooting the case. *Biden*, 2 F.4th 1284 (9th Cir. 2021).

within the ambit of § 1356(m). It is not designated by the Attorney General in any regulation, nor is it paid into the specified Treasury account. *See* § 1356(m); *see also* Declaration of Jerome Jackson, ¶¶ 4-7. The payment is not to cover costs, it performs a completely different function that is not expressly prohibited or otherwise governed by the INA. Rather, the Proclamation payment was set by the President as a restriction on entry that he found "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages" and it is paid into a general account for miscellaneous payments. 90 Fed. Reg. at 46027; Jackson Decl. ¶¶ 4-7. Plaintiffs' unilateral decision to characterize the Proclamation payment as "adjudication fee" is simply not supported by § 1356(m).

But even if one could characterize it as a fee under that section, Plaintiffs' arguments still fail. Plaintiffs say the section only allows fees to recover costs "but no more than that." Br. 16. The statutory provision has no such limit. Instead, the statutory text *empowers* the Attorney General to set fees and is entirely permissive: "fees for providing adjudication and naturalization services *may be set* at a level that will ensure recovery of the full costs of providing all such services," and "*may also be set* at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m) (emphasis added). The Supreme Court "has repeatedly observed that the word 'may' clearly connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quotations omitted). Furthermore, subsection (m) is a general provision, not a fee schedule specific to H-1B petitions. It would be a significant limit to suggest this foreclosed any payment restriction under 1182(f) or 1185(a)(1) absent an express prohibition. Yet nothing in that section limits the possibility of any other payments.

Indeed, Plaintiffs acknowledge that other fees can be charged for H-1B petitions for other purposes and thus payments are not limited to section 1356(m) fees to cover costs. Br. 5, 18-19.

36

For example, section 1356(u) "authorize[s]" the Secretary to "establish and collect a premium fee," including for H-1B petitions. That section acknowledges payments "in addition to any other fees authorized by law." 8 U.S.C. § 1356(u)(1). Another provision Plaintiffs point to, 8 U.S.C. § 1184(c)(12), likewise says a fee "shall" be imposed for fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." So the fees that can be charged for H-1B are not limited to subsection (m). Sections 1182(f) and 1885(a)(1) allow for such payments "in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. There is no clear conflict other than those manufactured by Plaintiffs.

By contrast, Congress knows how to create a specific prohibition when it wants to. Section 1356(e)(3), for example, says that a specific fee "shall not apply" to certain immigrants arriving by ferry. 8 U.S.C. § 1356(e)(3). When Congress intends a specific prohibition to apply to immigration fees, it makes it express. There is no such prohibition in § 1356(m).

Plaintiffs rely on the legislative history to suggest that fees under § 1356(m) are limited. Br. 17. Even if such legislative history is relevant, the 1990 amendment to that section *expanded* the scope of fees to say they may be set at a level to *ensure* the *full cost* of all such services are recovered. *See Barahona v. Napolitano*, 2011 U.S. Dist. LEXIS 117536 at *6-9 (S.D.N.Y. Oct. 11, 2011) (explaining legislative history and amendment). While that may set a minimum for the fees, it does not set a maximum. In any event, none of the legislative history suggests that this is the only payment that can be levied. There is nothing in the history about the President's ability to set other payments under other authorities.

**2.**     As a final attempt to suggest § 1356(m) contains a specific prohibition, Plaintiffs cite two sentences in a Federal Register notice about fees from USCIS and a statement from a government reply brief in a different litigation. Br. at 17. *Chevron* was overruled; the agency's

statutory construction from last year is not entitled to deference. *Loper Bright v. Raimondo*, 603 U.S. 369, 412-13 (2024). That statement also speaks only to § 1356(m), and obviously does not foreclose all other payments. And the government brief, which is not binding on the agency and relates to a different issue entirely, argues that § 1356(m) does not set a ceiling on the fees. Indeed, the agency has argued in the past that § 1356(m) provides it leeway to assess fees beyond the cost of adjudication, to, for example, enhance its technology and services. *Barahona*, 2011 U.S. Dist. LEXIS 117536 at *11-12. At bottom, the fact remains that the plain language of the statute is permissive and does not contain a specific prohibition that would limit payments imposed under other authorities.

In fact, the agency's implementation of the Proclamation payment, requiring proof of submission of the payment with the petition, is required by section 1(b) of the Proclamation and is consistent with the INA. 8 U.S.C. § 1184(c) states that a nonimmigrant petition including an H-1B petition "shall be in such form and contain such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c). Here, consistent with the statute, USCIS made clear that the petition shall include proof of payment as directed by the Proclamation. *See* Pl. Ex. 5 (USCIS Guidance), ECF 18-23. If anything, the Proclamation aligns with the rest of the INA. At the very least, it does not conflict with other provisions.

**3.** Plaintiffs' claim that other H-1B fee provisions contain a prohibition on additional fees likewise fails. Plaintiffs cite to 8 U.S.C. § 1184(c)(9), (c)(12), 49 U.S.C. § 10101 (note), and 8 U.S.C. § 1356(u)(3) as the universe of fees that may be assessed for an H-1B petition, which they call a "carefully calibrated scheme." Br. 18-19. But nowhere in their brief do they cite any language in those statutory provisions containing a specific prohibition on levying additional fees or payments for the H-1B program. For example, 8 U.S.C. § 1184(c)(9) says a fee "shall" be

imposed but in no way limits other fees. And 8 U.S.C. § 1184(c)(12) says a fee "shall" be imposed for fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." Nothing in these statutes limit additional restrictions or payments.

Nor is it relevant that the Proclamation payment is more than the fees combined. All of those fees serve a different purpose than the payment required by the Proclamation: a restriction on entry to improve employment, wages, and national security while ensuring that the visas go to petitions that are absolutely necessary. This argument thus fails for the same reason Plaintiffs' 8 U.S.C. § 1356(m) argument fails: absent an express prohibition, the President can "impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. He did so here.

**4.** Similarly, the claim that the agency memoranda—which reiterate the Proclamation—should have gone through notice and comment rulemaking to ensure the payment is subject to arbitrary and capricious review is unavailing. Br. 19-20. Again, simply implementing a Proclamation is not reviewable under the APA, so its procedural and substantive limits on agency rulemaking are simply inapplicable. *See Tulare County,* 185 F. Supp. 2d at 21. A contrary rule would anomalously require agencies to disregard the President's directives if a court concluded that the President's policy choice was arbitrary and capricious—even though the court has no authority to make such a determination by directly reviewing the President's policy determination under the APA. *See Feds for Med. Freedom v. Biden*, 2022 WL 188329, at *7 & n.6 (S.D. Tex. Jan. 21, 2022) *vacated and remanded on other grounds by Fed. For Medical Freedom v.* Biden, 30 F.4th 503 (5th Cir. 2022) (concluding that APA review is unavailable for a rule implementing vaccination requirement for federal government contractors because Plaintiffs challenged only the agency's implementation of an executive order). At base, Plaintiffs are really challenging the

Proclamation. But under the APA, such a claim is unavailable.

Even so, section 1356(j) states that "[t]he Attorney General may prescribe such rules and regulations as may be necessary to *carry out the provisions of this section*." 8 U.S.C. § 1356(j) (emphasis added). As explained, the payment does not fall under subsection (m) or any other "provisions of this section." The payment is "in addition" to those sections and thus not subject to their rulemaking requirements. *Hawaii*, 585 U.S. at 684.

Moreover, section 1356(j) is permissive, as it says "[t]he Attorney General *may prescribe* such rules and regulations as *may be necessary* to carry out the provisions of this section." 8 U.S.C. § 1356(j) (emphasis added). By contrast, Congress used mandatory language in § 1356 when it wanted to impose specific regulatory requirements. In § 1356(u)(3)(B) for example (a subsection not mentioned by Plaintiffs), Congress required that for certain petitions, any premium processing fee "*shall be established by regulation*, which shall include methodology supporting the proposed premium amount." 8 U.S.C. § 1356(u)(3)(B) (emphasis added). Plaintiffs' reliance on *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) is similarly inapposite, because in that case, the statute said the Secretary of Labor "shall issue regulations." Br. 19.

Thus, the permissive statutory language in sections 1356(m) and 1356(j) is plain and unambiguous. *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020). The Proclamation neither "rewrites" the INA nor "overrid[es] the congressionally mandated fee-setting mechanism" as Plaintiffs claim, because § 1356(j) *permits* the Secretary to "prescribe such rules and regulations as may be necessary" but does not require it and § 1356(m) likewise says the Secretary "may" issue regulations. 8 U.S.C. § 1356(j), (m). Accordingly, even if the Proclamation Payment were found to fall within the ambit of § 1356(m), there is no requirement that the payment

must have been promulgated via regulation.[11]

5.    Plaintiffs also claim that the Proclamation payment is designed to turn the H-1B program into a program for "the best of the best" and is thus contrary to the INA, which has different sections for those of extraordinary ability. Br. 18, 21. But the H-1B program was never intended to be used to fill entry-level jobs that could be filled by Americans. Rather, the program was designed by Congress to fill openings in "specialty occupations" which by statute require "theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1). Yet, the President found that hiring aliens as H-1B nonimmigrants for entry-level jobs has become rampant, while Americans go unhired. 90 Fed. Reg. 46,027. As a result, the President imposed an entry restriction that supplements the restrictions of the INA, in accordance with his authority under § 1182(f), to address this detriment to the national interest. Nothing about that entry restriction contradicts the requirements for an H-1B versus other employment visas as Plaintiffs allege. If anything, the restriction better aligns current practice with the purpose of H-1B to ensure only highly specialized aliens with "theoretical and practical application of a body of highly specialized knowledge" that cannot otherwise be found in America are permitted entry. 8 U.S.C. § 1184(i)(1). Plaintiffs' policy disagreement is not a basis to enjoin or vacate the Proclamation. *See Hawaii*, 585 U.S. at 686-87, 708.

Plaintiffs also allege the Proclamation payment will cause fewer people to apply for H-1B visas than the statutory caps allow. Br. 22. As an initial matter, H-1B registrations for the lottery

---

[11] Plaintiffs do not actually argue that any agency action is itself arbitrary and capricious, so such a claim would be waived.

far exceed the statutory caps every single year. For the most recent FY 2026 lottery, USCIS received registrations for 336,153 separate individuals and selected 124,415 registrations in the lottery. https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process. Even if Plaintiffs' speculation that fewer people would apply is correct, the number would have to drop by about two thirds before USCIS would not meet the statutory caps. *See id.* Moreover, those statutory numbers are just that—ceilings, not floors. There is no requirement that USCIS must approve enough H-1B petitions every year to satisfy the visa caps. *See Goodluck v. Biden*, 104 F.4th 920, 928 (2024) (explaining worldwide levels of visas are ceilings, not floors); *Pacito*, 152 F.4th at 1087 (rejecting a similar cap argument against a proclamation). Therefore nothing Plaintiffs point to shows a conflict between the Proclamation and the INA.

## IV.    Relief and Stay.

Plaintiffs must also establish the traditional factors for equitable injunctive relief in support of their *ultra vires* claim. *Am. Foreign Serv. Ass'n,* 2025 WL 1742853, at *2 (an *ultra vires* claim is a claim in equity). A plaintiff seeking a permanent injunction must demonstrate that (1) he has suffered an irreparable injury; (2) remedies available at law, like monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not against the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

Plaintiffs cannot show irreparable injury. This case is about whether Plaintiffs should have to pay $100,000 to participate in the optional H-1B program within the next year (the current timeframe of the Proclamation), whether through a cap-exempt petition or through the lottery in March 2026. Plaintiffs allege that the "imposition of a new $100,000 fee to continue using that

program is thus a concrete harm suffered by the numerous members who participate in the program" because "[s]ome members are unable to pay that fee and therefore must either reduce or entirely forgo their planned entries into the March 2026 lottery." Br. 19. "[I]t is 'well settled that economic loss does not, in and of itself, constitute irreparable harm,'" *Doe Co. v. Cordray*, 849 F. 3d 1129, 1134 (D.C. Cir. 2017) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). At most, the Chamber speculates that some members may not be able to afford the fee and this will disrupt projects. Br. 37. The AAU has even less and cannot plausibly claim that universities with billions in endowments cannot pay $100,000 to petition for H-1B visas, especially when the money could be reimbursed. Br. 37-38. Simply having to adjust budgets or divert resources is hardly irreparable, as that is true of most cases involving money. Br. 37-38, 41-44; *see Coney Island Prep v. HHS*, 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020) (diversion of resources often is not an injury much less an irreparable one). And since there is a cap on H-1B visas, it is speculative that they would receive all of the workers they need in any event. Moreover, it is not apparent that Plaintiffs cannot simply hire Americans to fulfil their labor needs. There is no concrete, non-economic, non-self-inflicted, *irreparable* harm in their motion. Thus, Plaintiffs cannot show irreparable harm during the timeframe of the Proclamation.

A claim for injunctive relief also requires showing that remedies at law are inadequate. Plaintiffs do not even attempt such a showing. Indeed, the funds are set up to allow reimbursements if a payment is made for a petition but the visa is ultimately not awarded. As a result, refunds can be made and Plaintiffs could theoretically have a remedy at law if they paid the $100,000 payment. The fact that Plaintiffs chose to bring causes of action that cannot award damages was their choice and does not entitle them to an injunction.

Finally, the balance of hardships and public interest weigh in favor of the Government.

Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). By challenging the Proclamation, Plaintiffs seek to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be detrimental to the nation's interests. Here, the Proclamation is directed at resolving "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id.* at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* Those are quintessential national interests, and an injunction severely impedes the Executive's ability to safeguard them. As the D.C. Circuit has explained, such relief "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). And while Plaintiffs have failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Trump v. CASA, Inc.*, 606 U.S. 831, 145 S. Ct. 2540, 2562 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Every day an injunction is in place, the President loses valuable time to implement his policies. So the balance of equities and public interest weigh decidedly in Defendants' favor.

If the Court decides relief is warranted, however, it must limit any relief to the actual members of each Plaintiff. *See CASA, Inc.*, 145 S. Ct. at 2562–63. The same is true for vacatur under the APA. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring). Section 706(2) says nothing about vacatur and is located under "Scope of Review," the rest of which clearly relates to review. By contrast, section 703 says parties can bring "any applicable

form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," never mentioning vacatur. Instead, remedies under the APA should reflect historical equitable remedies with the same limits. *See Texas*, 599 U.S. at 695–99 (Gorsuch, J., concurring). Even so, vacatur is not mandatory. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023). For the same equitable reasons explained, the Court should not totally vacate the implementation of the Proclamation beyond the parties here.

Regardless, for all of the reasons explained the Court should stay any injunction or vacatur pending appeal. *See Nken*, 556 U.S. at 435. Preventing the President from implementing a core policy touching on national security would irreparably harm Defendants. And the balance of equities favor Defendants for all the reasons explained. So the Court should not grant injunctive relief or vacate any policy. If the Court does, however, it should stay the relief pending appeal.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and enter summary judgment for Defendants.

Respectfully submitted,

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

Glenn Girdharry
Acting Deputy Director

By: */s/ Alexandra McTague*
**Alexandra McTague**
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 718-0483
Alexandra.mctague2@usdoj.gov
*Counsel for Defendants*