## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

and

ASSOCIATION OF AMERICAN
UNIVERSITIES,

                        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY et al.,

                       Defendants.

Case No. 1:25-cv-3675-BAH

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' CROSS-MOTION

Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of
American Universities*

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce of the
United States of America*

**ORAL ARGUMENT SCHEDULED FOR DECEMBER 19, 2025, at 10:00 A.M.**

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Index of Exhibits ............................................................................................................ x

Introduction .................................................................................................................... 1

Argument ....................................................................................................................... 3

I.    The Proclamation unlawfully exceeds the President's authority ............................. 3

    A.    The Proclamation conflicts with express provisions of the INA ................... 3

    B.    The Proclamation violates Section 212's textual limitations ...................... 11

        1.    The Proclamation does not impose a "restriction" on "entry" ............ 12

        2.    The Proclamation does not satisfy Section 212(f)'s other requirements. .... 18

    C.    Section 215(a)(1) cannot rescue the Proclamation. ..................................... 21

II.    Plaintiffs' claims are justiciable. ........................................................................ 22

    A.    The doctrine of consular nonreviewability does not apply to challenges, like this one, to forward-looking policies. ................................................. 22

    B.    Plaintiffs have two causes of action: one in equity and another under the APA. ......... 24

        1.    Plaintiffs have an ultra vires claim. ................................................. 24

        2.    The APA provides a cause of action to challenge agency implementation of the Proclamation. ................................................................. 28

III.    Plaintiffs are entitled to relief ........................................................................... 34

    A.    Plaintiffs have satisfied the standard for a permanent injunction. ............... 34

        1.    Plaintiffs' members are irreparably harmed ..................................... 36

        2.    The remaining equitable factors favor a permanent injunction. ........... 40

    B.    Plaintiffs are entitled to declaratory and set-aside relief. ........................... 41

Conclusion ................................................................................................................... 44

## TABLE OF AUTHORITIES[*]

**Cases**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) .................................................................27

*Al-Anazi v. Bush*,
  370 F. Supp. 2d 188 (D.D.C. 2005) .............................................................44

*Am. Foreign Serv. Ass'n v. Trump*,
  2025 WL 1742853 (D.C. Cir. June 20, 2025) ........................................27, 28

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) .....................................................................24

*Amgen Inc. v. Azar*,
  2018 WL 1990521 (D.D.C. Feb. 22, 2018) .................................................44

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ....................................................................................34

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
  64 F.4th 1354 (D.C. Cir. 2023) ...................................................................41

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*,
  698 F.3d 171 (4th Cir. 2012) .......................................................................31

*Ashtari v. Pompeo*,
  496 F. Supp. 3d 462 (D.D.C. 2020) .............................................................29

*Aviel v. Gor*,
  2025 WL 2374618 (D.D.C. Aug. 14, 2025) .................................................41

*Bailey v. Drexel Furniture Co.*,
  259 U.S. 20 (1922) ................................................................................15, 16

*Bowles v. Russell*,
  551 U.S. 205 (2007) ......................................................................................5

*Cabrera v. U.S. Dep't of Lab.*,
  792 F. Supp. 3d 91 (D.D.C. 2025) ..............................................................43

**Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................ *passim*

*Citizens for Resp. & Ethics in Washington v. Leavitt*,
  577 F. Supp. 2d 427 (D.D.C. 2008) .............................................................35

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) .....................................................................35

*Coney Island Prep v. U.S. Dep't of Health & Human Servs.*,
  506 F. Supp. 3d 203 (S.D.N.Y. 2020) .........................................................38

---

[*] Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

Dalton v. Specter,
511 U.S. 462 (1994)..................................................................................25

Dep't of Com. v. New York,
588 U.S. 752 (2019)..................................................................................33

Dep't of State v. Muñoz,
602 U.S. 899 (2024)..................................................................................23

Detroit Int'l Bridge Co. v. Government of Canada,
189 F. Supp. 3d 85 (D.D.C. 2016)...........................................................30

Doe #1 v. Trump,
423 F. Supp. 3d 1040 (D. Or. 2019).........................................................32

Downs L. Grp., P.A. v. U. S. Coast Guard,
2023 WL 4744044 (D.D.C. July 25, 2023).................................................35

Drs. for Am. v. Off. of Pers. Mgmt.,
793 F. Supp. 3d 112 (D.D.C. 2025)..........................................................32

eBay Inc. v. MercExchange, L.L.C.,
547 U.S. 388 (2006)..................................................................................34

Ecological Rts. Found. v. U.S. EPA,
541 F. Supp. 3d 34 (D.D.C. 2021)............................................................35

FBME Bank Ltd. v. Lew,
125 F. Supp. 3d 109 (D.D.C. 2015)..........................................................37

FCC v. Consumers' Rsch.,
606 U.S. 656 (2025)....................................................................................4

In re Fed. Bureau of Prisons' Execution Protocol Cases,
980 F.3d 123 (D.C. Cir. 2020)..................................................................44

Feinerman v. Bernardi,
558 F. Supp. 2d 36 (D.D.C. 2008)............................................................37

Fiallo v. Bell,
430 U.S. 787 (1977)..................................................................................23

Filazapovich v. Dep't of State,
560 F. Supp. 3d 203 (D.D.C. 2021)..........................................................17

Fong Yue Ting v. United States,
149 U.S. 698 (1893)..................................................................................14

Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,
529 U.S. 120 (2000)..................................................................................15

Franklin v. Massachusetts,
505 U.S. 788 (1992)...................................................................25, 27, 28, 30

**Cases—continued**

*Glenn v. Thomas Fortune Fay*,
    222 F. Supp. 3d 31 (D.D.C. 2016) ................................................41, 42

*Glob. Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ................................................................27

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ........................................25, 29, 32

*Goodluck v. Biden*,
    104 F.4th 920 (2024) ...........................................................................10

*Griffith v. Fed. Lab. Rels. Auth.*,
    842 F.2d 487 (D.C. Cir. 1988) .............................................................27

*Haig v. Agee*,
    453 U.S. 280 (1981) .............................................................................21

*Harris v. Bessent*,
    775 F. Supp. 3d 86 (D.D.C. 2025) .......................................................40

*Head Money Cases*,
    112 U.S. 580, 593 (1884) .....................................................................15

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*,
    71 F.4th 59 (D.C. Cir. 2023) ..................................................................5

*INS v. Chadha*,
    462 U.S. 919 (1983) .............................................................................26

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
    761 F.2d 798 (D.C. Cir. 1985) ........................................................22, 23

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017) ...........................................................37

*Kent v. Dulles*,
    357 U.S. 116 (1958) .............................................................................21

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................23, 26

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................41

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ........................................................................27, 28

*Leopold v. Manger*,
    102 F.4th 491 (D.C. Cir. 2024) ............................................................28

*Luokung Tech. Corp. v. Dep't of Def.*,
    538 F. Supp. 3d 174 (D.D.C. 2021) ......................................................36

**Cases—continued**

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024)................................................................43

*Milligan v. Pompeo*,
502 F. Supp. 3d 302 (D.D.C. 2020)........................................................29

*Moghaddam v. Pompeo*,
424 F. Supp. 3d 104 (D.D.C. 2020)........................................................29

*Nalco Co. v. EPA*,
786 F. Supp. 2d 177 (D.D.C. 2011)........................................................37

*Nat'l Ass'n of Mfrs. v. DHS*,
491 F. Supp. 3d 549 (N.D. Cal. 2020)....................................................25

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022)..................................................................28

*\*Nat'l Cable Television Ass'n, Inc. v. United States*,
415 U.S. 336 (1974).......................................................................... *passim*

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
775 F. Supp. 3d 100 (D.D.C. 2025)........................................................42

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)..........................................................................16, 17

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025)............................................................................37

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998)..............................................................43

*Nat'l Venture Cap. Ass'n v. Duke*,
291 F. Supp. 3d 5 (D.D.C. 2017)............................................................39

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025)........................................................28

*New York v. Biden*,
636 F. Supp. 3d 1 (D.D.C. 2022)............................................................41

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025)................................................................................27

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019)..................................................29, 32

*P.K. v. Tillerson*,
302 F. Supp. 3d 1 (D.D.C. 2017)............................................................23

*Pacito v. Trump*,
152 F.4th 1082 (9th Cir. 2025)................................................................10

**Cases—continued**

*Patel v. Reno*,
   134 F.3d 929 (9th Cir. 1997) ...............................................................23

*Philip Morris USA Inc. v. Scott*,
   561 U.S. 1301 (2010) ..........................................................................37

*Pietersen v. U.S. Dep't of State*,
   138 F.4th 552 (D.C. Cir. 2025) ...........................................................22

*POM Wonderful LLC v. FTC*,
   894 F. Supp. 2d 40 (D.D.C. 2012) .......................................................41

*President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*,
   788 F. Supp. 3d 182 (D. Mass. 2025) .............................................23, 25

*Pub. Citizen v. U.S. Trade Representative*,
   5 F.3d 549 (D.C. Cir. 1993) ................................................................30

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .......................................................40

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ..............................................................................5

*Rainbow Nav., Inc. v. Dep't of Navy*,
   783 F.2d 1072 (D.C. Cir. 1986) ...........................................................26

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
   793 F. Supp. 3d 19 (D.D.C. 2025) ...........................................13, 25, 31

*Rudisill v. McDonough*,
   601 U.S. 294 (2024) ............................................................................21

*Rural Cellular Ass'n v. FCC*,
   685 F.3d 1083 (D.C. Cir. 2012) ...........................................................21

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993) .......................................................................13, 24

*Samuels v. Mackell*,
   401 U.S. 66 (1971) ..............................................................................41

*SAS Inst., Inc. v. Iancu*,
   584 U.S. 357 (2018) ..............................................................................8

*SEC v. Jarkesy*,
   603 U.S. 109 (2024) ............................................................................14

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) .............................................................29

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ..............................................................................6

**Cases—continued**

\*_Skinner v. Mid-Am. Pipeline Co._,
    490 U.S. 212 (1989)................................................................ _passim_

_SSM Litig. Grp. v. Env't Prot. Agency_,
    150 F.4th 593 (D.C. Cir. 2025)..............................................35

_State v. Su_,
    121 F.4th 1 (9th Cir. 2024) ..............................................29, 31

_Tate v. Pompeo_,
    513 F. Supp. 3d 132 (D.D.C. 2021) ..................................23, 29

_TikTok Inc. v. Trump_,
    490 F. Supp. 3d 73 (D.D.C. 2020) ........................................36

_Trudeau v. FTC_,
    456 F.3d 178 (D.C. Cir. 2006) ..............................................25

_Trump v. CASA, Inc._,
    606 U.S. 831 (2025)..............................................................43

\*_Trump v. Hawaii_,
    585 U.S. 667 (2018)........................................................ _passim_

_Tulare Cnty v. Bush_,
    185 F. Supp. 2d 18 (D.D.C. 2001) ........................................31

_Tulare Cnty. v. Bush_,
    306 F.3d 1138 (D.C. Cir. 2002) ............................................31

_United States v. Texas_,
    599 U.S. 670 (2023)..............................................................43

_United States v. Williams_,
    553 U.S. 285 (2008)..............................................................22

_Util. Air Regul. Grp. v. EPA_,
    573 U.S. 302 (2014)..............................................................15

_Webster v. Doe_,
    486 U.S. 592 (1988)..............................................................26

_West Virginia v. EPA_,
    597 U.S. 697 (2022)..............................................................15

_Whitman v. Am. Trucking Ass'ns_,
    531 U.S. 457 (2001)..............................................................15

_Whitman-Walker Clinic, Inc. v. HHS_,
    485 F. Supp. 3d 1 (D.D.C. 2020) ..........................................36

_Xiaomi Corp. v. Dep't of Def._,
    2021 WL 950144 (D.D.C. 2021) ..........................................36

**Cases—continued**

*Zadvydas v. Davis*,
  533 U.S. 678 (2001).............................................................................5

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)..............................................................................15

**Statutes and regulations**

5 U.S.C.
  § 553..............................................................................................7
  § 701(a)(2).....................................................................................33
  § 703............................................................................................44
  § 704............................................................................................42
  § 706............................................................................................43
  § 706(2)......................................................................................42, 43

8 U.S.C.
  § 1153(b)(1)(A)................................................................................9
  § 1153(b)(2)(A)................................................................................9
  § 1157(a)(2)...................................................................................10
  *§ 1182(f)..........................................................................12, 18, 20, 33
  § 1184(*i*)(1)..................................................................................9
  § 1184(a)(1)...................................................................................14
  § 1184(c).......................................................................................6
  § 1184(c)(9)....................................................................................8
  § 1184(c)(12)...................................................................................8
  § 1185.........................................................................................21
  § 1185(a)......................................................................................22
  § 1356(j)......................................................................................6, 7
  *§ 1356(m)................................................................................*passim*
  § 1356(u).......................................................................................8
  § 1356(u)(3)....................................................................................7

28 U.S.C.
  § 1746.........................................................................................35
  § 2201.........................................................................................41

Pub. L. No. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952)........................9

Pub. L. No. 114-113 § 402(g), 129 Stat. 2242 (2015)....................................8

55 Fed. Reg. 2606, 2608–2609 (Jan. 26, 1990)..........................................9

85 Fed. Reg. 34,353 (June 4, 2020)....................................................19

85 Fed. Reg. 36,139 (June 15, 2020)...................................................19

89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024).............................................6

**Constitutional provisions**

U.S. Const. art. I
§ 8, cl. 1 ...................................................................................................14
§ 8, cl. 3 ...................................................................................................14
§ 8, cl. 4 ...................................................................................................14

**Federal rules**

Fed. R. Evid. 602 .......................................................................................35, 36

Fed. R. Evid. 801 .......................................................................................35

**Other Authorities**

Class, *Black's Law Dictionary* (12th ed. 2024) ........................................18

Class, *Webster's New International Dictionary* 496 (2d ed. 1947) ............18

Exec. Order No. 12,324 (Sept. 29, 1981) ...................................................13

Exec. Order No. 12,807 (May 24, 1992) ....................................................13

H.R. Rep. 101-723(I), (Sept. 19, 1990) ......................................................9

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ................................30

Brett Samuels, *Trump on H-1B Visas: US Lacks Enough 'Talented People'*, The Hill (Nov. 12, 2025)..............................................................................2, 40

Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ........12

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Shen Decl. | Declaration of Patrick Shen |
| Daniels Decl. | Declaration of Condrad Daniels |
| Daniels Supp. Decl. | Supplemental Declaration of Condrad Daniels |
| Poser Decl. | Declaration of Torie Poser |
| Snyder Decl. | Declaration of Barbara Snyder, Association of American Universities |
| CMU Decl. | Declaration of James H. Garrett, Carnegie Mellon University |
| UIUC Decl. | Declaration of Charles L. Isbell, Jr., University of Illinois Urbana-Champaign |
| JHU Decl. | Declaration of Stephen J. Gange, Johns Hopkins University |
| Michigan Decl. | Declaration of Arthur Lupia and Judith Pennywell, University of Michigan |
| Minnesota Decl. | Declaration of Gretchen Ritter, University of Minnesota |
| Pitt. Decl. | Declaration of Anantha Shekhar, University of Pittsburgh |
| Utah Decl. | Declaration of Phyllis Vetter, University of Utah |
| WashU Decl. | Declaration of Paul J. Scheel, Washington University in St. Louis |
| UW-Madison Decl. | Declaration of Frances Vavrus, University of Wisconsin-Madison |
| Gonzales Decl. | Declaration of Nancy A. Gonzales |
| Hughes Decl. | Declaration of Paul W. Hughes |
| Exhibit 1 | Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 19, 2025) |
| Exhibit 2 | U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sept. 20, 2025) |
| Exhibit 3 | U.S. Customs and Border Protection, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]* (Sept. 20, 2025) |
| Exhibit 4 | U.S. Department of State, *H-1B FAQ* (Sept. 21, 2025) |
| Exhibit 5 | U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations* |
| Exhibit 6 | U.S. Citizenship and Immigration Services, *USCIS Fee Schedule* (Aug. 29, 2025) |
| Exhibit 7 | *The H-1B Visa Program*, FWD.us (Jan. 27, 2025) |
| Exhibit 8 | *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce |
| Exhibit 9 | *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033,* Association of American Medical Colleges (June 2020) |

| Exhibit 10 | Peter A. Kahn & Tova M. Gardin, *Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) |
| --- | --- |
| Exhibit 11 | *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis,* American Immigration Council (Mar. 29, 2017) |
| Exhibit 12 | Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015) |
| Exhibit 13 | Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* (May 2025) |
| Exhibit 14 | Hao Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation* (February 19, 2025) |
| Exhibit 15 | Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025) |
| Exhibit 16 | Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, Labour Economics (2019) |
| Exhibit 17 | *Chamber Litigation Center*, U.S. Chamber of Commerce |
| Exhibit 18 | *Topics: Immigration*, U.S. Chamber of Commerce |
| Exhibit 19 | Comment, *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers*, U.S. Chamber of Commerce (Dec. 22, 2023) |
| Exhibit 20 | Comment, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media,* U.S. Chamber of Commerce (Sept. 26, 2025) |
| Exhibit 21 | Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative (September 11, 2023) |
| Exhibit 22 | National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press (2017) |
| Exhibit 23 | Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation, Cato at Liberty* (May 14, 2020) |
| Exhibit 24 | Cat Zakrzewski et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025) |
| Exhibit 25 | *Major Initiatives: America Works Initiative*, U.S. Chamber of Commerce |
| Exhibit 26 | U.S. Citizenship and Immigration Services, *H-1B Electronic Registration Process* |
| Exhibit 27 | Stephen Dimmock et al., *Give Me Your Tired, Your Poor, Your High-Skilled Labor: H-1B Lottery Outcomes and Entrepreneurial Success* 68 Management Science 6950 (2021) |

| Exhibit 28 | Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024) |

## INTRODUCTION

As explained in Plaintiffs' opening memorandum, the Proclamation directly contradicts provisions of the Immigration and Nationality Act (INA) governing the H-1B program and exceeds the express textual limits of Sections 212(f) and 215(a)(1), under which the Proclamation purportedly was issued. By imposing a $100,000 fee on H-1B petitions, the Proclamation tramples the statutory scheme Congress designed. *Congress*, not the President, determined how much H-1B petitions should cost and what additional fees the Executive has the discretion to impose. The steep, extra-statutory exaction imposed by the Proclamation fundamentally transforms the visa category that Congress by statute created—changing it from a program to bolster the U.S. economy by providing a pathway for a broad spectrum of employers to hire talented specialty workers, into a prohibitively expensive one that few can afford.

The government hangs its claim to power on just one point, repeated over and over: The President's broad authority under Section 212(f). True, Section 212(f) is broad *within its sphere*, which has always been to bar noncitizens from entering the country when the President determines that their entry would be detrimental to the interests of the United States. But Congress in Section 212(f) did not authorize the President to displace other provisions of the INA, including its fee provisions. And Section 212(f)'s sphere does not sweep so far as to permit the President to rewrite a visa program by imposing an unprecedented fee on domestic employers, and purporting to deny entry only when those domestic employers are unable or unwilling to pay. The government is tellingly silent on its lack of any limiting principle, and for good reason: Its theory here would permit it to leverage Section 212(f) to regulate an unlimited swath of substantive conduct—including domestic conduct—so long as the government ties that regulation to a noncitizen who at some point crosses the border. Other courts have rejected such boundless claims, and this Court should too.

The government fares no better with its attempt to avoid the merits entirely—which reduces

to its expansive contention that it can do what it pleases in this area, with no oversight by federal courts. But again, court after court has rejected the same arguments. The government's makeweight invocation of consular nonreviewability disregards on-point D.C. Circuit precedent holding that this doctrine does not apply to challenges, such as this one, to forward-looking policies. Likewise, the D.C. Circuit—not to mention the Supreme Court—has held expressly that litigants can challenge unlawful presidential actions by bringing an injunctive suit against agencies implementing those actions. The Administrative Procedure Act (APA), meanwhile, provides independent authority to review the actions of agencies putting the Proclamation into practice.

The Court therefore both can and should enjoin implementation of the Proclamation. As already explained, the Proclamation fee, if not enjoined or vacated, will be disastrous. And the government's attempts to downplay the irreparable harm that Plaintiffs face runs headlong into the President himself, who recently reiterated the need for H-1B visas. When asked whether, in the absence of H-1B, American employers could hire domestic workers to replace their prospective international hires, the President was blunt: "You can't take people off an unemployment line and say, 'I'm going to put you into a factory where we're going to make missiles.'" Brett Samuels, *Trump on H-1B Visas: US Lacks Enough 'Talented People'*, The Hill (Nov. 12, 2025), https://thehill.com/homenews/administration/5601588-trump-h1b-visas-talent/. Just so. Plaintiffs have brought this suit precisely because their members *cannot* easily substitute domestic workers for their preferred candidates to fill specialized roles in manufacturing, cutting-edge computer science, and research and development, to name just a few areas. If it were that easy to hire appropriately qualified candidates domestically, this lawsuit would be unnecessary—contrary to the government's unfounded *ad hominem* accusation that Plaintiffs have "enjoyed the lucrative spoils of the system" at the expense of unnamed "economic losers." Opp. 2.

The Court should reject the government's effort to unilaterally and extra-statutorily transform the H-1B program to the detriment of employers and the public.

## ARGUMENT

### I.    THE PROCLAMATION UNLAWFULLY EXCEEDS THE PRESIDENT'S AUTHORITY.

#### A.    The Proclamation conflicts with express provisions of the INA.

The government does not appear to dispute that a Section 212(f) Proclamation cannot "expressly override particular provisions of the INA." *Trump v. Hawaii,* 585 U.S. 667, 689 (2018) (assuming this principle); Mot. 15 (collecting additional sources); *cf.* Opp. 35 (arguing that the Proclamation "does not conflict with any statutory provision"). But overriding particular INA provisions is precisely what the Proclamation does: It contradicts the specific provisions of the INA setting forth the fees that Congress deemed appropriate for the H-1B program. Mot. 16–19. It also conflicts with other congressional determinations about the contours and availability of H-1B status. *Id.* at 20–21. The government's contrary arguments fail.

**1.** Plaintiffs' opening memorandum explained (at 15–20) that the $100,000 fee imposed by the Proclamation conflicts with the basic fee structure for visas, including H-1B visas, under the INA. To recap: the statute provides for two categories of permissible fees—those imposed directly by Congress, and those that Congress expressly has authorized the Executive to impose through 8 U.S.C. § 1356(m). Section 1356(m) permits USCIS to promulgate through notice-and-comment rulemaking "fees for providing adjudication and naturalization services" that "may be set at a level that will ensure recovery of the full costs of providing all such services." *Id.* Here, the Proclamation imposes a fee for adjudicating H1-B petitions—but at a level ($100,000) that is completely untethered from the costs of providing any services. And because Congress has not elsewhere authorized that fee, it is unlawful.

The government admits, as it must, that the Proclamation fee is not a valid Section 1356(m) fee because it bears none of the characteristics of a fee promulgated under that subsection: It is "not to cover costs"; it is "not designated by the Attorney General in any regulation"; and it is not "paid into the specified Treasury account." Opp. 36. The government instead rests on its claim that

Section 1356(m) is "entirely permissive"—because it uses the word "may"—and that the President can, without express statutory authority, impose additional fees for H-1B visas that violate Section 1356's explicit requirements. Opp. 36. The government is wrong for two independent and mutually reinforcing reasons.

*First*, under the Constitution, it is Congress, not the Executive, that has the power to impose taxes or otherwise reach into the pockets of American businesses and institutions. *See, e.g.*, *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes."). And although Congress can delegate that power to the Executive, it "must indicate clearly its intention" to do so. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989); *accord FCC v. Consumers' Rsch.*, 606 U.S. 656, 673–677 (2025) (discussing *Skinner*). That rule applies with equal force regardless of "whether [such exactions are] characterized as 'fees' or 'taxes.'" *Skinner*, 490 U.S. at 224.

Accordingly, in the context of immigration fees, either *Congress* must have directly legislated the fees (as it has for many fees applicable to H-1B petitions) or *Congress* must have explicitly delegated that authority to the Executive (as it has in Section 1356(m), while imposing limitations on the delegated authority). There is no third option. For a fee to be authorized by the INA, it must fall into one of those two categories. Any other fee—like this one—both is unauthorized by statute in the first place (*see* pages 13–17, *infra*), and conflicts with the fee provisions that Congress did include.[2]

*Second*, the government's argument conflicts with Section 1356(m)'s express text. A statute stating that an agency "may" do something (such as set a fee "at a level that will ensure

---

[2]    Curiously, the government points to the existence of these other congressionally established fees as supporting its argument that "the fees that can be charged for H-1B are not limited to subsection (m)." Opp. 37. Correct: They also can be directly imposed by Congress. But the Proclamation's $100,000 fee is neither directly imposed by Congress nor authorized by Section 1356(m).

recovery of the full costs of providing all such services") necessarily means that the agency *may not go beyond* what it has been permitted to do. Thus, for example, the Supreme Court has held that where a statute and federal rule stated that district courts "may" reopen a certain deadline "for a period of 14 days," reopenings lasting longer than 14 days were jurisdictionally barred—not, as the government would have it, that the statutory "may" makes compliance with the 14-day limitation optional. *Bowles v. Russell*, 551 U.S. 205, 208–209, 213 (2007); *see generally, e.g.*, *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority[,] it necessarily, or at least reasonably, implies the preclusion of alternatives." (quotation marks omitted; alterations incorporated)).

So too here. When Congress specified that the Executive "may" impose fees "at a level that will ensure recovery of the full costs of providing all such services," it also precluded the government from setting those fees at a *higher* level. Otherwise, the statutory specification of appropriate fee levels would be superfluous, "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The government is thus wrong that "nothing in [Section 1356(m)] limits the possibility of any other payments." Opp. 36. The clear import of Section 1356(m) is that the Executive may impose fees to cover its costs, but not vastly greater fees having nothing to do with costs.[3]

As the government itself recently put it: Section 1356(m) "*requires* USCIS fees to be based

---

[3]    The government asserts that, when Congress amended Section 1356(m) in 1990 "to ensure the full cost" of services is recovered, that this "set a minimum" not a "maximum." Opp. 37. That is wrong. No ordinary speaker of English would read Section 1356(m)'s statement that USCIS "may" set its fees at a level to "ensure recovery of . . . full costs" and conclude that USCIS "must" do at least that much, and in fact is permitted to exceed that level. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 697 (2001) ("'[M]ay' suggests discretion,' but it "does not necessarily suggest unlimited discretion.").

on total costs for USCIS to carry out adjudication and naturalization services" (*USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024) (emphasis added)), and these fees must "bear[]" a "'relationship' to [USCIS's] costs." (Reply Mem. of Law in Supp. of Mot. to Dismiss at 10, *Tang v. United States*, No. 23-cv-9885 (S.D.N.Y. Oct. 3, 2024), Dkt. 65.).[4]

Even more strained is the government's argument that the Proclamation fee is authorized by the INA because 8 U.S.C. § 1184(c) states that an H-1B petition "shall be in such form and contain such information as the [Secretary of Homeland Security] shall prescribe," and USCIS, consistent with the Proclamation, now requires a "proof of payment" of the $100,000 fee. Opp. 38 (alteration in original). The problem here is not that the government requires a *proof* of payment; it is that it requires the payment in the first place. The government cannot seriously contend that a novel $100,000 fee is authorized by the INA because the *proof* of that payment is "information" and the government is permitted under the INA to prescribe that certain information be presented in an H-1B petition. That theory would permit the government to use pedestrian information requirements to bootstrap any conceivable substantive mandate.

Lastly, the government cannot avoid the Proclamation's violation of the statutory requirement for notice-and-comment rulemaking. *See* 8 U.S.C. § 1356(j). The government says that this requirement is limited to "rules and regulations" that are "necessary to carry out the provisions of this section" (*id.*) and that the $100,000 fee "does not fall under subsection (m) or any other 'provisions of this section'" but, rather, derives from some authority "in addition" to

---

[4]    The government argues that this first statement "is not entitled to deference" and that the second statement is "not binding on the agency." Opp. 38. That may be so, but it does nothing to diminish the persuasive force of these recent admissions of how to properly read Section 1356(m). *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944) (courts give weight to agency interpretations based on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

these. Opp. 40 (quoting *Hawaii*, 585 U.S. at 684). But, again, that is precisely the problem. The government has no authority to promulgate fees other than Section 1356(m), and its failure to promulgate the fee through notice-and-comment rulemaking demonstrates that Section 1356(m) cannot provide the needed authorization either.

The government notes that Section 1356(j) is also permissively phrased, stating that the "Attorney General *may prescribe* such rules and regulations as *may be necessary* to carry out the provisions of this section." Opp. 40 (emphasis in original) (quoting 8 U.S.C. § 1356(j)). But Section 1356(j)'s permissive phrasing means only that the government is not *required* to prescribe rules and regulations. It does not mean that when the government *does* prescribe rules and regulations, it may dispense with the foundational requirement that such rules be promulgated through notice and comment. *See* 5 U.S.C. § 553.

**2.** The Proclamation's $100,000 fee also conflicts with Congress's deliberate decisions about how much an H-1B visa should cost overall. Mot. 18–20. Added together, the fees promulgated under Section 1356(m) plus those Congress has enumerated—which include a filing fee and a "fraud prevention and detection fee," among others—add up to roughly $3,600 for the typical H-1B petitioner. *Id*. at 19. The $100,000 Proclamation fee dwarfs that by 25 times, and it is approximately ten times greater than what was previously the maximum possible fee applicable when an employer uses the H-1B program heavily or requests premium processing. *Id.*[5] And unless employers pay this massive fee, the government will not process their petitions *at all*—mocking Congress's directive that employers that pay an amount far less than $100,000 are entitled to premium processing. 8 U.S.C. § 1356(u)(3); *see* Mot. 5, 19. By rendering obsolete Congress'

---

[5]     The government shrugs off the relative size of the Proclamation fee compared to these existing fees, because the Proclamation fee "serve[s] a different purpose." Opp. 39. But the fee's purpose does not prevent it from conflicting with the statute. The Proclamation fee's sheer size, in comparison to those that Congress actually authorized, belies any notion that Congress could have intended anything like the $100,000 fee to apply. Congress not only knew how to set fees but also set them at a modest level. The Proclamation takes a wrecking ball to that considered policy choice.

judgment, based on its weighing of the costs and benefits of the program, regarding how much to charge for an H-1B petition, the Proclamation fee "expressly override[s]" that carefully calibrated fee schedule. *Hawaii,* 585 U.S. at 689.

The government's only response is that nothing in the text of the statutes creating these fees expressly states that other fees are not allowed. But when Congress has expressly imposed some fees and expressly authorized the Executive Branch to add other fees *in certain circumstances*, the only reasonable inference is that Congress has not authorized the Executive Branch to add yet further fees under entirely different circumstances. Had Congress wanted to give the Executive "similar authority" here as in the provisions explicitly providing for fees (*e.g.*, 8 U.S.C. §§ 1184(c)(9)(A)-(C), 1184(c)(12)(A)-(C), 1356(u); Pub. L. No. 114-113 § 402(g), 129 Stat. at 3006), "it knew exactly how to do so—it could have simply borrowed from the statute next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018). Moreover, the government's observation that there is no express statutory prohibition on imposing additional fees (Opp. 37) flips the relevant inquiry on its head: Since Congress holds the power of the purse, the Supreme Court requires a clear statement before concluding that a fee-generating power *exists* in a statute, not the opposite. *Skinner*, 490 U.S. at 224; *Nat'l Cable Television Ass'n*, 415 U.S. at 341.

**3.** The Proclamation also conflicts with Congress's considered judgment, as memorialized in the statutory text, that the H-1B program should provide employers of all sizes with a reasonable pathway to admitting a wide range of highly skilled nonimmigrant workers from specialized fields.

*First*, the Proclamation by its terms aims to transform the H-1B program into one making visas available for only the "best of the best." Ex. 1, 90 Fed. Reg. at 46,028; *see* Opp. 41 (acknowledging this fact). The government asserts that this transformation is justified because the H-1B program "was never intended to be used to fill entry-level jobs." *Id.* But the government does not even attempt to explain how the sole qualification-based condition for an H-1B visa— that the job be in a "specialty occupation," defined as requiring "a body of highly specialized

8

knowledge, and attainment of a bachelor's or higher degree in the specific specialty" (8 U.S.C. § 1184(*i*)(1))—is consistent with limiting entry to "the best of the best." The qualification criteria focus on the occupation itself—not the person occupying any particular position, or the level of that position, within the occupation. *Id.* For example, a first-year resident and a world-renowned surgical specialist are both doctors who require "highly specialized knowledge" and "a bachelor's or higher degree in the specific specialty" to do their jobs. *Id.* Congress has determined that if the *occupation* is one that meets the criteria, a noncitizen is eligible even if the position is at the entry level of that occupation.

Moreover, as already explained (at Mot. 21 n.5), it simply is not true as a historical matter that the H-1B visa "was never intended to be used to fill entry-level jobs." Opp. 41. Indeed, the government itself long maintained as much even before the current "specialty occupation" language was enacted and the statute instead required "distinguished merit and ability." Pub. L. No. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952); *see, e.g.*, 55 Fed. Reg. 2606, 2608–2609 (Jan. 26, 1990) (discussing government's "longstanding" interpretation that "entry-level members of a profession *per se* fit under the H-1 classification"). And Congress, in later enacting the operative "specialty occupation" language, was clear: "The bill recognizes that certain entry-level workers with highly specialized knowledge are needed in the United States and that sufficient U.S. workers are sometimes not available." H.R. Rep. 101-723(I), at 67 (Sept. 19, 1990). The change from the previous to the current statutory language therefore was intended to remove any doubt that entry-level positions *are* eligible for H-1B. Nor does the government have any response to the examples collected in the opening memorandum (Mot. 21 n.5) of other visa categories that do, unlike the H-1B program, express Congress's intention to attract foreign-born workers with "exceptional ability" or "extraordinary ability" (8 U.S.C. § 1153(b)(1)(A), (b)(2)(A))—again underscoring that H-1B has no such requirement.

*Second*, by ensuring (by design) that far fewer people will use the H-1B program, the

Proclamation contradicts Congress's judgment reflected by the statutory numerical caps. Mot. 21–22. When it set the caps, Congress determined that admitting up to that many H-1B visa holders would be in the national interest. After all, because there are more H-1B lottery registrants each year than there are slots (*see* Mot. 22; Opp. 5), Congress was aware that the statutory cap will also reflect roughly the number of non-cap-exempt visas issued each year.[6] That the caps are set out, in the government's words, as "ceilings, not floors" (Opp. 42 (citing *Goodluck v. Biden*, 104 F.4th 920, 928 (2024))), does not change the fact that they represent Congress's calculation of the ideal balance between making enough visas available to fill critical roles while simultaneously protecting American jobs. Imposing such a large fee to use the program, which is openly intended to reduce participation, conflicts with Congress's judgment.[7]

**4.** That leaves just the government's repeated invocations of *Hawaii*. Because *Hawaii* held that Section 212(f) empowers the President to "impose entry restrictions in addition to those elsewhere enumerated in the INA" (585 U.S. at 684) and found that the entry restrictions there did not conflict with other provisions of the INA (*id.* at 688–697), the government claims that Section 212(f) confers on the President limitless power to impose fees that the INA elsewhere rejects. Opp. 35.

But most obviously, *Hawaii* was not about fees. And for all the reasons just explained, the

---

[6]    Congress also exempted from the caps certain employers, such as institutions of higher education, reflecting a judgment that the number of H-1B workers for such employers should not be limited by the caps. But, if anything, the Proclamation fee stands as an even greater obstacle to use of the H-1B program for this cohort of employers, which includes many non-profit entities. *See, e.g.*, Poser Decl. ¶¶ 4–5; Snyder Decl. ¶ 12.

[7]    The government also relies (at 42) on *Pacito v. Trump*, 152 F.4th 1082 (9th Cir. 2025) as a purported example of a court rejecting a similar cap-based argument. But *Pacito* is inapposite. For one thing, that decision is a placeholder order pending issuance of a full opinion (*id.* at 1086), and contains no reasoning relevant to any cap issue, and for that reason is definitionally not persuasive authority on that question. More importantly, that case involved the refugee admission statute, 8 U.S.C. § 1157(a)(2), which expressly gives the President discretion to determine the appropriate number of annual refugee admissions—unlike the caps at issue here.

Proclamation conflicts with Congress's carefully crafted scheme in a host of ways not presented in *Hawaii*, starting with the square textual conflict with Section 1356(m).

Moreover, the government's assertion of open-ended authority is contrary to *Hawaii* itself, which discussed at length how the proclamation in question was consistent with the INA because it "support[ed] Congress's individualized approach for determining admissibility," "promote[d] the effectiveness of the vetting process," and sought to ensure that "high-risk countries provide a minimum baseline of information to adequately vet their nationals" which was a problem that "Congress [had] not address[ed]." 585 U.S. at 689–690. That is the very opposite of the current Proclamation, which entirely upends an area where "Congress *has* stepped into the space and solved the exact problem" (*id.* at 691 (emphasis added))—*i.e.*, how much an H-1B visa should cost and what adjudication fees the Executive may charge—based on considerations Congress already has addressed (protections for domestic workers). And the Proclamation does all this without regard to the practical consequences for a visa category that Congress specifically created. By contrast, *Hawaii* was rooted in that Proclamation's *consistency* with the INA; it therefore does not support the government's claim here.

**B.    The Proclamation violates Section 212's textual limitations.**

The government also has no adequate answer to how the Proclamation violates Section 212(f)'s textual requirements. *See* Mot. 22–28. First, and most important, by conditioning entry on the payment of a non-statutory fee, the Proclamation falls outside Section 212(f)'s authorization to "suspend" or "restrict[]" "entry." Second, the Proclamation does not target a properly defined "class" of noncitizens, as Section 212(f) requires—its application being based entirely on the employer's ability and willingness to pay, rather than any characteristics of the noncitizen prospective employees themselves. Finally, for similar reasons, the Proclamation does not make the findings the statute requires.

### 1. *The Proclamation does not impose a "restriction" on "entry."*

**a.** To begin, this Proclamation lacks the core feature of a lawful Section 212(f) proclamation: It does not "suspend" or "restrict" the entry "of aliens." Indeed, it does not even purport to "suspend" entry, as any noncitizen remains free to enter, provided his or her employer pays the Proclamation fee. Nor does the Proclamation "impose . . . restrictions" on "entry." Mot. 24. It imposes no negative or prohibitory limit, which was the plain meaning of that term both in 1952 and today. *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Mot. 24 & n.7 (canvassing additional dictionaries and other textual sources). Instead, the Proclamation attempts to impose a *condition*: Noncitizens can enter, but they cannot work once here unless their U.S. employer takes the affirmative step of paying a completely non-statutory $100,000 fee that the Executive has invented from whole cloth. That fundamentally domestic regulation is not a "restriction" on the "entry" "of aliens"—it is a rewriting of the H-1B statute to add a new and massive fee for U.S. employers to access the benefits of the program.

The government's responses are just more variants on the claim that Section 212(f) contains no meaningful limits. First, it stresses the statement in *Hawaii* that "[t]he sole prerequisite set forth in § 1182(f) is that the President 'find[ ]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'" 585 U.S. at 668, 685; *see* Opp. 25, 26–29. Although that may be the sole *procedural step* required, it does not mean that the President's authority is *substantively* unbounded. To the contrary, a proclamation must hew to Section 212(f)'s text—and this one does not.

Second, the government's claim that "entry restrictions may take whatever form the President chooses, and may take place before an alien reaches the border or a port of entry" (Opp. 31), is likewise an admission that the government has no limiting principle. If this Proclamation is permissible, there is nothing to stop the President from promulgating an entire shadow INA under

12

Section 212(f), modifying and overwriting any congressionally enacted immigration laws he sees fit by conditioning "entry" on compliance with non-statutory mandates. Mot. 26–27. Courts properly have rejected these unbounded claims, and this Court should too. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 79–86 (D.D.C. 2025) (*RAICES*) (rejecting use of Section 212(f) to create a non-statutory repatriation system).

Tellingly, the government's sole support is *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993). But the actual policies at issue in that case *refute* the government's argument. There, President Reagan suspended the "entry of undocumented aliens from the high seas," Procl. No. 4865 (Sept. 29, 1981), and then he *separately* ordered the interdiction of vessels carrying such aliens "outside the territorial waters of the United States," Exec. Order No. 12,324 (Sept. 29, 1981); *see also* Exec. Order No. 12,807 (May 24, 1992). The entry suspension therefore operated only at the border, and a separate action—interdiction at sea—occurred in international waters under the President's authority as Commander in Chief of the military. The facts of *Sale* thus underscore that entry suspensions must operate at the border, and separate authority is required for actions elsewhere. The Supreme Court's approval, in dicta, of a hypothetical naval blockade operating at the border—*i.e.*, physically preventing immigrants from "disembark[ing] on our shores," 509 U.S. at 187—hardly authorizes a fee assessed on domestic employers that expressly does *not* prevent any noncitizen from entering, but only *conditions* entry on payment.

**b.** The Proclamation's unlawfulness is especially clear because it imposes a non-statutory fee. *See* Mot. 25. The government, remarkably, says *not one word* about the Supreme Court's decision in *Skinner*, which reaffirms decades of law holding that "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority" to impose payment requirements on regulated parties, "whether characterized as 'fees' or 'taxes.'" *Skinner*, 490 U.S. at 224; *accord Nat'l Cable Tel. Ass'n*, 415 U.S. at 341. Whatever else might be true, Section 212(f) certainly does not "indicate clearly" that the President may use his authority under that provision

to collect money from American employers. *Id.* And Section 212(f)'s silence in this respect speaks especially loudly because other provisions in the INA *do* authorize the Executive to collect fees. *E.g.*, 8 U.S.C. §§ 1356(m), 1184(a)(1); *see supra* pages 7–8. The government responds that, if these provisions "are not an intrusion on Congress' . . . power" of the purse, then neither is imposing a limited payment" under Section 212(f). Opp. 32. But of course, fees under these other provisions do not intrude on congressional power *because they are expressly authorized by Congress.*

To the extent the government attempts to evade *Skinner*'s bedrock rule, it does so by claiming that Section 212(f) operates "at the intersection of foreign affairs and immigration where the President wields significant 'authority,'" and that an "express" delegation is therefore unnecessary. Opp. 32–33. Tellingly, the government cites no case declining to apply *Skinner*'s rule in the immigration realm, and Plaintiffs are not aware of any.

Moreover, the government's claims about the reach of the President's inherent powers are vastly overstated. The Constitution vests "plenary power over immigration" in "*Congress.*" *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024) (emphasis added). Thus, "[t]he power to exclude or to expel aliens . . . is to be regulated by treaty or by act of congress, and to be executed by the executive authority *according to the regulations so established.*" *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) (emphasis added). Given that the Constitution assigns principal authority over immigration (and foreign and domestic commerce) to Congress[8]—and given that it assigns *no* authority over taxes and fees to the President—there is no reason to think that the *Skinner* clear-statement rule should work any differently in the immigration context than elsewhere. After all, even in a true foreign-affairs context that is *not* assigned to Congress by the Constitution, "[t]he

---

[8]    U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish a[] uniform Rule of Naturalization."); *id.* cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises[.]"); *id.* cl. 3 ("The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States [.]").

Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015); *cf. Head Money Cases*, 112 U.S. 580, 593 (1884) (concluding that imposing a 50-cent-per-passenger fee on vessels bringing passengers from foreign ports—a fee that is, if anything, more foreign-facing than the one at issue here—"is a regulation of commerce with foreign nations, confided by the constitution *to the exclusive control of congress*" (quotation marks omitted; emphasis added)).

For similar reasons, the government has no adequate answer to the application of the major questions doctrine. Its principal response is that the doctrine does not apply "[g]iven the foreign affairs and immigration context" (Opp. 33)—a claim that fails for the reasons just explained. As for the assertion that Section 212(f) is "broad" (*id.*), that can be said in every major questions case, which always involve statutes that the government colorably can claim authorize its action (such as to forgive student loans, regulate power plant emissions in novel ways, and the like). But the Supreme Court nonetheless has found every "reason to hesitate" where, as here, the Executive "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformation in [its] regulatory authority.'" *West Virginia v. EPA*, 597 U.S. 697, 724–725 (2022) (first quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), then quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *see also, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The government's only remaining argument is a red herring. It suggests that the Proclamation's fee is not a "tax" because it "operates as a 'regulation' rather than 'revenue production.'" Opp. 32 (quoting *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922)). In its view, the "purpose" of the Proclamation is not to raise revenue, but to "increase employment and wages of Americans," which the government appears to be suggesting means that its imposition

of a $100,000 fee need not be expressly authorized. Opp. 32. The government is mistaken.

To begin, the clear-statement rule of *Skinner* explicitly applies to *any* "additional financial burdens" imposed by the government that do not "inur[e] directly to the benefit of regulated parties," *regardless* of "whether [they are] characterized as 'fees' or 'taxes.'" 490 U.S. at 224.[9] That rule, as explained above, establishes that the Proclamation's fee is unauthorized.

Nor, in any case, does the government's authority stand for the proposition that the Executive can take actions that otherwise would constitute taxation constitutionally reserved to Congress just because those actions may have a "regulatory" purpose. Instead, *Drexel Furniture* held that Congress could *not* "use its taxing power . . . to regulate behavior otherwise regarded at the time as beyond federal authority." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 572 (2012) (*NFIB*) (discussing *Drexel Furniture*). It says nothing whatsoever about *allowing* the Executive to unilaterally impose facially revenue-raising measures just because of a purported regulatory purpose.

Moreover, as the Supreme Court explained in *NFIB*, *Drexel Furniture* was something of a historical aberration even as to its actual holding: "More often and more recently we have declined to closely examine the regulatory motive or effect of revenue-raising measures." 567 U.S. at 573 (collecting authorities). The Court therefore upheld a penalty for failure to purchase health insurance as a valid tax, even though the provision "is plainly designed to expand health insurance coverage" by "affect[ing] individual conduct." *Id.* at 567; *see also id.* ("[T]axes that seek to influence conduct are nothing new. . . . Indeed, every tax is in some measure regulatory. To some

---

9    The government's evidence confirms that the $100,000 fee does not "inur[e] directly to the benefit of regulated parties." *Skinner*, 490 U.S. at 224; *see also* Mot. 25 n.8. Rather than being directed to some purposes relevant to the H-1B program, the funds collected are "not defined by law for a specific purpose," and therefore "will sweep to the General Fund of the U.S. Treasury at the end of the fiscal year." Jackson Decl. ¶¶ 4–7; *cf. Nat'l Cable Television Ass'n*, 415 U.S. at 340–341 (distinguishing the government's ability to "exact a fee . . . which . . . bestows a benefit on the applicant, not shared by other members of society").

extent it interposes an economic impediment to the activity taxed as compared with others not taxed."). As the Court explained, "[t]hat § 5000A," which was passed by *Congress*, "seeks to shape decisions about whether to buy health insurance does not mean that it cannot be a valid exercise of the taxing power." *Id.*

By the same token, the fact "that [the Proclamation] seeks to shape decisions about whether" to sponsor a prospective employee for H-1B status "does not mean" that the $100,000 fee it imposes is something other than an unauthorized "exercise of the taxing power." *NFIB*, 567 U.S. at 567. Thus, that the Proclamation also substantively burdens the H-1B program—and specifically, U.S. employers—by discouraging the hiring of H-1B workers does not somehow make it permissible. The notion that the President may unilaterally begin collecting a $100,000 fee, which the government audaciously describes as "limited" (Opp. 32), without express authorization by Congress, is impossible to square with basic separation-of-powers principles.

**c.** Additionally, Plaintiffs noted (at 27–28), that certain of the Proclamation's provisions are not even colorably related to entry, but, rather, target issues like the Department of State's approval of visa petitions and DHS's decisions on H-1B petitions, neither of which fall within the President's domain. The government asserts that "the entire point of a visa is to provide a mechanism to enter the country," but never even acknowledges the case law Plaintiffs cited explaining that, nonetheless, "entry" is distinct from "visa issuance" (*Hawaii*, 585 U.S. at 694–695 & n.3) and thus the State Department "ha[s] a specific and nondiscretionary obligation" to process visa applications presented to it, even if the visa applicant is currently barred from *entry* by a Section 212(f) proclamation. *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 234–235 (D.D.C. 2021) (rejecting government's argument "that a Proclamation banning an immigrant from entry renders her ineligible for a visa"), *rev'd on other grounds*, 104 F.4th 920 (D.C. Cir. 2024);

17

*see* Mot. 27–28.[10]

> ### 2. *The Proclamation does not satisfy Section 212(f)'s other requirements.*

The Proclamation also fails to satisfy two of Section 212(f)'s other textual requirements.

*First*, the Proclamation does not identify and operate on a valid "class of aliens," as the statute requires. 8 U.S.C. § 1182(f). The purported class here—noncitizens "whose petitions are [not] accompanied or supplemented by a payment of $100,000"—pushes the statutory term "class" beyond recognition. *See* Mot. 28–29. The Proclamation defines the supposed class not based on any "common characteristics or attributes" of the "people" who are included (Class, *Black's Law Dictionary* (12th ed. 2024); *accord* Class, *Webster's New International Dictionary* 496 (2d ed. 1947) (similar)), but based on their respective employers' willingness or ability to pay.

The government has no persuasive response. It observes that the Supreme Court in *Hawaii* rejected a *different* argument based on the "class of aliens" requirement—overlooking that *Hawaii* is flatly incompatible with the government's claim that the "text" does not "limit the President's broad discretion to determine the relevant class." Opp. 29. To the contrary, the Court agreed that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f). 585 U.S. at 687–688. And that requirement could not be a textual limit if it allowed the President to do anything he wanted. Thus, although the statute gives the President leeway to define the class, a proclamation still must specify *a* cognizable "class" within the term's ordinary meaning.

The proclamation at issue in *Hawaii* satisfied that requirement because it was nationality-based: Individuals were barred if they were nationals of certain countries that the President had determined did not sufficiently enable security vetting, and nationality certainly is a

---

[10]    The government puzzlingly accuses Plaintiffs of being "disingenuous" because "the INA specifically requires that other documents are required for entry." Opp. 33–34. The government's point is not entirely clear. Regardless, the fact that *other* documents are required for entry does not alter the fact that the Proclamation invalidly targets visa-issuance decisions that the Supreme Court has described as distinct from the question of entry.

common characteristic or attribute. *See Hawaii*, 585 U.S. at 688 (identifying the relevant "class" as "nationals of select countries."). By contrast, the Proclamation here does not target a class of noncitizens in any conceivable respect. The only criteria for membership within the group that the government claims is restricted from entry has nothing at all to do with characteristics of the *noncitizens*, but only of their *employers*, who submit the petition and pay (or fail to pay) the Proclamation fee.

Nor can the government prevail by rewriting the class that the Proclamation defines. It defends the Proclamation's "classification" by arguing that the "common link" is "the purpose of the alien's entry." Opp. 30. But that is not an accurate description. H-1B petitioners whose prospective employers have paid the Proclamation fee—and, having satisfied the Proclamation's condition, may enter the country—have the same "purpose" of entry as those who do not: to temporarily work in the United States in a specialty occupation. The only difference is whether the noncitizen's employer was willing and able to pay the fee. Accordingly, none of the past examples of entry classifications the government cites are comparable to the Proclamation, which is without precedent or analog. *Cf.* Opp. 30–31. For instance, the Proclamation of June 4, 2020, had a clear class: "Chinese students" (except for undergraduates) "seeking to enter the United States pursuant to an F or J visa . . . who either receives funding from or who currently is [or was] employed by, studies at, or conducts research at or on behalf of . . . an entity in the PRC that implements or supports the PRC's 'military-civil fusion strategy." 85 Fed. Reg. 34,353 (June 4, 2020). Members of that class share common links, including nationality, occupation, and affiliation with a particular entity. Likewise, the Proclamation of June 11, 2020, targeted employees of the International Criminal Court and their families, also a grouping of individuals with a common characteristic. *See* 85 Fed. Reg. 36,139 (June 15, 2020). Nothing similar is present here.

*Second*, the Proclamation lacks findings "that the entry of any *aliens* or of any class of *aliens"* "as immigrants or nonimmigrants" "would be detrimental to the interests of the United

States." 8 U.S.C. § 1182(f) (emphasis added). Mot. 29–30. It makes findings only about U.S.-based *employers* who, the Proclamation alleges, abuse the system. Those observations are unrelated to the entry of noncitizens but related instead only to the Proclamation's illegitimate goal of regulating the domestic activity of domestic H-1B employers.

The government argues that the Proclamation satisfies this prerequisite because the "President . . . explained his decision in detail." Opp. 26. But details do not help if, as here, they are about the wrong thing. The Proclamation's findings, however lengthy, are not about the *noncitizens* whose entry the Proclamation aims to restrict, but their prospective *domestic employers*. For instance, as the government notes (at 26), the Proclamation bemoans "exploit[ation]" of the H-1B program by employers and aims to "impose higher costs on companies seeking to use the H-1B program."

To this, the government responds that the noncitizens need not be "inherently detrimental," but only their "entry." Opp. 27. Again, that is unresponsive. As explained, the Proclamation is not suspending or restricting the "entry" of noncitizens at all (*supra* pages 12–13; Mot. 23–27)— indeed, it is agnostic to the entry of any given H-1B worker. Rather, the entry of any given worker depends on whether that worker's employer ultimately pays the fee. The Proclamation thus targets and penalizes U.S.-based employers who hire H-1B workers.

Finally, to the extent the government misunderstands Plaintiffs' arguments as being a challenge to the "effectiveness and wisdom" of the Proclamation (Opp. at 29 (quoting *Hawaii*, 585 U.S. at 708)), that simply is incorrect. Even taking all the allegations of abuse in the Proclamation as true for purposes of this motion (which Plaintiffs do not concede), and even assuming the policy wisdom of modifying the H-1B program to impose a $100,000 fee on employers (again, counterfactually), that does not mean the President has the power to enact those reforms unilaterally through Section 212(f), rather than by an act of Congress. He does not, and the Proclamation therefore is *ultra vires*.

### C.    Section 215(a)(1) cannot rescue the Proclamation.

Finally, the government suggests in passing (at 25) that even if the Proclamation is unauthorized by Section 212(f), it could be independently justified based on Section 215(a)(1). That argument flouts what the Supreme Court has described as the "substantial[] overlap[]" between the two provisions (*Hawaii*, 585 U.S. at 683 n.1), and would hide an enormous elephant in the smallest of mouseholes.

*First*, regardless of whatever Section 215(a)(1)'s precise boundaries might be, they certainly do not encompass the imposition of a $100,000 fee. Again, the Supreme Court has been clear that "Congress *must indicate clearly* its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties." *Skinner*, 490 U.S. at 224 (emphasis added); *accord Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012) (same, quoting *Skinner*). Section 215(a)(1) contains no such clear statement.

*Second*, the scope of Section 215(a)(1) is best understood with reference to the title of the section in which it appears: "Travel control of citizens and aliens." 8 U.S.C. § 1185; *see, e.g.*, *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) ("Section headings supply cues as to what Congress intended." (quotation marks omitted; alterations incorporated)). That is, Section 215 is a provision about travel control—regulating the physical act of entering or departing from the country—which would make it a surprising font of authority for a power to supplant (or even to supplement) the *substantive* criteria for an existing visa category. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 293 (1981) ("a passport" is "a travel control document"); *Kent v. Dulles*, 357 U.S. 116, 132 (1958) (Clark, J., dissenting) (discussing, in a case involving Section 215, "a succession of 'travel-control statutes' making possession of a passport a legal necessity to leaving or entering this country").

That conclusion is buttressed by the fact that Section 215(a)(1) applies to "depart[ure] from" as well as "enter[ing]" the country, which again is an unnatural fit for authority over substantive visa-eligibility questions. Likewise, each of the six remaining paragraphs of Section 215(a) relates to the integrity of the travel control process, including prohibitions on false statements and forged travel documents—again suggesting that subsection (a)(1) is similar in scope. 8 U.S.C. § 1185(a)(2)-(7); *see, e.g.*, *United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated," and may "narrow[]" the "meanings" to which statutory terms may otherwise be "susceptible.").

Section 215(a)(1) does not authorize the President to rewrite the INA's substantive provisions or to substantively alter the H-1B visa program by imposing an unprecedented extra-statutory fee on U.S. employers. Like Section 212(f), it cannot justify the Proclamation.

## II.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE.

If the Proclamation and its implementation are unlawful—and they are—then this Court can carry out its Article III duty and so hold. The government's recycled threshold arguments, which courts uniformly have rejected, all fail. The doctrine of consular nonreviewability does not apply, Plaintiffs may challenge the Proclamation and implementing actions as *ultra vires*, and Plaintiffs may challenge agency actions implementing the Proclamation under the APA.

### A.    The doctrine of consular nonreviewability does not apply to challenges, like this one, to forward-looking policies.

Consular nonreviewability does not shield the government's unlawful actions from review. It is black-letter law that that doctrine applies only to challenges to "particular visa determinations by a consular officer." *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). Thus, even if the Proclamation and its implementation concerned "consular decisions," it is "well settled" that consular nonreviewability does not bar review of "forward-looking challenges to the lawfulness of regulations or policies governing [such] decisions." *Id.* (quoting *Int'l Union of*

*Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985)). Indeed, this Court has held that D.C. Circuit precedent "allow[s] challenges to the legality of State Department policies—and their application—without implicating the discretionary decisionmaking of individual consular officers." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (Howell, C.J.) (citing *Bricklayers* and *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 12 (D.D.C. 2017)); *cf. Patel v. Reno*, 134 F.3d 929, 931–932 (9th Cir. 1997) ("[W]hen the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists."). That is conclusive here, as the Proclamation plainly sets forward-looking policy and does not adjudicate any particular visa determination.

Remarkably, the government does not acknowledge or attempt to address the decades of precedent allowing review of forward-looking policies like the Proclamation. And tellingly, the government cites no case holding that consular nonreviewability bars such challenges. Instead, it points to cases in which—unlike this one—plaintiffs challenged individual determinations. *Dep't of State v. Muñoz,* 602 U.S. 899, 908 (2024); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see* Opp. 13–14 (citing various lower-court decisions, all involving individual determinations). The government also invokes *Fiallo v. Bell*, but that case did not involve consular nonreviewability at all. 430 U.S. 787 (1977). *Fiallo* merely reaffirmed that courts apply a deferential standard of review to constitutional challenges to Congress's laws; it provides no support to the government's claim that the Executive Branch can rewrite statutes with no review. *Fiallo*, 430 U.S. at 792–796. Indeed, the government's quotation elides a rather important clause: that the topics discussed "have been recognized as matters solely for the responsibility of *the Congress*" (*id.* at 796 (emphasis added))—not for unreviewable executive action contrary to statute. *See President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 193 (D. Mass. 2025) (observing that the relevant passage in *Fiallo* "is discussing *Congress's* power to regulate the entry of aliens, not the power of the Executive to do so").

23

Even more strained is the government's reliance on *Trump v. Hawaii*, in which the Supreme Court *in fact reviewed* a challenge to a 212(f) proclamation, "notwithstanding" the government's invocation of "consular nonreviewability" and other justiciability bars. 585 U.S. at 682–683; *see* Opp. 12–13, 23–24. True, the Court declined to definitively reject the government's position, "assum[ing] without deciding" review was available. *Hawaii*, 585 U.S. at 683. But it is bizarre for the government to suggest that *Hawaii* affirmatively supports its position that courts *cannot* review the very type of decision that the Supreme Court in that case *did* review. The Supreme Court's repeated consideration of statutory claims like the ones presented here—in both *Hawaii* and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)—underscores that such review poses no threat to the separation of powers.[11] Consular nonreviewability is no bar to review here.

### B.    Plaintiffs have two causes of action: one in equity and another under the APA.

The government has no adequate answer to Plaintiffs' dual causes of action—an equitable cause of action to challenge the Proclamation as *ultra vires*, and a cause of action under the APA for agency actions implementing the Proclamation.

#### 1.    *Plaintiffs have an* ultra vires *claim.*

The government claims (at 19-24) that Plaintiffs lack an *ultra vires* claim, but this argument again defies on-point D.C. Circuit precedent—this time, the precedent recognizing that "a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024) (citing *Chamber of Com. of*

---

[11]    Because the doctrine is not applicable here, the government's argument about which types of officers or agencies the doctrine applies to (Opp. 13–14) are of no moment. These arguments serve only to highlight just how expansive the government's position is, *i.e.*, that no court can *ever* review the statutory legality of any agency policy that has a downstream effect on visa approvals or denials.

*U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)); *see also Trudeau v. FTC*, 456 F.3d 178, 189–190 (D.C. Cir. 2006) ("[J]udicial review is available when an agency acts *ultra vires*, even if a statutory cause of action is lacking."). Moreover, it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Reich*, 74 F.3d at 1328 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and in the judgment)). The government's contrary position—that courts are powerless to review both the Proclamation and any agency actions implementing it—would "insulate the entire executive branch from judicial review" based solely on the idea that "the 'executive's' action here is essentially that of the President." *Reich*, 74 F.3d at 1328.

Courts regularly entertain equitable claims challenging the President's statutory authority to take certain actions. *See, e.g.*, *Reich*, 74 F.3d at 1327–1328 (recounting long history of such claims). And in particular, courts repeatedly and routinely review claims that Section 212(f) proclamations exceed the President's authority. *E.g.*, *RAICES v. Noem*, 793 F. Supp. 3d 19, 76–77 (D.D.C. 2025), *appeal docketed*, No. 25-5243 (D.C. Cir. July 3, 2025); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020); *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 560–566 (N.D. Cal. 2020); *Harvard*, 788 F. Supp. 3d at 193. Indeed, in the government's pending D.C. Circuit appeal of a decision invalidating another Section 212(f) proclamation, it *did not even argue* that the district court erred in finding that the plaintiffs had a non-statutory cause of action. *See generally* Brief for Appellant at 27–65, *RAICES*, No. 25-5243 (D.C. Cir. Aug. 22, 2025).

As these cases recognize, "the statute[s] in question" do not "commit" the relevant issues "to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). The government bases its contrary argument on misdirection. It says that Section 212(f) grants the President broad discretion to determine whether entry of a class of noncitizens "would be detrimental to the interests of the United States," averring that this discretion is not just broad but *unreviewable*. Opp.

20–21. But to begin, the Supreme Court in *Hawaii* again *in fact reviewed* even that sort of question, assessing the President's findings to determine whether they met the statute's requirements. 585 U.S. 667, 682–683. And more important, Plaintiffs' claims here do not focus on the adequacy of the President's findings: They contend that the Proclamation conflicts with other statutes and exceeds the authority Congress conferred in Section 212(f) by, *inter alia*, rewriting the H-1B visa program to impose an unprecedented fee on U.S. businesses and higher-education institutions. Congress nowhere delegated to the President the exclusive authority to determine whether Section 212(f) empowers him to abrogate other laws, or to decide for himself the metes and bounds of his own powers. *See INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983) ("Executive action under legislatively delegated authority" is "always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review.").

The government fares even worse with its nonreviewability arguments based on Section 1185(a)(1), whose grant of authority—to promulgate "reasonable" restrictions on entry and exit—is the very opposite of the language the Supreme Court has found to withdraw judicial review. *See Knauff*, 338 U.S. at 544 (evaluating whether regulations were "reasonable" under predecessor version of Section 1185(a)(1)); *Rainbow Nav., Inc. v. Dep't of Navy*, 783 F.2d 1072, 1080 (D.C. Cir. 1986) (Scalia, J.) (finding that the regulatory standard "reasonable profit" furnished a "meaningful standard" for judicial review; *cf. Webster v. Doe,* 486 U.S. 592, 600 (1988) (authorizing the termination of a CIA employee whenever the Director "shall deem such termination necessary or advisable in the interests of the United States," with no reasonableness limitation).[12]

---

[12]   The government's claim that *Reich* is inapposite because the relevant grant of discretion in that case was more "circumscribed" than here (Opp. 23) also misses the entire point of the Circuit's holding there. Presidential power "*must* be exercised consistently" with the statute from which that power derives, and courts have the power to determine whether that is so. *Reich*, 74 F.3d at 1330–1331.

The government engages in yet more misdirection with its reliance on *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) (*NRC*), and related cases. *NRC* addresses a different question: Where Congress has presumptively *foreclosed* judicial review, when may courts nonetheless exercise review via a nonstatutory cause of action? *Id.* at 680–681. In such circumstances, based on principles articulated by the Supreme Court in *Leedom v. Kyne*, 358 U.S. 184 (1958), plaintiffs can obtain nonstatutory *ultra vires* review by showing that defendants "'exercise[d] power . . . specifically withheld' and . . . violated a 'specific prohibition' in the" statute. *NRC*, 605 U.S. at 681 (quoting *Kyne*, 358 U.S. at 188–189); *see Glob. Health Council v. Trump*, 153 F.4th 1, 20–21 (D.C. Cir. 2025) (same where Impoundment Control Act precluded statutory review).

But where, as here, there is no implied preclusion of review (such as through the creation of a presumptively exclusive statutory review scheme), the *Kyne* doctrine does not apply. *See Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988) (explaining that "[e]ven where Congress is understood generally to have *precluded review*," "the Supreme Court has found an implicit but narrow exception" as articulated in *Kyne* (emphasis added)); *see also Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1168, 1172–1175 (D.C. Cir. 2003) (recognizing *ultra vires* cause of action without application of *Kyne* test where statute did not foreclose judicial review, and rejecting agency's "position" that the challenged action was "permissible because the statute does not expressly foreclose the construction advanced by the agency"); *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (stating that "*ultra vires* review . . . is 'strictly limited' *when 'other judicial-review statutes' are present*.") (quoting *NRC*, 605 U.S. at 681 (emphasis added)).[13] And perhaps most tellingly, the Supreme Court in *Hawaii*

---

[13]  This case, which the government cites for the proposition that "it is doubtful that *ultra vires* review is available to challenge presidential actions at all" (Opp. 19) actually refutes that proposition. It based its hesitancy on the fact that "courts generally lack authority to enjoin the President" (2025 WL 1742853, at *2 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 802–803

did not apply *Kyne* review to the Proclamation at issue there, instead evaluating it on the merits and finding it "squarely within the scope of Presidential authority under the INA." 585 U.S. at 697.

In all events, the unlawful actions here would be subject to review, and would be unlawful, even under *Kyne*'s standard. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (even under the *Kyne* standard, "[s]o long as a statutory provision plainly delineates the outer limits of agency authority . . . the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms."); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 206 (D.D.C. 2025) ("Conduct in violation of specific statutory limitations 'is just one example of an *ultra vires* act—not the *only* example of an *ultra vires* action.'" (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)).

### 2. *The APA provides a cause of action to challenge agency implementation of the Proclamation.*

Plaintiffs plainly have not asserted APA claims against the Proclamation itself, so the government's arguments on that score are beside the point. *See* Opp. 15. And, *contra* the government, Plaintiffs via the APA may challenge agencies' implementation of the Proclamation—both the policy documents agencies have promulgated and their policies of refusing to process or grant H-1B petitions absent payment of the $100,000 fee. The government raises three counterarguments, all meritless.

***Presidential action.*** First, the government is wrong that the agency actions here are unreviewable simply because they stem in some respect from a Presidential proclamation. The Supreme Court "has never excepted a final [agency action] from APA review because it carried

(1992) (plurality op.))—but the President is not a defendant in this case, and as explained (Mot. 34–35), "[r]eview of the legality of Presidential action *can* ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (*Reich*, 74 F.3d at 1328 (quoting *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part) (emphasis added))). And, *American Foreign Service Association* in fact did review the action in question; it just found the claim lacking on the merits. 2025 WL 1742853, at *3.

out a presidential directive." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). And courts regularly review, under the APA, agency actions to implement presidential directives. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012) (APA review of NIH guidance implementing an executive order); *Gomez*, 485 F. Supp. 3d at 191–194 (APA review of "cluster of guidance documents, cables, and directives" implementing proclamation); *O.A. v. Trump*, 404 F. Supp. 3d 109, 134 (D.D.C. 2019) (APA review of agency defendants' implementation of presidential proclamation); *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (APA review of "agency adherence to [a] Proclamation . . . and agency guidance"); *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 469 (D.D.C. 2020) (similar); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (APA review of internal agency policy of not processing certain visas after Proclamation suspended entry); *Su*, 121 F.4th at 15–16 (agency actions are subject to APA review "even if implementing an executive order"); *see also Reich*, 74 F.3d at 1327 (expressing "doubt" that agency actions "based on [an] Executive Order" should be exempt from APA review on that basis); *Tate*, 513 F. Supp. 3d at 142 (rejecting "attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to the State Department"). This Court can do so, too.

The government's case law, by contrast, is doubly irrelevant. First, in the government's cases finding that the President's actions precluded APA review, there was no meaningful dispute that the President had *statutory* authority to direct the relevant agency actions. For example, this authority was undisputed in both *Detroit International Bridge Co.* and this Court's prior decision in *Tate*, *see* 513 F. Supp. 3d at 143. It is one thing to say that plaintiffs may not obtain APA arbitrary-and-capricious review of an agency's ministerial implementation of a Presidential action that is concededly within the President's authority. It is something else entirely to claim that courts under the APA may not review even a claim, such as those here, that the agencies' actions exceed the statutory authority that purportedly authorizes them. None of the government's cases so hold.

Second, in all events, action by the President limits the availability of APA review only

where the usual order of operations is reversed and "the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (citing *Franklin*, 505 U.S. at 799–800). Hence, the government's cases involve situations where the operative action belongs only and exclusively to the President. In both *Franklin* and *Public Citizen*, the parties were not affected by agency action unless and until the President made a (discretionary) transmission to Congress. *Franklin*, 505 U.S. at 799 (relying on the fact that "the Secretary's report to the President has no direct effect on reapportionment until the President takes affirmative steps to calculate and transmit the apportionment to Congress"); *Public Citizen*, 5 F.3d at 551–52 ("The President is not obligated to submit any agreement to Congress, and until he does there is no final action. If and when the agreement is submitted to Congress, it will be the result of action by the President, action clearly not reviewable under the APA.").

Here, by contrast, the Proclamation specifically tasks agencies and agency officials with taking various actions to implement and enforce it. *See* Mot. 35 & n.36 (detailing implementation actions by USCIS, U.S. Customs and Border Protection, and the Department of State). Agencies undertake such actions pursuant to their *own* authorities and functions, not solely by virtue of authority delegated by the President, and thus agencies' exercise of their own authorities remain reviewable. *See Detroit Int'l Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016) (citing Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001)).

More than that: These agency actions involve substantial discretion, including that DHS and the State Department must "coordinate to take *all necessary and appropriate action* to implement this proclamation" and that the DHS Secretary may decline to apply the restriction on entry to "any individual alien, all aliens working for a company, or all aliens working in an industry, if" she "determines, in the Secretary's discretion, that" an exception "is in the national

interest and does not pose a threat to the security or welfare of the United States." Ex. 1, 90 Fed. Reg. at 46,028–46,029; *see also id.* (requiring Secretary of State to process "only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation"). Hence, *every* application of the Proclamation in part reflects an exercise of agency discretion—whether to apply, or not, the restrictions that the Proclamation authorizes. Final authority thus rests with the agencies, and their actions are not unreviewable simply because they stem from presidential action. Instead, Plaintiffs may obtain plenary APA review of these actions, including arbitrary-and-capricious review. If it were otherwise, presidents could "insulate" from judicial review any future agency actions "with the single stroke of an executive pen." *Su*, 121 F.4th at 15; *see Reich*, 74 F.3d at 1327; *accord RAICES*, 793 F. Supp. 3d at 74 (President did not have "final constitutional or statutory responsibility" where proclamation directed agency officials to "take all appropriate action to" implement it).

Unsurprisingly, the government musters little support, citing two cases in which the courts of appeals did not actually endorse its position here. In *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, the Fourth Circuit did not pass on the district court's conclusion that an APA challenge was improper because the agency was exercising delegated authority from the President, instead affirming because, even if the APA applied, the agency's actions "did not run afoul of any APA standard." 698 F.3d 171, 183–184 (4th Cir. 2012). Similarly, in *Tulare County v. Bush*, the D.C. Circuit did not adopt the district court's determination that APA review was unavailable because the agency was "merely carrying out directives of the President" (*Tulare Cnty v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001)) instead noting that the plaintiff's challenges to the "non-presidential actions" of the agency lacked "sufficient specificity" to state a claim (306 F.3d 1138, 1143 (D.C. Cir. 2002)).

***Final agency action.*** This Court may review the agencies' ongoing, real-world implementation of the Proclamation as well as the challenged agency documents, all of which

satisfy the APA's requirement of final agency action. They mark the consummation of the agency's decisionmaking process as to the manner of implementation of the Proclamation, and legal consequences flow from them. *See, e.g.*, *Gomez*, 485 F. Supp. 3d at 191–194 (agency defendants' implementation of proclamation via "cluster of guidance documents, cables, and directives" was final because defendants' "decisionmaking process [was] not in flux" and, as a result, "thousands of otherwise qualified visa applications [were] not being processed"); *O.A.*, 404 F. Supp. 3d at 147 (agency rule final even where it implemented proclamation because it—not the proclamation—"ha[d] operative effect"); *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 138 (D.D.C. 2025) (OPM memorandum was "consummation of [its] decisionmaking process with respect to how agencies should implement the [challenged] E.O"). As another district court explained in a challenge to a different Section 212(f) proclamation, such proclamations are not "self-executing without agency action" and can in fact "require[] significant agency action to implement," such that those agency actions are themselves final. *Doe #1 v. Trump*, 423 F. Supp. 3d 1040, 1044 (D. Or. 2019).

Here, the government admits that the agencies are engaging in final agency action—because "[t]he agencies . . . explained the Proclamation and *have otherwise been implementing it*." Opp. 17 (emphasis added). Each agency's decision to implement the Proclamation is *itself* a final agency action that is having ongoing, real-world effect on myriad individuals and organizations. Each agency's decision to implement the Proclamation is not tentative, and "has direct and appreciable legal consequences" because it "alter[s] the legal regime to which" all future H-1B petitions are subject—to be approved they must either pay the $100,000 fee or obtain a waiver. Nothing more is needed to identify a binding, non-tentative agency action.

Moreover, even if it were necessary to identify a specific document (it is not), the limited documents submitted as part of the government's sparse administrative record confirm that the agencies have made binding, final decisions that change the way H-1B petitions are processed.

32

*See, e.g.*, Dkt. No. 45-1 at 5-6, ¶ 5 (State Department cable from Secretary Rubio instructing that "[t]he PP's restriction on issuance and entry under INA 212(f) applies to H-1B visa applicants with petitions filed AFTER 12:01 a.m. EDT on September 21, 2025, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000, as verified by DHS"); Dkt. No. 45-2 at 11 ("United States Citizenship and Immigration Services and the Department of State have been instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only."); Dkt. No. 45-3 at 7, 8 (USCIS guidance explaining discretionary grounds for exceptions to Proclamation and stating that Proclamation applies to noncitizens deemed ineligible for requested changes of status or amendment or extensions of stay); Dkt. No. 45-3 at 3 (USCIS guidance regarding prospective application of Proclamation directing that "[a]ll officers of [USCIS] shall ensure that their decisions are consistent with [the] guidance"). Those documents are proof of ongoing implementation by agencies—resulting in real-world harms to real people no longer able to come to this country, not to mention the real-world employers no longer able to employ them without paying an exorbitant fee. The government cannot hide from those binding, real-world effects by denying the existence of final agency action.

> ***Committed to agency discretion by law.*** Nor are the relevant agency actions here committed to agency discretion by law, *see* 5 U.S.C. § 701(a)(2)—for reasons largely already explained. *Supra* pages 25–26. This exception to reviewability is "quite narrow[]," *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019), and this case is not one of the "rare circumstances" in which it would apply—the President's authority under sections 212(f) and 215(a)(1), though broad, is not "unbounded." *Id.* And in particular, Congress has neither made the President the judge of the scope of his own authority under those provisions, nor empowered the President to determine when he can rely on those sections to abrogate other laws. *Supra* pages 25–26.

*    *    *

In any event, even if the government's arguments against APA review were correct, that does not render implementing agency actions unreviewable. Rather, the Proclamation, along with any implementing actions *not* subject to APA review, are subject to review as *ultra vires* and should be enjoined. *See* Mot. 36. Under either route, both the Proclamation and implementing agency actions are unlawful, and this Court should grant summary judgment to Plaintiffs.

## III.    PLAINTIFFS ARE ENTITLED TO RELIEF.

### A.  Plaintiffs have satisfied the standard for a permanent injunction.

In the opening memorandum, Plaintiffs explained in depth why they had satisfied the four-factor test governing preliminary injunctions. *See* Mot. 36–45. As Defendants note (Opp. 42), now that the Court has converted Plaintiffs' motion into one for summary judgment, Plaintiffs request a permanent injunction. *See* Dkt. No. 8 at 51 (asking the Court to "[e]njoin defendants from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiffs and each of their members."); Mot. 2, 45 (requesting, in the alternative, permanent relief). "The standard for a preliminary injunction is essentially the same as for a permanent injunction, with the exception that the plaintiff must show" actual success on the merits rather than a likelihood of success. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). All the rationales for a preliminary injunction explained in Plaintiffs' motion thus apply equally to the converted motion for summary judgment.

To obtain a permanent injunction, the "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006). Plaintiffs have satisfied that standard.[14]

---

[14]    The government disputes nearly every fact in Plaintiffs' Statement of Undisputed Material Facts (Pls.' SUMF) that is based upon the Shen and Snyder declarations on the grounds that those statements are not based on the personal knowledge of the declarants or are hearsay. *See* Defs.s' Response to Plaintiffs' Statement of Undisputed Material Facts at 5–15. These arguments are meritless.

To begin, the government misunderstands the personal knowledge requirement: the "standard of personal knowledge is deemed met by an affiant who reviews the business records of the organization that he or she is affiliated with, and who testifies on the basis of information acquired through the performance of his or her official duties." *Ecological Rts. Found. v. U.S. EPA*, 541 F. Supp. 3d 34, 47 (D.D.C. 2021) (BAH). Mr. Shen and Ms. Snyder plainly meet that requirement, as both declarations provide information about the associations' members that are based on the declarants' "own personal knowledge" and "business records" reasonably available to them in their respective roles as Vice President for Immigration Policy at the Chamber of Commerce and President of the American Association of Universities. *See* Shen Decl. ¶ 1; Snyder Decl. ¶¶ 1-2; *see also* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."); *SSM Litig. Grp. v. Env't Prot. Agency*, 150 F.4th 593, 597–598 (D.C. Cir. 2025) (finding declarations from two associations describing the impact of the agency action under review on their members made the associations' standing "patently obvious and irrefutable").

And the government should know that Plaintiffs' declarations satisfy the personal knowledge standard, as government officials often submit declarations to courts in this district that are deemed admissible under the same standard. *E.g.*, *Ecological Rts. Found.*, 541 F. Supp. 3d. at 48–49 (declaration based on "personal knowledge" included "information supplied to [the declarant] by employees . . . or employees in other EPA offices" and "his representation that he acquired information . . . in the course of his official duties" was sufficient); *Citizens for Resp. & Ethics in Washington v. Leavitt*, 577 F. Supp. 2d 427, 434 n.5 (D.D.C. 2008) (acting director of agency averred "that her declaration is based on her personal knowledge or information made known to her in the course of her official duties. . . . Thus, there can be no suggestion that [she] was not the appropriate party to provide the relevant information."). The fact that some statements do not provide details that the government would like is no basis for a personal knowledge objection.

Nor does the government's suggestion that Mr. Shen's affidavit lacks foundation under 28 U.S.C. § 1746 have any merit, as "a declaration or certification that includes the disclaimer 'to the best of [the declarant's] knowledge, information or belief' is sufficient under . . . the statute." *Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004); *see Downs L. Grp., P.A. v. U. S. Coast Guard*, 2023 WL 4744044, at *7 & n.4 (D.D.C. July 25, 2023) (relying on such an affidavit at summary judgment).

The government also claims Plaintiffs' SUMF is replete with "inadmissible hearsay," yet for most of the facts for which the government makes this objection, there is no out-of-court statement repeated by any declarant that even *could be* hearsay. *See* Fed. R. Evid. 801; *e.g.*, Def.s' SUMF at 12 (disputing Ms. Snyder's statement that "AAU members have submitted thousands of H-1B visa petitions" in 2025 as "inadmissible hearsay," even though that sentence contains no out-of-court statement by someone other than Ms. Snyder). Finally, the fact that Mr. Shen explained that he has

##### *1.*    *Plaintiffs' members are irreparably harmed.*

**a.** As the opening memorandum explains (Mot. 36–44), Plaintiffs' members already are irreparably harmed by the Proclamation, and without relief they will continue to suffer additional harms. In brief summary, members of both the U.S. Chamber and AAU anticipated using the H-1B program this year to recruit needed talent, yet now are unable to do so because of the Proclamation. *See* Mot. 37–41 (citing numerous member declarations describing recruitment difficulty resulting from the Proclamation). This "difficulty recruiting and retaining top talent . . . [is] an outcome with the potential to seriously harm [an organization's] business" and has been held by numerous courts to represent irreparable harm. *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *12 (D.D.C. 2021); *see also Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83–84 (D.D.C. 2020).

Just so here. This massive disruption to Plaintiffs' members' recruitment efforts will result—indeed, already has begun to result—in irreparable harm in several critical respects, including: the inability to hire anticipated talent; the need to cancel or downsize planned projects; the need to undertake time- and resource-intensive workforce restructuring, including potential offshoring of roles or departments; and, from all of these disruptions, a corresponding drag on Plaintiffs' members' ability to research, innovate, and advance their missions as businesses and research institutions. That the Proclamation so profoundly will "frustrate[]" the "mission[s]" of Plaintiffs' members is reason enough to find irreparable harm. *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57 (D.D.C. 2020) (collecting examples).

Against all this, the government says little about why it thinks irreparable harm will not

---

read the other declarations submitted in support of Plaintiffs' motion is no basis to find a material dispute of fact, as the Gonzales, Daniels, and Poser declarations independently establish the relevant portions of Plaintiffs' statement of undisputed facts. *See* Fed. R. Evid. 602, advisory comm. note 1972 ("This rule does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement.").

accrue. It first asserts that "'[i]t is well settled that economic loss does not, in and of itself, constitute irreparable harm,'" and thus being forced to pay the Proclamation fee is not irreparable. Mot. 42 (quoting *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017)). Plaintiffs' irreparable injuries, however, are not rooted in the collection of the Proclamation fee alone, but instead in all the concrete and inevitable consequences that follow from suddenly imposing such a massive impediment to their members being able to recruit key talent.[15] Indeed, at least for U.S. Chamber member GoRural, these consequences are nothing short of existential. Mot. 42; *see also FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (a "threat[]" to the "very existence" of a business is irreparable harm). The government, however, does not even acknowledge the irreparable harm facing GoRural if the Proclamation remains in effect.

The government's remaining counterarguments are conclusory. It says that for U.S. Chamber members, the Proclamation will, "[a]t most . . . disrupt projects" and that "having to adjust budgets or divert resources is hardly irreparable." Opp. 43. As just explained, this is not at all an accurate description of the harms to Plaintiffs' members described in the opening memorandum. Rather, because of the Proclamation, Plaintiffs' members must put recruitment on hold, prepare to eliminate or offshore anticipated positions, restructure their workforce management strategies, and triage planned projects that cannot be supported as intended in a post-Proclamation reality. These are not mere budgeting tweaks, they are irreversible changes to business operations touching on areas so fundamental as personnel, structure, and mission.

---

[15]    Additionally, as noted in the opening memorandum (Mot. 43), economic harm *is* "irreparable *per se*" where "a plaintiff 'cannot recover damages from the defendant due to the defendant's sovereign immunity." *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008)); *see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (mem) (2025) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010))). The government does not address this point at all, which applies here.

The only case the government cites on this point, *Coney Island Prep v. United States Department of Health & Human Services*, is irrelevant. In that case, there was no irreparable harm because "Plaintiffs' diversion of resources [was] not due to Defendants' conduct—rather, it [was] due to the pandemic." 506 F. Supp. 3d 203, 215 (S.D.N.Y. 2020). Here, by contrast, the Proclamation is the indisputable source of the harm to Plaintiffs. Were it not for the $100,000 fee, Plaintiffs' members would not face disruption in their hiring, be forced to cancel projects and implement restructuring measures, and experience drag on their organizational missions as businesses and educational institutions.

The government says, without any citation or explanation, that AAU "cannot plausibly claim that universities with billions in endowments cannot pay $100,000 to petition for H-1B visas, especially when the money could be reimbursed." Opp. 43. It provides no evidence about these endowments, and it does not identify of which members it speaks. Nor does it engage with the limitations on endowment funds described in the declarations. *See, e.g.*, UIUC Decl. ¶ 19 (describing how most endowment funds are donor-restricted and funds are otherwise subject to a managed annual payout); Minnesota Decl. ¶ 19 (similar); WashU Decl. ¶ 12 (similar). Or with the fact that AAU's members *cannot* "cobble together funding to pay the Proclamation's exorbitant fee, particularly not on a timeline that would avoid significant disruption and especially given the limits they face as non-profits." Mot. 38.[16]

The government next claims that Plaintiffs' injuries are speculative because there is an H-1B lottery. *Id.* But not all the U.S. Chamber's members (Shen Decl. ¶ 7) and none of AAU's members (Snyder Decl. ¶ 11) are subject to the numerical cap and therefore subject to the lottery. Additionally, the Proclamation has made it impossible for some U.S. Chamber members to even

---

[16]  The government also does not explain its reference to reimbursement, though it appears to reference reimbursements available if the $100,000 fee is paid, but the H-1B visa not *issued*. Opp. 43.

*consider* hiring through the H-1B program. Shen Decl. ¶¶ 14, 17. And many U.S. Chamber members hire numerous H-1B workers, making it certain that, but for the cap, they would hire H-1B workers. *Id.* ¶ 17 (discussing "member companies that routinely hire multiple H-1B workers").[17] In any event, Plaintiffs' cognizable harms include "the lost *opportunity* to obtain" H-1B visas in the lottery, even if actually obtaining them is not "certain." *Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 13–14 (D.D.C. 2017) ("That lost opportunity is itself a concrete injury, and a favorable decision would redress it." (quotation marks omitted)).

Lastly, the government speculates that Plaintiffs' members can "simply hire Americans to fulfil their labor needs" (Opp. 43) but does not address any of the evidence showing that this is not so. *See, e.g.*, Mot. 37 (explaining that Plaintiffs' members "will be unable to fill positions for highly skilled workers"). For example, due to a severe domestic shortage, Washington University in St. Louis depends on the H-1B program to bring in anesthesiologists from outside the United States to fill critical patient care positions. WashU Decl. ¶ 10. And because of the Proclamation, the university has been forced to pause three such H-1B petitions. *Id.* ¶ 11; *see also* Mot. 37–38. Nor does the government's evidence-free assertion address the fact that, even if employers *can* fill some roles with domestic workers, they "los[e] the ability to fill them with the best candidates, as determined through the members' rigorous hiring processes," which is itself a form of irreparable harm. *See* Mot. 41.[18]

---

[17]  To take a numerical example, in the March 2025 lottery governing visas for 2026, any individual lottery registration had slightly better than a one-in-three chance of being selected (and the employer therefore being permitted to submit a visa petition for that beneficiary). *See* USCIS, *H-1B Electronic Registration Process* (updated July 18, 2025), https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations/h-1b-electronic-registration-process. Applying those same odds, an employer who was planning to submit lottery entries for, say, six prospective H-1B employees would have over a 90 percent chance that at least one entry would be selected. ($1 - 0.67^6 = \sim 0.9095$).

[18]  The government takes issue with Plaintiffs' demonstration of harm to one of the U.S. Chamber's members, HJI. *See* Dkt. No. 36-1, at 9–10. As described in Mr. Daniels' supplemental declaration (at ¶ 3), HJI finally has been able, since the original declaration was signed, to fill its

### 2. *The remaining equitable factors favor a permanent injunction.*

The remaining equitable factors also favor relief. Mot. 44–45. *First*, Plaintiffs have no adequate remedy at law (*cf.* Mot. 35 n.12) and the government points to none. At most, the government vaguely suggests that it has made available "reimbursements if a payment is made for a petition *but the visa is ultimately not awarded*." Opp. 43 (emphasis added). This is no remedy at all. The problem is the imposition of a $100,000 fee assuming the visa *is* awarded—a fee that many of Plaintiffs' members cannot pay and, accordingly, forces them to go without needed staff. The government does not suggest that there is any remedy for *that*.

*Second*, equitable balancing does not support the government. For the public interest, the government only parrots the harms listed in the Proclamation but provides no evidence to support those suggested public interests. Opp. 44.[19] By contrast, as Plaintiffs explained (Mot. 44–45), Congress has determined that a well-functioning H-1B program, allowing for workers up to the statutory cap amount, plus cap-exempt workers, serves the public by fostering innovation, growing the economy, and creating jobs, as considerable research corroborates. Nor can the government claim irreparable harm (*cf. id.*) by being prevented from engaging in "an unlawful practice." *Harris v. Bessent*, 775 F. Supp. 3d 86, 99–100 (D.D.C. 2025) (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). To the contrary, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.*

---

open Integration Engineer position—but it was forced to settle for a candidate who was underqualified compared to the role's requirements and lacked the experience HJI was seeking. Daniels Supp. Decl. ¶¶ 3–4. As a result, HJI continues to divert resources to provide on-the-job training for this individual—a recognized harm that would not have accrued had HJI been able to hire an appropriately experienced candidate through the H-1B program.

[19] Indeed, on the contrary, the President recently stated in an interview, in reference to the H-1B program, that the country "has to bring in talent" because the existing domestic workforce doesn't "have certain talents and people have to learn. You can't take people off an unemployment line" and ask them to do specialized work. *See* Brett Samuels, *Trump on H-1B visas: US lacks enough 'talented people'*, The Hill (Nov. 12, 2025) https://thehill.com/homenews/administration/5601588-trump-h1b-visas-talent/.

(quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

**B.    Plaintiffs are entitled to declaratory and set-aside relief.**

The government fails to address meaningfully the other forms of relief to which Plaintiffs are entitled, in addition to a permanent injunction.

**1.** Plaintiffs have asked for declaratory relief. *See* Dkt. No. 8 at 51 (asking the Court to "Declare that the Proclamation and any implementing agency action exceed the executive branch's lawful authority"). Though "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act," "two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (first quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012) and then quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Further, because "[d]eclaratory and injunctive relief are both forms of equitable remedies[,] . . . 'the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment.'" *Aviel v. Gor*, 2025 WL 2374618, at *14 (D.D.C. Aug. 14, 2025) (quoting *Samuels v. Mackell*, 401 U.S. 66, 70, 73 (1971)). Thus, for all the reasons described above, declaratory relief is a proper equitable remedy in this case.[20]

---

[20]    Indeed, the Supreme Court has been clear that declaratory relief can be a proper remedy even if "it has been concluded that injunctive relief would be improper." *Id.* (quoting *Samuels*, 401 U.S. at 70). A declaration is available "whether or not further relief is or could be sought." *Id.*; *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366 (D.C. Cir. 2023); *see also* 28 U.S.C. § 2201. Thus, for example, where the parties may be "beyond the reach of the court's injunctive powers," a declaration remains available.

In addition to enjoining and declaring unlawful the enforcement of the Proclamation itself against their members, Plaintiffs are entitled to APA relief against the agencies' actions implementing the Proclamation. *See* 5 U.S.C. § 706(2). For the reasons discussed in the opening memorandum (Mot. 35–36) and above (*supra* pages 28–33), Plaintiffs have a cause of action under the APA, as certain actions of the government to implement the Proclamation constitute final agency action subject to APA review. *See* 5 U.S.C. § 704. The Proclamation fee is not self-executing. Rather, it requires implementation by Defendants—agencies and their officials. *See* Mot. 35 (citing Sections 1(b), 2(b), and 3(b) of the Proclamation, all of which instruct agencies and their leaders to take implementing action that lies beyond the authority of the president to take directly). And the government has implemented the Proclamation fee through final agency action, including the promulgation of department-wide policies related to the imposition and collection of the Proclamation fee. APA review is available in these circumstances. *See Reich*, 74 F.3d at 1327 ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.").

**2.** Plaintiffs are also substantively entitled to APA relief because, for the reasons discussed in the opening memorandum (Mot. 14–29) and above (*supra* pages 2–22), the Proclamation fee is unlawful, and thus final agency action implementing it is "not in accordance with law," "contrary to constitutional . . . power," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2); *see also, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 126 (D.D.C. 2025) (Agencies "'literally have no power to

---

Here, Plaintiffs are entitled to an injunction for all the reasons discussed above. Barring injunctive relief, however, a declaration would provide a measure of relief from the "uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36. It would provide Plaintiffs a judgment that the Proclamation is unenforceable against them, giving them the ability to proceed with H-1B recruitment as planned.

act except to the extent Congress has authorized.' . . . If an agency exceeds that power, the court must set aside its action under the APA." (cleaned up) (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024))). The Proclamation expressly contradicts the INA and exceeds the textual limitations of Section 212(f). Accordingly, agency action taken to implement the Proclamation is itself unlawful. *See Reich*, 74 F.3d at 1327 (contemplating that agency regulations implementing an unlawful presidential executive order would be unlawful under the APA). The agency implementation of the Proclamation fee, moreover, is arbitrary and capricious and "without observance of procedure required by law," given that the fee rests on no lawful basis and was not promulgated through notice-and-comment rulemaking. 5 U.S.C. § 706(2). For this reason, as well, the agencies' implementing actions must be set aside.

Citing only a concurrence, the government argues that even if Plaintiffs prevail under the APA, set-aside relief under that statute applies only to Plaintiffs' members. Opp. 44 (citing *United States v. Texas,* 599 U.S. 670, 695–699 (2023) (Gorsuch, J., concurring)). That is wrong. Though the Supreme Court recently held that *injunctive* relief likely must be limited to the parties before the court (*see Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025)), *CASA*'s holding explicitly does not apply to APA vacatur (*id.* at 847 n.10). And decades of APA precedent, in both the D.C. Circuit and the Supreme Court, confirm that "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *accord, e.g.*, *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (rejecting agency's argument "that any relief under the APA should be limited to the parties before the Court," because "vacatur under § 706 is not a party-specific remedy").

Nor, for the same reasons as recounted above, is there any equitable reason not to vacate the unlawful agency actions in this case. *Cf.* Opp. 45. To the contrary, and again for the same reasons, the Court can and should enter an injunction on Plaintiffs' APA claims in addition to

vacatur, independently from the *ultra vires* claims. *See, e.g.*, 5 U.S.C. § 703 (authorizing "actions for . . . writs of prohibitory or mandatory injunction" under the APA); *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020) (recognizing that courts may enter permanent injunctive relief on APA claims if the traditional equitable factors are satisfied).

**3.** Finally, for the same equitable reasons, the Court should not stay its holding pending appeal. *Cf.* Opp. 45. Because "[t]he standards for evaluating a motion for an injunction pending appeal are 'substantially the same as those for issuing a preliminary injunction'" (*Amgen Inc. v. Azar*, 2018 WL 1990521, at *1 (D.D.C. Feb. 22, 2018) (quoting *Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 199 n.11 (D.D.C. 2005))), if the Court concludes—as it should—that injunctive or other equitable relief is warranted, that conclusion would dispose of the government's request for a stay.

## CONCLUSION

The Court should grant summary judgment in Plaintiffs' favor and deny summary judgment to the government. It should therefore enjoin enforcement of the Proclamation against Plaintiffs and their members, declare the Proclamation and agency action implementing it unlawful as in excess of executive branch authority, and vacate, set aside, and enjoin, under the APA, agency actions taken to implement the Proclamation.

Dated:  December 10, 2025

/s/ *Lindsay C. Harrison*
Adam G. Unikowsky (Bar No. 989053)
Elizabeth Henthorne (Bar No. 1562688)
Ishan K. Bhabha (Bar No. 1015673)
Lindsay C. Harrison (Bar No. 977407)
Zachary C. Schauf (Bar No. 1021638)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
T: +1 202 637 6000
F: +1 202 639 6066
lharrison@jenner.com

*Attorneys for Plaintiff Association of
American Universities*

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Grace Wallack (Bar No. 1719385)
Alex Boota (Bar No. 90001014)
Emmett Witkovsky-Eldred (Bar No. 90012725)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*