**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, )<br><br>Defendants. ) | No. 1:25-cv-3675-BAH |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

ARGUMENT......................................................................................................................... 4

I.      PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE. ................................................... 4

II.     PLAINTIFFS *ULTRA VIRES* CLAIM FAILS ............................................................. 6

      A.     Actions Taken in Accordance with the Presidents' Discretionary Authority
            are Unreviewable................................................................................................ 6

      B.     Plaintiffs Have Not Met the Strict *Ultra Vires* Test and are Wrong on its
            Applicability...................................................................................................... 8

III.    PLAINTIFFS' APA CAUSE OF ACTION FAILS ....................................................... 9

IV.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS ..................................................... 12

      A.     The Proclamation Readily Satisfies the Requirements of Section 1182(f) and
            1185(a)............................................................................................................. 13

      B.     The Proclamation Does Not Conflict with the INA............................................ 18

V.      PLAINTIFFS HAVE NOT MET THE REQUIREMENTS FOR RELIEF ................... 23

CONCLUSION.................................................................................................................... 24

TABLE OF AUTHORITIES

CASE LAW

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986) ................................................................................. 5

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................... 8

*Am. Butterfly Ass'n v. Wolf*,
  977 F.3d 1244 (D.C. Cir. 2020) ................................................................................. 9

*Am. Foreign Serv. Ass'n v. Trump*,
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ...................................... 7

*Ancient Coin Collectors Guild v. CBP*,
  801 F. Supp. 2d 383 (D. Md. 2011) ........................................................................ 12

*Aviel v. Gor*,
  2025 WL 2374618 (D.D.C. Aug. 14, 2025) ............................................................ 24

*Bailey v. Drexel Furniture Co.*,
  259 U.S. 20 (1922) ................................................................................................... 20

*Bowles v. Russell*,
  551 U.S. 205 (2007) ................................................................................................. 19

*Cboe Futures Exch., LLC v. SEC*,
  77 F.4th 971 (D.C. Cir. 2023) ................................................................................. 24

*Chamber of Commerce v Reich*,
  74 F.3d 1322 ............................................................................................................ 11

*Department of State v. Muñoz*,
  144 S. Ct. 1812 (2024) ........................................................................................ 4, 6

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) .................................................................... 10, 12

*Doe #1 v. Trump*,
  984 F.3d 848 (9th Cir. 2020) .................................................................................. 14

*Dubey v. Dep't of Homeland Security*,
  154 F.4th 534 (7th Cir. 2025) ................................................................................. 12

*Fiallo v. Bell*,
   430 U.S. 787 (1977)............................................................................................5

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)..........................................................................................11

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025)...............................................................................8

*Goodluck v. Biden*,
   104 F.4th 920 (2024)........................................................................................21

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
   761 F.2d 798 (D.C. Cir. 1985)............................................................................6

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892)..........................................................................................20

*Milligan v. Pompeo*,
   502 F.Supp.3d 302 (D.D.C. 2020) .....................................................................10

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)..........................................................................................20

*Nken v. Holder*,
   556 U.S. 418 (2009)..........................................................................................24

*Norton v. S.Utah Wilderness All.*,
   542 U.S. 55 (2004)............................................................................................11

*NRC v. Texas*,
   605 U.S. 665 (2025).......................................................................................2, 8

*Patel v. Reno*,
   134 F.3d 929 (9th Cir. 1997) ..............................................................................6

*Pennsylvania Dept. of Corrections v. Yeskey*,
   524 U.S. 206 (1998)..........................................................................................17

*Pieterson v. Dep't of State*,
   138 F.4th 552 (D.C. Cir. 2025)...........................................................................6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)..........................................................................................17

*Saavedra Bruno v Albirght,*
  197 F.3d 1153 (D.C. Cir. 1999) ............................................................... 5

*Sale v. Haitian Centers Council, Inc.,*
  509 U.S. 155 (1993) ............................................................................. 15

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) .............................................................. 11

*Skinner v. Mid-Am. Pipeline Co.*
  490 U.S. 212 (1989) ............................................................................. 20

*Tate v Pompeo,*
  513 F. Supp. 3d 132 (D.D.C. 2021) ................................................... 6, 10

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ............................................................................. 24

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ....................................................................... *passim*

*Tulare County v. Bush,*
  185 F. Supp. 2d 18 (D.D.C. 2001) ........................................................ 12

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ........................................................................... 4, 5

*United States v. George S. Bush & Co.,*
  310 U.S. 371 (1940) .............................................................................. 7

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................................. 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) .............................................................................. 6

*Zemel v. Rusk,*
  381 U.S. 1 (1965) ................................................................................. 20

## STATUTES

8 U.S.C. § 1182(f) .............................................................................. *passim*

8 U.S.C. § 1185(a) ............................................................................. *passim*

8 U.S.C. § 1184(i) ...................................................................................................... 15, 22

8 U.S.C. § 1356(e)(3) ...................................................................................................... 18

8 U.S.C. § 1356(j) ...................................................................................................... 20

8 U.S.C. § 1356(m) ...................................................................................................... 18

## FEDERAL REGISTER

85 Fed. Reg. 34,353 ...................................................................................................... 14, 15

85 Fed. Reg. 36,139 ...................................................................................................... 14

90 Fed. Reg. 46,027-28 ...................................................................................................... 14

## OTHER AUTHORITIES

H.R. Rep. 101-723, Part 1 (Sept. 19, 1990) ...................................................................................................... 22

## INTRODUCTION

The H-1B visa program has been abused by aliens entering the United States and taking valuable jobs from qualified Americans for years. This is contrary to Congress's purpose in creating H-1B as a temporary release valve to get highly skilled workers that are not otherwise available in America. Recognizing this substantial detriment to the American people, and the adverse effect of the systemic abuse on the United States' economic and national security, the President issued a Proclamation temporarily suspending the entry of aliens as H-1B nonimmigrants unless the petition filed on the alien's behalf is accompanied or supplemented by a payment of $100,000. The Proclamation is a valid exercise of the broad discretion delegated to the President by Congress. Section 1182(f) states that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." In addition, Section 1185(a)(1) permits the President to prescribe "reasonable rules, regulations, and orders" for the entry of aliens. Congress placed few limits on that discretion, as the Sections "exude[ ] deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Plaintiffs are organizations that represent businesses and universities that would apparently prefer that the systemic abuse of the H-1B program that undermines the wages, working conditions and job opportunities of American workers and harms the United States' economic and national security, continue, rather than make the $100,000 payment. Plaintiffs' claims face numerous hurdles they cannot clear. To start, the Proclamation is not reviewable at all under consular non-reviewability and because of the discretionary nature of the President's authority and the

implications for foreign policy and national security in the exclusion of aliens. But even if review is available, Plaintiffs must meet the stringent test for statutory *ultra vires* claims, which the Supreme Court recently described as a "Hail Mary pass" requiring a showing that the action in question is "entirely in excess of its delegated powers and contrary to a *specific prohibition*" in a statute. *NRC v. Texas*, 605 U.S. 665, 681 (2025) (cleaned). Plaintiffs cannot meet that showing because there is no specific statutory prohibition on the Proclamation at issue. And, in any event, Plaintiffs have failed to demonstrate that the Proclamation is so clearly unlawful as to satisfy even a lower standard for *ultra vires* review.

Plaintiffs likewise cannot establish an APA claim because the President is not an agency, the action in question is committed to his discretion, and the agency memoranda implementing it are merely ministerial implementations of the President's action and thus likewise unreviewable. At any rate, none of the agency documents are final agency actions. In other words, Plaintiffs have not established any element of an APA claim.

Even if this Court were to consider the merits, however, the Proclamation readily satisfies any requirements set forth in Section 1182(f). The Proclamation clearly explains the President's finding that the entry of cheap labor through the H-1B program has been determinantal to America's workers and the nation's economic and national security. Plaintiffs' attempt to reframe the Proclamation as focusing on domestic entities ignores that the H-1B program is fundamentally about bringing alien workers into the United States. Similarly, the purpose of entry for those aliens is defined by the H-1B classification: to perform a "specialty occupation." That is the class whose entry is suspended absent a $100,000 payment. Finally, this is a suspension on entry. They cannot enter absent the payment. And even if it was not, Plaintiffs ignore that Section 1182(f) permits the President to level "any restrictions he may deem to be appropriate" and Section 1185(a)(1) allows

the President to set "reasonable rules, regulations, and orders." At the very least the payment is a restriction or regulation on entry. Plaintiffs have no answer to this authority other than to render it entirely meaningless.

Plaintiffs also cannot prevail because the Proclamation permissibly supplements the requirements of the INA rather than overriding them. Indeed, there is no conflict between the permissive fees and other provisions Plaintiffs cite and the temporary suspension in the Proclamation. If Plaintiffs' argument that the existence of some INA requirements means that Sections 1182(f) and 1185(a) cannot create temporary additional restrictions were correct, it would render Congress's broad delegations a hollow husk. Plaintiffs' argument is simply an attempt to misframe a valid entry restriction into a tax or specific type of fee. That is wrong and ignores Congress's broad delegations under Sections 1182(f) and 1185(a). It is Plaintiffs, not Defendants, who seek to undermine Congress's intent.

Finally, Plaintiffs cannot establish any entitlement to relief. An injunction is inappropriate because they have not established that any member will suffer irreparable harm from the Proclamation, nor have they shown the other injunction factors favor Plaintiffs. Nor is vacatur an appropriate form of relief even if Plaintiffs could establish an APA claim, particularly when, as here, the final agency action is the grant or denial of an H-1B petition, which is an individual decision that would be subject to remand.

At the end of the day, the purpose of the Proclamation is to reduce the harm caused to Americans by the entry of aliens as H-1B nonimmigrants unless their qualifications are truly valuable. Notably, Plaintiffs do not even contest that the H-1B program suffers from substantial abuse. Plaintiffs simply want cheap labor from abroad rather than having to pay or train American workers. Indeed, Plaintiffs themselves have demonstrated that the Proclamation is already

working, as one of their members hired an American citizen for a high paying position rather than an alien. That member somehow claims this is still a harm because they had to train an entry level American rather than import an alien with 1 year of experience. The fact that the member would have preferred an alien is of no moment. Plaintiffs are free to disagree with the President's method of addressing this serious detriment to the interest of the nation, but that does not grant them carte blanche to block the President's valid Proclamation. This Court should enter summary judgment for the Defendants and uphold the President's strong action in favor of American workers.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

The Proclamation is not reviewable by courts for a host of reasons. To start, the Supreme Court has held that the doctrine of consular nonreviewability means that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) (quotations omitted). The admission and entry of aliens is precisely what the Proclamation addresses. Plaintiffs claim that only individual visa decisions are unreviewable while the policies and procedures governing entry remain reviewable by a court. ECF 48 (Opp.) 22-23. Not so.

The logic of consular nonreviewability rests on two premises, neither of which turn on whether the challenge is to an individual visa decision or a policy. First, aliens have "no 'claim of right' to enter the United States." *Hawaii*, 585 U.S. at 682 (quoting *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542–543 (1950)). That is just as true for a challenge to a policy as it is for a challenge to an individual visa determination. Second, the separation of powers dictates that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to

4

aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo v. Bell*, 430 U.S. 787, 796 (1977). Again, this applies equally to programmatic challenges like Plaintiffs'. It would invert the constitutional structure to deny review of decisions by consular officers—subordinate Executive Branch officials—while permitting review of the President's decision to restrict or suspend the entry of aliens on national-interests grounds. *See Saavedra Bruno v Albirght*, 197 F.3d at 1153, 1159 (D.C. Cir. 1999).

Plaintiffs claim *Fiallo* is inapplicable because the particular quote relates to the powers of Congress. Opp. 23. Defendants have never said Congress has no role, just that the judiciary does not. Indeed, *Fiallo* has been relied on for the more general proposition that "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii,* 585 U.S. at 702 (quoting 430 U.S. at 792). This is not just about Congress. To the contrary, "such decisions are frequently of a character more appropriate to either the Legislature *or the Executive* than to the Judiciary." *Fiallo,* 430 U.S. at 792 (emphasis added). And Plaintiffs have no response to the fact that the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

Congress made a policy choice in Sections 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose any restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). So, whereas here, "the President acts pursuant to an express or implied authorization of Congress," the President's "authority is at its maximum,

for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). As a result, there is no review absent an express avenue created by Congress, which Plaintiffs have not and cannot identify. *Muñoz*, 144 S. Ct. at 1820.

The Supreme Court acknowledged as much in *Hawaii*. Plaintiffs criticize this point because the Supreme Court ultimately did review the Proclamations in *Hawaii* and *Sale*. Opp. 24. But the Supreme Court made clear that in both cases it chose to "assume without deciding that plaintiffs' statutory claims are reviewable" because it is a "difficult question." *Hawaii*, 585 U.S. at 682-83.

The other cases cited by Plaintiffs do not change the analysis. Fundamentally, most of the cases do not involve a Presidential Proclamation exercised under broad authority delegated by Congress as here. *See Pieterson v. Dep't of State,* 138 F.4th 552, 556 (D.C. Cir. 2025), *Int'l Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798, 800 (D.C. Cir. 1985); *Patel v. Reno* 134 F.3d 929, 932 (9th Cir. 1997). And while *Tate v Pompeo*, does address implementation of a presidential proclamation, it is inapplicable because the court found that the agency had *expanded* the scope of the proclamation. 513 F. Supp. 3d 132 (D.D.C. 2021). That expansion is what was being challenged. As explained in Defendants' opening brief, the agencies here are merely carrying out the directives of the Proclamation. ECF 36 at 15-17. Thus, the principles that underlie nonreviewability and Congress's sweeping grant of discretionary authority decisively cut against judicial review.

## II.    PLAINTIFFS' ULTRA VIRES CLAIM FAILS

### A.  Actions Taken in Accordance with the Presidents' Discretionary Authority are Unreviewable.

Plaintiffs spill much ink to convince this Court that it may review the exercise of the President's discretion under § 1182(f) and § 1185(a). Opp. 24-26. However, they fail to distinguish

the clear language of *Dalton v. Specter*, where the Supreme Court stated that "longstanding authority holds that such review is *not available* when the statute in question commits the decision to the discretion of the President" because "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for our review." *Id.* at 474, 486. Put another way, "no question of law is raised when the exercise of [the President's] discretion is challenged." *Id.* at 486 (*quoting United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940)). Indeed the D.C. Circuit has questioned whether Presidential action is reviewable via an *ultra vires* claim at all, particularly when the action is committed to the President's discretion. *Am. Foreign Serv. Ass'n v. Trump,* No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025). And here, there can be no legitimate argument that Section 1182(f) is not such a statute since the Supreme Court has held that it "exudes deference" to the President. *Hawaii*, 585 U.S. at 684. Plaintiffs try to parse out the deference as only about the findings, not the nature of the suspension or even any regulation under 1185(a). Opp. 26-27. That distinction has no basis in law. The law "exudes deference to the President in every clause," including "on what conditions ('any restrictions he may deem to be appropriate')." *Hawaii*, 585 U.S. at 684. There is no review of Presidential actions under Section 1182(f).

Plaintiffs claim such Proclamations are often reviewed. Opp. 25-26. But the government has generally not raised this or other causes of action defenses. That does not make them invalid. Similar arguments were raised in *Hawaii*, and as noted, the Supreme Court found them "difficult" and chose to uphold the Proclamation on other grounds. 585 U.S. at 682-83. Plaintiffs also claim that *Am. Foreign. Serv.* confirms reviewability because the court assumed reviewability and proceeded to the merits of the claims. Opp. 27 n.13. But that means only that the court found for the government in an alternate way, thus sidestepping the issue, just as the Supreme Court did in *Hawaii*. It does not mean that the claims are in fact reviewable. None of those cases discuss *Dalton*

7

*v. Spencer* and whether an exercise of Presidential discretion is reviewable at all. It is not.

**B.     Plaintiffs Have Not Met the Strict Ultra Vires Test and are Wrong on its Applicability.**

Plaintiffs seek non-statutory *ultra vires* review. Opp. 25. Congress knows how to create a cause of action to enforce a statute, but it clearly did not here. Implied causes of actions for statutes are highly disfavored. *See Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001). "Before enactment of the APA, those challenging agency action often lacked a statutory cause of action." *NRC v. Texas*, 605 U.S. 665, 680 (2025). To prevent litigants from circumventing Congress's decision by using equity, the Supreme Court requires the challenged action to be "in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* at 681 (quotation omitted).

Plaintiffs make no attempt to meet this test. Nowhere do they identify a specific statutory prohibition (because there isn't one). Nowhere do they establish that the Proclamation "entirely exceeds" the authority granted to the President by Congress. Rather, they have "dress[ed] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. Because they cannot meet the standard, Plaintiffs argue the test is inapplicable and criticize Defendants' reliance on the most recent Supreme Court case addressing *ultra vires* claims. Opp. 27. Instead, Plaintiffs incorrectly believe that any statutory violation suffices. *Id.* That would create an "easy end-run around" Congress's decision not to create a cause of action and to commit this authority to the President's sole discretion. *NRC*, 605 U.S. at 68.

Plaintiffs argue that absent a presumptively exclusive statutory review scheme, the *ultra vires* bar is low. Opp. 27. This is wrong. The D.C. Circuit has made clear that *NRC* applies generally to statutory *ultra vires* claims. *See Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). But even if *NRC's* test was limited to statutes otherwise precluding judicial review, it would still apply here. As explained, both consular nonreviewability and *Dalton* otherwise

preclude judicial review of the President's actions or agency implementation because the authority is solely committed to the President's discretion under Sections 1182(f) and 1185(a). To the extent an *ultra vires* claim could still be brought at all, it would certainly have to meet the *NRC* standard.

Regardless, even if *NRC's* test does not apply, that does not mean *ultra vires* claims can be brought for any routine statutory violation. That would render Congress's choice not to create a cause of action void. At most, even a broader view of *ultra vires* claims requires the statutory violation to be "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (finding the statute did not preclude review and then denying *ultra vires* claim). Plaintiffs cannot demonstrate the Proclamation is "obviously beyond the terms of the statute." The Proclamation was clearly lawful. But at most, given the broad delegation and deference at issue, this is a close and contestable issue on the margins. That is insufficient for any statutory *ultra vires* claims.

Ultimately, Plaintiffs identify no express statutory provision that was violated, nor do they state facts sufficient to show the Proclamation "entirely exceeded" the broad grant of authority in Sections 1182(f) and 1185(a). Summary judgment should be granted for Defendants on Count I.

## III.    PLAINTIFFS' APA CAUSE OF ACTION FAILS

Plaintiffs lack an APA cause of action for multiple reasons. The first of which is that the challenged agency actions here merely reiterate the Presidential Proclamation, which is unreviewable. ECF 36 at 15-17. Moreover, there is no final agency action and any action is committed to agency discretion.

**1.**    Plaintiffs seem to concede that *Detroit Int'l Bridge Co v. Gov't of Canada.* stands for the proposition that "plaintiffs may not obtain APA arbitrary-and-capricious review of an agency's ministerial implementation of a Presidential action" if that action was within the President's

authority. Opp. 29. That is the ballgame. *Detroit Int'l Bridge* explains that if the action is "the exercise of discretionary authority committed to the President" then it is "presidential in nature." 189 F. Supp. 3d 85, 101 (D.D.C. 2016). While Plaintiffs try to distinguish those cases based on the appellate courts affirming on different grounds, the district court decisions stand and the reasoning remains applicable. Opp. 31. Indeed, a case by this Court that Plaintiffs rely on acknowledged that the "mere ministerial implementation of presidential action" is not reviewable but distinguished those cases because the agency action at issue "expanded the scope of the Presidential Proclamation." *Tate*, 513 F. Supp. 3d at 143 (D.D.C. 2021) (quoting *Milligan v. Pompeo*, 502 F.Supp.3d 302, 314 (D.D.C. 2020)). Here the agency actions at issue are simply guidance documents implementing and clarifying the Proclamation. There is no basis to argue they are expanding the Proclamation to some new realm (and Plaintiffs do not claim otherwise). And despite Plaintiffs' claim that those cases are limited to arbitrary and capricious review, they express no such limit. Opp. 29. Plaintiffs insist that if the action is *ultra vires*, APA review of the agency action may be had. There is no basis for this and this collapses distinct causes of action; if they have ultra vires claims they cannot bring APA claims. At bottom, the agency actions challenged by Plaintiffs restate the Proclamation and are thus presidential in nature and not subject to review. *See Detroit Bridge*, 189 F. Supp. at 102.

Plaintiffs' arguments that the agencies used "substantial discretion" to implement the proclamation is unavailing. Opp. 30. Plaintiffs challenge memoranda that are less than one page in length that cite to and quote the Proclamation. And their reliance on the Secretary of Homeland Security's ability to grant discretionary waivers (*id.*) is irrelevant because Plaintiffs do not challenge the denial of any waivers or even allege that they sought one.

Plaintiffs claim that APA review is available for the agency implementing memoranda,

relying on, *e.g., Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012) which they describe as "APA review of NIH guidance implementing an executive order." Opp. 29. What they neglect to mention is that in that case, the challenged "guidance" was issued through notice and comment rulemaking. *Id.; see also Chamber of Commerce v Reich*, 74 F.3d 1322, 1326-27 (D.C. Cir. 1996) (challenge to regulations promulgated through notice and comment rulemaking). This is not a case about notice and comment rulemaking and Plaintiffs' reliance on such cases is misplaced.

Similarly, Plaintiffs' reliance on the final agency action portion of *Franklin* to argue that Presidential action is limited to situations where the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action is wrong. In *Franklin*, the agency made a recommendation to the President and the question was whether the President then exercised his discretion after receiving that recommendation. *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992). Here, by contrast, the President took action to restrict the entry of a class of aliens pursuant to Sections 1182(f) and 1185(a)—the Proclamation—which the agencies then followed. But even if the Court were to apply *Franklin's* reasoning, the final step is the Proclamation because it imposes the restrictions. The agencies merely comply with that directive.

**2.**    Plaintiffs have not identified a final agency action, and now they conflate multiple actions to conjure one. Opp. 32. In their Complaint and Opening brief, they challenge particular agency memoranda. Am. Compl. ECF 8 ¶ 183; ECF 18-1, 36 n.13. Now they claim that the agency's "decision to implement the Proclamation" is a final agency action and they do not need to identify a specific action. Opp. 32. That reveals the programmatic nature of their challenge. *See Norton v. S.Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Regardless, the agencies are required to comply with the Proclamation; the decision to do so is not a final action. There is no decision-making process to culminate. Plaintiffs also argue that such decisions have "ongoing, real-world effect on

myriad individuals and organizations"—but the fact that an agency carrying out a Presidential Proclamation may have some effect on someone does not render it a final action. The final action is the decision on any single H-1B petition, and here, Plaintiffs have not identified a single H-1B petition denial that they challenge. *See, e.g., Dubey v. Dep't of Homeland Security*, 154 F.4th 534, 537 (7th Cir. 2025) (database entry of inadmissibility was not final action but the denial of a visa would be a final agency action). And while Plaintiffs argue that the Certified Administrative Records produced in this case show final actions were made, what they actually show is that the agencies merely followed the Presidential directives of the Proclamation.[1] The actions challenged are not the consummation of agency decisionmaking, but are instead presidential actions. *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001); *Ancient Coin Collectors Guild v. CBP,* 801 F. Supp. 2d 383, 403 (D. Md. 2011).

**3.**     Plaintiffs only response to the obvious point that any action is committed to discretion and that Plaintiffs' challenge is programmatic is to say this is a narrow exception that at most applies to the President's findings. Opp. 33. Given the President's discretion to impose "any restrictions he may deem to be appropriate," it is apparent that more than fact finding is committed to his discretion. *Hawaii*, 585 U.S. at 684 (quoting 8 U.S.C. § 1182(f)). The agencies' implementation of the proclamation is thus also committed to agency discretion. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06.

## IV.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Plaintiffs' arguments as to the scope and merits of the Proclamation largely repeat their opening brief. They still fail for the same reasons.

---

[1] Defendants made clear they produced documents to comply with the Court's order by collecting anything relevant and non-privileged. That is not a concession that there is a final agency action, which is why Defendants moved to avoid having to produce anything.

**A. The Proclamation Readily Satisfies the Requirements of Sections 1182(f) and 1185(a).**

Plaintiffs' fundamental argument is really a slippery slope fallacy that there are no limits to this power. Opp. 12. While the authority Congress delegated is sweeping and highly deferential, that is not the case. For example, the Proclamation must be temporary not permanent, apply to aliens not citizens, and suspend, restrict, or regulate their entry or departure from the country. The fact that some of these limits may provide the President broad leeway or not be amenable to judicial review is a feature of Congress's delegation, not a bug. In any event, Plaintiffs only challenge some aspects of the Proclamation. Those arguments are based on the false premise that the Proclamation is simply requiring domestic entities to pay a tax. Not so. The Proclamation temporarily suspends or restricts entry for aliens seeking to enter the country to work in a "specialty occupation" unless there is a $100,000 payment in order to reduce the detriment of their entry on American workers and the nation's economic and national security. Simply put, that is a suspension of entry on a class of aliens. And the fact that Plaintiffs largely ignore that Section 1182(f) permits the President to level "any restrictions he may deem to be appropriate" and Section 1185(a)(1) allows the President to set "reasonable rules, regulations, and orders" is telling.

1.      At the outset, Plaintiffs challenge the "sole prerequisite" that "the President finds" that the entry of aliens "would be detrimental to the interests of the United States." *Hawaii*, 585 U.S. at 685. Plaintiffs claim that they "do not focus on the adequacy of the President's findings[.]" Opp. 26.[2] Yet that is exactly what Plaintiffs do in arguing that the findings are all about domestic employers, not the aliens. Opp. 20. Not so.

---

[2] That is in stark contrast to their Amended Complaint, which argues the findings in the Proclamation were "seriously deficient" based upon "misleading" data and an "unnamed" study, and failed to make findings about the "putative 'class of aliens'" or "any noncitizen" concluding the Proclamation "fails to make the threshold findings required by law." Am. Compl. ¶¶ 167-177. It is good to know Plaintiffs are not pursuing such a frivolous claim. *See Hawaii*, 585 U.S. at 686.

This myopically ignores the other side of the H-1B program; it takes two to tango. Plaintiffs fail to even address Defendants' clear argument that ultimately it is the entry of aliens to take valuable jobs that is harming American workers. ECF 36 at 28. Absent the entry of those *aliens*, many of those jobs would go to Americans, as one of Plaintiffs' own members demonstrates. Indeed, the Proclamation makes it clear that "low-wage *workers* in the H-1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level," and harm the ability of Americans to compete in STEM fields and thus threaten national security. 90 Fed. Reg. 46027-28 (emphasis added). The fact that the intent or effect might be primarily domestic is of no moment, as the detriment is still the entry of the aliens. *See Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) ("all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree."). So whatever harms the Proclamation attributes to employers, that is ultimately caused by the entry of aliens on H-1B visas taking opportunities to the detriment of Americans. That easily satisfies the sole requirement.

**2.**      The Proclamation also suspends the entry of a "class of aliens," namely aliens seeking to work in America through the H-1B visa. Plaintiffs argue that this is not a common characteristic. But what constitutes a common characteristic is nearly infinite. *See, e.g.,* 85 Fed. Reg. 34,353 (June 4, 2020) (based on educational visa); 85 Fed. Reg. 36,139 (based on connection to ICC). Purpose of entry surely suffices. One's purpose of entry is part of the point of visas, to determine whether an alien may be allowed to enter the country, for purposes such as tourism, business, education, or work. ECF 36 at 30. Aliens can often enter for one reason but not another. So if they lose a particular visa, they may not be able to enter at all. H-1B visas are defined by their purpose of entry, to work in a "specialty occupation" that "requires *theoretical and practical application*

of a body of highly specialized knowledge" *and* "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) *as a minimum for entry* into the occupation." 8 U.S.C. § 1184(i) (emphasis added). That is a common characteristic of the class whose entry is restricted. Plaintiffs try to redefine the class as any alien whose employer will pay $100,000 to let them enter. Opp. 18. But that flips the class on its head and defines it by the restriction. The class is all aliens seeking initial entry into the United States as H-1B nonimmigrants. The suspension or restriction on entry is that aliens in the class may be subject to payment of $100,000. The fact they can overcome that entry restriction does not mean the class is suddenly defined by the restriction itself. And even so, that restriction is a common characteristic too.

**3.**      At its base, all of Plaintiffs' statutory arguments are that the $100,000 payment is not a suspension on entry because if an employer pays it, the alien can suddenly enter. Opp. 12. That is nonsensical. The aliens subject to the Proclamation are literally suspended from entering for a year or unless the employer pays $100,000. This is underscored by the fact that aliens already within the United States may be able to seek an initial H-1B classification without the $100,000 payment. Plaintiffs also have no response to the argument that individual aliens can often gain entry in other ways. For example, in *Hawaii* the same alien could enter for asylum but not tourism and as here an alien could get an individual exemption or seek to enter on a different lawful basis. 585 U.S. at 680, 685.[3] Again, an alien could have entry suspended under one visa but be perfectly free to enter on another visa with a different purpose. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (Only applying to J and F visas). This demonstrates that a suspension of entry does not mean that an alien cannot

---

[3] Plaintiffs strangely argue that *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993) proves that the powers under Section 1182(f) are more limited because the blockade was issued under separate authorities. Opp. 13. The Supreme Court disagreed, using the blockade as an example of the President's "ample power" under Section 1182(f). *Hawaii*, 585 U.S. at 684 (citing *Sale,* 509 U.S., at 187).

enter in other ways or if certain restrictions are satisfied. The fact is the class of aliens are temporarily suspended from entering, unless exempted.

Even if the Proclamation is not a "suspension" on entry, Section 1182(f) permits the President to level "*any restrictions* he may deem to be appropriate." That is an exceedingly broad and flexible delegation. At a minimum, the $100,000 payment is a restriction on entry. Plaintiffs only response is to claim that is a "condition," not a restriction. Opp. 12. Plaintiffs' word games have no meaning or basis in law. The Proclamation literally restricts, limits, restrains, or confines entry to aliens whose petition includes proof of payment. If that is not a restriction on entry it is difficult to see what is. Plaintiffs seem to believe a total prohibition is required, but that renders "restrictions" superfluous in contrast to suspension. The payment is clearly within the statute's terms.

**4.** In addition, Section 1185(a)(1) grants the President authority to restrict the entrance and departure of aliens with "reasonable rules, regulations, and orders." So even if the Proclamation is not a suspension or even restriction under Plaintiffs' unduly cabined interpretation, it is surely an order or regulation (as any additional "condition" would be). Plaintiffs try to argue that this is a minor point for Defendants. Opp. 21. Not so. Defendants relied on Section 1185(a)(1) throughout as a separate and sufficient basis for the Proclamation. Plaintiffs then boldly claim this "flouts" the Supreme Court's dicta that the provisions have "substantial[] overlap[]." *Id.* (quoting *Hawaii*, 585 U.S. at 683 n.1). The Supreme Court simply noted that it agreed with the government that it "need not resolve … the precise relationship between the two statutes" because all agreed the proclamation in *Hawaii* was a suspension on entry. *Hawaii*, 585 U.S. at 683 n.1. Here, Plaintiffs argue it is a "condition," not a suspension. While Defendants disagree, that raises the distinct issue of whether this is an order or regulation under Section 1185(a)(1).

Plaintiffs' argument that Section 1185(a)(1) completely overlaps with 1182(f) would render that entire subsection superfluous. As Plaintiffs acknowledge elsewhere, that is not how statutes are typically interpreted. Opp. 5 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). But even if there is complete overlap, that just means that suspension or restriction under Section 1182(f) encompasses regulations, rules, and orders under Section 1185(a). Surely even under Plaintiffs' recharacterize of the Proclamation as a "condition" it would qualify as an order or regulation on entry.

Finally, Plaintiffs argue that § 1185(a) actually is distinct based upon the title of the section: "Travel control of citizens and aliens." Opp. 21-22. It is hard to see why this matters, as the Proclamation is a suspension, restriction, or order on entry into the country, which is a "travel control." *See Hawaii*, 585 U.S. at 694 (discussing ban in terms of "travel"). Plaintiffs use surrounding sections to argue this is really about the integrity of travel controls, like documents and fraud. *Id.* Even so, petitions for a visa to seek entry are documents relating to travel control. Regardless, Section 1185(a)(1) is not so limited. It allows the President to make it "unlawful" for "any alien to depart from or enter" the nation "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." That is a broad authority to regulate the entry of any aliens in the President's sole discretion. And this focus on entrance regulations is buttressed by subsection 1185(a)(2), which makes it unlawful to knowingly transport someone "into the United States" if they are restricted by such rules, regulations, or orders. That is not simply about documents and their integrity. Whatever "the title of a statute" might be, it "cannot limit the plain meaning of the text." *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). And Section 1185(a)(1) plainly allows the President to regulate the entrance of H-1B applicants unless they pay $100,000.

**B. The Proclamation Does Not Conflict with the INA.**

Plaintiffs claim that pursuant to *Hawaii,* the Proclamation cannot "expressly override particular provisions of the INA." Opp. 3. Assuming that this is true, as the Supreme Court in *Hawaii* did, the President did not "expressly override" a provision of the INA. *Hawaii*, 585 U.S. at 689 (assuming without deciding). The Supreme Court has made clear that the President has "ample power to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. That is all the President did here, add restrictions. To "expressly override" part of the INA, the Proclamation must fully displace a provision or directly conflict with an express limit. *Id.* The Proclamation does neither. The existing provisions of the INA remain in effect, the statutory fees still apply, and the Proclamation does not run afoul of any express provision.

**1.**     Plaintiffs do not dispute that the Proclamation may *supplement* the other requirements of the INA. *Hawaii*, 585 U.S. at 684. That is all it does. Plaintiffs argue at length that Congress intended to limit the fee structure for H-1B petitions and any additional payments conflict with that structure and Congressional intent. Opp. 3-8. But if Congress's intent were so clear, it would have expressly stated that no other fees or payments shall be imposed. Congress did no such thing despite knowing how to do so. *See, e.g.,* 8 U.S.C. § 1356(e)(3) (fee "shall not" be imposed). In fact, Congress made clear that those fees were discretionary and non-exhaustive.

Plaintiffs claim that Section 1356(m) is the only means by which the executive may impose any payment related to an H-1B petition and it must be limited to costs and go through notice and comment rulemaking. Opp. 3-11. But Section 1356(m)'s language is permissive and contains no prohibition on other payments, it just governs fees to cover costs. 8 U.S.C. § 1356(m). None of the other varied H-1B fees precludes the imposition of other payments either. ECF 36 at 38-39. For

example, Section 1184(c)(12) says a fee "shall" be imposed for fraud prevention, but expressly acknowledges this is "[i]n addition to any other fees authorized by law." That is the opposite of an express prohibition on other types of payments. Nothing in these statutes limit additional restrictions or payments. Indeed, they acknowledge the existence of other possible payments.

Relying on *Bowles v. Russell*, 551 U.S. 205, 208–209, 213 (2007), Plaintiffs claim that the fact the fees "may" be imposed implicitly means "that the agency *may not go beyond*" that fee. Opp. 4-5. To start, *Bowles* is an appellate jurisdiction case and has no bearing on the scope of 1182(f). More importantly, Plaintiffs' argument is that the existence of some provisions, even a discretionary one like Section 1356(m), implicitly precludes all other even possibly related restrictions under Section 1182(f). Opp. 3-8. At most the existence of Section 1356(m) could preclude other fees to cover costs, but the payment here is neither a fee nor is it to cover costs. It serves a wholly different purpose that Section 1356(m) does not preclude. So Plaintiffs' argument must sweep even broader: the existence of some permissive fees implicitly precludes any other payment restriction under Section 1182(f). *Id.* That would eviscerate Section 1182(f), which often "impose[s] entry restrictions in addition" to even more comprehensive provisions on admissibility in the INA. *Hawaii*, 585 U.S. at 684. The Supreme Court rejected an even stronger argument that the INA's default vetting and waiver scheme "implicitly bar[red]" the President from supplementing those restrictions under Sections 1182(f) and 1185(a). *Hawaii*, 585 U.S. at 689-91. Thus to "expressly override" part of the INA, the Proclamation must fully displace a provision or directly conflict with an express limit. *Id.* Plaintiffs can point to no express limit and none of the existing fees or provisions is being overridden, they still apply. And Plaintiffs' argument that the payment exceeds all existing fees is thus also irrelevant, that is not a conflict. Opp. 7-8. As a result, the Proclamation has not overridden anything, it has merely supplemented existing H-1B

requirements. That is precisely what Sections 1182(f) and 1185(a) are designed to do.

**2.**     Likewise, Plaintiffs incorrectly claim the Proclamation payment is a "tax" that must be specifically authorized by Congress. Opp. 4-5, 13-17. But a regulatory payment is not the same as a tax. The Supreme Court continues to recognize that not all payments are taxes, distinguishing them, in part, on how high the payment is and who collects it. *NFIB v. Sebelius*, 567 U.S. 519, 565–66 (2012) (citing *Bailey v. Drexel Furniture Co.,* 259 U.S. 20, 36–37 (1922)). Unlike *NFIB*, the fee here is collected by USCIS, not the IRS. *Id.* And in *NFIB* the tax could never be more than insurance, but here Plaintiffs' core argument is the payment is excessive in relation to H-1B application (purposefully so) and this causes them irreparable harm because it is allegedly ruinous. *Id.* Plaintiffs cannot have it both ways, if the payment is so large it can be "prohibitory," it is a penalty or fee rather than a tax. *Id.* The payment is a suspension or restriction on entry, not a tax.

Even if it were, *Skinner v. Mid-Am. Pipeline Co.* expressly declined to create a "stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power;" Congress does not have to be clearer than with other delegations and any intelligible principle will do. 490 U.S. 212, 222–23 (1989). Given the breadth of Congress's express delegations in Sections 1182(f) and 1185(a) to suspend, restrict, or regulate the entry of aliens, a temporary tax or fee would easily be encompassed. That is especially so given the intersection of foreign affairs and immigration, where the President wields significant "authority," so Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965); *see also Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892). Strangely relying on a case about jury trials for certain SEC proceedings, Plaintiffs make the unremarkable point that Congress still has a say. Opp. 14-15. Again, Congress

delegated the broad authority here. This has also never been seen as a major question. It is Plaintiffs who seek to undermine Congress's express will.

**3.**      Plaintiffs' remaining arguments that the Proclamation conflict with notice and comment rulemaking and the H-1B lottery are unavailing. Opp. 6-10. Section 1356(j) is permissive and cannot apply to a Proclamation under Sections 1182(f) or 1185(a) as it is limited to "provisions of this section." On the lottery cap, Plaintiffs have no response to the fact that (1) the cap is a maximum not a minimum so there is no conflict with the statute and (2) the applicants always far exceed the cap. *See* ECF 36 at 41-42; *Goodluck v. Biden*, 104 F.4th 920, 928 (2024) (explaining worldwide levels of visas are ceilings, not floors).

**4.**      Plaintiffs rely on an overruled case to argue that any restriction on entry can only take effect at the border and cannot apply to "visa issuance" even though Section 1182(f) has no such requirement. Opp. 17. Plaintiffs claim *Hawaii* makes this distinction clear. *Id.* Quite the opposite. It says "Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)." *Hawaii*, 585 U.S. at 695. While distinct steps with some different legal frameworks, they are related and Section 1182(f) can apply to both. Even so, moving the restriction from the issuance to entry would not remedy any injury to Plaintiffs.

**5.**      Plaintiffs also allege that the Proclamation impermissibly recasts the H-1B program into a limited program to hire the "best of the best." Opp. 8-9. Plaintiffs' limited understanding of the purpose of the H-1B program in no way cabins Congress's express delegations in Sections 1182(f) and 1185(a), much less creates a conflict that "expressly overrides" the INA. *Hawaii*, 585 U.S. at 684. This point is irrelevant. Plaintiffs' limited legislative history and previous non-binding regulatory gloss cannot alter the text of the H-1B provisions or the scope of Sections 1182(f) and 1185(a). Opp. 9.

Even so, Plaintiffs' reliance on the pre-1990 H-1 classification to state that the H-1B classification is designed for entry level workers is misplaced. The H-1 classification covered a broad range of workers and Congress acknowledged it was subject to abuse by employers. *See* H.R. Rep. 101-723, Part 1 (Sept. 19, 1990) at 44 ("[t]he H-1 visa ([known at that time as] aliens of 'distinguished merit and ability') has been the most controversial nonimmigrant visa" in part because "aliens with nothing more than a baccalaureate degree have been deemed 'distinguished.'"). Further, the current H-1B classification requires more than Plaintiffs suggest (Opp. 8-9) because a "specialty occupation" is one that "requires *theoretical and practical application* of a body of highly specialized knowledge" *and* "attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) *as a minimum for entry* into the occupation." 8 U.S.C. § 1184(i). A job that lacks the application of highly specialized knowledge or lacks a degree in the specific specialty for entry into the occupation, does not qualify. In practice the H-1B has been expanded overtime to include ever more entry level jobs, which is part of the problem. That itself is contrary to Congress's purpose as expressed by the text of the H-1B program.

The Daniels Declarations, from Chamber of Commerce Member HJI, best explains the problem and correcting effects of the Proclamation. Mr. Daniels stated that his company sought to fill a position for an "Integrations Engineer", which required a person having a "bachelor's degree in computer science, information systems, or a related technical field, 1-3 years of experience in a similar role, and familiarity with the various [systems, tools, and applications] that the IT team regularly uses." ECF 18-5 ¶ 6. Mr. Daniels claimed injury to his company from the Proclamation because it could not afford to pay $100,000 for an H-1B petition. *Id.* ¶ 10. By the time Defendants' brief was filed, the job posting was gone. Mr. Daniels submitted another declaration stating that because he was discouraged from using the H-1B program, the company instead hired an

American. ECF 48-1 ¶ 3. The American was "entry level"—likely slightly less than the 1 year experience the company had hoped for—and thus requires additional training. *Id.* But clearly any additional training will cost less than the $100,000 or Mr. Daniels' company may have paid to file a petition to bring a temporary foreign worker with one year of experience into the country. Thus, the Proclamation worked as intended – an American with a bachelor's degree was able to land an entry-level job that may otherwise have been filled with a temporary foreign worker having just one year of experience. That is in accordance with the actual purpose of the H-1B program and proves that the Proclamation works. American workers are available for these jobs.

## V.    PLAINTIFFS HAVE NOT MET THE REQUIREMENTS FOR RELIEF

As explained in Defendants' Opposition, Plaintiffs cannot meet the requirements for relief. Plaintiffs have done nothing to remedy their relief problem.

**1.**    Plaintiffs have not shown irreparable harm. Plaintiffs argue that the disruption to hiring for their members, *in toto*, supports a finding of irreparable harm because of the "massive disruption" to the members. Opp. 36. But any such "massive disruption" is caused by Plaintiffs' own choice not to pay the fee and not to participate in the program. No Plaintiff put forth evidence that paying the fee would amount to irreparable economic harm, a high burden to show. Rather, they claim, in the aggregate, that they cannot recruit aliens for jobs because they do not wish to pay the fee. That is a self-inflicted harm that is not irreparable. There is also no proof that any member will suffer irreparable economic injury by paying the fee. Indeed, one member simply hired an American instead, demonstrating the efficacy of the Proclamation.

**2.**    Just as Plaintiffs have not shown the economic harm of $100,000 is irreparable, they have not shown there is no adequate remedy at law. If Plaintiffs ultimately prevail, the fees could be refunded, as a reimbursement process already exists. Plaintiffs claim it is the harm from choosing

not to pay the fee and hire H-1B workers outside of the United States for one year (the timeframe of the proclamation) that is irreparable, but they have not shown how a single hiring season will create irreparable harm in any one of their businesses.

3.      The balance of equities and public interest favor the government for all the reasons stated in its opening brief. ECF 36 at 42-45. Ultimately, Plaintiffs have no response to the fact that national security concerns outweigh the perceived harm by the Plaintiffs of having to pay $100,000 or forego hiring a limited number of foreign workers for a short period of time. Their only response is that there is no interest in enforcing what Plaintiffs call an *ultra vires* proclamation, but that conflates the merits prong of injunctive relief with the public interest factors, thus eviscerating the latter prong. And if an injunction is put in place and the aliens enter, Defendants likely cannot remove those aliens quickly or recoup the money owed.

4.      As Plaintiffs point out, declaratory relief can also turn on the same equitable factors. *Aviel v. Gor*, 2025 WL 2374618, at *14 (D.D.C. Aug. 14, 2025). The same is true for APA vacatur, even assuming such a thing exists. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023); *United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring). And the same factors at least favor a stay pending appeal. *Nken v. Holder*, 556 U.S. 418, 435 (2009). At a minimum, the Court should enter an administrative stay so Defendants can seek appellate relief.

5.      Plaintiffs do not contest that any equitable remedy would be limited to the Plaintiffs' injured members. *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). The same should be true for any APA relief. *Texas,* 599 U.S. at 695–699 (2023) (Gorsuch, J., concurring)).

## CONCLUSION

The Court should enter summary judgment in favor of Defendants on all claims.

Respectfully submitted,

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**Glenn Girdharry**
Acting Deputy Director

By: */s/ Alexandra McTague*
**Alexandra McTague**
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 718-0483
alexandra.mctague2@usdoj.gov
*Counsel for Defendants*