UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 * * * * * * * * * * * * * * *
CHAMBER OF COMMERCE OF THE        )  Civil Action
UNITED STATES OF AMERICA, et al.  )  No. 25-3675
              Plaintiffs,         )
vs.                               )
                                  )
UNITED STATES DEPARTMENT OF       )  December 19, 2025
HOMELAND SECURITY, et al.,        )  10:12 a.m.
              Defendants.         )  Washington, D.C.
 * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR PLAINTIFF UNITED STATES CHAMBER OF COMMERCE:

PAUL WHITFIELD HUGHES, III
EMMETT WITKOVSKY-ELDRED
McDermott, Will & Schulte, LLP
500 North Capitol Street, N.W.
Washington, DC 20001
(202) 756-8988
phughes@mwe.com
ewitkovsky-eldred@mwe.com

FOR PLAINTIFF AMERICAN ASSOCIATION OF UNIVERSITIES:

ZACHARY CHARLES SCHAUF
ELIZABETH HENTHORNE
Jenner & Block LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001-4412
(202) 639-6025
zschauf@jenner.com
bhenthorne@jenner.com

**_(Appearances Continued)_**

_**This transcript is work product**. **This transcript shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or copied in any manner by any party without authorization of the signatory.**_

**APPEARANCES (Continued)**:


FOR THE DEFENDANTS:
          TIBERIUS T. DAVIS
          United States Department of Justice
          Civil Division
          950 Pennsylvania Avenue, Suite 400
          Washington, DC 20530-0001
          (202) 514-4357
          tiberius.davis@usdoj.gov



Court Reporter: Elizabeth Davila, RPR, FCRR
                Official Court Reporter



*This transcript is work product. This transcript shall be considered null and void if the transcript is edited, printed, disassembled, screenshot, and/or copied in any manner by any party without authorization of the signatory.*



Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, this is Civil Action 25-3675, Chamber of Commerce of the United States of America v. United States Department of Homeland Security, et al.

Would the parties please come forward to the lectern and identify yourselves for the record this morning. We'll start with plaintiffs' counsel first.

MR. HUGHES:  Good morning, Your Honor. Paul Hughes of McDermott, Will & Schulte for the plaintiff the United States Chamber of Commerce.

THE COURT:  All right.  Good morning.

MR. SCHAUF:  Thank you, Your Honor. Zach Schauf of Jenner & Block for Plaintiff American Association of Universities.

THE COURT:  All right.  Zach Schauf.  Okay.  Your name is not on the list here.

MS. HENTHORNE:  Good morning, Your Honor. Betsy Henthorne from Jenner & Block for the Association of American Universities.

THE COURT:  Good morning, Your Honor.

MR. WITKOVSKY-ELDRED:  Good morning, Your Honor. Emmett Witkovsky-Eldred from McDermott, Will & Schulte for Plaintiff Chamber of Commerce of United States of America.

THE COURT:  Okay.  Good morning.

And for the defendants.

MR. DAVIS:  Good morning, Your Honor. Tiberius Davis on behalf of defendants.

THE COURT:  All right.  So we're here today to consider a case filed by the plaintiffs, Chamber of Commerce and Association of American Universities.  I am going to call the Chamber "the Chamber."  I am going to call the universities "the AAU," I think.  And they have sued the Department of Homeland Security and the Department of State and the secretaries of those two federal agencies, challenging the agencies' implementation of Presidential Proclamation 10973, which was issued in mid-September and requires $100,000 payment for any new petitions filed by a U.S. employer intending to hire foreign workers to the H-1B visa program.

Both sides have moved for summary judgment.  The defendants filed -- just this week, on Monday -- a motion to dismiss the complaint.  Briefing is fully complete on the cross-motions for summary judgment, with the defendants' filing the last brief in that set of motions on Monday -- no, on Wednesday actually, just a day before yesterday.

The plaintiffs requested a hearing on the cross-motions for summary judgment, and that's part of the reason we're holding the hearing today.

Just to provide some brief background on the

issues at stake, plaintiffs have two legal claims alleging that the Presidential Proclamation 10973 and the defendants' implementing actions were *ultra vires*, that's in Count 1; in other words, beyond the President's and the agencies' legal authority.  And two, the plaintiffs have challenged under the Administrative Procedure Act, which I will refer to as the "APA," the agencies' implementation of the proclamation in Count 2.

The defendants have responded that the proclamation and the agencies' implementation are not *ultra vires* because Congress and two sections of the Immigration and Naturalization Act [sic] have given the President broad discretion to suspend the entry of aliens whenever he finds their admission detrimental to the interests of the United States.  The defendants also say that the President has amply justified the proclamation by finding that systemic abuse of the H-1B program has undermined both the United State's economic and national security through the large-scale replacement of American workers.

The defendants also raise a number of threshold arguments in response to the plaintiffs' APA claim, contending, for example, this Court doesn't have the authority to even review the defendants' actions under the APA.

So with that general background, I will hear,

first, from the plaintiffs since they filed the opening motion here.

MR. HUGHES:  Good morning.  Thank you, Your Honor.

And as I was noting a moment ago, with the Court's permission, both the Chamber and AAU would like to be heard.

The way we had thought about dividing arguments, if it meets the Court's approval, is that I would tend to focus on issues focusing on the conflict between the INA and the proclamation, as well as remedies; and Mr. Schauf would focus on the scope of 212(f) and the various judiciability questions.

THE COURT:  Okay.  Well, I have got a whole series of questions.  You can just feel free, if I am asking a question to you, to say:  Oh, I am going to call on my co-counsel.

That's just fine.  I know you-all have probably spent a lot of time organizing this, and I am going to mess up your organization because I am just going to pursue some of my questions.  I do want to hear everything you have to say to me, but I do want to also review the questions that I have; and I am going to start with one of those.

MR. HUGHES:  Of course.

THE COURT:  I know the plaintiffs at one point in the briefing -- don't ask me where, because there has been a lot of briefing and exhibits -- requested resolution of the

pending cross-motions by December 15th.

Okay.  So that certainly didn't happen with the government shutdown and the administrative record that needed to be filed, and so on, which the plaintiffs also wanted.  We didn't get the final brief until December 17th.

MR. HUGHES:  Yes, Your Honor.

THE COURT:  A couple of days after the date you wanted everything resolved.  Now, as I've mentioned, the defendants filed a motion to dismiss on Monday.  Under the procedural rules, plaintiffs have 14 days to respond, then the government has 7 days to reply.  That puts us 21 days out.

Do plaintiffs want me to delay ruling on resolving the pending motions until the defendants' motion to dismiss is fully ripe?  Or how do you want to proceed with that?

MR. HUGHES:  Well, Your Honor, I think we'll be prepared to file our opposition to the plaintiffs' motion to dismiss probably later today.

The plaintiffs' motion --

THE COURT:  Or you can just do it orally.

MR. HUGHES:  Well, yes, Your Honor.  We can do it --

THE COURT:  Because I have got a lot of paper, and I have seen all of your arguments.  You could just orally oppose the motion and incorporate all of the arguments in

opposition that have already been presented in the plaintiffs' motion for summary judgment.

MR. HUGHES:  That's a better idea, Your Honor.

So I wish to orally oppose that motion and incorporate what we have said in both our opening papers as well as our opposition reply because that is exactly what we would do in writing, and so we don't need to put more in the record for the Court.  So we will orally oppose that motion.

THE COURT:  All right.  And that would avoid any further delay in resolving this for either side.

MR. HUGHES:  And, Your Honor, you brought up the timing; there is not one specific date.  But where our members find themselves is, because of the coming lottery in March, they really need certainty as to what the rules of the lottery are.  And then for some of our -- the Chamber members that are cap exempt, as well as all of AAU's members that are cap exempt, they have petitions that they wish to file today and they cannot do so because of the $100,000 fee.

So it is past December 15th.  If the Court is able to resolve this issue, say, by the first week or so of January, that would certainly be satisfactory for plaintiffs' purposes.  But we do --

THE COURT:  I love it when counsel say:  You just work as hard as you can all over the Christmas holidays and

New Year's; I just love that.

MR. HUGHES:  Well, Your Honor, we, of course, appreciate --

THE COURT:  But I appreciate -- I appreciate -- the schedule got a little confused with the filing of the motion to dismiss on Monday.  So I just wanted to make clear that both sides aren't planning and presenting any new arguments, and so I can proceed apace.

MR. HUGHES:  Yes, Your Honor.  There is nothing new from us; no surprises.  I think the Court has the full range of argumentation that the plaintiffs intend to bring.

As we've described in the papers, our clients have urgency.  But we appreciate the Court is diligently working on this case and understand the holidays upcoming.

THE COURT:  All right.  So let me just talk about the general scope.  This was a proclamation that was issued in mid-September, it affects a number of people, a number of businesses, other kinds of employers who use H-1B visa workers.  So I thought it would be helpful to start by hearing precisely what the case is and is not about by making clear precisely whether the $100,000 payment for an H-1B visa applies or not.

Since you-all, as the parties in this case with a great interest in the H-1B visa, are following more -- very closely, I am sure, what the agencies are doing in

implementing the proclamation, I just thought -- I wanted to start to make that clear.

Defendants' counsel, just listen carefully because if there is something that needs clarification, I am going to count on you to do that as well.

I do have the public access line open.  Given the number of calls to chambers asking if there is going to be a public access line, I have a feeling there might be a number of people interested in the issue; wanting to be as clear as possible about what the status of the $100,000 payment is for new H-1B petitions.

Okay.  So employers are not subject to the $100,000 payment for existing H-1B visa holders because that payment only applies to new applications for H-1B visas; is that correct?

MR. HUGHES:  That's correct.  That's my understanding, Your Honor.

And I will say, after the proclamation first issued, there was mass confusion.  I mean, there were individuals who currently had H-1Bs who immediately got on planes because they were unclear, if they did not enter the United States before its entry -- the entering into effect, within a day or two, if they were going to be subject to the $100,000 fee.

After the proclamation issued in subsequent agency

actions, there was further clarification that existing H-1B holders would not be subject to the H-1B fee; it was for petitions that would be filed after the effective date.

THE COURT: All right. And if a current H-1B visa holder travels outside of the United States, this proclamation does not affect that visa holder's eligibility to reenter, at least for the period the visa covers; is that correct?

MR. HUGHES: I understand the United States government to have clarified that after the proclamation, that that is beyond the scope, yes, Your Honor.

THE COURT: And H-1B petitions that were pending before September 21, 2025, are not covered by the presidential proclamation and do not need to be supplemented with a $100,000 payment; is that correct?

MR. HUGHES: That's my understanding. Yes, Your Honor.

THE COURT: And the presidential proclamation, in Section 3(a), limits its scope only to aliens who enter or attempt to enter the United States after the effective date of the proclamation, as set out in Section 1(a) of the proclamation; so that limits the scope explicitly to new H-1B petitions. So immigrants and nonimmigrants traveling to the United States on a valid visa, other than an H-1B visa, are not affected or at all subject to this

proclamation or the $100,000 payment; is that correct?

MR. HUGHES:  I believe that's correct, Your Honor. The only caveat that I am not sure is entirely clear is if somebody, for example, could travel to the United States on a visitor visa but shortly thereafter adjusts to an H-1B, the $100,000 fee may apply to those individuals in those circumstances.

I think there is a different category of individuals who are already present in the United States at the time that there is a petition; and my understanding is the government said, for those individuals, the $100,000 fee would not apply.

THE COURT:  Okay.  So what is clear is that immigrants or nonimmigrants already in the United States on a valid visa other than an H-1B visa may apply for an H-1B visa here without having to make the $100,000 payment; is that correct?

MR. HUGHES:  Yes.  And I think that has been clarified in subsequent agency action, yes, Your Honor.

THE COURT:  So a student on an F-1 visa studying in the United States can apply for a H-1B amendment without being subject to the $100,000 payment; is that correct?

MR. HUGHES:  That is how we understand the government's interpretation of the proclamation, yes, Your Honor.

THE COURT:  Okay.  So the only people -- and this also goes to standing issues.  The only people subject to the $100,000 payment for an H-1B visa are nonimmigrants who do not hold another valid visa for entry into the United States and who are applying for a new H-1B visa?

MR. HUGHES:  I believe that is a correct characterization, yes, Your Honor.

THE COURT:  All right.  And for defendants' counsel, if you need me to repeat any of those for clarification, we can do that straight-up when we turn to you.

Okay.  So let me just -- I do want to hear everything you have to say.

MR. HUGHES:  Of course.

THE COURT:  So a significant part of the plaintiffs' complaint and, by my count, at least 18 of the fairly voluminous exhibits provide lots of information about the benefits of the H-1B program.

It's interesting reading, but it's not the job of the Court to set economic policy; it's the President's job to do that.

So why do the supposed economic benefits of the H-1B program matter in this case?

MR. HUGHES:  So --

THE COURT:  I mean, you have sort of sent me a

whole bunch of articles.  But why is that relevant here?

MR. HUGHES:  Your Honor, to be candid, I think the Court is -- you are quite right, the Court is not setting economic policy.

What we are demonstrating -- well, our legal argument hinges entirely on the fact that the proclamation is unlawful because it conflicts with Congress's recent judgments in the INA and it exceeds the President's authority under Section 212(f).  We don't believe the Court can or should or needs to make any judgment as to economic policy.  The reason that we've included --

THE COURT:  That's good, because I am a mere JD. I really don't know that much about economic policy.

MR. HUGHES:  Your Honor, the reason we have included some of this argument material in the papers -- and I don't think the Court needs to reach it, but it is in response to what we anticipated the government would argue -- and the government did argue -- in terms of the equitable factors for an injunction as to what is in the public interest.

I don't think the Court needs to address any of the, sort of, weighing and balancing of the H-1B program because the case law is quite clear that it's in the public interest for the government to follow the law.

And if the Court agrees with us that there is a

violation of the INA or in excess of 212(f), I don't think the Court needs to go further in saying that it's in the public interest to issue an injunction for the government to follow the law.

THE COURT:  Right.  So plaintiffs -- you agree, plaintiffs' legal claims here rise or fall on the statutory interpretation given to the provisions written by Congress? INA --

MR. HUGHES:  That is --

THE COURT:  -- and the specific provisions in there that the defendants rely on that grant broad authority to the President to regulate entry into the borders of this country?

MR. HUGHES:  Yes, Your Honor, that is entirely correct.  Again, the proclamation rests -- what we think -- is on a flawed view of the benefits that the H-1B program provides, so we felt it useful to provide the robust research demonstrating that.  But it's truly not relevant to the legal questions that are before the Court.

THE COURT:  Right.

And so when I read -- I used to work on the Hill. All of these kinds of exhibits and studies, and so on, to me looked like a lobbying effort that would be appropriate to Congress because they're the people who wrote the statutes that I have to interpret here, and they are the people who

can change those statutes and claw back power and authority from the President that they have granted if they are persuaded by all of these articles and studies, right?

MR. HUGHES:  Well, Your Honor, I would frame that -- I largely agree, but I would frame that slightly differently.

Congress has created the H-1B program and created certain standards for the H-1B program, has decided that this program is going to exist for entry-level employees. Congress has decided how much this program is going to cost.

Congress has said when the executive gets to set fees, it's limited to things like cost recovery; there is a cap on how much those fees can be.  And there are protections for the regulated public, including notice and comment rulemaking.  And so --

THE COURT:  Okay.  I am going to get to all of that in a second, because the next thing I want to get to is "standing."

The defendants haven't challenged the plaintiffs' standing here, but I know you are well aware --

MR. HUGHES:  Of course.

THE COURT:  -- I have my own independent obligation to assure myself, as a court of limited jurisdiction, that I can exercise subject matter jurisdiction here.

You have already referred to the cap-exempt employers as well as those subject to the cap on the total annual number of H-1B visas that are made available.

Do plaintiffs agree that members who are subject to the cap and to the lottery system would have trouble showing a concrete, nonspeculative harm from the proclamation to establish any harm at this point before they have won the lottery?

MR. HUGHES:  No, Your Honor.

And so, of course, we have the cap-exempt folks, but setting those aside and focusing on the cap individuals.

This is a frequent issue in immigration cases in other contexts where the question is:  Can you apply for a government benefit?

And there is a long line of case law.

So we cited, in our reply papers, Judge Boasberg's decision, the *National Venture Capital Association* litigation, where Judge Boasberg says it's true that if you apply for a particular immigration benefit, there is discretion -- there is a chance that the immigration authority may not give it to you; but that can't deny standing at the outset because what you lose is the opportunity to obtain that benefit.

So we pointed the Court to the *National Venture Capital Association* case; and that turns -- Judge Boasberg,

in turn, looked to the D.C. Circuit's decision in *CC Distributors*, which is talking there a challenge to -- I believe it was a Department of Defense contracting program and the eligibility criteria for that, even though there was a possibility that the applicant wouldn't be -- wouldn't ultimately win the benefit that they were seeking.

THE COURT:  So are you arguing -- because I didn't see this in your papers, to be quite honest.  Are you arguing that the members' -- because both AAU and Chamber are only arguing for associational standing, not organizational standing -- associational standing based on their members having standing to sue.

So are you -- and I had understood that both plaintiffs were arguing for associational standing based solely on their members who are cap exempt.

I am hearing you now, and are you also arguing, that your members who are cap subject may also have standing?

MR. HUGHES:  Yes, Your Honor, absolutely; and I apologize if we weren't clear in our papers.  But our members who are subject --

THE COURT:  Well, you presented declarations by University of Arizona, who appears to be a member of both AAU and the Chamber; is that right?

MR. HUGHES:  Yes, Your Honor.

THE COURT:  And of GoRural, which is cap exempt -- is GoRural cap exempt or cap subject?

MR. HUGHES:  GoRural is a placement company that places H-1Bs with nonprofits.

THE COURT:  So they're not making the applications for H-1B visas at all, they're just helping employers do that; is that right?

MR. HUGHES:  That's their business, Your Honor, is they fill out the applications.  They pair -- they go find the specialized workers and pair them with the rural facilities in Idaho and Montana that need specialty workers.

THE COURT:  So do I have any declarations from a member of the Chamber who are subject to the cap in the lottery?

MR. HUGHES:  Yes, Your Honor.  So, first, the Shen Declaration in, I think, pretty substantial detail.  This is around paragraphs -- from 17 through 22, describes several different members who have -- historically hired hundreds of H-1B visa --

THE COURT:  So that's a person who works for the Chamber?  That's not a member itself making the declaration?

MR. HUGHES:  That's right, Your Honor.  It is --

THE COURT:  Why didn't a member of the Chamber, that is, a business employer who is subject to the cap in the lottery, not submit a declaration under that member's

name, just like University of Arizona did and GoRural did?

MR. HUGHES:  Your Honor, I think in the current environment, there are significant pressures from entities to decide whether they provide their information to the Chamber, and the Chamber can represent them in associational standing capacity and present that information to the Court. We cite case law that demonstrates it is appropriate for an association to take their members' information and provide that to the Court.

Membership in an association or *Claiborne Hardware* has a First Amendment right to anonymous participation in advocacy organizations and associations, like the Chamber of Commence --

THE COURT:  So the business entities are not as brave as the University of Arizona, in putting their name on the declaration?

MR. HUGHES:  The universities are very brave, Your Honor.  So it is, I think, though, consistent with this Court in the D.C. Circuit's case law to recognize that associations can represent the facts of their membership to the Court; and the Court can appreciate that there are, as Mr. Shen's declaration describes, hundreds of members who currently employ tens of thousands of H-1B workers who, in normal years, file --

THE COURT:  Well, let me ask you about this,

because the Chamber of Commerce represents approximately 300,000 direct members.  I think that's from the Shen declaration.  And that is -- and by "direct members," that means people who actually pay dues to the Chamber to be members; is that what "direct members" mean?

MR. HUGHES:  Direct -- yes, Your Honor.

What "direct members," I think, is getting at, Your Honor, is that there are also associations that are members.  So there can be somebody who is a member of an association who is a member of the Chamber, and that would not be considered a direct member.

THE COURT:  Understood.  Okay.  I just wanted clarification on that.

What percentage of these 300,000 direct members are subject to the cap versus cap exempt, if you know?

MR. HUGHES:  I don't know a percentage.  But I would say that the vast majority are, because cap exempt are traditionally nonprofit organizations and other limited entities; and that is a distinct minority of the U.S. Chamber's membership.  It does include cap exempt as we described, but those who are subject to the cap are present. And, again, Mr. Shen goes into great detail --

THE COURT:  Right.  How long has Arizona State University been a member of the Chamber?

MR. HUGHES:  I don't know that, Your Honor.  I can

find that and provide an update to the Court on that.

THE COURT:  Okay.  So they might be a very brave new member of the Chamber that helps provide standing?

MR. HUGHES:  I don't think it was something in the last -- it's not something new since this litigation, I don't believe.  But I can -- we can examine that.

THE COURT:  Okay.  Is there a significant overlap of membership between AAU and the Chamber?

MR. HUGHES:  No, Your Honor.  I don't believe --

THE COURT:  Is it only the University of Arizona?

MR. HUGHES:  That is the only that I know of.  I don't know the status of all of the other AAU members.  The AAU members are public on their website.  I am not aware of any other AAU member being a Chamber member.  But I would need to confer with my client to affirmatively say whether or not --

THE COURT:  You would agree with me, despite reliance on Chief Judge Boasberg's decision, that it is the cap-exempt members who have more clear standing in this case?

MR. HUGHES:  Well, Your Honor, what I --

THE COURT:  Would you agree with that?

MR. HUGHES:  No.  I think I would resist that, Your Honor.  What I will say is that the cap-exempt members -- and one of the reasons you saw them focused on in

our preliminary injunction papers is I will agree that the cap-exempt members had yet more urgency than the cap-subject members. And that's because the cap-subject members, as the government points out -- the lottery is in March, so they are not getting petitions approved until March; whereas the cap-exempt members have individuals that -- but for the proclamation, they would have hoped would be working for their respective entities today.

So we focused on the cap-exempt members, in the opening papers, in the context of a preliminary injunction because, candidly, there is more -- there was, especially at the time, more urgency around cap exempt who could be petitioning in real time; whereas, right now, what we're looking at -- and I want to be clear, it still is a very urgent issue for cap-subject members because they have to engage companies that hire hundreds of H-1B workers in a year, are right now working on their recruiting classes that would start over the summer and the fall; and they have to understand, can they be trying to make offers and hire individuals who are outside the United States and have them participate in the lottery or not?

That's a very urgent, pressing question.

And, again, I do think it is pretty clear under *National Venture Capital Association*, that framework, that there is -- and that is a standing decision, that Judge

Boasberg says:  It can't be the case that just because there is some uncertainty if somebody is going to get a benefit here, win the lottery, that somebody, all of a sudden, loses standing.

That would essentially, you know, eviscerate any opportunity to bring a challenge to a whole host of government --

THE COURT:  That's your strongest citation for that.  And unfortunately -- I mean, it may be persuasive, but it's not binding on me.

Okay.  Let me move on to the proclamation itself.

MR. HUGHES:  Yes, Your Honor.

THE COURT:  The defendants' opposition starts off defending the proclamation, saying the document sets out detailed findings that are far more detailed than many prior proclamations issued by other Presidents.

And when I look at the proclamation, I see that it is pretty chock full of supportive statistics that, among computer and math occupations, the foreign chair of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019.  With the key facilitator for this influx of foreign STEM labor being H-1B visa.

The share of IT workers in the H-1B program grew from 32 percent in FY 2003 to an average of over 65 percent in the last five fiscal years.

The study from the Federal Reserve Bank of New York, finding that among college graduates, ages 22 to 27, computer science and engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent respectively.

The proclamation also found that many American tech companies have laid off their qualified and highly skilled American workers, and simultaneously hired thousands of H-1B workers, providing examples of only four tech companies which the proclamation reports that:  These four companies together announced layoffs totaling 45,400 employees, while simultaneously petitioning and receiving approval to employ about 32,800 H-1B employees.  Those are very large numbers.

I mean, so despite all of plaintiffs' reports and declarations submitted with their briefing, nowhere do I see those specific statistics relied upon in the proclamation disputed as in any way inaccurate or -- you know, they are very clear.

Do plaintiffs dispute the accuracy of the statistics that are set out in the proclamation?

MR. HUGHES:  So a few things about that, Your Honor.  And I may suggest turning over the microphone to my colleague, Mr. Schauf, to touch on the scope of the 212(f) authority; but a few things I would like to say.

First, I think the statistics that are identified, we have not contested particular numbers. But what -- the reason we put in, as we discussed earlier, the bulk of evidence about the enormous economic benefits that the H-1B program provides is because we think those handful of statistics are quite misleading as to what the broader picture is and how the H-1B program provides economic benefits to the United States as a whole.

But I will say, Your Honor -- this goes to the Court's broader question -- is: What is the exercise here today? And I think the important part is the President clearly disagrees --

THE COURT: Well, my point is that I think a lot of Americans would find those statistics very concerning. It would be of concern if they were inaccurate. But I think what you are telling me is -- what the plaintiffs want is to have a broader perspective without disputing the accuracy of any of those statistics; is that right?

MR. HUGHES: Well, Your Honor, I think our central point is that if the President thinks that the H-1B policy is currently improperly balanced, that, as the Court put it, is a question for Congress. That is a policy dispute that is fine to have as a policy dispute. But 212(f) does not give the President the power to countermand what Congress has specifically decided in the context of the INA. The INA

has specifically identified the --

THE COURT:  Well, plaintiffs are also not arguing that there are no abuses of the H-1B program, right?

MR. HUGHES:  No, Your Honor.  But that's to say, every program that, you know, exists has some abuses.

We don't throw away enormously valuable programs because there can be abuses at the margins.  And a whole range of civil and criminal mechanisms to address abuses. Abuses, obviously, should be addressed in the program.  That does not, in any way, undermine the overall benefits that Congress sought to provide.

But, again, this goes to --

THE COURT:  Well, I mean, it was interesting, with the declaration from HJI, where the HJI declaration indicated that, when they couldn't afford the $100,000 payment for an H-1B worker, they actually hired and are now training an entry-level IT-related person in the job, which -- the defendants seize on that example to say: That's exactly what the purpose of this proclamation was; to take entry-level people in this country, who are Americans, and train them up to get a good high-paying job.

So from the defendants' perspective, the proclamation -- it's only been in existence for a couple of months, it's already working.  Aren't the defendants right on that?

MR. HUGHES: Well, no, Your Honor. I think Mr. Daniels, in his reply declaration, explains that this imposes significant costs on the company in a way that is not in any way beneficial.

But again, to the point of -- it goes to: Does the President have the authority to fundamentally change the H-1B program from what Congress designed because of a policy view?

And the way government -- our system works is that: If the President disagrees with existing legislation, it's not to use some -- the 212(f) authority to countermand and contradict what Congress has explicitly said. If there is a policy dispute, to have the legislation change. This is a question for Congress, not a question for a unilateral executive action.

And so this is why we have several declarations. So, for example, the GoRural declaration explains a healthcare facility that is on the verge of closing because they can't find staff for a laboratory. If that healthcare facility can't get an H-1B worker because there is no finding a domestic worker who is available to fulfill this role, this healthcare facility is going to close, and the nearest facility that can address things like heart attacks is going to be a three-and-a-half-hour drive or, if you can find an ambulance, ambulance ride away. These are these

rural healthcare centers that the GoRural declaration shows are on the precipice of closing because of the proclamation.

There are a whole host of very real-world, practical implications and harms that this proclamation is going to cause.

And, again, we point out in our --

THE COURT:  Well, let me just turn to the fact that even though plaintiffs give very little attention to this -- barely mentioned it, only in a footnote in its opening brief, very minimal also in its reply brief -- the defendants don't spend very much time on it either; but it's the waiver exception authority that the proclamation gives in 1(c) to the DHS Secretary.

And, for example, the GoRural dire circumstance of a rural hospital relying so heavily on H-1B workers that a whole health center might close -- which really does make one scratch your head about what is going on in our medical delivery system here that our medical schools and other universities aren't training enough people to provide health care across the country -- but that's a much bigger policy issue that certainly, thank God, is not in front of me.  But why can't that person just go get a waiver?

MR. HUGHES:  Well, Your Honor, it's not in the record, but I can represent that certain hospitals and health systems have requested broad waivers from DHS, and

they have not been granted them.  So, again --

THE COURT:  So there have been denials of waiver requests under the --

MR. HUGHES:  What I understand --

THE COURT:  -- pursuant to the proclamation?

MR. HUGHES:  Well, let me be clear in what I understand has occurred, Your Honor, and I admit this is not provided to the Court in the record; is that, generally, broad associations that represent the healthcare industry asked DHS for waivers for various aspects of the healthcare industry, and DHS informed that there would be no broad-based waiver that would be available.

So that is what I understand.  Again, that's not in the record before the Court, which is presumably why the defendants also don't focus on that issue.

But what we do point to --

THE COURT:  Well, the defendants do dispute in the statement of facts -- and I was just -- I wanted to give you an opportunity to explain that -- because the plaintiffs claim that the proclamation confers on the Secretary of DHS the ability to grant exceptions on an individual-by-individual basis, and that the Secretary will not grant any companywide or industrywide waivers or exceptions pursuant to Section 1(c) of the proclamation.

That's how the plaintiffs describe it.  Defendants

dispute the assertion.

Do you want to respond to that?

MR. HUGHES:  Your Honor, we included that because we were interested as to what position the defendants would take.  And while they dispute it, we, as I said, understand that associations have asked for waivers that have not been forthcoming.

Now, maybe the denial is just holding out the possibility that if somebody else asked a different industry, I don't -- I think that would be a question for the government, Your Honor, as to what they mean by disputing that.

But when we talk about the issues that GoRural is facing, when we talk about the Washington University declaration where they explain that they are looking to have international medical graduates to fill important roles in anesthesiology and infectious diseases that they are unable to appropriately fill, those are harms that are happening. And there has been no waiver that has been forthcoming on that.

I think that --

THE COURT:  Well, the only place that you really talk about this waiver discretion is in your reply when you are defending the plaintiffs' position that the proclamation does require the exercise of agency discretion.  And you

mention it in a very cursory way, this waiver exception.

Whereas, I think this waiver exception in 1(c) is an interesting one, to say the least, starting with the fact that DHS has been given authority in 1(c) to grant individual-by-individual -- or "particular alien" are the words used in the uses guidance waivers -- industrywide or company-based waivers.  And the DHS Secretary has already exercised some discretion to say:  Even though I may have authority under 1(c) to grant waivers on a companywide basis or an industrywide basis, I am sticking to this, one of those three areas where I can exercise my authority provided to me under the proclamation.

So that's already, in some ways, an exercise of discretion there, which is not an argument that the plaintiffs have made, actually, in terms of showing the exercise of agency discretion even in how 1(c) will be implemented as already reflected on the administrative record is, in some ways, demonstrating that it is not just a ministerial implementation of the proclamation.  There is a lot of agency discretion being made here.

But you haven't made that argument.

MR. HUGHES:  Well, I think, as the Court pointed out, we do describe it in the reply brief when we talk through the APA issues.  But we're --

THE COURT:  Not really.

MR. HUGHES:  Well, first, Your Honor --

THE COURT:  I have been waiting for it, and I never saw it.

MR. HUGHES:  Well, I appreciate that, Your Honor. And I think it is an argument that is there, and it's an argument we can further develop.  But how --

THE COURT:  Well, maybe it's just because the plaintiffs aren't interested in the waiver, the 1(c) waiver.

MR. HUGHES:  Well, Your Honor, I think that would be just a Band-Aid on an otherwise flatly unlawful policy. So we have focused on the fact that the proclamation as a whole is flatly unlawful and, you know, solving it for one pocket is certainly better than nothing; but we don't think the President has the authority to do this at all, that the INA forecloses this.  So it's true, we have been less focused on trying to place a Band-Aid on this --

THE COURT:  Does the Chamber or AAU have any concern about the exercise of the discretion under 1(c) in terms of whatever quid pro quo might be asked for for a waiver on an individual basis for an individual particular alien or on a companywide basis?

MR. HUGHES:  Absolutely, Your Honor.  And I think that the Chamber --

THE COURT:  Because that's not talked about at all either.

MR. HUGHES:  Well, Your Honor, in an appropriate circumstance, we would love to get discovery to understand to be able to present a record -- that's part of why we wanted an administrative record that doesn't -- that's yet to see how any individual adjudications of this have come out.  I think that the Court is quite right, that there could be quite a bit of variability, shall we say, in terms of how a waiver is granted, if -- we simply don't know.

And so, again, we have focused on --

THE COURT:  Well, we have information, you know, already filed in another case, a stipulation by two federal agencies, it's in a case before another judge on this court, where these two agencies have entered the stipulation saying that -- I just want to find the specific language that they stipulated to.

Yes.  This is in *City of Saint Paul v. Wright*, 25-CV-3899, where they stipulated that the selection of grant termination decisions has been influenced by whether a grantee's address was located in a state that tends to elect and/or has recently elected democratic candidates in state and national elections, so-called blue states.

The defendants, in the stipulation, went on to explain:  Defendants reiterates their legal position that consideration of partisan politics is constitutionally permissible, including because it can serve as a proxy for

legitimate policy considerations.

So does the Chamber and its members have any concern that, in seeking a waiver from the $100,000 payment on a companywide basis, industrywide basis, on an individual particular alien basis -- that the address of the employer is going to play a role in whether the waiver is granted or not?

MR. HUGHES:  Well, Your Honor, I think that is a distinct problem with, first, imposing an unlawful $100,000 fee and then having a discretionary way to get around an unlawful fee in the first place.

THE COURT:  That was a simple yes or no.

MR. HUGHES:  Yes, Your Honor.

THE COURT:  Do members have concerns about that?

MR. HUGHES:  I think there are concerns, yes, Your Honor.  There are concerns.

THE COURT:  And the Chamber represents members from the so-called "blue states," I am just quoting the defendants, and other states?

MR. HUGHES:  The Chamber represents members from the entire country, all aspects, in all sectors of the U.S. economy.

THE COURT:  Okay.  So I just want to be clear about one thing.  The plaintiffs Count 1 *ultra vires* challenge, is that directed only at the proclamation with

the APA challenge in Count 2 only limited to the agency implementing action, or are both claims targeting both the proclamation and the agency implementation?

MR. HUGHES:  I think the *ultra vires* claim, to start with, is targeting everything.  So it is targeting the proclamation as well as the agency implementation of it. The APA claims are focused, most exclusively, on the agencies just given the broader posturing of the APA claim.

THE COURT:  All right.  So now let's turn to the INA.  I know you have been wanting to get there.

MR. HUGHES:  Happy to do whatever the Court would prefer.

THE COURT:  Okay.  I am there now.

Okay.  But you have been focusing a lot on the (f) provision, 1182(f).  The defendants also rely on the INA provision at 8 U.S.C. Section 1185(a)(1) as support for the defendants' position that Congress has fully authorized the President to take steps in the national interest, like this proclamation.

The plaintiffs haven't really dealt very extensively with 1185(a)(1), but I want to spend a couple of minutes on 1185(a)(1) because that's a statutory provision of very long standing.  It's been in existence in the INA since, I think, 1918, maybe; like long before 1182(f).

(A)(1) basically says:  Unless otherwise ordered

by the President, it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States, except under such reasonable rules, regulations and orders, and subject to such limitations and exceptions as the President may prescribe.

That is very broad authority, and it doesn't mention a need for any kind of presidential statement or finding about the national interests; it doesn't mention classes of aliens or anything like that, which are all of the arguments -- a number of the arguments that the plaintiffs make for why the H-1B visa $100,000 payment is contrary to statute when all of those particular challenges are just not even existent in 1185(a)(1).

How do you get around 1185(a)(1)?

MR. HUGHES:  So a few responses to that, Your Honor.  I think this is one issue, too, that my colleague, Mr. Schauf, would want to be heard on in a few minutes, but I will be happy to take a first -- I just want to preview that Mr. Schauf has focused on this question extensively.

THE COURT:  Okay.

MR. HUGHES:  But the first point is that, in *Hawaii*, the U.S. Supreme Court said that 1185(a)(1) and 212(f) or 1182(f) substantially overlap, and the Court found these as sort of very similar powers.  And the Court went through the analysis under 212(f) to see if there was a

212(f) power.

If, by contrast, 215(a)(1), 1185 (a)(1) was this carte blanche authority, the Supreme Court in *Hawaii* wouldn't have had the need to actually walk through the 212(f) analysis if 1185(a)(1) already gave the President sort of unfettered power or unchecked power.

The second point is, as the Court read, one of the key terms here is "reasonable" rules --

THE COURT: And didn't the Supreme Court in *Hawaii* basically say, yes, they overlap. One doesn't -- statutory interpretation-wise, those statutory interpretation principles require us to read them as coexisting and in harmony as much as possible.

So they found that the authority was sufficiently provided for the action in 1182(f), right?

MR. HUGHES: That's right, Your Honor. And given --

THE COURT: So they never really said that if the exercise of authority ran afoul somehow of 1182(f), 1185(a)(1) could provide the authority.

MR. HUGHES: Well, Your Honor, if this was, again, an unchecked grant of authority that didn't have any of the limitations on 212(f), it would be surprising, at least, if the Court would have gone through all of the analysis to show why the exercise of authority in 212(f) was appropriate

in that context.

But, again, there is a limitation on "reasonable"; two additional arguments that I think are critical. One is the context of what 1185(a)(1) is doing. This is in the passport control context. When you read subparts (2) through (7), they are all clearly talking about travel documents and things of that nature. And I think it would be an incorrect interpretation to read from a travel document-style --

THE COURT: I have to disagree with you.

I mean, I think that the statutory language is pretty darn clear. The title of 1185(a)(1) is "Travel Control of Citizens and Aliens"; and (a)(1) starts off with attempting to -- from entering or departing from the United States, in very broad terms.

MR. HUGHES: So, Your Honor, even -- again, I think there is a more narrowing construction. And I may defer to Mr. Schauf on some of that.

But let's set all of that aside.

If you disagree with me on the whole about that, I think the analysis that *Hawaii* finds, which is from a general purpose power that is authorized, something like 212(f) or 215(a)(1) here, the President still can't exercise one statutory authority to directly conflict with other parts of the INA. You can't read into 215(a)(1) the power

to essentially rescind or nullify other provisions of the INA.

So even if the Court were to disagree with all of the reasons why we think 215(a)(1) doesn't provide the power, it isn't appropriately limited, it still takes us right to the conflict with the INA argument. And it certainly can't be a power to say the President can overstep other limitations that exist in the INA; in particular, policy judgments that Congress has elsewhere made.

THE COURT: All right. Let's turn to 1182(f).

So in this statute, 1182(f), Congress has handed off to the President, with a red ribbon on it, three things that it authorizes the President to do: Suspend the entry of all aliens, suspend the entry of any class of aliens as immigrants or nonimmigrants and, then, the third thing is to impose on the entry of aliens any restrictions he may deem to be appropriate.

That also seems to be so broad that the proclamation could have said, by the President: I find it in the interest of the United States to suspend all H-1B visas.

Do you agree?

MR. HUGHES: Well, no. Your Honor, would you mind if I hand it off at this point to my colleague, Mr. Schauf? I think this would be an appropriate segue. But what I

would say --

THE COURT:  It's the plaintiffs' argument.  You can jump up and down as you lie.

MR. HUGHES:  Thank you.

I would like, before we turn it over entirely, just to come back to talk through the very specific fee provisions and how 1356(m) applies because I think that has significant relevance.  But for some of the 1182(f), I would like to hand it to Mr. Schauf for a time.  Thank you.

THE COURT:  Okay.  And I do want to get to that.

MR. HUGHES:  Thank you, Your Honor.

THE COURT:  Mr. Schauf, do you want to go back to 1185(a)(1) --

MR. SCHAUF:  Sure.  I am happy to go --

THE COURT:  -- or are you satisfied with your co-counsel's answers?  Is there anything you want to add to that?  Maybe that's a nicer way of saying it.

Is there anything you would like to add to the plaintiffs' argument on 8 U.S.C. Section 1185(a)(1)?

MR. SCHAUF:  I think, with the invitation, I will actually go one step further back, which was on what we said in the briefs about the discretionary authority in the proclamation.  I think if you look at page 35 of our opening brief and pages 30 to 31, especially of our reply brief, the paragraph that starts "More than that," I think you will

find a pretty clear argument about why that provision is relevant to our claims that, you know, this is not just a ministerial application of the proclamation.

So I will just refer to those pages in our brief.

THE COURT:  And you are talking about the Secretary's discretionary authority to grant waivers?

MR. SCHAUF:  That is correct, Your Honor.

THE COURT:  But having looked at those pages, and I have them excerpted right in front of me, Mr. Schauf, I don't see the argument that -- I see the plaintiffs pointing out that discretion has been granted to the Homeland Security Secretary to make determinations on whether a waiver should be granted, but what I don't see is the argument that the Homeland Security Secretary has already exercised that discretion by deciding only to issue waivers on a particular alien or individual-by-individual basis and not to use the authority granted to her under 1(c) to also issue waivers on a companywide basis or an industrywide basis.

Could you point or read to me from those sections where you make that argument that the Secretary's discretion has already been exercised in a decision to only do it on an individual-by-individual basis different from and, therefore, not merely ministerial than what the proclamation authorizes?

MR. SCHAUF:  So I think the direct answer to your question is we did not point to the exercise of discretion.

But I think the fact that discretion was exercised underscores what I think is, sort of, the broader point in our brief, which is that, you know, this is not just ministerial implementation; you know, seen this way, among others, that the actual implementation of the proclamation differs from, you know, what you would get from the face of the proclamation.

THE COURT:  Do members of the AAU share the concerns of members of the Chamber that the exercise of that discretion will, as stipulated in another case about grant making, possibly depend on the address of the employer or the university and whether it is -- and what defendants in the other case -- where federal agencies have called "blue states" versus other states?

MR. SCHAUF:  So I agree entirely with what Mr. Hughes said.  You know, yes, it's a concern.  And yes, this is, sort of, a feature of having an extraordinarily broad, in our view, you know, unlawful proclamation, then there is an open-ended discretionary exemption from; and, you know, certainly the existence of that exception can't salvage the unlawfulness of the proclamation.  I think, if anything, you know, it underscores the concerns with the proclamation.

And maybe, actually, I will start -- sort of, there is a broader point that I think plays into the arguments on both 1185(a)(1) and 1182(f), which is, if you took the government's theory here, here is all of the things that would be authorized under one of these two authorities. So, you know, same fee, but now it's a million dollars, and it's imposed only on employers whose activities are viewed as not consistent with the interests of the United States or a similar bar --

THE COURT:  Or the current administration of the United States.

MR. SCHAUF:  The administration's view of the interest of the United States, that's right; you know, a similar bar on H-1B visas.  But now the petitioning employer has to attach, you know, like, an enforceable covenant that they are not going to engage in layoffs, off-shoring, or some other conduct that the administration identifies for five years, or maybe just bar all immigration entirely unless noncitizens entering the country agree to follow a new migrant code promulgated by the President.

And, you know, all we hear from the government in reply is that those sorts of hypotheticals aren't this case; and that, I think, is a surefire sign that they don't have a limiting principle and, candidly, I don't think they want a limiting principle because they want these authorities to be

available to achieve all of those ends.

And now we pick up the dialogue, maybe, on Section 1185 --

THE COURT:  Let me just ask you this question because I read 1182(f), I read 1185(a)(1) where Congress has handed all of this authority to the President; so it's pretty broad, and it's pretty hard to see limiting principles in those two statutes to bar the President from doing exactly what you have speculated about.

MR. SCHAUF:  So I guess what I --

THE COURT:  And is that a problem of making those actions unlawful under the INA, or is that a problem where Congress needs to take another look at this, about the authority they have given to the President?

MR. SCHAUF:  So what I think about both -- of 212(f) or 1182(f) --

THE COURT:  I mean, the Chamber is one of the bigger lobbying outfits possibly in the world, if not this country.  They know how to go to Congress and get Congress to modify statutes, if Congress -- if they are able to persuade Congress that that's the right policy and share all of the exhibits I have been given; and say:  Look at what's happening, look at the authority you have handed over to the President that actually is not serving business interests here.

But for me to find it, what the proclamation is doing, unlawful when I have these broad statutes?  Don't you agree you have got a bit of a hurdle there?

MR. SCHAUF:  So this is clearly a broad authority to do certain things; and I think those things are what the -- these authorities have been used for since 1952 -- I mean, they have been used 90 times -- and always to create, sort of, thou-shalt-not-enter commands, barring people from entry into the United States.  It is a broad statute within that domain.

But what it's never been used to do is impose a fee, much less one that effectively regulates domestic conduct, which is employment in the U.S.; does so in order to alter the incentives of U.S. companies and institutions; and operates directly on U.S. persons by imposing obligations directly on them.

And, you know, I think you can get that limit out of the text of both 215(a)(1) and 1182(f).  But before I, sort of, do, I want to talk about one important piece of the backdrop here because this is a case about fees.  So that is a core power vested in Congress by the Constitution.

THE COURT:  Well, that is the plaintiffs' position.  The defendants dispute that and say this has nothing to do with fees, this is part of our restriction and regulation, specifically on American employers.  They are

not afraid of being -- of a characterization of this proclamation as regulating American businesses; that's the point.  You read this regulation, and the proclamation is about abuses of the H-1B program by American employers.

So this is not a fee in the views of the defendants; this is a payment on American employers who, in the President's view, have been abusing the H-1B visa program to displace American workers in favor of H-1B workers.  And the statistics set out in the proclamation make no bones about how the numbers are in the thousands, and the President's view that that is a national security and economic security issue, that he seeks to address this way.

MR. SCHAUF:  So, you know, there is a lot in there.  Let me --

THE COURT:  So you say it's a fee to get it into the INA's fee structure part.  But the defendants are vigorously disputing that this is at all a fee and saying that this is a payment on American employers.

MR. SCHAUF:  So a couple of responses.  I mean, first, we don't think the, sort of, precise characterization here matters.  I mean, what the Supreme Court said in the *Skinner* case is that you need a clear statement to impose requirements on regulated parties, whether characterized as a fee or tax.  And, you know, I think you can probably add

to that list, sort of, any other label you might put onto it.

But, you know, if labels matter, I think the important thing is this requirement is something that is a core congressional power to impose charges on, you know, American businesses and institutions.  You know, it's not just me saying that this is part of the power textual vested in Congress.

If you go back to the *Passenger Cases* -- this is not cited in our briefs -- but 1849 U.S. Supreme Court case, Justice McLean was looking at a per-passenger charge for noncitizens coming -- being brought into the United States, and said, you know, that falls -- that is an impost within the meaning of the Constitution.

And so here, too, we are in the neighborhood of -- you know, those are core congressional powers.  And this cuts across both; you know, the arguments I am up here to focus on and the arguments that Mr. Hughes is going to focus on.  Because we have this core congressional power, you need a clear statement that the executive can exercise it, which is why we think this is not -- one of the reasons we think this is not authorized by 1182(f) or 215(a)(1).  And that is reinforced by the fact that when Congress has wanted to convey this sort of fee authority, it has done it very expressly in all of the provisions that Mr. Hughes is going to talk about in more detail that show, you know, the

conflict between the choices Congress has made and this proclamation.

THE COURT:  So looking at the fee statute, 1356(m) that the plaintiffs rely on, it imposes a limitation using a "may"; that fees may be set at a level that will ensure recovery of the full cost of providing all adjudication and naturalization services.

So if Congress had wanted to limit presidential authority over fees for visas, could this statute in either 1182(f) or 1185(a)(1) have simply said that the President may not impose any limitation or restriction in the form of any monetary payment or fee beyond what Congress has expressly authorized, including regarding H-1B visa petitions?

Congress could have said that; but they didn't, did they?

MR. SCHAUF:  A couple of varieties of answer; and again, I may tap in Mr. Hughes on some of the specific statutory points.

But on 1182(f) and 215(a)(1), I mean, I think --

THE COURT:  And also 1356(m), which uses a "may"; you know, you can set fees at this level.  There is nothing in any part of 1356 that says -- which is directed towards the agencies setting fees, nothing that says "these fees shall" only be this.

It basically uses a "may."

And there is nothing -- and it is silent on the presidential power under two other provisions, 1182(f) and 1185(a)(1), that limits the President's discretion under those statutes to impose restrictions that have a monetary form.

MR. SCHAUF:  So I think this is why the starting point in the Constitution in the *Skinner* case is important; because what that starting point means is that the authority to impose these sorts of exemptions on American businesses and institutions, if it is not conferred clearly, it does not exist.

And we don't think it's conferred clearly in either 1182(f) or 215(a)(1) which, again, is consistent with, you know, all of the historical practice that has existed under the statute -- both of these statutes from sort of time immemorial.  And, you know, we think this is reinforced by additional aspects of the text of both of these statutes.

So to start with 215(a)(1), which Your Honor has discussed a few times -- in addition to the points Mr. Hughes made, let me make a specific textual point and then a sort of broader point.

On the text, what this provision authorizes is the President to impose regulations under which noncitizens must

enter.  We think that means, you know, this is a provision that is really about control over the border, not employment in the United States; much less, again, a restriction that operates on American businesses and institutions in the form of a fee.

And Your Honor also mentioned the absence of the predicate requirements that exist in 1182(f), which the government has made a lot of.  And I think, actually, that goes all our way because if you imagine the world as the government sees it, Congress created, you know, this statute that allows the President to basically the same thing but with none of the requirements that Congress imposed in 1182(f).  And that's a pretty good clue that the government has gone wrong somewhere.

I think the place that they have gone wrong is that 1185(a)(1) simply doesn't authorize these sorts of substantive restrictions on who can come in.

THE COURT:  Let's say, in part, because of the legislative history, you know, 1185(a)(1) started as a wartime power; it's much older.

You know, 1182(f) came in with the INA, it's the more recent one, it has -- Congress did impose a few more limits on the scope of the President's authority in 1182(f).  So let's say 1182(f) applies here.

The plaintiffs do argue that the prerequisites for

invocation of 1182(f) haven't been met here, one of those being the finding as to the detriment to the interests of the United States, as I understand the plaintiffs' argument; and the second has to do with an undefined class of aliens, which the plaintiffs say 1182(f) requires.

Is that pretty much the plaintiffs' argument on 1182(f) and why it shouldn't be invoked -- or is unlawfully invoked here?

MR. SCHAUF:  I would just add one more, which is just, I think, our most basic argument, which is that the substantive thing that the proclamation does, which is impose this fee premised on U.S. employment, is not a restriction upon the entry of aliens within the meaning of 1182(f).  And that, actually, I think, is, you know, our meed [sic] argument on this issue.

THE COURT:  So it really turns on the meaning of the word "restriction"?

MR. SCHAUF:  So yes; and I think the government would like this authority to be one to impose restrictions on aliens so that if you are imposing limits on noncitizens, you know, anything goes.  But it's narrower than that; it is restrictions on the entry of aliens.

And we think there are three overlapping reasons why this proclamation doesn't qualify.  Number one, the thing that it is targeting is employment in the

United States, that is domestic conduct.  Second, the reason -- and the proclamation is very express about this -- that the proclamation has issued is in order to shift the incentives of businesses and institutions in the United States; and, again, it operates by imposing requirements directly on these same U.S. entities.  And all of that together, we think, indicates that this is not, in fact, a restriction on entry within the -- restriction on the entry of aliens within the meaning of the statute.  And --

THE COURT:  It's interesting that you should say that when I have this example that evolved during the course of this litigation with HJI, where HJI was going to get an H-1B worker to fill a position, and then they didn't because of the $100,000 payment.  So they hired an American to train up for the position.  So they opted not to start the process of having a foreign worker come in under an H-1B visa.  So the effect was not having an H-1B worker enter the borders.

The defendants say:  It worked, it's working.

So how -- that's a real example of this proclamation having the effect of restricting an H-1B worker from coming into the United States.

I am not sure I am persuaded by this argument that the meaning of the word "restriction," when it is providing -- it's putting a thumb on the incentives of

employers in the United States is not a restriction that's affecting the entry of H-1B workers.

MR. SCHAUF:  So a couple of responses.  I mean, I think our first answer is the fact that what this proclamation is doing and is intended to do is shift the hiring practices of American businesses in the United States is part of the problem.

And the second part of the answer is that if you took the government's theory and -- you know, anything goes under Section 212(f) as long as some mechanism in the chain is stopping someone at the border then, you know, you get all of the potential actions that I outlined at the beginning -- and I won't, sort of, rehash -- but, like, you can add to them.

I mean, suppose the President finds the activities of some nonprofit are detrimental to the interests of the United States; and that nonprofit depends, in part, on noncitizens who are working for that institution; and so the President says:  I am going to bar, you know, those noncitizens who are going to work for that nonprofit from entry.

I mean, it would have the same features, Your Honor, that you just identified; and we think it would be outside the authority conveyed under Section 1182(f) for the same reasons as this one.  And, you know, that's even

without adding, again, the fee aspect, which we think makes this a pretty straightforward case.

THE COURT:  All right.

MR. SCHAUF:  If it works for the Court, I might propose Mr. Hughes talk about some of the conflict arguments.

THE COURT:  Let me -- I don't know whether it goes to you or Mr. Hughes.  But do plaintiffs agree that if the proclamation is found not to be *ultra vires*, then an agency's implementation of the proclamation would also not be arbitrary or capricious or contrary to law?

MR. SCHAUF:  So I want to be precise.  I mean, I think if -- obviously, we dispute the premise.  But if the proclamation was lawful and the only thing that the agencies are doing are, you know, things that are compelled by the proclamation then, you know, we certainly have not claimed that you would have an arbitrary and capricious challenge, you know, as to those things.  And, you know, to the contrary, I think that's --

THE COURT:  Yes.  I think you didn't give me much argument, if any at all, on arbitrary and capricious.

MR. SCHAUF:  Right.  And, you know, I think courts have exhibited some caution in allowing the use of, you know, arbitrary and capricious claims against agencies to effectively get arbitrary and capricious review of

presidential action which, of course, Congress has not provided.  And so, you know, our arguments to this Court is not about arbitrary and capricious action, it is about contrary-to-law action.

THE COURT:  All right.  And so if the proclamation is found to be lawful, not *ultra vires*, as the plaintiffs claim in Count 1, the effect of that on the APA claim is what?

MR. SCHAUF:  So I think the APA claim that we have pressed so far is about, you know, the unlawfulness of the proclamation, whether -- you know, because it's unauthorized by 212(f) and 215(a)(1) or because it conflicts with Congress's statutes.  And so, you know, those claims would not work if you thought the proclamation was lawful.

I think there are probably other claims that one could develop and press based on, you know, agencies implementing the proclamation in a manner, you know, not -- it, sort of, went beyond the proclamation, including, you know, how they have applied the discretionary exemption; but, you know, those are not claims that we are pressing here.

THE COURT:  All right.  Back to you, Mr. Hughes.

MR. HUGHES:  Thank you, Your Honor.

I want to pick up on the 1356(m) and the conflicts with the INA.  I think the starting point -- you touched on

this with my colleague -- is what's the nature of the $100,000 fee.  And I think it's pretty clear that -- again, I agree with Mr. Schauf -- regardless if it is characterized as a tax or a fee or an extraction or an impose, it is revenue raising.  And that's made clear in the defendants' declaration from Mr. Jackson, who says:  This $100,000 fee is being paid into the general fund of the Treasury.

So Article I, Section A of the Constitution says that these sorts of measures are entrusted to the exclusive authority of Congress.  This is clearly revenue raising.  To the extent that there is any kind of exception, it's as if the government is selling federal property or leasing a federal building or, potentially, a user fee for some sort of benefit, and there is no claim here that this is any of those things.

And Mr. Jackson's declaration disclaims that. It's $100,000 that goes into the general fund; and like many taxes or fees, is designed to incent behavior.  So it is clearly an exercise of revenue-raising function.

THE COURT:  So are you saying that the proclamation, even if it comports with the broad jurisdictional -- or broad authority granted by Congress under 1182(f) and 1185(a)(1), it raises an -- it's *ultra vires* because it's unconstitutional under separation of powers scrutiny?

MR. HUGHES:  At the very least, Your Honor, I think it's an avoidance canon as to why 212(f) just doesn't reach this.  Our presentation all along has been:  212(f) is not a delegation of revenue-raising authority.  And we know this because -- and this is where I'm heading to the Court's question on 1356(m) --

THE COURT:  Because you haven't raised a separation of powers constitutional challenge as part of your argument for *ultra vires*, have you?

MR. HUGHES:  Well, we have raised it, Your Honor, in service of our statutory construction argument, which is where I think it does fit.  We have not brought a separate claim for separation of powers violations.  And, again, we're always happy to amend our complaint for belts and suspenders.

But what we've done, which I think is correct, is to say this conflicts with the -- it's in excess of the President's 212(f) authority and it conflicts with the INA provisions.

And this goes to *Skinner*.  We talk about *Skinner* and the other cases throughout the briefs that say there has to be a clear statement.  And there is a clear statement in the INA, that's 1356(m).  So Congress has said:  We are going to take some of our revenue-raising authority and we are going to delegate it to the executive.

But there are a couple of key limitations.  The first is notice and comment rulemaking; USCIS, when they set fees, have to show their homework.  And so the government doesn't say this is an exercise of 1356(m) power; they can't because it wasn't done via notice and comment rulemaking.

The second thing about 1356(m) is it's retained -- or it's restricted to cost recovery.  Now, Your Honor asked the question:  Well, how should we read that statute because it has the language "may"?  Isn't this just saying that we can add -- the President can add anything on top?

Well, first, I have already --

THE COURT:  Under its authority under the two other provisions.

MR. HUGHES:  Yeah.  And let me explain a few reasons why that just isn't a plausible reading of 1356(m).

So you start with, as Mr. Schauf just talked about, there has to be a clear statement.  This is a clear statement.  But let's look at the text of 1356(m) because what 1356(m) does is, it first says that the President may -- and so by "may" is not "must."  If the President doesn't want to have this user fee, the executive doesn't have to do it.  That's what "may" is doing, is it's optional.  But if the President does it, it's then restricted to recovering costs.

But then it goes on, and it gives the President,

the executive, the agencies, two additional things that the agency can charge under 1356(m), that is what is called the asylum fee; it's the -- that fee for providing adjudication naturalization services, maybe set at a level that will ensure recovery for the full costs of providing all such services --

THE COURT:  You have to slow down.  My court reporter is losing you.

MR. HUGHES.  Sorry.  You can throw a pencil at me or something, I'll take it.

THE COURT:  She's not shy.

MR. HUGHES:  I know.  It's happened before.

So that's the cost recovery.  But the next sentence says:  Similar service is provided without charge to asylum applicants can also be added.

And then the final clause says:  You can add additional costs associated with the administration of the fees collected.

So what Congress has done is said:  You can set a fee up to cost recovery, then you can add on an asylum fee, and you can add on an administration fee.

Well, if this is just a floor, and the executive can do anything they want, Congress wouldn't have had to have given explicit authority for the asylum fee or the administration fee because the President would have just

had, you know, cart blanche authority to do as he wished.

The next point about this is, this was -- 1356(m) was enacted in 1988 and then amended in 1990, long after 212(f) and 215(a)(1). If this sort of general fee-generating authority that the defendants claim, sort of, already existed in 212(f), 1356(m) would, sort of, be a strange thing for Congress to adopt. This is the clear delegation.

And, again, as I said, the key thing that Congress did was say: Yes, you can charge fees, but the regulated public is protected through notice and comment rulemaking. USCIS has to show their homework as to how they calculate the user recovery; and second, it's capped at a user recovery plus asylum fee, plus others.

So I think that's the first thing that there is a clear conflict. And I want to talk, kind of, three conflicts. The first one is what 1356(m) explicitly does.

The second is, Congress has told us how much an H-1B should cost. I want to talk through that. And the third thing is, Congress has said: Here are the qualifications for who should be eligible for an H-1B visa. And the proclamation just takes a wrecking ball to congressional judgment there.

So I already described the first point.

The second point about how much it should cost, we

described in the briefs that between the discretion --

THE COURT: And even if -- let me just say that if this all turns on 1182(f) and 1185(a)(1) because -- to the extent that the proclamation does take a wrecking ball, if he is authorized to take that wrecking ball onto those two other statutes -- too bad, so sad --

MR. HUGHES: But here is what the Supreme Court said in *Hawaii* --

THE COURT: -- as my torts professor used to say.

MR. HUGHES: What the Supreme Court said in *Hawaii*, it sort of assumed this framework. But then the Ninth Circuit -- Judge Moss, in the *RAICES* case, have all agreed that this is the right framework to apply: Is you ask a series of, essentially, conflict questions. Does something that -- the exercise of 212(f) authority -- one, the Court asked: Does it expressly override something Congress has done?

And for reasons I have just described, will continue to describe, expressly overrides.

But then the Chief Justice's opinion in *Hawaii* goes on to say: Is there an implicit conflict?

The opinion, when it goes through that conflict analysis, used the words "implicitly" twice. It's asking: Is there something implicit between the 212(f) exercise that implicitly conflicts with what -- the text of the INA?

And then the third thing that the *Hawaii* decision says, it asks the question whether, quote/unquote, Congress has stepped into the space and solved the exact problem?

And again, for -- the Court went through that analysis in *Hawaii.* And the reason that the challengers to the proclamation lost was the Court found there wasn't a conflict. There, again, as the Court is aware, it was about blocking nationals from foreign countries entering the United States on the basis that those countries weren't providing information that the executive deemed was necessary for purposes of vetting, and the Court went through rigorous analysis:

Was there an express conflict with the INA? No. The INA said concert [sic] officials need to vet, so getting more information to help vet is appropriate.

Is there an implicit conflict? No.

There's the visa waiver program. But just saying that we are going to have a visa waiver program doesn't deny the authority to do this. And had Congress solved this exact problem? The Court said no.

But when you ask those questions to this proclamation, because of the reticulated nature of the H-1B statute, the answer is yes on all of those conflict questions; that's what makes this quite different.

So again, it's the 1356(m) conflict.

The second conflict is Congress and -- I can cite all of the statutes if useful, but we have them in the briefs.  It's generally about $3600 for an H-1B visa.  It's and additional $4,000 if it is a --

THE COURT:  I have read all of that.

MR. HUGHES:  And the point is, Congress has said: This is how much it should cost, and we're going to charge certain employers more to -- because we think that these employers deserve to pay more, no doubt, in part to shape conduct.  That is all part of the statute.

And having a fee that is 25 times what Congress set is, if not an express, certainly an implicit rejection of the congressional judgment.

The third point is:  On the face of the proclamation -- and the Court has pointed out -- the proclamation's intended effect is to hire only, quote/unquote, the best of the best, and is to set the standards at a very high threshold rate; but that is not what Congress designed.

Congress said a bachelor's degree -- textual in the text, Congress said a bachelor's degree is sufficient. And we walked in --

THE COURT:  Well, the plaintiffs have said that businesses want to hire their best candidate, the best candidate available.  And isn't the best candidate

available, in part, based on the cost of a candidate?

MR. HUGHES:  I mean, that is --

THE COURT:  For how much is a candidate going to demand in wages to -- with the appropriate degrees and skill set to perform a job.

MR. HUGHES:  And I want to just also --

THE COURT:  Yes or no?

Isn't a best candidate, from a business perspective, the best candidate at the lowest wage?

MR. HUGHES:  I don't know if -- I don't -- I disagree with that, Your Honor.  Not every company that -- are going to make a wide variety of business -- different business judgments.  I, in my business, hire people at higher wages --

THE COURT:  When the plaintiffs say:  Your members want to hire the best candidate for a job.

When you are using the term "the best candidate," is the cost of that candidate, in terms of wages, a consideration?

MR. HUGHES:  Your Honor, this is going to be on an individual member by member.

I will agree with you, at least some members are going to consider the cost in wages of hiring.  But what is important for the H-1B program is Congress has thought through and worked on this with the labor certification

process.  So employers have to list and advertise these jobs as available and make a demonstration that there is not the specialized domestic labor available for these positions to even be able to hire these positions in the first place. There is --

THE COURT:  And I think what the proclamation is pointing out is that that is part of the exploitation and abuse of the H-1B program because -- based on the statistics, you know, four companies that are used as examples are laying off thousands and thousands of employees and replacing them by hiring H-1B workers.

MR. HUGHES:  Your Honor, this is why we attached those articles we discussed at the outset that pushed strongly their direction of saying how this is critical to all segments of the economy, including in graduate medical education, including in rural medical provision.  And the Court asked Mr. Schauf, you know, is this a lobbying question?

And the point is, this is a lobbying question for the President.  If the President wants to change how Congress has structured the H-1B program, that is a policy -- a priority that the administration can take to Congress and suggest the decisions that Congress has made via statute should change; that is how the system works, that is how the legislative process works.

212(f) does not give the President unilateral authority to say:  Well, this is what Congress has done, but I dislike it.  I think it is the wrong policy, so I am going to disregard it and craft a new immigration policy out of whole cloth through 212(f).  That does not comport with what the Supreme Court said in *Hawaii*.  It is inconsistent with how Congress has established this program.

And again, let's talk about the 20,000 cap for master's degrees students.  So Congress has thought about this program.  Do we want to have some sort of special, you know, benefit or ability for those workers with yet more training beyond the bachelor's degree?

Congress looked at that and said:  Yeah.  Here is what we're going to do:  We're going to have 65,000 visas available for everybody who has a bachelor's or higher.  And then we are going to have an additional 20,000 visas that go to individuals who have more training, a master's degree or higher.

That was Congress looking at this question of how do we balance between entry-level workers, more seasoned workers with greater training; and Congress made a judgment about that.

THE COURT:  Okay.  Mr. Hughes, I want to turn to the defense.

MR. HUGHES:  Thank you, Your Honor.

MR. DAVIS:  I will try to keep everything that I was thinking in my mind and try to read my notes.

THE COURT:  Well, why don't we just start with the first question.

Is there anything about plaintiffs' representations about who is and is not subject to the $100,000 payment that you think requires more clarification, or has there been more guidance from the agencies that you can share about how this $100,000 payment is going to apply?

MR. DAVIS:  I don't think so.  I think that the proclamation, sort of, lays out who has applied it to; and to the extent there has been clarifications, the clarifications have made it clear that, once it went into effect, then people who were applying after the effective date from outside the country have to pay the 100,000; people who applied before or already have H-1Bs do not.

If you have an H-1B or another visa, you can still enter the country.  And if you are -- let's say somebody is inside the country and has one type of visa or has an H-1B but needs it to extend, as long as they stay within the country and they are applying for an H-1B, they also don't have to pay the 100,000, which I think emphasizes the fact that this is not overriding the H-1B program.

It's adding a restriction on entry because people who are seeking H-1Bs within the country can do so without

this restriction being applied.

But otherwise, I think the description of generally who it applies to and not was accurate.

THE COURT:  All right.  Let me just briefly talk about standing.

Defendants have raised no standing challenge to either of the plaintiffs here.  And just for clarity of the record, the defendants are not disputing standing -- the plaintiffs standing to challenge the proclamation or its implementation under either one of the claims; the *ultra vires* claim or the APA claim.

MR. DAVIS:  The defendants' understanding of plaintiffs' standing arguments were that they at least -- each association had at least one member who was subject to either the lottery and had applied significantly in the past and would do so again, or that they had members who were exempt from the lottery and were being injured.

I think -- I agree with Your Honor that the lottery is much harder because not only are there other reasons you might not get an H-1B visa, but there is some speculative nature to the lottery.  I think that's a close call because there is some case law about the opportunity to seek.  But again, this doesn't foreclose the opportunity; it just imposes restriction, a payment on it.

I do think that this -- I am thinking about the

standing problem that you raise, Your Honor, more in terms of relief and irreparable harm that, you know, the associations might have standing to bring the claims in general, but that doesn't mean all of their members are injured and that the relief should only extend to the members who are injured.  And I don't think that they have identified that many members who have.

As you pointed out, the Shen declaration is quite general.  I don't really understand their First Amendment argument, like NAACP was about a law forcing disclosure.  They came and brought this suit; and for associational standing, they need to identify the members.  And so I think that they need to show what members are injured for them to get the relief here.

And I also think the speculative nature of getting the lottery goes more to irreparable harm.  It might be enough for an Article III injury, but probably not for irreparable harm.

THE COURT:  All right.  So in the briefing there is a -- I found a little bit of uncertainty as to whether the President's implied constitutional powers are being used to inform the interpretation of 8 U.S.C. Section 1182(f) and 1185(a)(1) or if those implied powers are being used as an independent basis to bolster the President's authority over entry.

Are the defendants arguing regarding the President's implied constitutional authority, which he does invoke in the proclamation, it gives him the authority to do this; or only the former, which is that the defendants are proceeding under a purely delegation theory that occurred through the INA?

MR. DAVIS:  We don't dispute that Congress has a role in immigration and foreign affairs, and so it's really about -- I think it goes to two things; the President's, sort of, inherent authority and the political branches' control over immigration and foreign affairs.

I think one goes to the reasons that we don't think this is reviewable, to consular nonreviewability, to the discretion that the President has and is at its apex here, under *Youngstown*, when it's both presidential power and something that Congress delegated.

And we think also, to the interpretation of the scope of 1182(f) and 1185(a)(1), that it's at its maximum power and these delegations are at the maximum power when they are involving immigration, foreign affairs, and national security.

THE COURT:  Okay.  Let's just talk a little bit about where I left off with with plaintiffs, which is 18 U.S.C. Section 1356(m), where Congress has a fairly comprehensive fee schedule with the limitations on that fee

schedule to pay for administrative costs.

So why doesn't that fee-setting statute take up all the room here, in that the President's $100,000 payment is yet another fee?

MR. DAVIS:  I think several responses, Your Honor.

To begin with, Subsection (n) is specifically about costs for administration and allows, in the discretion of the executive, to set that up to the maximum to cover all of the costs, and some other things.

And then, in that section, there is also Subsection (j) which talks about the rulemaking, which may be allowed for that subsection.  So that is just talking about the 13, I believe, 46.  And then they also -- but that's not the only fee that even applies to H-1B.  So just by its nature, (m) does not occupy the field.

They point to Subsection (u) in the same area, and that says and acknowledges that there may be other fees. And then they point to a whole other section in the statute where (j) wouldn't apply that has fraud and other fees in there that also apply.  And the fraud one also says that this can be in accordance with other fees that can be applied.

And I think the most fundamental point here is that those fees are not being displaced, they still apply, we are not overriding them; and that they don't have

anything that excludes the possibility of other payments or that limits the President's power.

Also in the same subsection -- well, the same section as (m), there is Subsection (e), which expressly limits certain types of fees.  So Congress knows how to do that, but they didn't do that anywhere else.  They haven't limited 1182(f) anywhere else or 1185(a)(1).

And I think if you take plaintiffs' argument to its logic, what they are saying is:  Well, Congress provided for some fees so, implicitly, everything else is forbidden or is in conflict.

But if you take that argument seriously, that eviscerates 1182(f) because the INA has a lot of specifics on admissibility and on inadmissibility.

And in the Ninth Circuit, the plaintiffs in *Hawaii* all said:  Well, Your Honor, Congress has a clear scheme on how vetting works, on how waivers work; so they have an articulated scheme, I think were the words they said in the Ninth Circuit; and the Supreme Court said:  No.  This adds in supplement, it's ample, in addition.

So unless there is really a direct conflict or a specific prohibition, that's not enough.  They said it wasn't enough there.

Another case on point -- and admittedly, this hasn't gone to a merits opinion yet -- is *Pacito* in the

Ninth Circuit.  Different panels in the Ninth Circuit have all issued stays on an injunction saying that were likely to succeed under *Hawaii* on a proclamation that bans the entry of refugees.  And there, what the plaintiffs were arguing and what the district court said is Congress made a policy choice; it's articulated that refugees can enter under these situations.

And what we said was, you know, 1182(f) allows for temporary suspension or restrictions.  This is a temporary restriction or suspension on top of that, and that's allowed.  And so far, the Ninth Circuit has agreed with us in multiple stays; and the merits opinion is supposed to be forthcoming.

THE COURT:  Well, with respect to restrictions and its use in both 1185(a)(1) and 1182(f), the plaintiffs say a restriction can't be a monetary penalty like this.  The examples you are giving from the Ninth Circuit are not monetary restrictions.

Have either 1182(f) or 1185(a)(1) ever been invoked to authorize -- have they ever been invoked to impose a monetary form of restriction, like this proclamation does?

MR. DAVIS:  I don't believe 1182(f) has.

I am not sure about 1185(a)(1) because, as Your Honor pointed out, it's much older and applies to entry and

departure in a whole host of ways, so that might have.  I am not entirely sure about 1185(a)(1).

And I think to the overlap point --

THE COURT:  So this is a new creative use of 1182(f).

MR. DAVIS:  Right.  But I don't think past practice necessarily ossifies the meaning or the ability of the President to have new uses if it's within his delegation.

You know, I think Justice Barrett and others in the Supreme Court have made clear that just because a statute was used one way, and there was some history and practice at the time, that doesn't ossify the powers of the political branches necessarily.

THE COURT:  And what is the defendants' response to the *Skinner* argument posed by the plaintiffs?

MR. DAVIS:  All right.  So I think there is two points to be had there.  I think, one, we don't see this as a tax, right?  Not every payment requirement is a tax.  There are fines in the Eighth Amendment.

And *Sebelius* -- *NFIB v. Sebelius* acknowledges *Drexel*, it does doesn't overrule *Drexel*.  It says --

THE COURT:  But didn't *Skinner* just say it doesn't matter what you call it?

If you are imposing a monetary burden that does

not enure to the benefit of a group of people subject to the regulation, it doesn't matter whether you call it a tax or not; there is a separation of powers concern there.

MR. DAVIS:  I don't think *Skinner* speaks to this particularly.  And I would point to the fact that, again, this is sort of at the intersection of immigration and foreign affairs; it's taxing an alien coming in.  That's not, typically, what you would think of as a normal tax; it's almost more like a tariff or a payment fee, or something like that.

But even taking -- let's assume that this falls within *Skinner*.  The argument that was being made in *Skinner* was:  The taxing power is so core, so important to Congress, that it should have a higher bar for the nondelegation doctrine, and it should be even more clear.

The Supreme Court said:  No, not at all.  It's just like any other power.  Its delegation is just the same, the delegation has to be as clear as anything else.

And we think that 1182(f) and 1185(a)(1), which allow for suspensions, restrictions, any restrictions that the President may deem appropriate -- and 85(a)(1), about rules, regulations, and orders would encompass a payment on the entry.

And again, like, this is fairly restrictive in some sense because it has to be, at least under 1182(f),

limited in time and only on the entry of aliens.  But I do think that is actually a distinction between 1185(a)(1) and 1182(f).  I don't think (a)(1) has to be time limited.  And I also am not convinced that 1185(a)(1) could include a full suspension, its rules, regulations on entry; where 1182(f) can include full-on suspensions on entry.

So I do think there is overlap, but there is also some distinctions.  What *Hawaii* said was:  We don't really have to deal with how these parse out because the government says for these purposes there is complete overlap.  And that's because nobody there questioned that this was a suspension; it very clearly was a travel ban.

We think that this qualifies as a suspension; but plaintiffs are contesting that quite heavily, saying:  No, no, no, this doesn't look anything like a suspension.

Well, if so, then --

THE COURT:  Well, I was interested in your reply brief filed on Wednesday that you make this explicit statement that this is a suspension when -- to be honest, I thought that this was going to be -- this was more of a regulation; you know, this was -- imposed on the entry --

MR. DAVIS:  Or a restriction.

THE COURT:  -- any restriction.

So I was curious that the defendants called the proclamation a "suspension" as opposed to a "restriction."

MR. DAVIS:  So I think this partially goes to the class of aliens being defined and part of the problem with plaintiffs' redefinition of the class.

The class is H-1B applicants who are outside of the country, and their entry is suspended.

THE COURT:  But even under 1182(f), although plaintiffs focus a lot on the first sentence which refers to any class of aliens.  Before it mentions "class of aliens" 1182(f) says:  Whenever the President finds that the entry of any aliens.

So it doesn't have to be a class even.  So the whole debate over:  How do you define a "class" and do they have a common characteristic is, you know, sort of, beside the point when it also says that 1182(f) can apply to the entry of any aliens, meaning all aliens trying to seek an H-1B visa -- with no other characteristic other than they're all aliens seeking an H-1B visa for the first time.

Am I the only person in the room reading it this way?  Perhaps.

MR. DAVIS:  No.  I think that's right.  And I think that even if you think that class is a separate limitation -- like, "class" is kind of infinitely permeable. Like, there can be a lot of different things that can be a class.  And I do think there is a common characteristic, that you are seeking a visa for a purpose.

But I do agree that "any aliens" means that you can suspend a certain subset --

THE COURT:  Well, the parties were having this big debate among themselves in their papers about:  Is it a class?  Is it not a class?  How do you define a class?  What makes a class?

And I just thought, why are we bothering with that?

MR. DAVIS:  I think that's a fair point, Your Honor.  And I also, to your point earlier, believe that 1185(a)(1) actually doesn't have that --

THE COURT:  But you don't agree?  That's not what you have argued.

MR. DAVIS:  I do agree.  I have argued several of these; and, usually, the courts do focus on the class limit and so we wanted to take that on directly.

But I do think it can be more malleable than it having to be a particular class.  And I think that's especially true of 1185(a)(1), which definitely does not have any limits on it having to be a class.

THE COURT:  Right.  Also, with the "suspend the entry of all aliens or any class of aliens," why do the defendants view the proclamation as a suspension of entry as opposed to restrictions on entry?

MR. DAVIS:  Right.  So I think it can be both.

The reason I think it can be a suspension is because it's in terms of people seeking H-1Bs. Those people, their entry is suspended unless there is a payment made. So I think it's a suspension unless that restriction is overcome.

But if you want to just think of that -- and plaintiffs try to redefine the class in terms of the restriction, which I don't think makes any sense. But even if you want to see it as a restriction or a regulation, I think it's well-encompassed within the statute.

I mean, the Supreme Court in *Hawaii* made clear that the conditions -- which plaintiffs say they think this is a condition -- it says: He may impose any conditions, and then quotes the language that he can place any restrictions he deems appropriate.

THE COURT: Okay. So the plaintiffs have raised, I think, a significant question about: What are the limits to the President's power under 8 U.S.C. Section 1182(f), certainly when combined with (a)(1)?

Are there any outer bounds to the President's authority that Congress has handed off to him in these two provisions in regulating entry into the United States?

MR. DAVIS: I think, to be blunt, Your Honor, based on some of the Supreme Court cases on the authority of the political branches over foreign affairs and immigration

and Congress's ability to delegate this power, I think it is very broad and doesn't have very many limits; but that's not to say there are none.

1182(f), again, has to be temporary.  You know, the Supreme Court says he doesn't have to put a date on it; but here, there is a year.  And I do think it can't be forever.

I don't think -- if there is a specific prohibition in the INA, it could necessarily overcome the specific prohibition.

It, obviously, can't apply to citizens; it's only aliens, and it's only on entry.

1185(a)(1) also applies to departure.  But if somebody is just doing something completely within the United States, like, somebody -- let's say, they are here on a J visa to attend school, they graduate, they seek a change to H-1B, that all happens here.  That can't be touched by 1182(f).  So I do think there are some meaningful limits here.

THE COURT:  Okay.  Let me just talk about some other potential limits.

And I want to return to Section 1(c), which is the waiver authority granted under the proclamation to the DHS Secretary to, basically, suspend the requirement of the $100,000 payment.  And I want to start with the scope of the

waiver authority because the defendants do dispute the plaintiffs' assertion that the proclamation confers on the Secretary the ability to grant exceptions on an individual-by-individual basis.

So I puzzled over:  What are you disputing about that?  Because the "uses" clarification makes it clear that the Secretary is only going to make exceptions after determining that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, and a few other requirements.

A "particular alien" does sound to me like an individual-by-individual basis.  So what are you disputing precisely?

MR. DAVIS:  We just don't think that the Secretary has made, like, a categorical determination that there won't be waivers in the future for industries or businesses, and that that clarification doesn't exclude that possibility.

THE COURT:  I see.  So you would agree that:  Up to this point, the Secretary has made the decision, exercised her discretion to make the decision that, out of the broader authority she has been granted under the proclamation, she's only going to exercise one part of it; which is waiver authority on an individual-by-individual basis but not on a company wide or industrywide basis?

MR. DAVIS:  I don't -- I think -- no.  I think our

dispute is she hasn't made that decision.  She hasn't decided to limit her discretion at this time; that's our point.

And I also think, you know, it makes sense that plaintiffs didn't focus on the waiver piece as the way they are attacking because it doesn't harm them that there is a possible waiver.  And if that's really the way to, sort of, backdoor attack the entire proclamation, I mean, the President could, frankly, just pass another proclamation and just get rid of the waiver altogether.

But, obviously, the waiver is a way that they can get exempted, and I think that's more beneficial to them than it is actually harmful.

And I also would like to point out that almost all proclamations have had this individual waiver; *Hawaii* did.  And they actually, sort of, said:  That might be a problem because there is the exemption waiver thing.

The Supreme Court said:  No, that doesn't override this.  Like, the Supreme Court said it actually favored the legality of the proclamation that it had this waiver exception to it.

THE COURT:  Well, given the statement -- the stipulation by two federal agencies, Department of Energy and Office of Management and Budget, in this other case, that they are going to make selection of grant termination

decisions based on a grantee's address and whether it's located in a state that tends to elect and/or has recently elected democratic candidates in state and national elections -- "so-called blue states," quote, from the defendants' stipulation -- would you agree that there would be APA review of individual waiver decisions that may be based on a similar kind of decision-making as the defendants have stipulated to in this other case?

MR. DAVIS:  I think it's hard to know in the abstract because no decision has been made here.  And I don't know what the agency stipulated to in that other case. I think it's --

THE COURT:  Do you want me to read it to you?

MR. DAVIS:  I heard what you said, but I don't know the context or anything about that case.

I think it would depend on a number of things.  If there is, like, a written policy where the Secretary makes that clear, I think it's possible that they could have APA review of that policy and challenge that.

I think plaintiff said, like, if these waiver decisions start coming and we think there is a policy or something that they -- that that would be a separate claim they can bring, and that does seem like a possible separate claim.  Again, like, if there is a policy written or unwritten of doing that, I think that that could be

separately, possibly, challenged.

THE COURT:  I mean, I think that -- as I have understood the defendants' position here, is that the -- is, basically, threshold arguments; that there is -- that proclamation is not really reviewable and the agency actions here to implement a proclamation, which the defendants' position is that it's lawful, is also -- any agency action implementing the proclamation is similarly unreviewable.

Do I have the defendants' position understood correctly?

MR. DAVIS:  Yes.  I do think there are limits. For example, the waiver policy we just came up with, the proclamation does tell the agencies to engage in some rulemaking, those rulemakings haven't happened; but if they did, that would separately be challengeable.

I think it's just the proclamation itself clearly can't be, despite them saying they are bringing *ultra vires* claims against the proclamation itself, that can't be challenged.  The President certainly can't be enjoined.

And I believe based on the *Detroit International Bridge* and the long, sort of, line of cases there going back, that just the ministerial implementation by the agencies, which is -- all of the clarification guidance documents are doing, also can't be challenged under the APA.

And plaintiffs try to say that's just -- they

acknowledge that line of cases, they sort of acknowledge its application to the arbitrary and capricious but say it doesn't apply outside of that context. I don't read that limit in any of those cases. *Detroit Bridge* had contrary to law and said APA review just fails and then, in the alternative, it is also legal. So I think that squarely applies here.

And Your Honor's -- they cite to Your Honor's case previously that acknowledged the ministerial aspect of it but said there it was an expansion and that the Secretary was engaging in sort of discretionary rulemaking.

I just don't think based on where we are now and the challenges they're bringing that there is anything like that here. They haven't even argued that there is an expansion.

I mean, I believe I heard plaintiffs say: No, they're just challenging the proclamation and the implementation of the proclamation; they are not challenging anything else.

THE COURT: All right. Anything further that you want to respond?

MR. DAVIS: Your Honor, I think it's worth briefly pausing on the consular nonreviewability. You know, plaintiffs argue that there is, sort of, a distinction between forward-looking policies and individual

determinations.  Most of the cases they cite for that didn't involve a proclamation, like here, which gives sweeping powers to the President.  And these arguments were raised in a number of Supreme Court cases -- *Hawaii*, *Sale* -- and then the *Doe* decision in the Ninth Circuit, which was vacated as moot later on.

In all of those cases, including *Hawaii*, they explicitly said:  That's a difficult question, but we don't have to decide it because this one is on the merits.

THE COURT:  I think I have done that myself a few times.

MR. DAVIS:  Yeah.  And you are perfectly free to do so here.

THE COURT:  In, virtually, every visa mandamus case that I have, where the government is trying so hard to get me to make a decision about consular nonreviewability.

MR. DAVIS:  And we are perfectly happy for you to do that here; but we just think that that is not a foreclosed argument at all, and *Hawaii* expressly understands that that is a difficult question.

And two, I think, going back to the point that Congress created H-1B, this is sort of a reticulated, clear statement of Congress's policy.  The policy in H-1B is a safety valve so that temporary workers can come to fill important specialized positions that they can't find

otherwise in the United States.  It's not to find that position at the cheapest labor.

And I think HGI [sic] proves this.  They were able to find an American to fill that position who had just one year less than what they were looking for, and they complain about having to train him.  But H-1B was not meant to get rid of training for American citizens.

So I don't think this is at all in conflict with H-1B, it's not overriding H-1B; it still exists.  It's a year long.  People within the country can still seek H-1B and not be subject to this.  This is in addition to and supplementing, as *Hawaii* said, for all arguments there.

And if you take plaintiffs' argument seriously, this means there could never be a restriction, regulation, suspension under 1182(f) or 1185(a) to any visa program because Congress set out the visa.  But we know that's not the case.  They did so in -- the President did so with J and F visas for Chinese students, I believe, in 2019 and 2020; and there were no real challenges to that.

So I think it can be to visas.  Visas are a means of entry; that's the whole purpose.  They are entering for a purpose.

And the one thing I would also want to pause on, Your Honor, is the argument that this really is about regulating domestic entities, that that's all the

proclamation is about; and that that's improper.  I think the proclamation itself, quite clearly, says that that's not what it is doing.  It says that the entry of the workers are detrimental.

Let me see if I can find, really quick, that section.

All right.  So the ultimate conclusion in the proclamation is that:  The unrestricted entry into the United States of certain foreign workers would be detrimental to the interest of the United States; otherwise -- he says -- the high numbers of relatively low-wage workers in the H-1B program are detrimental to American workers' wages and labor opportunities, especially at the entry level.

THE COURT:  I think in the paragraph just before that, though, the proclamation does hit on precisely what the plaintiffs were saying, which is it is a regulation of American businesses, when it says:  It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program.

So, I mean, I think the proclamation basically covers both bases.

MR. DAVIS:  Well, right.  So I do sort of agree with that, Your Honor, in the sense that H-1B, by its

nature, requires, sort of, a business sponsorship; and it's kind of unique in that way.  J and F visas also have university sponsorships.  And again, those have been subject to proclamations.

I don't think the fact that it has this input by a business means that it's suddenly exempt from 1182(f) but no other visas are.  I think it still is.

And I think, as we point out, it takes two to tango in H-1B.  It is the entry of the alien that is causing the harm, and that is the restriction.  And while the business is technically the one who makes the payment, like, where the money comes from -- if it's the alien, the alien's family, something foreign -- it doesn't really matter; it's just that the payment is there to try to address the abuses that plaintiffs themselves didn't even dispute when they were up here and you were going through all of the problems.

And I would just like to point out:  In the *Doe* opinion from the Ninth Circuit, which the history -- they cite the district court and the stay decision.  But then, on the merits, the Ninth Circuit reversed; and then that was vacated as moot later which -- but there, the Ninth Circuit said:  Look, you are making this argument that this is really a domestic regulation.

But all admissions, in inadmissibility decisions, are about domestic policy fundamentally.  They are about

health concerns.  They are about national security concerns. *Hawaii* talked about public safety in America.  Like, the fact that this is about the American economy and it happens to impact companies does not mean it is not a restriction or suspension on the entry of aliens; that is literally what it is doing.

THE COURT:  Thank you.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  Any response from plaintiffs?

MR. SCHAUF:  So just a couple of quick points for myself, and I think Mr. Hughes has a couple as well.

So just to start where my friend on the other side left off, you know, we are not here arguing that the 212(f) authority or 1185(a)(1) disappears just because, you know, there is some domestic ingredient somewhere.  You know, this case, we think, is about, number one, the fee; and number two, the thing that is truly unique, which is the confluence of, you know, regulating employment in order to alter the incentives of domestic entities by imposing requirements directly on domestic entities.  There is no proclamation ever that has done this.

Also, on 212(f), on the suspension authority, and I was sort of interested to see that in the reply brief because, actually, the proclamation itself does not invoke the suspension authority; so I don't really think the

government can invoke the President's power in their brief in this court.

But, anyway, I think the answer would be basically the same ones we have given under the restrictions authority; that this doesn't operate on, you know, entry. And in any event, the fee aspect makes it impermissible.

So I think that's all I have got on the merits, unless you have questions. I will make a couple points on the threshold issues.

So on consular nonreviewability, you know, we think this is, in the D.C. Circuit, controlled by the *Peterson* case; same principle Your Honor applied in the *Tate* case.

A small point. I was a little puzzled by my friend's suggestion that one could challenge the discretionary implementation of that exception in the proclamation that DHS has. I would have thought that, you know, if their nonreviewability argument had merit, it would -- you know, same result would be there. But we don't have to get into that.

And then, you know, the last point I will make on cause of action. The *Chamber of Commerce* case, I think is very express that we can get *ultra vires* review here. The line of cases my friend relies on are about instances where review has been widely foreclosed. We would go through -- I

won't take the Court's time -- go through all of our cases, they are all of that type.

And then on APA -- actually, you can, again, start with the *Chamber of Commerce* case which says you can do APA review for legality when you have agencies implementing a presidential action even if the legality of the presidential action is thereby drawn into question.  That's just what Judge Moss did in the *RAICES* case where there was guidance. And, you know, he did not say:  I am going to limit my review of the guidance for legality to the things that are, like, outside the scope of what was compelled by the proclamation.

He reviewed the whole thing.  And that's consistent, we think, with the text of the APA which allows challenges and relief against agency action that is contrary to law, so long as you are not trying to backdoor arbitrary and capricious review of the President's decision-making.

THE COURT:  Thank you.

Mr. Hughes.

MR. HUGHES:  Thank you, Your Honor.

Just two very brief points.  I want to focus, first, on the policy and then, second, the law.

The Court's asked several questions about the policy and the harms.  I want to focus -- there are real, true, current harms of the proclamation.  So I point the

Court to Torie Poser's declaration; this is Document 18-6 in the record, at paragraphs 14 to 15.  She describes a rural hospital in the communities that she serves that is on the precipice of closing because they cannot get the right people to work in their laboratories.  That hospital is on the precipice of closing, and the nearest facility is three and a half hours away.  So when we talk about --

THE COURT:  I have read that declaration.

MR. HUGHES:  So the point, Your Honor, is not that this Court is making a policy judgment.  It is that there is a policy debate, and that is a debate the President can have; it is a debate with Congress.  It is not for the President to unilaterally change the judgments that Congress has made, because Congress made those judgments for particularly good reasons.

That takes me to the law.

I think the most straightforward way to resolve this is:  Whatever the limits of 212(f), the limits of 215(a)(1), the one thing we know that those statutes cannot authorize the President to do is to contradict other provisions of the INA.  In the INA, Congress said:  We are going to bestow our revenue-raising authority on the executive in very limited ways; and when we do so, it is going to have protections for the regulated public of notice and comment rulemaking, and limits on the amount.

My colleague points to other provisions of the H-1B fee, that simply shows Congress exercised its revenue-making authority.  That doesn't suggest that Congress has somehow silently delegated carte blanche authority to the President in 212(f) or 215(a)(1) when there is an explicit textual delegation of authority in 1356(m) that the government recognizes they cannot invoke here because they don't comply with any of the limitations.  And not only does it conflict with 1356(m), it conflicts with Congress's judgment precisely as to how much an H-1B should cost, and it conflicts with Congress's judgment as to who should be eligible for H-1Bs.

Again, the President is entitled to disagree. That's a policy question for Congress.  212(f), 215(a)(1) cannot override the policy decisions Congress has made in the INA.

THE COURT:  Thank you.

I am reserving decision.

(Whereupon, the proceeding concludes, 12:22 p.m.)

* * * * *

## <u>CERTIFICATE</u>

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 23rd day of December, 2024.


<u>/s/ Elizabeth Davila, RPR, FCRR</u>
Official Court Reporter

**$**

**$100,000** [25] - 4:13, 8:18, 9:21, 10:10, 10:13, 10:24, 11:15, 12:1, 12:6, 12:11, 12:16, 12:22, 13:3, 27:15, 35:3, 35:9, 37:11, 53:15, 57:2, 57:6, 57:17, 68:7, 68:9, 72:3, 81:25
**$3600** [1] - 64:3
**$4,000** [1] - 64:4

**/**

**/s** [1] - 96:14

**1**

**1** [3] - 5:3, 35:24, 56:7
**1(a** [1] - 11:21
**1(c** [10] - 29:13, 30:24, 32:2, 32:4, 32:9, 32:16, 33:8, 33:18, 42:17, 81:22
**100,000** [2] - 68:15, 68:22
**10973** [2] - 4:12, 5:2
**1099** [1] - 1:19
**10:12** [1] - 1:6
**1182(f** [40] - 37:23, 38:15, 38:19, 40:11, 41:8, 44:3, 45:5, 45:16, 48:21, 49:10, 49:20, 50:3, 50:14, 51:7, 51:21, 51:24, 52:1, 52:5, 52:7, 54:24, 57:23, 62:3, 70:22, 71:18, 73:7, 73:13, 74:8, 74:15, 74:19, 74:23, 76:19, 76:25, 77:5, 78:6, 78:9, 78:14, 80:18, 81:4, 88:15, 90:6
**1182(f)** [10] - 36:15, 36:24, 40:10, 46:18, 51:13, 51:23, 52:14, 75:5, 77:3, 81:18
**1185** [2] - 38:2, 45:3
**1185(a** [1] - 88:15
**1185(a)(1** [31] - 36:16, 36:21, 36:22, 37:14, 37:22, 38:5, 38:20, 39:4, 39:12, 41:13, 41:19, 44:3, 45:5, 49:10, 50:4, 51:16, 51:19, 57:23, 62:3, 70:23, 71:18, 74:15, 74:19, 74:24, 76:19,

77:2, 77:4, 79:11, 79:19, 81:13, 91:14
**1185(a)(1)** [3] - 37:13, 73:7, 75:2
**12:22** [1] - 95:19
**13** [1] - 72:13
**1356** [1] - 49:23
**1356(m** [17] - 41:7, 49:3, 49:21, 56:24, 58:6, 59:4, 59:6, 59:18, 59:19, 60:2, 61:2, 61:6, 61:17, 63:25, 71:24, 95:6, 95:9
**1356(m)** [2] - 58:23, 59:15
**14** [2] - 7:10, 94:2
**15** [1] - 94:2
**15th** [2] - 7:1, 8:20
**17** [1] - 19:17
**17.7** [1] - 24:20
**17th** [1] - 7:5
**18** [2] - 13:16, 71:24
**18-6** [1] - 94:1
**1849** [1] - 48:9
**19** [1] - 1:5
**1918** [1] - 36:24
**1952** [1] - 46:6
**1988** [1] - 61:3
**1990** [1] - 61:3

**2**

**2** [3] - 5:8, 36:1, 39:5
**20,000** [2] - 67:8, 67:16
**2000** [1] - 24:20
**20001** [1] - 1:14
**20001-4412** [1] - 1:20
**2003** [1] - 24:24
**2019** [2] - 24:21, 88:18
**202** [3] - 1:14, 1:20, 2:5
**2020** [1] - 88:18
**2024** [1] - 96:13
**2025** [2] - 1:5, 11:13
**20530-0001** [1] - 2:5
**21** [2] - 7:11, 11:13
**212(f** [28] - 6:10, 15:1, 25:24, 26:23, 28:11, 37:23, 37:25, 38:1, 38:5, 38:23, 38:25, 39:23, 45:16, 54:10, 56:12, 58:2, 58:3, 58:18, 61:4, 61:6, 62:15, 62:24, 67:1, 91:13, 91:22, 94:18, 95:5, 95:14
**212(f)** [2] - 14:9, 67:5
**215(a)(1** [12] - 38:2,

39:23, 39:25, 40:4, 46:18, 49:20, 50:14, 50:20, 56:12, 94:19, 95:5, 95:14
**215(a)(1)** [2] - 48:21, 61:4
**22** [2] - 19:17, 25:2
**23rd** [1] - 96:13
**25** [1] - 64:11
**25-3675** [2] - 1:3, 3:3
**25-CV-3899** [1] - 34:17
**26.1** [1] - 24:20
**27** [1] - 25:3

**3**

**3(a** [1] - 11:19
**30** [1] - 41:24
**300,000** [2] - 21:2, 21:14
**31** [1] - 41:24
**32** [1] - 24:24
**32,800** [1] - 25:13
**35** [1] - 41:23

**4**

**400** [1] - 2:4
**45,400** [1] - 25:11
**46** [1] - 72:13

**5**

**500** [1] - 1:13
**514-4357** [1] - 2:5

**6**

**6.1** [1] - 25:4
**639-6025** [1] - 1:20
**65** [1] - 24:24
**65,000** [1] - 67:14

**7**

**7** [2] - 7:11, 39:6
**7.5** [1] - 25:5
**756-8988** [1] - 1:14

**8**

**8** [4] - 36:16, 41:19, 70:22, 80:18
**85(a)(1** [1] - 76:21

**9**

**90** [1] - 46:7
**900** [1] - 1:19
**950** [1] - 2:4

**A**

**a)(1** [5] - 36:25, 38:2, 39:13, 77:3, 80:19
**a.m** [1] - 1:6
**AAU** [10] - 4:8, 6:5, 18:9, 18:24, 22:8, 22:12, 22:13, 22:14, 33:17, 43:10
**AAU's** [1] - 8:16
**ability** [6] - 30:21, 67:11, 75:7, 81:1, 82:3, 96:7
**able** [5] - 8:20, 34:3, 45:20, 66:4, 88:3
**absence** [1] - 51:6
**absolutely** [2] - 18:19, 33:22
**abstract** [1] - 84:10
**abuse** [3] - 5:17, 66:8, 89:20
**abuses** [7] - 27:3, 27:5, 27:7, 27:8, 27:9, 47:4, 90:14
**abusing** [1] - 47:7
**access** [2] - 10:6, 10:8
**accordance** [1] - 72:21
**accuracy** [2] - 25:20, 26:17
**accurate** [2] - 69:3, 96:4
**achieve** [1] - 45:1
**acknowledge** [2] - 86:1
**acknowledged** [1] - 86:9
**acknowledges** [2] - 72:17, 75:21
**Act** [2] - 5:6, 5:12
**action** [12] - 12:19, 28:15, 36:2, 38:15, 56:1, 56:3, 56:4, 85:7, 92:22, 93:6, 93:7, 93:15
**Action** [2] - 1:3, 3:3
**actions** [6] - 5:3, 5:23, 11:1, 45:12, 54:12, 85:5
**activities** [2] - 44:7, 54:15
**actual** [1] - 43:7
**add** [10] - 41:16, 41:18, 47:25, 52:9, 54:14, 59:10, 60:16, 60:20, 60:21
**added** [1] - 60:15
**adding** [2] - 55:1, 68:24
**addition** [3] - 50:21,

73:20, 88:11
**additional** [6] - 39:3, 50:18, 60:1, 60:17, 64:4, 67:16
**address** [10] - 14:21, 27:8, 28:23, 34:19, 35:5, 43:13, 47:12, 84:1, 89:20, 90:14
**addressed** [1] - 27:9
**adds** [1] - 73:19
**adjudication** [2] - 49:6, 60:3
**adjudications** [1] - 34:5
**adjusts** [1] - 12:5
**administration** [7] - 44:10, 44:17, 60:17, 60:21, 60:25, 66:22, 72:7
**administration's** [1] - 44:12
**administrative** [4] - 7:3, 32:17, 34:4, 72:1
**Administrative** [1] - 5:6
**admissibility** [1] - 73:14
**admission** [1] - 5:14
**admissions** [1] - 90:24
**admit** [1] - 30:7
**admittedly** [1] - 73:24
**adopt** [1] - 61:7
**advertise** [1] - 66:1
**advocacy** [1] - 20:12
**affairs** [5] - 71:8, 71:11, 71:20, 76:7, 80:25
**affect** [1] - 11:6
**affected** [1] - 11:25
**affecting** [1] - 54:2
**affects** [1] - 9:17
**affirmatively** [1] - 22:15
**afford** [1] - 27:15
**afoul** [1] - 38:19
**afraid** [1] - 47:1
**agencies** [16] - 4:10, 9:25, 34:12, 34:13, 36:8, 43:15, 49:24, 55:14, 55:24, 56:16, 60:1, 68:8, 83:23, 85:13, 85:23, 93:5
**agencies'** [4] - 4:11, 5:4, 5:7, 5:10
**agency** [13] - 10:25, 12:19, 31:25, 32:16, 32:20, 36:1, 36:3, 36:6, 60:2, 84:11,

85:5, 85:7, 93:15
**agency's** [1] - 55:10
**ages** [1] - 25:2
**ago** [1] - 6:4
**agree** [20] - 15:5, 16:5, 17:4, 22:17, 22:22, 23:1, 40:22, 43:17, 44:19, 46:3, 55:8, 57:3, 65:22, 69:18, 79:1, 79:12, 79:14, 82:18, 84:5, 89:24
**agreed** [2] - 62:13, 74:11
**agrees** [1] - 14:25
**Aid** [2] - 33:10, 33:16
**aided** [1] - 2:14
**al** [3] - 1:3, 1:6, 3:5
**alien** [10] - 32:5, 33:21, 35:5, 37:1, 42:16, 76:7, 82:8, 82:11, 90:9, 90:12
**alien's** [1] - 90:12
**Aliens** [1] - 39:13
**aliens** [24] - 5:13, 11:19, 37:9, 40:14, 40:16, 52:4, 52:13, 52:20, 52:22, 53:9, 77:1, 78:2, 78:8, 78:10, 78:15, 78:17, 79:1, 79:22, 81:12, 91:5
**alleging** [1] - 5:1
**allow** [1] - 76:20
**allowed** [2] - 72:12, 74:11
**allowing** [1] - 55:23
**allows** [4] - 51:11, 72:7, 74:8, 93:14
**almost** [2] - 76:9, 83:14
**alter** [2] - 46:14, 91:18
**alternative** [1] - 86:6
**altogether** [1] - 83:10
**ambulance** [2] - 28:25
**amend** [1] - 58:14
**amended** [1] - 61:3
**Amendment** [3] - 20:11, 70:9, 75:20
**amendment** [1] - 12:21
**AMERICA** [1] - 1:3
**America** [3] - 3:4, 3:24, 91:2
**AMERICAN** [1] - 1:17
**American** [22] - 3:14, 3:20, 4:6, 5:19, 25:6, 25:8, 46:25, 47:2, 47:4, 47:6, 47:8, 47:19, 48:5, 50:10, 51:4, 53:15, 54:6,

88:4, 88:7, 89:13, 89:18, 91:3
**Americans** [2] - 26:14, 27:20
**amount** [1] - 94:25
**ample** [1] - 73:20
**amply** [1] - 5:16
**analysis** [7] - 37:25, 38:5, 38:24, 39:21, 62:23, 63:5, 63:12
**anesthesiology** [1] - 31:17
**announced** [1] - 25:11
**annual** [1] - 17:3
**anonymous** [1] - 20:11
**answer** [6] - 43:1, 49:17, 54:4, 54:8, 63:23, 92:3
**answers** [1] - 41:16
**anticipated** [1] - 14:17
**anyway** [1] - 92:3
**APA** [17] - 5:7, 5:21, 5:24, 32:24, 36:1, 36:7, 36:8, 56:7, 56:9, 69:11, 84:6, 84:18, 85:24, 86:5, 93:3, 93:4, 93:14
**apace** [1] - 9:8
**apex** [1] - 71:14
**apologize** [1] - 18:20
**APPEARANCES** [2] - 1:10, 2:1
**Appearances** [1] - 1:22
**applicant** [1] - 18:5
**applicants** [2] - 60:15, 78:4
**application** [2] - 42:3, 86:2
**applications** [3] - 10:14, 19:5, 19:9
**applied** [7] - 56:19, 68:11, 68:16, 69:1, 69:15, 72:22, 92:12
**applies** [9] - 9:22, 10:14, 41:7, 51:24, 69:3, 72:14, 74:25, 81:13, 86:7
**apply** [14] - 12:6, 12:12, 12:15, 12:21, 17:13, 17:19, 62:13, 68:9, 72:19, 72:20, 72:24, 78:14, 81:11, 86:3
**applying** [3] - 13:5, 68:14, 68:21
**appreciate** [6] - 9:3, 9:4, 9:13, 20:21, 33:4

**appropriate** [10] - 15:23, 20:7, 34:1, 38:25, 40:17, 40:25, 63:15, 65:4, 76:21, 80:15
**appropriately** [2] - 31:18, 40:5
**approval** [2] - 6:7, 25:13
**approved** [1] - 23:5
**arbitrary** [8] - 55:11, 55:17, 55:21, 55:24, 55:25, 56:3, 86:2, 93:16
**area** [1] - 72:16
**areas** [1] - 32:11
**argue** [4] - 14:18, 51:25, 86:24
**argued** [3] - 79:13, 79:14, 86:14
**arguing** [9] - 18:7, 18:9, 18:10, 18:14, 18:16, 27:2, 71:1, 74:4, 91:13
**argument** [31] - 14:6, 14:15, 32:14, 32:21, 33:5, 33:6, 40:6, 41:2, 41:19, 42:1, 42:10, 42:14, 42:21, 52:3, 52:6, 52:10, 52:15, 53:23, 55:21, 58:9, 58:11, 70:10, 73:8, 73:12, 75:16, 76:12, 87:19, 88:13, 88:24, 90:22, 92:18
**argumentation** [1] - 9:11
**arguments** [17] - 5:21, 6:6, 7:24, 7:25, 9:8, 37:10, 39:3, 44:3, 48:16, 48:17, 55:6, 56:2, 69:13, 85:4, 87:3, 88:12
**Arizona** [5] - 18:23, 20:1, 20:15, 21:23, 22:10
**Article** [2] - 57:8, 70:17
**articles** [3] - 14:1, 16:3, 66:13
**articulated** [2] - 73:18, 74:6
**aside** [2] - 17:11, 39:19
**aspect** [3] - 55:1, 86:9, 92:6
**aspects** [3] - 30:10, 35:21, 50:18
**assertion** [2] - 31:1, 82:2

**associated** [1] - 60:17
**association** [4] - 20:8, 20:10, 21:10, 69:14
**Association** [6] - 3:15, 3:19, 4:6, 17:17, 17:25, 23:24
**ASSOCIATION** [1] - 1:17
**associational** [5] - 18:10, 18:11, 18:14, 20:5, 70:11
**associations** [6] - 20:12, 20:20, 21:8, 30:9, 31:6, 70:3
**assume** [1] - 76:11
**assumed** [1] - 62:11
**assure** [1] - 16:23
**asylum** [5] - 60:3, 60:15, 60:20, 60:24, 61:14
**attach** [1] - 44:15
**attached** [1] - 66:12
**attack** [1] - 83:8
**attacking** [1] - 83:6
**attacks** [1] - 28:23
**attempt** [2] - 11:20, 37:2
**attempting** [1] - 39:14
**attend** [1] - 81:16
**attention** [1] - 29:8
**authorities** [3] - 44:5, 44:25, 46:6
**authority** [65] - 5:5, 5:23, 14:9, 15:11, 16:1, 17:21, 25:25, 28:6, 28:11, 29:12, 32:4, 32:9, 32:11, 33:14, 37:6, 38:3, 38:14, 38:19, 38:20, 38:22, 38:25, 39:24, 41:22, 42:6, 42:17, 45:6, 45:14, 45:23, 46:4, 48:23, 49:9, 50:9, 51:23, 52:19, 54:24, 57:10, 57:22, 58:4, 58:18, 58:24, 59:12, 60:24, 61:1, 61:5, 62:15, 63:19, 67:2, 70:24, 71:2, 71:3, 71:10, 80:21, 80:24, 81:23, 82:1, 82:21, 82:23, 91:14, 91:22, 91:25, 92:5, 94:22, 95:3, 95:5, 95:6
**authorization** [3] - 1:25, 2:12, 96:10
**authorize** [3] - 51:16, 74:20, 94:20
**authorized** [6] - 36:17,

39:22, 44:5, 48:21, 49:13, 62:5
**authorizes** [3] - 40:13, 42:25, 50:24
**available** [9] - 17:3, 28:21, 30:12, 45:1, 64:25, 65:1, 66:2, 66:3, 67:15
**Ave** [1] - 1:19
**Avenue** [1] - 2:4
**average** [1] - 24:24
**avoid** [1] - 8:9
**avoidance** [1] - 58:2
**aware** [3] - 16:20, 22:13, 63:7

## B

**bachelor's** [4] - 64:20, 64:21, 67:12, 67:15
**backdoor** [2] - 83:8, 93:16
**backdrop** [1] - 46:20
**background** [2] - 4:25, 5:25
**bad** [1] - 62:6
**balance** [1] - 67:20
**balanced** [1] - 26:21
**balancing** [1] - 14:22
**ball** [3] - 61:22, 62:4, 62:5
**ban** [1] - 77:12
**Band** [2] - 33:10, 33:16
**Band-Aid** [2] - 33:10, 33:16
**Bank** [1] - 25:1
**bans** [1] - 74:3
**bar** [6] - 44:9, 44:14, 44:18, 45:8, 54:19, 76:14
**barely** [1] - 29:9
**Barrett** [1] - 75:10
**barring** [1] - 46:8
**based** [12] - 18:11, 18:14, 30:12, 32:7, 56:16, 65:1, 66:8, 80:24, 84:1, 84:7, 85:20, 86:12
**bases** [1] - 89:23
**basic** [1] - 52:10
**basis** [18] - 30:22, 32:9, 32:10, 33:20, 33:21, 35:4, 35:5, 42:16, 42:18, 42:19, 42:23, 63:9, 70:24, 82:4, 82:12, 82:24
**BEFORE** [1] - 1:8
**begin** [1] - 72:6
**beginning** [1] - 54:13

behalf [1] - 4:3
behavior [1] - 57:18
below [1] - 96:11
belts [1] - 58:14
beneficial [2] - 28:4, 83:12
benefit [8] - 17:14, 17:19, 17:23, 18:6, 24:2, 57:14, 67:11, 76:1
benefits [6] - 13:18, 13:22, 15:16, 26:4, 26:8, 27:10
BERYL [1] - 1:8
beside [1] - 78:13
best [10] - 64:17, 64:24, 64:25, 65:8, 65:9, 65:16, 65:17, 96:6
bestow [1] - 94:22
Betsy [1] - 3:19
better [2] - 8:3, 33:13
between [8] - 6:8, 22:8, 49:1, 62:1, 62:24, 67:20, 77:2, 86:25
beyond [5] - 5:4, 11:11, 49:12, 56:18, 67:12
bhenthorne@jenner. com [1] - 1:21
big [1] - 79:3
bigger [2] - 29:20, 45:18
binding [1] - 24:10
bit [4] - 34:7, 46:3, 70:20, 71:22
blanche [3] - 38:3, 61:1, 95:4
Block [3] - 1:19, 3:14, 3:19
blocking [1] - 63:8
blue [4] - 34:21, 35:18, 43:15, 84:4
blunt [1] - 80:23
Boasberg [3] - 17:18, 17:25, 24:1
Boasberg's [2] - 17:16, 22:18
bolster [1] - 70:24
bones [1] - 47:10
border [2] - 51:2, 54:11
borders [2] - 15:12, 53:18
bothering [1] - 79:7
bounds [1] - 80:20
branches [2] - 75:14, 80:25
branches' [1] - 71:10

brave [3] - 20:15, 20:17, 22:2
Bridge [2] - 85:21, 86:4
brief [14] - 4:20, 4:25, 7:5, 29:10, 32:23, 41:24, 42:4, 43:5, 77:18, 91:23, 92:1, 93:21
briefing [5] - 4:18, 6:24, 6:25, 25:16, 70:19
briefly [2] - 69:4, 86:22
briefs [5] - 41:22, 48:9, 58:21, 62:1, 64:3
bring [4] - 9:11, 24:6, 70:3, 84:23
bringing [2] - 85:17, 86:13
broad [16] - 5:12, 15:11, 29:25, 30:9, 30:12, 37:6, 39:15, 40:18, 43:20, 45:7, 46:2, 46:4, 46:9, 57:21, 57:22, 81:2
broad-based [1] - 30:12
broader [8] - 26:6, 26:10, 26:17, 36:8, 43:4, 44:2, 50:23, 82:21
brought [4] - 8:11, 48:11, 58:12, 70:11
Budget [1] - 83:24
building [1] - 57:13
bulk [1] - 26:3
bunch [1] - 14:1
burden [1] - 75:25
business [11] - 19:8, 19:24, 20:14, 45:24, 65:8, 65:12, 65:13, 90:1, 90:6, 90:11
businesses [10] - 9:18, 47:2, 48:5, 50:10, 51:4, 53:4, 54:6, 64:24, 82:16, 89:18

## C

calculate [1] - 61:12
candid [1] - 14:2
candidate [10] - 64:24, 64:25, 65:1, 65:3, 65:8, 65:9, 65:16, 65:17, 65:18
candidates [2] - 34:20, 84:3

candidly [2] - 23:11, 44:24
cannot [5] - 8:18, 94:4, 94:19, 95:7, 95:15
canon [1] - 58:2
cap [30] - 8:16, 8:17, 16:13, 17:1, 17:2, 17:5, 17:10, 17:11, 18:15, 18:17, 19:1, 19:2, 19:13, 19:24, 21:15, 21:17, 21:20, 21:21, 22:19, 22:24, 23:2, 23:3, 23:6, 23:9, 23:12, 23:15, 67:8
cap-exempt [7] - 17:1, 17:10, 22:19, 22:24, 23:2, 23:6, 23:9
cap-subject [3] - 23:2, 23:3, 23:15
capacity [1] - 20:6
Capital [3] - 17:17, 17:25, 23:24
Capitol [1] - 1:13
capped [1] - 61:13
capricious [8] - 55:11, 55:17, 55:21, 55:24, 55:25, 56:3, 86:2, 93:17
care [1] - 29:20
carefully [1] - 10:3
cart [1] - 61:1
carte [2] - 38:3, 95:4
case [38] - 4:5, 9:14, 9:20, 9:23, 13:23, 14:23, 17:15, 17:25, 20:7, 20:19, 22:20, 24:1, 34:11, 34:12, 43:12, 43:15, 44:22, 46:20, 47:23, 48:9, 50:8, 55:2, 62:12, 69:22, 73:24, 83:24, 84:8, 84:11, 84:15, 86:8, 87:15, 88:17, 91:16, 92:12, 92:13, 92:22, 93:4, 93:8
cases [11] - 17:12, 58:21, 80:24, 85:21, 86:1, 86:4, 87:1, 87:4, 87:7, 92:24, 93:1
Cases [1] - 48:8
categorical [1] - 82:15
category [1] - 12:8
causing [1] - 90:9
caution [1] - 55:23
caveat [1] - 12:3
CC [1] - 18:1
center [1] - 29:16

centers [1] - 29:1
central [1] - 26:19
certain [7] - 16:8, 29:24, 46:5, 64:8, 73:5, 79:2, 89:9
certainly [10] - 7:2, 8:22, 29:21, 33:13, 40:7, 43:22, 55:16, 64:12, 80:19, 85:19
certainty [1] - 8:14
CERTIFICATE [1] - 96:1
certificate [1] - 96:8
certification [1] - 65:25
certify [1] - 96:3
chain [1] - 54:10
chair [1] - 24:19
challenge [10] - 18:2, 24:6, 35:25, 36:1, 55:17, 58:8, 69:6, 69:9, 84:19, 92:15
challengeable [1] - 85:15
challenged [5] - 5:5, 16:19, 85:1, 85:19, 85:24
challengers [1] - 63:5
challenges [4] - 37:12, 86:13, 88:19, 93:15
challenging [3] - 4:11, 86:17, 86:18
CHAMBER [2] - 1:3, 1:11
Chamber [32] - 3:3, 3:11, 3:24, 4:5, 4:7, 6:5, 8:15, 18:9, 18:24, 19:13, 19:21, 19:23, 20:5, 20:12, 21:1, 21:4, 21:10, 21:24, 22:3, 22:8, 22:14, 33:17, 33:23, 35:2, 35:17, 35:20, 43:11, 45:17, 92:22, 93:4
Chamber's [1] - 21:20
chambers [1] - 10:7
chance [1] - 17:20
change [7] - 16:1, 28:6, 28:13, 66:20, 66:24, 81:16, 94:13
characteristic [3] - 78:13, 78:16, 78:24
characterization [3] - 13:7, 47:1, 47:21
characterized [2] - 47:24, 57:3
charge [5] - 48:10, 60:2, 60:14, 61:10,

64:7
charges [1] - 48:4
CHARLES [1] - 1:18
cheapest [1] - 88:2
Chief [2] - 22:18, 62:20
Chinese [1] - 88:18
chock [1] - 24:18
choice [1] - 74:6
choices [1] - 49:1
Christmas [1] - 8:25
Circuit [12] - 62:12, 73:15, 73:19, 74:1, 74:11, 74:17, 87:5, 90:18, 90:20, 90:21, 92:11
Circuit's [2] - 18:1, 20:19
circumstance [2] - 29:14, 34:2
circumstances [1] - 12:7
citation [1] - 24:8
cite [5] - 20:7, 64:1, 86:8, 87:1, 90:19
cited [2] - 17:16, 48:9
Citizens [1] - 39:13
citizens [2] - 81:11, 88:7
City [1] - 34:16
civil [1] - 27:8
Civil [3] - 1:3, 2:4, 3:2
Claiborne [1] - 20:10
claim [14] - 5:21, 30:20, 36:4, 36:8, 56:7, 56:9, 57:14, 58:13, 61:5, 69:11, 84:22, 84:24
claimed [1] - 55:16
claims [12] - 5:1, 15:6, 36:2, 36:7, 42:2, 55:24, 56:13, 56:15, 56:20, 69:10, 70:3, 85:18
clarification [8] - 10:4, 11:1, 13:10, 21:13, 68:7, 82:6, 82:17, 85:23
clarifications [2] - 68:12, 68:13
clarified [2] - 11:10, 12:19
clarity [1] - 69:7
class [21] - 40:14, 52:4, 78:2, 78:3, 78:4, 78:8, 78:11, 78:12, 78:21, 78:22, 78:24, 79:5, 79:6, 79:15, 79:18, 79:20, 79:22, 80:7

**classes** [2] - 23:17, 37:9
**clause** [1] - 60:16
**claw** [1] - 16:1
**clear** [35] - 9:6, 9:21, 10:2, 10:9, 12:3, 12:13, 14:23, 18:20, 22:19, 23:14, 23:23, 25:19, 30:6, 35:23, 39:12, 42:1, 47:23, 48:19, 57:2, 57:5, 58:22, 59:17, 61:7, 61:16, 68:13, 73:16, 75:11, 76:15, 76:18, 80:11, 82:6, 84:18, 87:22
**clearly** [10] - 26:12, 39:6, 46:4, 50:11, 50:13, 57:10, 57:19, 77:12, 85:16, 89:2
**client** [1] - 22:15
**clients** [1] - 9:12
**close** [3] - 28:22, 29:16, 69:21
**closely** [1] - 9:25
**closing** [4] - 28:18, 29:2, 94:4, 94:6
**cloth** [1] - 67:5
**clue** [1] - 51:13
**co** [2] - 6:15, 41:16
**co-counsel** [1] - 6:15
**co-counsel's** [1] - 41:16
**code** [1] - 44:20
**coexisting** [1] - 38:12
**colleague** [5] - 25:24, 37:16, 40:24, 57:1, 95:1
**collected** [1] - 60:18
**college** [1] - 25:2
**COLUMBIA** [1] - 1:1
**combined** [1] - 80:19
**coming** [5] - 8:13, 48:11, 53:22, 76:7, 84:21
**commands** [1] - 46:8
**Commence** [1] - 20:13
**comment** [5] - 16:15, 59:2, 59:5, 61:11, 94:25
**Commerce** [7] - 3:3, 3:11, 3:24, 4:5, 21:1, 92:22, 93:4
**COMMERCE** [2] - 1:3, 1:11
**common** [2] - 78:13, 78:24
**communities** [1] - 94:3
**companies** [8] -

23:16, 25:7, 25:10, 25:11, 46:14, 66:9, 89:19, 91:4
**company** [5] - 19:3, 28:3, 32:7, 65:11, 82:24
**company-based** [1] - 32:7
**companywide** [5] - 30:23, 32:9, 33:21, 35:4, 42:18
**compelled** [2] - 55:15, 93:11
**complain** [1] - 88:5
**complaint** [3] - 4:18, 13:16, 58:14
**complete** [3] - 4:18, 77:10, 96:6
**completely** [1] - 81:14
**comply** [1] - 95:8
**comport** [1] - 67:5
**comports** [1] - 57:21
**comprehensive** [1] - 71:25
**computer** [3] - 2:14, 24:19, 25:3
**computer-aided** [1] - 2:14
**concern** [5] - 26:15, 33:18, 35:3, 43:18, 76:3
**concerning** [1] - 26:14
**concerns** [7] - 35:14, 35:15, 35:16, 43:11, 43:24, 91:1
**concert** [1] - 63:14
**concludes** [1] - 95:19
**conclusion** [1] - 89:7
**concrete** [1] - 17:6
**condition** [1] - 80:13
**conditions** [2] - 80:12, 80:13
**conduct** [4] - 44:17, 46:13, 53:1, 64:10
**confer** [1] - 22:15
**conferred** [2] - 50:11, 50:13
**confers** [2] - 30:20, 82:2
**conflict** [19] - 6:8, 39:24, 40:6, 49:1, 55:5, 61:16, 62:14, 62:21, 62:22, 63:7, 63:13, 63:16, 63:23, 63:25, 64:1, 73:11, 73:21, 88:8, 95:9
**conflicts** [9] - 14:7, 56:12, 56:24, 58:17, 58:18, 61:17, 62:25, 95:9, 95:11

**confluence** [1] - 91:17
**confused** [1] - 9:5
**confusion** [1] - 10:19
**Congress** [79] - 5:11, 15:7, 15:24, 16:7, 16:10, 16:11, 26:22, 26:24, 27:11, 28:7, 28:12, 28:14, 36:17, 40:9, 40:11, 45:5, 45:13, 45:19, 45:20, 45:21, 46:21, 48:7, 48:22, 49:1, 49:8, 49:12, 49:15, 51:10, 51:12, 51:22, 56:1, 57:10, 57:22, 58:23, 60:19, 60:23, 61:7, 61:9, 61:18, 61:20, 62:17, 63:2, 63:19, 64:1, 64:6, 64:11, 64:19, 64:20, 64:21, 65:24, 66:21, 66:23, 67:2, 67:7, 67:9, 67:13, 67:19, 67:21, 71:7, 71:16, 71:24, 73:5, 73:9, 73:16, 74:5, 76:13, 80:21, 87:22, 88:16, 94:12, 94:13, 94:14, 94:21, 95:2, 95:4, 95:14, 95:15
**Congress's** [6] - 14:7, 56:13, 81:1, 87:23, 95:10, 95:11
**congressional** [5] - 48:4, 48:15, 48:18, 61:23, 64:13
**consider** [2] - 4:5, 65:23
**consideration** [2] - 34:24, 65:19
**considerations** [1] - 35:1
**considered** [4] - 1:24, 2:11, 21:11, 96:8
**consistent** [4] - 20:18, 44:8, 50:14, 93:14
**constitutes** [1] - 96:4
**Constitution** [4] - 46:21, 48:13, 50:8, 57:8
**constitutional** [3] - 58:8, 70:21, 71:2
**constitutionally** [1] - 34:24
**construction** [2] - 39:17, 58:11
**consular** [4] - 71:13, 86:23, 87:16, 92:10
**contending** [1] - 5:22
**contested** [1] - 26:2

**contesting** [1] - 77:14
**context** [7] - 23:10, 26:25, 39:1, 39:4, 39:5, 84:15, 86:3
**contexts** [1] - 17:13
**continue** [1] - 62:19
**Continued** [2] - 1:22, 2:1
**contracting** [1] - 18:3
**contradict** [2] - 28:12, 94:20
**contrary** [6] - 37:12, 55:11, 55:19, 56:4, 86:4, 93:15
**contrary-to-law** [1] - 56:4
**contrast** [1] - 38:2
**control** [3] - 39:5, 51:2, 71:11
**Control** [1] - 39:13
**controlled** [1] - 92:11
**convey** [1] - 48:23
**conveyed** [1] - 54:24
**convinced** [1] - 77:4
**copied** [2] - 1:24, 2:11
**core** [5] - 46:21, 48:4, 48:15, 48:18, 76:13
**correct** [12] - 10:15, 10:16, 11:8, 11:15, 12:1, 12:2, 12:17, 12:22, 13:6, 15:15, 42:7, 58:16
**correctly** [1] - 85:10
**cost** [13] - 16:10, 16:12, 49:6, 59:7, 60:13, 60:20, 61:19, 61:25, 64:7, 65:1, 65:18, 65:23, 95:11
**costs** [8] - 28:3, 59:24, 60:5, 60:17, 72:1, 72:7, 72:9, 89:19
**counsel** [5] - 3:8, 6:15, 8:24, 10:3, 13:9
**counsel's** [1] - 41:16
**count** [2] - 10:5, 13:16
**Count** [5] - 5:3, 5:8, 35:24, 36:1, 56:7
**countermand** [2] - 26:24, 28:11
**countries** [2] - 63:8, 63:9
**country** [14] - 15:13, 25:4, 27:20, 29:20, 35:21, 44:19, 45:19, 68:15, 68:18, 68:19, 68:21, 68:25, 78:5, 88:10
**couple** [10] - 7:7, 27:23, 36:21, 47:20,

49:17, 54:3, 59:1, 91:10, 91:11, 92:8
**course** [7] - 6:22, 9:2, 13:14, 16:21, 17:10, 53:12, 56:1
**COURT** [140] - 1:1, 1:9, 3:12, 3:16, 3:21, 3:25, 4:4, 6:12, 6:23, 7:7, 7:20, 7:23, 8:9, 8:24, 9:4, 9:15, 11:4, 11:12, 11:18, 12:13, 12:20, 13:1, 13:8, 13:15, 13:25, 14:12, 15:5, 15:10, 15:20, 16:16, 16:22, 18:7, 18:22, 19:1, 19:5, 19:12, 19:20, 19:23, 20:14, 20:25, 21:12, 21:23, 22:2, 22:7, 22:10, 22:17, 22:22, 24:8, 24:13, 26:13, 27:2, 27:13, 29:7, 30:2, 30:5, 30:17, 31:22, 32:25, 33:2, 33:7, 33:17, 33:24, 34:10, 35:12, 35:14, 35:17, 35:23, 36:9, 36:13, 37:20, 38:9, 38:18, 39:10, 40:10, 41:2, 41:10, 41:12, 41:15, 42:5, 42:8, 43:10, 44:10, 45:4, 45:11, 45:17, 46:22, 47:16, 49:3, 49:21, 51:18, 52:16, 53:11, 55:3, 55:7, 55:20, 56:5, 56:22, 57:20, 58:7, 59:12, 60:7, 60:11, 62:2, 62:9, 64:5, 64:23, 65:3, 65:7, 65:15, 66:6, 67:23, 68:3, 69:4, 70:19, 71:22, 74:14, 75:4, 75:15, 75:23, 77:17, 77:23, 78:6, 79:3, 79:12, 79:21, 80:16, 81:20, 82:18, 83:22, 84:13, 85:2, 86:20, 87:10, 87:14, 89:15, 91:7, 91:9, 93:18, 94:8, 95:17
**Court** [64] - 2:8, 2:8, 5:22, 8:8, 8:20, 9:10, 9:13, 13:20, 14:3, 14:9, 14:16, 14:21, 14:25, 15:2, 15:19, 17:24, 20:6, 20:9, 20:19, 20:21, 22:1, 26:21, 30:8, 30:14, 32:22, 34:6, 36:11, 37:22, 37:23, 37:24,

38:3, 38:7, 38:9, 38:24, 40:3, 47:22, 48:9, 55:4, 56:2, 62:7, 62:10, 62:16, 63:4, 63:6, 63:7, 63:11, 63:20, 64:15, 66:17, 67:6, 73:19, 75:11, 76:16, 80:11, 80:24, 81:5, 83:18, 83:19, 87:4, 94:1, 94:10, 96:15
**court** [6] - 16:23, 34:12, 60:7, 74:5, 90:19, 92:2
**Court's** [6] - 6:4, 6:7, 26:10, 58:5, 93:1, 93:23
**COURTROOM** [1] - 3:2
**courts** [2] - 55:22, 79:15
**covenant** [1] - 44:15
**cover** [1] - 72:8
**covered** [1] - 11:13
**covers** [2] - 11:7, 89:23
**craft** [1] - 67:4
**create** [1] - 46:7
**created** [4] - 16:7, 51:10, 87:22
**creative** [1] - 75:4
**criminal** [1] - 27:8
**criteria** [1] - 18:4
**critical** [2] - 39:3, 66:14
**cross** [3] - 4:19, 4:23, 7:1
**cross-motions** [3] - 4:19, 4:23, 7:1
**curious** [1] - 77:24
**current** [4] - 11:4, 20:2, 44:10, 93:25
**cursory** [1] - 32:1
**cuts** [1] - 48:16

**D**

**D.C** [4] - 1:6, 18:1, 20:19, 92:11
**Daniels** [1] - 28:2
**darn** [1] - 39:12
**date** [6] - 7:7, 8:12, 11:3, 11:20, 68:15, 81:5
**Dated** [1] - 96:13
**Davila** [2] - 2:8, 96:14
**DAVILA** [1] - 96:3
**Davis** [1] - 4:3
**DAVIS** [28] - 2:3, 4:2, 68:1, 68:10, 69:12,

71:7, 72:5, 74:23, 75:6, 75:17, 76:4, 77:22, 78:1, 78:20, 79:9, 79:14, 79:25, 80:23, 82:14, 82:25, 84:9, 84:14, 85:11, 86:22, 87:12, 87:17, 89:24, 91:8
**days** [4] - 7:7, 7:10, 7:11
**DC** [3] - 1:14, 1:20, 2:5
**deal** [1] - 77:9
**dealt** [1] - 36:20
**debate** [5] - 78:12, 79:4, 94:11, 94:12
**December** [5] - 1:5, 7:1, 7:5, 8:20, 96:13
**decide** [2] - 20:4, 87:9
**decided** [4] - 16:8, 16:10, 26:25, 83:2
**deciding** [1] - 42:15
**decision** [16] - 17:17, 18:1, 22:18, 23:25, 42:22, 63:1, 82:19, 82:20, 83:1, 84:7, 84:10, 87:5, 87:16, 90:19, 93:17, 95:18
**decision-making** [2] - 84:7, 93:17
**decisions** [7] - 34:18, 66:23, 84:1, 84:6, 84:21, 90:24, 95:15
**Declaration** [1] - 19:16
**declaration** [16] - 19:21, 19:25, 20:16, 20:22, 21:3, 27:14, 28:2, 28:17, 29:1, 31:15, 57:6, 57:16, 70:8, 94:1, 94:8
**declarations** [4] - 18:22, 19:12, 25:16, 28:16
**deem** [2] - 40:16, 76:21
**deemed** [1] - 63:10
**deems** [1] - 80:15
**Defendants** [1] - 1:6
**DEFENDANTS** [1] - 2:2
**defendants** [34] - 4:1, 4:3, 4:17, 5:9, 5:15, 5:20, 7:9, 15:11, 16:19, 27:18, 27:24, 29:11, 30:15, 30:17, 30:25, 31:4, 34:22, 34:23, 35:19, 36:15, 43:14, 46:23, 47:6, 47:17, 53:19, 61:5, 69:6, 69:8, 71:1,

71:4, 77:24, 79:23, 82:1, 84:7
**defendants'** [16] - 4:19, 5:2, 5:23, 7:14, 10:3, 13:8, 24:13, 27:22, 36:17, 57:5, 69:12, 75:15, 84:5, 85:3, 85:6, 85:9
**defending** [2] - 24:14, 31:24
**defense** [1] - 67:24
**Defense** [1] - 18:3
**defer** [1] - 39:18
**define** [2] - 78:12, 79:5
**defined** [1] - 78:2
**definitely** [1] - 79:19
**degree** [4] - 64:20, 64:21, 67:12, 67:17
**degrees** [2] - 65:4, 67:9
**delay** [2] - 7:13, 8:10
**delegate** [2] - 58:25, 81:1
**delegated** [2] - 71:16, 95:4
**delegation** [7] - 58:4, 61:8, 71:5, 75:9, 76:17, 76:18, 95:6
**delegations** [1] - 71:19
**delivery** [1] - 29:18
**demand** [1] - 65:4
**democratic** [2] - 34:20, 84:3
**demonstrates** [1] - 20:7
**demonstrating** [3] - 14:5, 15:18, 32:18
**demonstration** [1] - 66:2
**denial** [1] - 31:8
**denials** [1] - 30:2
**deny** [2] - 17:21, 63:18
**depart** [2] - 37:2
**departing** [1] - 39:14
**DEPARTMENT** [1] - 1:5
**Department** [6] - 2:3, 3:4, 4:9, 18:3, 83:23
**departure** [2] - 75:1, 81:13
**DEPUTY** [1] - 3:2
**describe** [3] - 30:25, 32:23, 62:19
**described** [5] - 9:12, 21:21, 61:24, 62:1, 62:18
**describes** [3] - 19:17, 20:22, 94:2

**description** [1] - 69:2
**deserve** [1] - 64:9
**designed** [3] - 28:7, 57:18, 64:19
**despite** [3] - 22:17, 25:15, 85:17
**detail** [3] - 19:16, 21:22, 48:25
**detailed** [2] - 24:15
**determination** [1] - 82:15
**determinations** [2] - 42:12, 87:1
**determining** [1] - 82:8
**detriment** [1] - 52:2
**detrimental** [5] - 5:14, 54:16, 89:4, 89:10, 89:12
**Detroit** [2] - 85:20, 86:4
**develop** [2] - 33:6, 56:16
**DHS** [9] - 29:13, 29:25, 30:10, 30:11, 30:20, 32:4, 32:7, 81:23, 92:17
**dialogue** [1] - 45:2
**different** [8] - 12:8, 19:18, 31:9, 42:23, 63:24, 65:12, 74:1, 78:23
**differently** [1] - 16:6
**differs** [1] - 43:8
**difficult** [2] - 87:8, 87:20
**diligently** [1] - 9:13
**dire** [1] - 29:14
**direct** [9] - 21:2, 21:3, 21:5, 21:6, 21:7, 21:11, 21:14, 43:1, 73:21
**directed** [2] - 35:25, 49:23
**direction** [1] - 66:14
**directly** [6] - 39:24, 46:15, 46:16, 53:6, 79:16, 91:20
**disagree** [5] - 39:10, 39:20, 40:3, 65:11, 95:13
**disagrees** [2] - 26:12, 28:10
**disappears** [1] - 91:14
**disassembled** [3] - 1:24, 2:11, 96:9
**disclaims** [1] - 57:16
**disclosure** [1] - 70:10
**discovery** [1] - 34:2
**discretion** [21] - 5:13, 17:20, 31:23, 31:25,

32:8, 32:14, 32:16, 32:20, 33:18, 42:11, 42:15, 42:21, 43:2, 43:3, 43:12, 50:4, 62:1, 71:14, 72:7, 82:20, 83:2
**discretionary** [7] - 35:10, 41:22, 42:6, 43:21, 56:19, 86:11, 92:16
**discussed** [3] - 26:3, 50:21, 66:13
**diseases** [1] - 31:17
**dislike** [1] - 67:3
**dismiss** [5] - 4:18, 7:9, 7:14, 7:18, 9:6
**displace** [1] - 47:8
**displaced** [1] - 72:24
**dispute** [13] - 25:20, 26:22, 26:23, 28:13, 30:17, 31:1, 31:5, 46:23, 55:13, 71:7, 82:1, 83:1, 90:15
**disputed** [1] - 25:18
**disputing** [6] - 26:17, 31:12, 47:18, 69:8, 82:5, 82:12
**disregard** [1] - 67:4
**distinct** [2] - 21:19, 35:9
**distinction** [2] - 77:2, 86:24
**distinctions** [1] - 77:8
**Distributors** [1] - 18:2
**district** [2] - 74:5, 90:19
**DISTRICT** [3] - 1:1, 1:1, 1:9
**dividing** [1] - 6:6
**Division** [1] - 2:4
**doctrine** [1] - 76:15
**Document** [1] - 94:1
**document** [2] - 24:14, 39:9
**document-style** [1] - 39:9
**documents** [2] - 39:7, 85:24
**Doe** [2] - 87:5, 90:17
**dollars** [1] - 44:6
**domain** [1] - 46:10
**domestic** [10] - 28:21, 46:12, 53:1, 66:3, 88:25, 90:23, 90:25, 91:15, 91:19, 91:20
**done** [8] - 48:23, 58:16, 59:5, 60:19, 62:17, 67:2, 87:10, 91:21
**doubt** [1] - 64:9

6

**down** [2] - 41:3, 60:7
**drawn** [1] - 93:7
**Drexel** [2] - 75:22
**drive** [1] - 28:24
**dues** [1] - 21:4
**during** [1] - 53:12

## E

**economic** [9] - 5:18, 13:20, 13:22, 14:4, 14:10, 14:13, 26:4, 26:7, 47:12
**economy** [3] - 35:22, 66:15, 91:3
**edited** [2] - 1:24, 2:11
**education** [1] - 66:16
**effect** [6] - 10:22, 53:18, 53:21, 56:7, 64:16, 68:14
**effective** [3] - 11:3, 11:20, 68:14
**effectively** [2] - 46:12, 55:25
**effort** [1] - 15:23
**Eighth** [1] - 75:20
**either** [9] - 8:10, 29:11, 33:25, 49:9, 50:14, 69:7, 69:10, 69:15, 74:19
**Eldred** [1] - 3:23
**ELDRED** [2] - 1:12, 3:22
**eldred@mwe.com** [1] - 1:15
**elect** [2] - 34:19, 84:2
**elected** [2] - 34:20, 84:3
**elections** [2] - 34:21, 84:4
**eligibility** [2] - 11:6, 18:4
**eligible** [2] - 61:21, 95:12
**ELIZABETH** [2] - 1:18, 96:3
**Elizabeth** [2] - 2:8, 96:14
**elsewhere** [1] - 40:9
**EMMETT** [1] - 1:12
**Emmett** [1] - 3:23
**emphasizes** [1] - 68:22
**employ** [2] - 20:23, 25:13
**employees** [4] - 16:9, 25:12, 25:13, 66:10
**employer** [5] - 4:14, 19:24, 35:5, 43:13, 44:14

**employers** [13] - 9:18, 10:12, 17:2, 19:6, 44:7, 46:25, 47:4, 47:6, 47:19, 54:1, 64:8, 64:9, 66:1
**employment** [5] - 46:13, 51:2, 52:12, 52:25, 91:18
**enacted** [1] - 61:3
**encompass** [1] - 76:22
**encompassed** [1] - 80:10
**ended** [1] - 43:21
**ends** [1] - 45:1
**Energy** [1] - 83:23
**enforceable** [1] - 44:15
**engage** [3] - 23:16, 44:16, 85:13
**engaging** [1] - 86:11
**engineering** [1] - 25:3
**enjoined** [1] - 85:19
**enormous** [1] - 26:4
**enormously** [1] - 27:6
**ensure** [2] - 49:5, 60:5
**enter** [10] - 10:21, 11:19, 11:20, 37:2, 46:8, 51:1, 53:18, 68:18, 74:6
**entered** [1] - 34:13
**entering** [5] - 10:22, 39:14, 44:19, 63:8, 88:21
**entire** [2] - 35:21, 83:8
**entirely** [7] - 12:3, 14:6, 15:14, 41:5, 43:17, 44:18, 75:2
**entities** [8] - 20:3, 20:14, 21:19, 23:8, 53:6, 88:25, 91:19, 91:20
**entitled** [1] - 95:13
**entrusted** [1] - 57:9
**entry** [43] - 5:13, 10:22, 13:4, 15:12, 16:9, 27:17, 27:20, 40:13, 40:14, 40:16, 46:9, 52:13, 52:22, 53:8, 53:9, 54:2, 54:21, 67:20, 68:24, 70:25, 74:3, 74:25, 76:23, 77:1, 77:5, 77:6, 77:21, 78:5, 78:9, 78:15, 79:22, 79:23, 79:24, 80:3, 80:22, 81:12, 88:21, 89:3, 89:8, 89:14, 90:9, 91:5, 92:5
**entry-level** [4] - 16:9,

27:17, 27:20, 67:20
**enure** [1] - 76:1
**environment** [1] - 20:3
**equitable** [1] - 14:19
**especially** [4] - 23:11, 41:24, 79:19, 89:13
**essentially** [3] - 24:5, 40:1, 62:14
**establish** [1] - 17:7
**established** [1] - 67:7
**et** [3] - 1:3, 1:6, 3:5
**event** [1] - 92:6
**evidence** [1] - 26:4
**eviscerate** [1] - 24:5
**eviscerates** [1] - 73:13
**evolved** [1] - 53:12
**ewitkovsky** [1] - 1:15
**ewitkovsky-eldred@ mwe.com** [1] - 1:15
**exact** [2] - 63:3, 63:20
**exactly** [3] - 8:6, 27:19, 45:9
**examine** [1] - 22:6
**example** [8] - 5:22, 12:4, 27:18, 28:17, 29:14, 53:12, 53:20, 85:12
**examples** [3] - 25:9, 66:10, 74:17
**exceeds** [1] - 14:8
**except** [1] - 37:3
**exception** [7] - 29:12, 32:1, 32:2, 43:22, 57:11, 83:21, 92:16
**exceptions** [5] - 30:21, 30:24, 37:5, 82:3, 82:7
**excerpted** [1] - 42:9
**excess** [2] - 15:1, 58:17
**exclude** [1] - 82:17
**excludes** [1] - 73:1
**exclusive** [1] - 57:9
**exclusively** [1] - 36:7
**executive** [10] - 16:11, 28:15, 48:19, 58:25, 59:21, 60:1, 60:22, 63:10, 72:8, 94:23
**exempt** [18] - 8:16, 8:17, 17:1, 17:10, 18:15, 19:1, 19:2, 21:15, 21:17, 21:20, 22:19, 22:24, 23:2, 23:6, 23:9, 23:12, 69:17, 90:6
**exempted** [1] - 83:12
**exemption** [3] - 43:21, 56:19, 83:17
**exemptions** [1] - 50:10

**exercise** [18] - 16:24, 26:10, 31:25, 32:11, 32:13, 32:16, 33:18, 38:19, 38:25, 39:23, 43:2, 43:11, 48:19, 57:19, 59:4, 62:15, 62:24, 82:22
**exercised** [6] - 32:8, 42:15, 42:22, 43:3, 82:20, 95:2
**exhibited** [1] - 55:23
**exhibits** [4] - 6:25, 13:17, 15:22, 45:22
**exist** [4] - 16:9, 40:8, 50:12, 51:7
**existed** [2] - 50:16, 61:6
**existence** [3] - 27:23, 36:23, 43:22
**existent** [1] - 37:13
**existing** [3] - 10:13, 11:1, 28:10
**exists** [2] - 27:5, 88:9
**expansion** [2] - 86:10, 86:15
**explain** [4] - 30:19, 31:15, 34:23, 59:14
**explains** [2] - 28:2, 28:17
**explicit** [3] - 60:24, 77:18, 95:6
**explicitly** [4] - 11:22, 28:12, 61:17, 87:8
**exploitation** [1] - 66:7
**express** [4] - 53:2, 63:13, 64:12, 92:23
**expressly** [6] - 48:24, 49:13, 62:16, 62:19, 73:4, 87:19
**extend** [2] - 68:20, 70:5
**extensively** [2] - 36:21, 37:19
**extent** [3] - 57:11, 62:4, 68:12
**extraction** [1] - 57:4
**extraordinarily** [1] - 43:19

## F

**F-1** [1] - 12:20
**face** [2] - 43:8, 64:14
**facilitator** [1] - 24:21
**facilities** [1] - 19:11
**facility** [5] - 28:18, 28:20, 28:22, 28:23, 94:6
**facing** [2] - 25:3, 31:14

**fact** [12] - 14:6, 29:7, 32:3, 33:11, 43:3, 48:22, 53:8, 54:4, 68:22, 76:5, 90:5, 91:3
**factors** [1] - 14:19
**facts** [2] - 20:20, 30:18
**fails** [1] - 86:5
**fair** [1] - 79:9
**fairly** [3] - 13:17, 71:24, 76:24
**fall** [2] - 15:6, 23:18
**falls** [2] - 48:12, 76:11
**family** [1] - 90:13
**far** [3] - 24:15, 56:10, 74:11
**favor** [1] - 47:8
**favored** [1] - 83:19
**FCRR** [3] - 2:8, 96:3, 96:14
**feature** [1] - 43:19
**features** [1] - 54:22
**Federal** [1] - 25:1
**federal** [6] - 4:10, 34:11, 43:15, 57:12, 57:13, 83:23
**fee** [45] - 8:19, 10:24, 11:2, 12:6, 12:11, 35:10, 35:11, 41:6, 44:6, 46:12, 47:5, 47:16, 47:17, 47:18, 47:25, 48:23, 49:3, 49:12, 51:5, 52:12, 55:1, 57:2, 57:4, 57:6, 57:13, 59:21, 60:3, 60:20, 60:21, 60:24, 60:25, 61:5, 61:14, 64:11, 71:25, 72:2, 72:4, 72:14, 76:9, 91:16, 92:6, 95:2
**fee-generating** [1] - 61:5
**fee-setting** [1] - 72:2
**fees** [19] - 16:12, 16:13, 46:20, 46:24, 49:5, 49:9, 49:22, 49:24, 57:18, 59:3, 60:18, 61:10, 72:17, 72:19, 72:21, 72:24, 73:5, 73:10
**felt** [1] - 15:17
**few** [9] - 25:22, 25:25, 37:15, 37:17, 50:21, 51:22, 59:14, 82:10, 87:10
**field** [1] - 72:15
**file** [3] - 7:17, 8:18, 20:24
**filed** [9] - 4:5, 4:13,

4:17, 6:1, 7:4, 7:9, 11:3, 34:11, 77:18
**filing** [2] - 4:20, 9:5
**fill** [6] - 19:9, 31:16, 31:18, 53:14, 87:24, 88:4
**final** [2] - 7:5, 60:16
**findings** [1] - 24:15
**fine** [2] - 6:16, 26:23
**fines** [1] - 75:20
**first** [24] - 3:8, 6:1, 8:21, 10:18, 19:15, 26:1, 33:1, 35:9, 35:11, 37:18, 37:21, 47:21, 54:4, 59:2, 59:11, 59:19, 61:15, 61:17, 61:24, 66:4, 68:4, 78:7, 78:17, 93:22
**First** [2] - 20:11, 70:9
**fiscal** [1] - 24:25
**fit** [1] - 58:12
**five** [2] - 24:25, 44:18
**flatly** [2] - 33:10, 33:12
**flawed** [1] - 15:16
**floor** [1] - 60:22
**focus** [10] - 6:8, 6:10, 30:15, 48:17, 78:7, 79:15, 83:5, 93:21, 93:24
**focused** [7] - 22:25, 23:9, 33:11, 33:16, 34:9, 36:7, 37:19
**focusing** [3] - 6:8, 17:11, 36:14
**folks** [1] - 17:10
**follow** [3] - 14:24, 15:4, 44:19
**following** [1] - 9:24
**footnote** [1] - 29:9
**FOR** [4] - 1:1, 1:11, 1:17, 2:2
**forbidden** [1] - 73:10
**forcing** [1] - 70:10
**foreclose** [1] - 69:23
**foreclosed** [2] - 87:19, 92:25
**forecloses** [1] - 33:15
**foregoing** [1] - 96:4
**foreign** [12] - 4:14, 24:19, 24:21, 53:17, 63:8, 71:8, 71:11, 71:20, 76:7, 80:25, 89:9, 90:13
**forever** [1] - 81:7
**form** [4] - 49:11, 50:6, 51:4, 74:21
**former** [1] - 71:4
**forthcoming** [3] - 31:7, 31:19, 74:13

**forward** [2] - 3:6, 86:25
**forward-looking** [1] - 86:25
**four** [3] - 25:9, 25:10, 66:9
**frame** [2] - 16:4, 16:5
**framework** [3] - 23:24, 62:11, 62:13
**frankly** [1] - 83:9
**fraud** [2] - 72:19, 72:20
**free** [2] - 6:13, 87:12
**frequent** [1] - 17:12
**friend** [2] - 91:12, 92:24
**friend's** [1] - 92:15
**front** [2] - 29:21, 42:9
**fulfill** [1] - 28:21
**full** [7] - 9:10, 24:18, 49:6, 60:5, 77:4, 77:6, 96:5
**full-on** [1] - 77:6
**fully** [3] - 4:18, 7:15, 36:17
**function** [1] - 57:19
**fund** [2] - 57:7, 57:17
**fundamental** [1] - 72:23
**fundamentally** [2] - 28:6, 90:25
**future** [1] - 82:16
**FY** [1] - 24:24

## G

**general** [8] - 5:25, 9:16, 39:22, 57:7, 57:17, 61:4, 70:4, 70:9
**generally** [3] - 30:8, 64:3, 69:3
**generating** [1] - 61:5
**given** [11] - 5:12, 10:6, 15:7, 32:4, 36:8, 38:17, 45:14, 45:22, 60:24, 83:22, 92:4
**God** [1] - 29:21
**GoRural** [8] - 19:1, 19:2, 19:3, 20:1, 28:17, 29:1, 29:14, 31:13
**government** [24] - 7:3, 7:11, 11:10, 12:11, 14:17, 14:18, 14:24, 15:3, 17:14, 23:4, 24:7, 28:9, 31:11, 44:21, 51:8, 51:10, 51:13, 52:18, 57:12, 59:3, 77:9, 87:15,

92:1, 95:7
**government's** [3] - 12:24, 44:4, 54:9
**graduate** [2] - 66:15, 81:16
**graduates** [2] - 25:2, 31:16
**grant** [11] - 15:11, 30:21, 30:23, 32:4, 32:9, 34:18, 38:22, 42:6, 43:12, 82:3, 83:25
**granted** [10] - 16:2, 30:1, 34:8, 35:6, 42:11, 42:13, 42:17, 57:22, 81:23, 82:21
**grantee's** [2] - 34:19, 84:1
**great** [2] - 9:24, 21:22
**greater** [1] - 67:21
**grew** [2] - 24:20, 24:23
**group** [1] - 76:1
**guess** [1] - 45:10
**guidance** [5] - 32:6, 68:8, 85:23, 93:8, 93:10

## H

**H-1B** [86] - 4:14, 5:17, 9:18, 9:22, 9:24, 10:11, 10:13, 10:14, 11:1, 11:2, 11:4, 11:12, 11:23, 11:24, 12:5, 12:15, 12:21, 13:3, 13:5, 13:18, 13:23, 14:22, 15:16, 16:7, 16:8, 17:3, 19:6, 19:19, 20:23, 23:16, 24:22, 24:23, 25:9, 25:13, 26:4, 26:7, 26:20, 27:3, 27:16, 28:7, 28:20, 29:15, 37:11, 40:20, 44:14, 47:4, 47:7, 47:8, 49:13, 53:14, 53:17, 53:18, 53:21, 54:2, 61:19, 61:21, 63:22, 64:3, 65:24, 66:8, 66:11, 66:21, 68:17, 68:19, 68:21, 68:23, 69:20, 72:14, 78:4, 78:16, 78:17, 81:17, 82:9, 87:22, 87:23, 88:6, 88:9, 88:10, 89:12, 89:20, 89:25, 90:9, 95:2, 95:10
**H-1Bs** [6] - 10:20, 19:4, 68:16, 68:25,

80:2, 95:12
**half** [2] - 28:24, 94:7
**hand** [2] - 40:24, 41:9
**handed** [4] - 40:11, 45:6, 45:23, 80:21
**handful** [1] - 26:5
**happy** [5] - 36:11, 37:18, 41:14, 58:14, 87:17
**hard** [4] - 8:25, 45:7, 84:9, 87:15
**harder** [1] - 69:19
**Hardware** [1] - 20:10
**harm** [7] - 17:6, 17:7, 70:2, 70:16, 70:18, 83:6, 90:10
**harmful** [1] - 83:13
**harmony** [1] - 38:13
**harms** [4] - 29:4, 31:18, 93:24, 93:25
**Hawaii** [20] - 37:22, 38:3, 38:9, 39:21, 62:8, 62:11, 62:20, 63:1, 63:5, 67:6, 73:15, 74:3, 77:8, 80:11, 83:15, 87:4, 87:7, 87:19, 88:12, 91:2
**head** [1] - 29:17
**heading** [1] - 58:5
**health** [4] - 29:16, 29:19, 29:25, 91:1
**healthcare** [6] - 28:18, 28:19, 28:22, 29:1, 30:9, 30:10
**hear** [4] - 5:25, 6:19, 13:12, 44:21
**heard** [4] - 6:5, 37:17, 84:14, 86:16
**HEARING** [1] - 1:8
**hearing** [4] - 4:22, 4:24, 9:20, 18:16
**heart** [1] - 28:23
**heavily** [2] - 29:15, 77:14
**help** [1] - 63:15
**helpful** [1] - 9:19
**helping** [1] - 19:6
**helps** [1] - 22:3
**Henthorne** [1] - 3:19
**HENTHORNE** [2] - 1:18, 3:18
**hereby** [1] - 96:3
**HGI** [1] - 88:3
**high** [3] - 27:21, 64:18, 89:11
**high-paying** [1] - 27:21
**higher** [5] - 65:14, 67:15, 67:18, 76:14,

89:19
**highest** [1] - 25:4
**highly** [1] - 25:7
**Hill** [1] - 15:21
**hinges** [1] - 14:6
**hire** [8] - 4:14, 23:16, 23:19, 64:16, 64:24, 65:13, 65:16, 66:4
**hired** [4] - 19:18, 25:8, 27:16, 53:15
**hiring** [3] - 54:6, 65:23, 66:11
**historical** [1] - 50:15
**historically** [1] - 19:18
**history** [3] - 51:19, 75:12, 90:18
**hit** [1] - 89:16
**HJI** [4] - 27:14, 53:13
**hold** [1] - 13:4
**holder** [1] - 11:5
**holder's** [1] - 11:6
**holders** [2] - 10:13, 11:2
**holding** [2] - 4:24, 31:8
**holidays** [2] - 8:25, 9:14
**HOMELAND** [1] - 1:6
**Homeland** [4] - 3:4, 4:9, 42:11, 42:14
**homework** [2] - 59:3, 61:12
**honest** [2] - 18:8, 77:19
**Honor** [90] - 3:2, 3:9, 3:13, 3:18, 3:21, 3:22, 4:2, 6:3, 7:6, 7:16, 7:21, 8:3, 8:11, 9:2, 9:9, 10:17, 11:11, 11:17, 12:2, 12:19, 12:25, 13:7, 14:2, 14:14, 15:14, 16:4, 17:9, 18:19, 18:25, 19:8, 19:15, 19:22, 20:2, 20:18, 21:6, 21:8, 21:25, 22:9, 22:21, 22:24, 24:12, 25:23, 26:9, 26:19, 27:4, 28:1, 29:23, 30:7, 31:3, 31:11, 33:1, 33:4, 33:9, 33:22, 34:1, 35:8, 35:13, 35:16, 37:16, 38:16, 38:21, 39:16, 40:23, 41:11, 42:7, 50:20, 51:6, 54:23, 56:23, 58:1, 58:10, 59:7, 65:11, 65:20, 66:12, 67:25, 69:18, 70:1, 72:5,

73:16, 74:25, 79:10, 80:23, 86:22, 88:24, 89:25, 91:8, 92:12, 93:20, 94:9
**Honor's** [2] - 86:8
**HONORABLE** [1] - 1:8
**hoped** [1] - 23:7
**hospital** [3] - 29:15, 94:3, 94:5
**hospitals** [1] - 29:24
**host** [3] - 24:6, 29:3, 75:1
**hour** [1] - 28:24
**hours** [1] - 94:7
**HOWELL** [1] - 1:8
**Hughes** [12] - 3:10, 43:18, 48:17, 48:24, 49:18, 50:22, 55:5, 55:8, 56:22, 67:23, 91:11, 93:19
**HUGHES** [89] - 1:12, 3:9, 6:3, 6:22, 7:6, 7:16, 7:21, 8:3, 8:11, 9:2, 9:9, 10:16, 11:9, 11:16, 12:2, 12:18, 12:23, 13:6, 13:14, 13:24, 14:2, 14:14, 15:9, 15:14, 16:4, 16:21, 17:9, 18:19, 18:25, 19:3, 19:8, 19:15, 19:22, 20:2, 20:17, 21:6, 21:16, 21:25, 22:4, 22:9, 22:11, 22:21, 22:23, 24:12, 25:22, 26:19, 27:4, 28:1, 29:23, 30:4, 30:6, 31:3, 32:22, 33:1, 33:4, 33:9, 33:22, 34:1, 35:8, 35:13, 35:15, 35:20, 36:4, 36:11, 37:15, 37:21, 38:16, 38:21, 39:16, 40:23, 41:4, 41:11, 56:23, 58:1, 58:10, 59:14, 60:9, 60:12, 62:7, 62:10, 64:6, 65:2, 65:6, 65:10, 65:20, 66:12, 67:25, 93:20, 94:9
**hundreds** [3] - 19:18, 20:22, 23:16
**hurdle** [1] - 46:3
**hypotheticals** [1] - 44:22

## I

**Idaho** [1] - 19:11
**idea** [1] - 8:3

**identified** [4] - 26:1, 27:1, 54:23, 70:7
**identifies** [1] - 44:17
**identify** [2] - 3:7, 70:12
**III** [2] - 1:12, 70:17
**imagine** [1] - 51:9
**immediately** [1] - 10:20
**immemorial** [1] - 50:17
**immigrants** [3] - 11:23, 12:14, 40:15
**Immigration** [1] - 5:11
**immigration** [10] - 17:12, 17:19, 17:20, 44:18, 67:4, 71:8, 71:11, 71:20, 76:6, 80:25
**impact** [1] - 91:4
**impermissible** [1] - 92:6
**implement** [1] - 85:6
**implementation** [13] - 4:11, 5:7, 5:10, 32:19, 36:3, 36:6, 43:6, 43:7, 55:10, 69:10, 85:22, 86:18, 92:16
**implemented** [1] - 32:17
**implementing** [6] - 5:3, 10:1, 36:2, 56:17, 85:8, 93:5
**implications** [1] - 29:4
**implicit** [4] - 62:21, 62:24, 63:16, 64:12
**implicitly** [3] - 62:23, 62:25, 73:10
**implied** [3] - 70:21, 70:23, 71:2
**important** [8] - 26:11, 31:16, 46:19, 48:3, 50:8, 65:24, 76:13, 87:25
**impose** [15] - 40:16, 46:11, 47:23, 48:4, 49:11, 50:5, 50:10, 50:25, 51:22, 52:12, 52:19, 57:4, 74:21, 80:13, 89:19
**imposed** [3] - 44:7, 51:12, 77:21
**imposes** [3] - 28:3, 49:4, 69:24
**imposing** [6] - 35:9, 46:15, 52:20, 53:5, 75:25, 91:19
**impost** [1] - 48:12
**improper** [1] - 89:1

**improperly** [1] - 26:21
**INA** [28] - 6:8, 14:8, 15:1, 15:8, 26:25, 33:15, 36:10, 36:15, 36:23, 39:25, 40:2, 40:6, 40:8, 45:12, 51:21, 56:25, 58:18, 58:23, 62:25, 63:13, 63:14, 71:6, 73:13, 81:9, 94:21, 95:16
**INA's** [1] - 47:17
**inaccurate** [2] - 25:18, 26:15
**inadmissibility** [2] - 73:14, 90:24
**incent** [1] - 57:18
**incentives** [4] - 46:14, 53:4, 53:25, 91:19
**include** [3] - 21:20, 77:4, 77:6
**included** [3] - 14:11, 14:15, 31:3
**including** [7] - 16:14, 34:25, 49:13, 56:18, 66:15, 66:16, 87:7
**inconsistent** [1] - 67:6
**incorporate** [2] - 7:25, 8:5
**incorrect** [1] - 39:8
**independent** [2] - 16:22, 70:24
**indicated** [1] - 27:15
**indicates** [1] - 53:7
**individual** [22] - 30:22, 32:5, 33:20, 34:5, 35:4, 42:16, 42:23, 65:21, 82:4, 82:12, 82:23, 83:15, 84:6, 86:25
**individual-by-individual** [7] - 30:22, 32:5, 42:16, 42:23, 82:4, 82:12, 82:23
**individuals** [8] - 10:20, 12:6, 12:9, 12:11, 17:11, 23:6, 23:20, 67:17
**industries** [1] - 82:16
**industry** [3] - 30:9, 30:11, 31:10
**industrywide** [6] - 30:23, 32:6, 32:10, 35:4, 42:18, 82:24
**infectious** [1] - 31:17
**infinitely** [1] - 78:22
**influenced** [1] - 34:18
**influx** [1] - 24:21
**inform** [1] - 70:22
**information** [7] -

13:17, 20:4, 20:6, 20:8, 34:10, 63:10, 63:15
**informed** [1] - 30:11
**ingredient** [1] - 91:15
**inherent** [1] - 71:10
**injunction** [5] - 14:19, 15:3, 23:1, 23:10, 74:2
**injured** [4] - 69:17, 70:5, 70:6, 70:13
**injury** [1] - 70:17
**input** [1] - 90:5
**inside** [1] - 68:19
**instances** [1] - 92:24
**institution** [1] - 54:18
**institutions** [5] - 46:14, 48:5, 50:11, 51:4, 53:4
**intend** [1] - 9:11
**intended** [2] - 54:5, 64:16
**intending** [1] - 4:14
**interest** [9] - 9:24, 14:20, 14:24, 15:3, 36:18, 40:20, 44:13, 82:9, 89:10
**interested** [5] - 10:9, 31:4, 33:8, 77:17, 91:23
**interesting** [4] - 13:19, 27:13, 32:3, 53:11
**interests** [6] - 5:14, 37:8, 44:8, 45:24, 52:2, 54:16
**International** [1] - 85:20
**international** [1] - 31:16
**interpret** [1] - 15:25
**interpretation** [7] - 12:24, 15:7, 38:11, 39:8, 70:22, 71:17
**interpretation-wise** [1] - 38:11
**intersection** [1] - 76:6
**invitation** [1] - 41:20
**invocation** [1] - 52:1
**invoke** [4] - 71:3, 91:24, 92:1, 95:7
**invoked** [4] - 52:7, 52:8, 74:20
**involve** [1] - 87:2
**involving** [1] - 71:20
**irreparable** [3] - 70:2, 70:16, 70:18
**issue** [12] - 8:21, 10:9, 15:3, 17:12, 23:15, 29:21, 30:15, 37:16, 42:15, 42:18, 47:12,

52:15
**issued** [7] - 4:12, 9:16, 10:19, 10:25, 24:16, 53:3, 74:2
**issues** [6] - 5:1, 6:8, 13:2, 31:13, 32:24, 92:9
**IT** [2] - 24:23, 27:17
**IT-related** [1] - 27:17
**itself** [6] - 19:21, 24:11, 85:16, 85:18, 89:2, 91:24

## J

**Jackson** [1] - 57:6
**Jackson's** [1] - 57:16
**January** [1] - 8:22
**JD** [1] - 14:12
**Jenner** [3] - 1:19, 3:14, 3:19
**job** [6] - 13:19, 13:20, 27:17, 27:21, 65:5, 65:16
**jobs** [1] - 66:1
**Judge** [7] - 17:16, 17:18, 17:25, 22:18, 23:25, 62:12, 93:8
**judge** [1] - 34:12
**JUDGE** [1] - 1:9
**judgment** [11] - 4:16, 4:19, 4:23, 8:2, 14:10, 61:23, 64:13, 67:21, 94:10, 95:10, 95:11
**judgments** [5] - 14:8, 40:9, 65:13, 94:13, 94:14
**judiciability** [1] - 6:10
**jump** [1] - 41:3
**jurisdiction** [2] - 16:24, 16:25
**jurisdictional** [1] - 57:22
**Justice** [3] - 2:3, 48:10, 75:10
**Justice's** [1] - 62:20
**justified** [1] - 5:16

## K

**keep** [1] - 68:1
**key** [4] - 24:21, 38:8, 59:1, 61:9
**kind** [6] - 37:7, 57:11, 61:16, 78:22, 84:7, 90:2
**kinds** [2] - 9:18, 15:22
**knows** [1] - 73:5

## L

**label** [1] - 48:1
**labels** [1] - 48:2
**labor** [5] - 24:22, 65:25, 66:3, 88:2, 89:13
**laboratories** [1] - 94:5
**laboratory** [1] - 28:19
**laid** [1] - 25:7
**language** [4] - 34:14, 39:11, 59:9, 80:14
**large** [2] - 5:19, 25:14
**large-scale** [1] - 5:19
**largely** [1] - 16:5
**last** [4] - 4:20, 22:5, 24:25, 92:21
**law** [14] - 14:23, 14:24, 15:4, 17:15, 20:7, 20:19, 55:11, 56:4, 69:22, 70:10, 86:5, 93:16, 93:22, 94:16
**lawful** [4] - 55:14, 56:6, 56:14, 85:7
**laying** [1] - 66:10
**layoffs** [2] - 25:11, 44:16
**lays** [1] - 68:11
**leasing** [1] - 57:12
**least** [9] - 11:7, 13:16, 32:3, 38:23, 58:1, 65:22, 69:13, 69:14, 76:25
**lectern** [1] - 3:7
**left** [2] - 71:23, 91:13
**legal** [7] - 5:1, 5:4, 14:5, 15:6, 15:19, 34:23, 86:6
**legality** [4] - 83:20, 93:5, 93:6, 93:10
**legislation** [2] - 28:10, 28:13
**legislative** [2] - 51:19, 66:25
**legitimate** [1] - 35:1
**less** [4] - 33:15, 46:12, 51:3, 88:5
**level** [8] - 16:9, 27:17, 27:20, 49:5, 49:22, 60:4, 67:20, 89:14
**lie** [1] - 41:3
**likely** [1] - 74:2
**limit** [6] - 46:17, 49:8, 79:15, 83:2, 86:4, 93:9
**limitation** [4] - 39:2, 49:4, 49:11, 78:22
**limitations** [6] - 37:4, 38:23, 40:8, 59:1, 71:25, 95:8

**limited** [9] - 16:12, 16:23, 21:18, 36:1, 40:5, 73:7, 77:1, 77:3, 94:23
**limiting** [3] - 44:24, 44:25, 45:7
**limits** [16] - 11:19, 11:22, 50:4, 51:23, 52:20, 73:2, 73:5, 79:20, 80:17, 81:2, 81:18, 81:21, 85:11, 94:18, 94:25
**line** [6] - 10:6, 10:8, 17:15, 85:21, 86:1, 92:24
**list** [3] - 3:17, 48:1, 66:1
**listen** [1] - 10:3
**literally** [1] - 91:5
**litigation** [3] - 17:18, 22:5, 53:13
**LLP** [2] - 1:13, 1:19
**lobbying** [4] - 15:23, 45:18, 66:17, 66:19
**located** [2] - 34:19, 84:2
**logic** [1] - 73:9
**look** [8] - 24:17, 41:23, 45:13, 45:22, 45:23, 59:18, 77:15, 90:22
**looked** [4] - 15:23, 18:1, 42:8, 67:13
**looking** [7] - 23:14, 31:15, 48:10, 49:3, 67:19, 86:25, 88:5
**lose** [1] - 17:22
**loses** [1] - 24:3
**losing** [1] - 60:8
**lost** [1] - 63:6
**lottery** [14] - 8:13, 8:15, 17:5, 17:8, 19:14, 19:25, 23:4, 23:21, 24:3, 69:15, 69:17, 69:19, 69:21, 70:16
**love** [3] - 8:24, 9:1, 34:2
**low** [1] - 89:12
**low-wage** [1] - 89:12
**lowest** [1] - 65:9

## M

**machine** [1] - 2:14
**majority** [1] - 21:17
**majors** [1] - 25:3
**malleable** [1] - 79:17
**Management** [1] - 83:24
**mandamus** [1] - 87:14

**manner** [4] - 1:24, 2:11, 56:17, 96:10
**March** [3] - 8:14, 23:4, 23:5
**margins** [1] - 27:7
**mass** [1] - 10:19
**master's** [2] - 67:9, 67:17
**material** [1] - 14:15
**math** [1] - 24:19
**matter** [6] - 13:23, 16:24, 48:2, 75:24, 76:2, 90:13
**matters** [1] - 47:22
**maximum** [3] - 71:18, 71:19, 72:8
**McDermott** [3] - 1:13, 3:10, 3:23
**McLean** [1] - 48:10
**mean** [25] - 10:19, 13:25, 21:5, 24:9, 25:15, 27:13, 31:11, 39:11, 45:17, 46:7, 47:20, 47:22, 49:20, 54:3, 54:15, 54:22, 55:12, 65:2, 70:4, 80:11, 83:8, 85:2, 86:16, 89:22, 91:4
**meaning** [7] - 48:13, 52:13, 52:16, 53:9, 53:24, 75:7, 78:15
**meaningful** [1] - 81:18
**means** [7] - 21:4, 50:9, 51:1, 79:1, 88:14, 88:20, 90:6
**meant** [1] - 88:6
**measures** [1] - 57:9
**mechanism** [1] - 54:10
**mechanisms** [1] - 27:8
**medical** [5] - 29:17, 29:18, 31:16, 66:15, 66:16
**meed** [1] - 52:15
**meets** [1] - 6:7
**member** [14] - 18:23, 19:13, 19:21, 19:23, 21:9, 21:10, 21:11, 21:24, 22:3, 22:14, 65:21, 69:14
**member's** [1] - 19:25
**members** [41] - 8:13, 8:16, 17:4, 18:12, 18:15, 18:17, 18:21, 19:18, 20:22, 21:2, 21:3, 21:5, 21:7, 21:9, 21:14, 22:12, 22:13, 22:19, 22:25, 23:2, 23:3, 23:6,

23:9, 23:15, 35:2, 35:14, 35:17, 35:20, 43:10, 43:11, 65:15, 65:22, 69:16, 70:4, 70:6, 70:7, 70:12, 70:13
**members'** [2] - 18:9, 20:8
**membership** [4] - 20:10, 20:20, 21:20, 22:8
**mention** [3] - 32:1, 37:7, 37:8
**mentioned** [3] - 7:8, 29:9, 51:6
**mentions** [1] - 78:8
**mere** [1] - 14:12
**merely** [1] - 42:24
**merit** [1] - 92:18
**merits** [5] - 73:25, 74:12, 87:9, 90:20, 92:7
**mess** [1] - 6:17
**met** [1] - 52:1
**microphone** [1] - 25:23
**mid** [2] - 4:12, 9:17
**mid-September** [2] - 4:12, 9:17
**might** [11] - 10:8, 22:2, 29:16, 33:19, 48:1, 55:4, 69:20, 70:3, 70:16, 75:1, 83:16
**migrant** [1] - 44:20
**million** [1] - 44:6
**mind** [2] - 40:23, 68:2
**minimal** [1] - 29:10
**ministerial** [6] - 32:19, 42:3, 42:24, 43:6, 85:22, 86:9
**minority** [1] - 21:19
**minutes** [2] - 36:22, 37:17
**misleading** [1] - 26:6
**modify** [1] - 45:20
**moment** [1] - 6:4
**Monday** [4] - 4:17, 4:20, 7:9, 9:6
**monetary** [6] - 49:12, 50:5, 74:16, 74:18, 74:21, 75:25
**money** [1] - 90:12
**Montana** [1] - 19:11
**months** [1] - 27:24
**moot** [2] - 87:6, 90:21
**morning** [9] - 3:7, 3:9, 3:12, 3:18, 3:21, 3:22, 3:25, 4:2, 6:3
**Moss** [2] - 62:12, 93:8
**most** [5] - 36:7, 52:10,

72:23, 87:1, 94:17
**MOTION** [1] - 1:8
**motion** [11] - 4:17, 6:2, 7:9, 7:14, 7:17, 7:19, 7:25, 8:2, 8:4, 8:8, 9:6
**motions** [5] - 4:19, 4:20, 4:23, 7:1, 7:14
**move** [1] - 24:11
**moved** [1] - 4:16
**MR** [138] - 3:9, 3:13, 3:22, 4:2, 6:3, 6:22, 7:6, 7:16, 7:21, 8:3, 8:11, 9:2, 9:9, 10:16, 11:9, 11:16, 12:2, 12:18, 12:23, 13:6, 13:14, 13:24, 14:2, 14:14, 15:9, 15:14, 16:4, 16:21, 17:9, 18:19, 18:25, 19:3, 19:8, 19:15, 19:22, 20:2, 20:17, 21:6, 21:16, 21:25, 22:4, 22:9, 22:11, 22:21, 22:23, 24:12, 25:22, 26:19, 27:4, 28:1, 29:23, 30:4, 30:6, 31:3, 32:22, 33:1, 33:4, 33:9, 33:22, 34:1, 35:8, 35:13, 35:15, 35:20, 36:4, 36:11, 37:15, 37:21, 38:16, 38:21, 39:16, 40:23, 41:4, 41:11, 41:14, 41:20, 42:7, 43:1, 43:17, 44:12, 45:10, 45:15, 46:4, 47:14, 47:20, 49:17, 50:7, 52:9, 52:18, 54:3, 55:4, 55:12, 55:22, 56:9, 56:23, 58:1, 58:10, 59:14, 60:9, 60:12, 62:7, 62:10, 64:6, 65:2, 65:6, 65:10, 65:20, 66:12, 67:25, 68:1, 68:10, 69:12, 71:7, 72:5, 74:23, 75:6, 75:17, 76:4, 77:22, 78:1, 78:20, 79:9, 79:14, 79:25, 80:23, 82:14, 82:25, 84:9, 84:14, 85:11, 86:22, 87:12, 87:17, 89:24, 91:8, 91:10, 93:20, 94:9
**MS** [1] - 3:18
**multiple** [1] - 74:12
**must** [2] - 50:25, 59:20

## N

**N.W** [1] - 1:13
**NAACP** [1] - 70:10
**name** [3] - 3:17, 20:1, 20:15
**narrower** [1] - 52:21
**narrowing** [1] - 39:17
**National** [3] - 17:17, 17:24, 23:24
**national** [9] - 5:18, 34:21, 36:18, 37:8, 47:11, 71:21, 82:9, 84:3, 91:1
**nationals** [1] - 63:8
**naturalization** [2] - 49:7, 60:4
**Naturalization** [1] - 5:12
**nature** [7] - 39:7, 57:1, 63:22, 69:21, 70:15, 72:15, 90:1
**nearest** [2] - 28:23, 94:6
**necessarily** [3] - 75:7, 75:14, 81:9
**necessary** [2] - 63:11, 89:19
**need** [13] - 8:7, 8:14, 11:14, 13:9, 19:11, 22:15, 37:7, 38:4, 47:23, 48:18, 63:14, 70:12, 70:13
**needed** [1] - 7:4
**needs** [7] - 10:4, 14:10, 14:16, 14:21, 15:2, 45:13, 68:20
**neighborhood** [1] - 48:14
**never** [4] - 33:3, 38:18, 46:11, 88:14
**New** [3] - 1:19, 9:1, 25:2
**new** [13] - 4:13, 9:7, 9:10, 10:11, 10:14, 11:22, 13:5, 22:3, 22:5, 44:20, 67:4, 75:4, 75:8
**next** [3] - 16:17, 60:13, 61:2
**NFIB** [1] - 75:21
**nicer** [1] - 41:17
**Ninth** [11] - 62:12, 73:15, 73:19, 74:1, 74:11, 74:17, 87:5, 90:18, 90:20, 90:21
**nobody** [1] - 77:11
**noncitizens** [6] - 44:19, 48:11, 50:25, 52:20, 54:18, 54:20

**nondelegation** [1] - 76:14
**none** [2] - 51:12, 81:3
**nonimmigrants** [4] - 11:23, 12:14, 13:3, 40:15
**nonprofit** [4] - 21:18, 54:16, 54:17, 54:20
**nonprofits** [1] - 19:4
**nonreviewability** [5] - 71:13, 86:23, 87:16, 92:10, 92:18
**nonspeculative** [1] - 17:6
**normal** [2] - 20:24, 76:8
**North** [1] - 1:13
**notes** [2] - 68:2, 96:5
**nothing** [6] - 9:9, 33:13, 46:24, 49:22, 49:24, 50:2
**notice** [5] - 16:14, 59:2, 59:5, 61:11, 94:24
**noting** [1] - 6:4
**nowhere** [1] - 25:16
**null** [3] - 1:24, 2:11, 96:8
**nullify** [1] - 40:1
**number** [12] - 5:20, 9:17, 10:7, 10:8, 17:3, 37:10, 52:24, 84:16, 87:4, 91:16
**numbers** [4] - 25:14, 26:2, 47:10, 89:11
**NW** [1] - 1:19

## O

**obligation** [1] - 16:23
**obligations** [1] - 46:16
**obtain** [1] - 17:23
**obviously** [4] - 27:9, 55:13, 81:11, 83:11
**occupations** [1] - 24:19
**occupy** [1] - 72:15
**occurred** [2] - 30:7, 71:5
**OF** [8] - 1:1, 1:3, 1:3, 1:5, 1:8, 1:11, 1:17
**off-shoring** [1] - 44:16
**offers** [1] - 23:19
**Office** [1] - 83:24
**official** [1] - 96:15
**Official** [1] - 2:8
**officials** [1] - 63:14
**older** [2] - 51:20, 74:25
**once** [1] - 68:13

**one** [44] - 6:21, 6:23, 8:12, 22:25, 29:17, 32:3, 32:10, 33:12, 35:24, 37:16, 38:7, 38:10, 39:3, 39:24, 41:21, 44:5, 45:17, 46:12, 46:19, 48:20, 51:22, 52:1, 52:9, 52:19, 52:24, 54:25, 56:15, 61:17, 62:15, 68:19, 69:10, 69:14, 71:12, 72:20, 75:12, 75:18, 82:22, 87:9, 88:4, 88:23, 90:11, 91:16, 92:15, 94:19
**ones** [1] - 92:4
**open** [2] - 10:6, 43:21
**open-ended** [1] - 43:21
**opening** [5] - 6:1, 8:5, 23:10, 29:10, 41:23
**operate** [1] - 92:5
**operates** [3] - 46:15, 51:4, 53:5
**opinion** [5] - 62:20, 62:22, 73:25, 74:12, 90:18
**opportunities** [1] - 89:13
**opportunity** [5] - 17:23, 24:6, 30:19, 69:22, 69:23
**oppose** [3] - 7:25, 8:4, 8:8
**opposed** [2] - 77:25, 79:24
**opposition** [4] - 7:17, 8:1, 8:6, 24:13
**opted** [1] - 53:16
**optional** [1] - 59:23
**orally** [4] - 7:20, 7:24, 8:4, 8:8
**order** [4] - 46:13, 53:3, 89:20, 91:18
**ordered** [1] - 36:25
**orders** [2] - 37:4, 76:22
**organization** [1] - 6:18
**organizational** [1] - 18:11
**organizations** [2] - 20:12, 21:18
**organizing** [1] - 6:17
**ossifies** [1] - 75:7
**ossify** [1] - 75:13
**otherwise** [5] - 33:10, 36:25, 69:2, 88:1, 89:11
**outer** [1] - 80:20
**outfits** [1] - 45:18

**outlined** [1] - 54:12
**outset** [2] - 17:22, 66:13
**outside** [7] - 11:5, 23:20, 54:24, 68:15, 78:4, 86:3, 93:11
**overall** [1] - 27:10
**overcome** [2] - 80:5, 81:9
**overlap** [6] - 22:7, 37:23, 38:10, 75:3, 77:7, 77:10
**overlapping** [1] - 52:23
**override** [3] - 62:16, 83:18, 95:15
**overrides** [1] - 62:19
**overriding** [3] - 68:23, 72:25, 88:9
**overrule** [1] - 75:22
**overstep** [1] - 40:7
**own** [1] - 16:22

## P

**p.m** [1] - 95:19
**Pacito** [1] - 73:25
**page** [1] - 41:23
**pages** [3] - 41:24, 42:4, 42:8
**paid** [1] - 57:7
**pair** [2] - 19:9, 19:10
**panels** [1] - 74:1
**paper** [1] - 7:23
**papers** [9] - 8:5, 9:12, 14:15, 17:16, 18:8, 18:20, 23:1, 23:10, 79:4
**paragraph** [2] - 41:25, 89:15
**paragraphs** [2] - 19:17, 94:2
**parse** [1] - 77:9
**part** [19] - 4:23, 13:15, 26:11, 34:3, 46:24, 47:17, 48:6, 49:23, 51:18, 54:7, 54:8, 54:17, 58:8, 64:9, 64:10, 65:1, 66:7, 78:2, 82:22
**partially** [1] - 78:1
**participate** [1] - 23:21
**participation** [1] - 20:11
**particular** [11] - 17:19, 26:2, 32:5, 33:20, 35:5, 37:12, 40:8, 42:16, 79:18, 82:8, 82:11
**particularly** [2] - 76:5,

94:15
**parties** [4] - 3:6, 9:23, 47:24, 79:3
**partisan** [1] - 34:24
**parts** [1] - 39:25
**party** [3] - 1:25, 2:12, 96:10
**pass** [1] - 83:9
**Passenger** [1] - 48:8
**passenger** [1] - 48:10
**passport** [1] - 39:5
**past** [3] - 8:20, 69:15, 75:6
**PAUL** [1] - 1:12
**Paul** [2] - 3:10, 34:16
**pause** [1] - 88:23
**pausing** [1] - 86:23
**pay** [5] - 21:4, 64:9, 68:15, 68:22, 72:1
**paying** [1] - 27:21
**payment** [28] - 4:13, 9:21, 10:10, 10:13, 10:14, 11:15, 12:1, 12:16, 12:22, 13:3, 27:16, 35:3, 37:11, 47:6, 47:19, 49:12, 53:15, 68:7, 68:9, 69:24, 72:3, 75:19, 76:9, 76:22, 80:3, 81:25, 90:11, 90:14
**payments** [1] - 73:1
**penalty** [1] - 74:16
**pencil** [1] - 60:9
**pending** [3] - 7:1, 7:14, 11:12
**Pennsylvania** [1] - 2:4
**people** [19] - 9:17, 10:9, 13:1, 13:2, 15:24, 15:25, 21:4, 27:20, 29:19, 46:8, 65:13, 68:14, 68:16, 68:24, 76:1, 80:2, 80:3, 88:10, 94:5
**per** [1] - 48:10
**per-passenger** [1] - 48:10
**percent** [6] - 24:20, 24:24, 25:5
**percentage** [2] - 21:14, 21:16
**perfectly** [2] - 87:12, 87:17
**perform** [1] - 65:5
**perhaps** [1] - 78:19
**period** [1] - 11:7
**permeable** [1] - 78:22
**permissible** [1] - 34:25
**permission** [1] - 6:5
**person** [4] - 19:20,

27:17, 29:22, 78:18
**persons** [1] - 46:15
**perspective** [3] - 26:17, 27:22, 65:9
**persuade** [1] - 45:21
**persuaded** [2] - 16:3, 53:23
**persuasive** [1] - 24:9
**Peterson** [1] - 92:12
**petition** [1] - 12:10
**petitioning** [3] - 23:13, 25:12, 44:14
**petitions** [8] - 4:13, 8:17, 10:11, 11:3, 11:12, 11:23, 23:5, 49:14
**photocopied** [1] - 96:9
**phughes@mwe.com** [1] - 1:15
**pick** [2] - 45:2, 56:24
**picture** [1] - 26:7
**piece** [2] - 46:19, 83:5
**place** [6] - 31:22, 33:16, 35:11, 51:15, 66:4, 80:14
**placement** [1] - 19:3
**places** [1] - 19:4
**plaintiff** [2] - 3:10, 84:20
**PLAINTIFF** [2] - 1:11, 1:17
**Plaintiff** [2] - 3:14, 3:24
**Plaintiffs** [1] - 1:4
**plaintiffs** [51] - 4:5, 4:22, 5:1, 5:5, 6:1, 6:23, 7:4, 7:10, 7:13, 9:11, 15:5, 17:4, 18:14, 25:20, 26:16, 27:2, 29:8, 30:19, 30:25, 32:15, 33:8, 35:24, 36:20, 37:11, 42:10, 49:4, 51:25, 52:5, 55:8, 56:6, 64:23, 65:15, 69:7, 69:9, 71:23, 73:15, 74:4, 74:15, 75:16, 77:14, 78:7, 80:7, 80:12, 80:16, 83:5, 85:25, 86:16, 86:24, 89:17, 90:15, 91:9
**plaintiffs'** [22] - 3:8, 5:21, 7:17, 7:19, 8:2, 8:23, 13:16, 15:6, 16:19, 25:15, 31:24, 41:2, 41:19, 46:22, 52:3, 52:6, 68:5, 69:13, 73:8, 78:3, 82:2, 88:13

**planes** [1] - 10:21
**planning** [1] - 9:7
**plausible** [1] - 59:15
**play** [1] - 35:6
**plays** [1] - 44:2
**plus** [2] - 61:14
**pocket** [1] - 33:13
**point** [45] - 6:23, 17:7, 26:13, 26:20, 28:5, 29:6, 30:16, 37:21, 38:7, 40:24, 42:20, 43:2, 43:4, 44:2, 47:3, 50:8, 50:9, 50:22, 50:23, 56:25, 61:2, 61:24, 61:25, 64:6, 64:14, 66:19, 72:16, 72:18, 72:23, 73:24, 75:3, 76:5, 78:14, 79:9, 79:10, 82:19, 83:3, 83:14, 87:21, 90:8, 90:17, 92:14, 92:21, 93:25, 94:9
**pointed** [5] - 17:24, 32:22, 64:15, 70:8, 74:25
**pointing** [2] - 42:10, 66:7
**points** [8] - 23:4, 49:19, 50:21, 75:18, 91:10, 92:8, 93:21, 95:1
**policies** [1] - 86:25
**policy** [32] - 13:20, 14:4, 14:11, 14:13, 26:20, 26:22, 26:23, 28:7, 28:13, 29:20, 33:10, 35:1, 40:9, 45:21, 66:22, 67:3, 67:4, 74:5, 84:17, 84:19, 84:21, 84:24, 85:12, 87:23, 90:25, 93:22, 93:24, 94:10, 94:11, 95:14, 95:15
**political** [3] - 71:10, 75:14, 80:25
**politics** [1] - 34:24
**posed** [1] - 75:16
**Poser's** [1] - 94:1
**position** [12] - 31:4, 31:24, 34:23, 36:17, 46:23, 53:14, 53:16, 85:3, 85:7, 85:9, 88:2, 88:4
**positions** [3] - 66:3, 66:4, 87:25
**possibility** [4] - 18:5, 31:9, 73:1, 82:17
**possible** [5] - 10:10, 38:13, 83:7, 84:18,

84:23
**possibly** [3] - 43:13, 45:18, 85:1
**posturing** [1] - 36:8
**potential** [2] - 54:12, 81:21
**potentially** [1] - 57:13
**power** [25] - 16:1, 26:24, 38:1, 38:6, 39:22, 39:25, 40:5, 40:7, 46:21, 48:4, 48:6, 48:18, 50:3, 51:20, 59:4, 71:15, 71:19, 73:2, 76:13, 76:17, 80:18, 81:1, 92:1
**powers** [10] - 37:24, 48:15, 57:25, 58:8, 58:13, 70:21, 70:23, 75:13, 76:3, 87:3
**practical** [1] - 29:4
**practice** [3] - 50:15, 75:7, 75:13
**practices** [1] - 54:6
**precipice** [3] - 29:2, 94:4, 94:6
**precise** [2] - 47:21, 55:12
**precisely** [5] - 9:20, 9:21, 82:13, 89:16, 95:10
**predicate** [1] - 51:7
**prefer** [1] - 36:12
**preliminary** [2] - 23:1, 23:10
**premise** [1] - 55:13
**premised** [1] - 52:12
**prepared** [1] - 7:17
**prerequisites** [1] - 51:25
**prescribe** [1] - 37:5
**presence** [1] - 82:8
**present** [4] - 12:9, 20:6, 21:21, 34:3
**presentation** [1] - 58:3
**presented** [2] - 8:1, 18:22
**presenting** [1] - 9:7
**President** [51] - 5:12, 5:15, 15:12, 16:2, 26:11, 26:20, 26:24, 28:6, 28:10, 33:14, 36:18, 37:1, 37:5, 38:5, 39:23, 40:7, 40:12, 40:13, 40:19, 44:20, 45:6, 45:8, 45:14, 45:24, 49:10, 50:25, 51:11, 54:15, 54:19, 59:10, 59:19,

59:20, 59:23, 59:25, 60:25, 66:20, 67:1, 71:14, 75:8, 76:21, 78:9, 83:9, 85:19, 87:3, 88:17, 94:11, 94:13, 94:20, 95:5, 95:13
**President's** [18] - 5:4, 13:20, 14:8, 47:7, 47:11, 50:4, 51:23, 58:18, 70:21, 70:24, 71:2, 71:9, 72:3, 73:2, 80:18, 80:20, 92:1, 93:17
**presidential** [9] - 11:14, 11:18, 37:7, 49:8, 50:3, 56:1, 71:15, 93:6
**Presidential** [2] - 4:11, 5:2
**Presidents** [1] - 24:16
**press** [1] - 56:16
**pressed** [1] - 56:10
**pressing** [2] - 23:22, 56:20
**pressures** [1] - 20:3
**presumably** [1] - 30:14
**pretty** [11] - 19:16, 23:23, 24:18, 39:12, 42:1, 45:7, 51:13, 52:6, 55:2, 57:2
**preview** [1] - 37:18
**previously** [1] - 86:9
**principle** [3] - 44:24, 44:25, 92:12
**principles** [2] - 38:12, 45:8
**printed** [2] - 1:24, 2:11
**priority** [1] - 66:22
**pro** [1] - 33:19
**problem** [9] - 35:9, 45:11, 45:12, 54:7, 63:3, 63:20, 70:1, 78:2, 83:16
**problems** [1] - 90:16
**procedural** [1] - 7:10
**Procedure** [1] - 5:6
**proceed** [2] - 7:15, 9:8
**proceeding** [2] - 71:5, 95:19
**Proceedings** [1] - 2:14
**proceedings** [1] - 96:6
**process** [3] - 53:16, 66:1, 66:25
**proclamation** [111] - 5:7, 5:10, 5:16, 6:9, 9:16, 10:1, 10:18, 10:25, 11:6, 11:10,

11:14, 11:18, 11:21, 11:22, 12:1, 12:24, 14:6, 15:15, 17:7, 23:7, 24:11, 24:14, 24:17, 25:6, 25:10, 25:17, 25:21, 27:19, 27:23, 29:2, 29:4, 29:12, 30:5, 30:20, 30:24, 31:24, 32:12, 32:19, 33:11, 35:25, 36:3, 36:6, 36:19, 40:19, 41:23, 42:3, 42:24, 43:7, 43:9, 43:20, 43:23, 43:25, 46:1, 47:2, 47:3, 47:9, 49:2, 52:11, 52:24, 53:2, 53:3, 53:21, 54:5, 55:9, 55:10, 55:14, 55:16, 56:5, 56:11, 56:14, 56:17, 56:18, 57:21, 61:22, 62:4, 63:6, 63:22, 64:15, 66:6, 68:11, 69:9, 71:3, 74:3, 74:22, 77:25, 79:23, 81:23, 82:2, 82:22, 83:8, 83:9, 83:20, 85:5, 85:6, 85:8, 85:13, 85:16, 85:18, 86:17, 86:18, 87:2, 89:1, 89:2, 89:8, 89:16, 89:22, 91:20, 91:24, 92:17, 93:12, 93:25
**Proclamation** [2] - 4:12, 5:2
**proclamation's** [1] - 64:16
**proclamations** [3] - 24:16, 83:15, 90:4
**produced** [1] - 2:14
**product** [2] - 1:23, 2:10
**professor** [1] - 62:9
**program** [32] - 4:15, 5:17, 13:18, 13:23, 14:22, 15:16, 16:7, 16:8, 16:9, 16:10, 18:3, 24:23, 26:5, 26:7, 27:3, 27:5, 27:9, 28:7, 47:4, 47:8, 63:17, 63:18, 65:24, 66:8, 66:21, 67:7, 67:10, 68:23, 88:15, 89:12, 89:20, 89:21
**programs** [1] - 27:6
**prohibition** [3] - 73:22, 81:9, 81:10
**promulgated** [1] -

12

44:20
**property** [1] - 57:12
**propose** [1] - 55:5
**protected** [1] - 61:11
**protections** [2] -
16:14, 94:24
**proves** [1] - 88:3
**provide** [11] - 4:25,
13:17, 15:17, 20:4,
20:8, 22:1, 22:3,
27:11, 29:19, 38:20,
40:4
**provided** [6] - 30:8,
32:11, 38:15, 56:2,
60:14, 73:9
**provides** [3] - 15:17,
26:5, 26:7
**providing** [6] - 25:9,
49:6, 53:25, 60:3,
60:5, 63:10
**provision** [7] - 36:15,
36:16, 36:22, 42:1,
50:24, 51:1, 66:16
**provisions** [11] - 15:7,
15:10, 40:1, 41:7,
48:24, 50:3, 58:19,
59:13, 80:22, 94:21,
95:1
**proxy** [1] - 34:25
**public** [10] - 10:6,
10:8, 14:20, 14:23,
15:3, 16:14, 22:13,
61:11, 91:2, 94:24
**purely** [1] - 71:5
**purpose** [5] - 27:19,
39:22, 78:25, 88:21,
88:22
**purposes** [3] - 8:23,
63:11, 77:10
**pursuant** [2] - 30:5,
30:24
**pursue** [1] - 6:18
**pushed** [1] - 66:13
**put** [5] - 8:7, 26:3,
26:21, 48:1, 81:5
**puts** [1] - 7:11
**putting** [2] - 20:15,
53:25
**puzzled** [2] - 82:5,
92:14

## Q

**qualifications** [1] -
61:21
**qualified** [1] - 25:7
**qualifies** [1] - 77:13
**qualify** [1] - 52:24
**questioned** [1] - 77:11
**questions** [10] - 6:11,

6:13, 6:19, 6:20,
15:19, 62:14, 63:21,
63:24, 92:8, 93:23
**quick** [2] - 89:5, 91:10
**quid** [1] - 33:19
**quite** [10] - 14:3,
14:23, 18:8, 26:6,
34:6, 34:7, 63:24,
70:8, 77:14, 89:2
**quo** [1] - 33:19
**quote** [1] - 84:4
**quote/unquote** [2] -
63:2, 64:17
**quotes** [1] - 80:14
**quoting** [1] - 35:18

## R

**RAICES** [2] - 62:12,
93:8
**raise** [2] - 5:20, 70:1
**raised** [5] - 58:7,
58:10, 69:6, 80:16,
87:3
**raises** [1] - 57:23
**raising** [6] - 57:5,
57:10, 57:19, 58:4,
58:24, 94:22
**ran** [1] - 38:19
**range** [2] - 9:11, 27:8
**rate** [1] - 64:18
**rates** [1] - 25:4
**reach** [2] - 14:16, 58:3
**read** [16] - 15:21, 38:7,
38:12, 39:5, 39:8,
39:25, 42:20, 45:5,
47:3, 59:8, 64:5,
68:2, 84:13, 86:3,
94:8
**reading** [3] - 13:19,
59:15, 78:18
**real** [5] - 23:13, 29:3,
53:20, 88:19, 93:24
**real-world** [1] - 29:3
**really** [20] - 8:14,
14:13, 29:16, 31:22,
32:25, 36:20, 38:18,
51:2, 52:16, 70:9,
71:8, 73:21, 77:8,
83:7, 85:5, 88:24,
89:5, 90:13, 90:23,
91:25
**reason** [7] - 4:24,
14:11, 14:14, 26:3,
53:2, 63:5, 80:1
**reasonable** [3] - 37:3,
38:8, 39:2
**reasons** [10] - 22:25,
40:4, 48:20, 52:23,
54:25, 59:15, 62:18,

69:20, 71:12, 94:15
**receiving** [1] - 25:12
**recent** [2] - 14:7,
51:22
**recently** [2] - 34:20,
84:2
**recognize** [1] - 20:19
**recognizes** [1] - 95:7
**record** [11] - 3:7, 7:3,
8:8, 29:24, 30:8,
30:14, 32:18, 34:3,
34:4, 69:8, 94:2
**recovering** [1] - 59:24
**recovery** [8] - 16:12,
49:6, 59:7, 60:5,
60:13, 60:20, 61:13,
61:14
**recruiting** [1] - 23:17
**red** [1] - 40:12
**redefine** [1] - 80:7
**redefinition** [1] - 78:3
**reenter** [1] - 11:7
**refer** [2] - 5:6, 42:4
**referred** [1] - 17:1
**refers** [1] - 78:7
**reflected** [1] - 32:17
**refugees** [2] - 74:4,
74:6
**regarding** [2] - 49:13,
71:1
**regardless** [1] - 57:3
**regulate** [1] - 15:12
**regulated** [4] - 16:14,
47:24, 61:10, 94:24
**regulates** [1] - 46:12
**regulating** [4] - 47:2,
80:22, 88:25, 91:18
**regulation** [8] - 46:25,
47:3, 76:2, 77:21,
80:9, 88:14, 89:17,
90:23
**regulations** [4] - 37:4,
50:25, 76:22, 77:5
**rehash** [1] - 54:13
**reinforced** [2] - 48:22,
50:18
**reiterates** [1] - 34:23
**rejection** [1] - 64:12
**related** [1] - 27:17
**relatively** [1] - 89:11
**relevance** [1] - 41:8
**relevant** [3] - 14:1,
15:18, 42:2
**reliance** [1] - 22:18
**relied** [1] - 25:17
**relief** [4] - 70:2, 70:5,
70:14, 93:15
**relies** [1] - 92:24
**rely** [3] - 15:11, 36:15,
49:4

**relying** [1] - 29:15
**remedies** [1] - 6:9
**repeat** [1] - 13:9
**replacement** [1] - 5:19
**replacing** [1] - 66:11
**reply** [11] - 7:11, 8:6,
17:16, 28:2, 29:10,
31:23, 32:23, 41:24,
44:22, 77:17, 91:23
**reported** [1] - 2:14
**reporter** [1] - 60:8
**Reporter** [3] - 2:8, 2:8,
96:15
**reports** [2] - 25:10,
25:15
**represent** [4] - 20:5,
20:20, 29:24, 30:9
**representations** [1] -
68:6
**represents** [3] - 21:1,
35:17, 35:20
**requested** [3] - 4:22,
6:25, 29:25
**requests** [1] - 30:3
**require** [2] - 31:25,
38:12
**requirement** [3] -
48:3, 75:19, 81:24
**requirements** [6] -
47:24, 51:7, 51:12,
53:6, 82:10, 91:19
**requires** [4] - 4:13,
52:5, 68:7, 90:1
**rescind** [1] - 40:1
**research** [1] - 15:18
**Reserve** [1] - 25:1
**reserving** [1] - 95:18
**resist** [1] - 22:23
**resolution** [1] - 6:25
**resolve** [2] - 8:21,
94:17
**resolved** [1] - 7:8
**resolving** [2] - 7:13,
8:10
**respect** [1] - 74:14
**respective** [1] - 23:8
**respectively** [1] - 25:5
**respond** [3] - 7:10,
31:2, 86:21
**responded** [1] - 5:9
**response** [4] - 5:21,
14:17, 75:15, 91:9
**responses** [4] - 37:15,
47:20, 54:3, 72:5
**restricted** [2] - 59:7,
59:24
**restricting** [1] - 53:21
**restriction** [24] -
46:24, 49:11, 51:3,
52:13, 52:17, 53:8,

53:24, 54:1, 68:24,
69:1, 69:24, 74:10,
74:16, 74:21, 77:22,
77:23, 77:25, 80:4,
80:8, 80:9, 88:14,
90:10, 91:4
**restrictions** [13] -
40:16, 50:5, 51:17,
52:19, 52:22, 74:9,
74:14, 74:18, 76:20,
79:24, 80:15, 92:4
**restrictive** [1] - 76:24
**rests** [1] - 15:15
**result** [1] - 92:19
**retained** [1] - 59:6
**reticulated** [2] - 63:22,
87:22
**return** [1] - 81:22
**revenue** [7] - 57:5,
57:10, 57:19, 58:4,
58:24, 94:22, 95:3
**revenue-making** [1] -
95:3
**revenue-raising** [4] -
57:19, 58:4, 58:24,
94:22
**reversed** [1] - 90:20
**review** [11] - 5:23,
6:20, 55:25, 84:6,
84:19, 86:5, 92:23,
92:25, 93:5, 93:10,
93:17
**reviewable** [2] - 71:13,
85:5
**reviewed** [1] - 93:13
**ribbon** [1] - 40:12
**rid** [2] - 83:10, 88:7
**ride** [1] - 28:25
**rigorous** [1] - 63:12
**ripe** [1] - 7:15
**rise** [1] - 15:6
**robust** [1] - 15:17
**role** [3] - 28:22, 35:6,
71:8
**roles** [1] - 31:16
**room** [2] - 72:3, 78:18
**RPR** [3] - 2:8, 96:3,
96:14
**rulemaking** [8] -
16:15, 59:2, 59:5,
61:11, 72:11, 85:14,
86:11, 94:25
**rulemakings** [1] -
85:14
**rules** [6] - 7:10, 8:14,
37:3, 38:8, 76:22,
77:5
**ruling** [1] - 7:13
**rural** [5] - 19:10, 29:1,
29:15, 66:16, 94:2

13

## S

**sad** [1] - 62:6
**safety** [2] - 87:24, 91:2
**Saint** [1] - 34:16
**Sale** [1] - 87:4
**salvage** [1] - 43:23
**satisfactory** [1] - 8:22
**satisfied** [1] - 41:15
**saw** [2] - 22:25, 33:3
**scale** [1] - 5:19
**Schauf** [14] - 3:14, 3:16, 6:9, 25:24, 37:17, 37:19, 39:18, 40:24, 41:9, 41:12, 42:9, 57:3, 59:16, 66:17
**SCHAUF** [23] - 1:18, 3:13, 41:14, 41:20, 42:7, 43:1, 43:17, 44:12, 45:10, 45:15, 46:4, 47:14, 47:20, 49:17, 50:7, 52:9, 52:18, 54:3, 55:4, 55:12, 55:22, 56:9, 91:10
**schedule** [3] - 9:5, 71:25, 72:1
**scheme** [2] - 73:16, 73:18
**school** [1] - 81:16
**schools** [1] - 29:18
**Schulte** [3] - 1:13, 3:10, 3:23
**science** [1] - 25:3
**scope** [10] - 6:10, 9:16, 11:11, 11:19, 11:22, 25:24, 51:23, 71:18, 81:25, 93:11
**scratch** [1] - 29:17
**screenshot** [2] - 1:24, 2:11
**scrutiny** [1] - 57:25
**seasoned** [1] - 67:20
**Sebelius** [2] - 75:21
**second** [11] - 16:17, 38:7, 52:4, 53:1, 54:8, 59:6, 61:13, 61:18, 61:25, 64:1, 93:22
**secretaries** [1] - 4:10
**Secretary** [13] - 29:13, 30:20, 30:22, 32:7, 42:12, 42:14, 81:24, 82:3, 82:7, 82:14, 82:19, 84:17, 86:10
**Secretary's** [2] - 42:6, 42:21
**Section** [14] - 11:19, 11:21, 14:9, 30:24,

36:16, 41:19, 45:3, 54:10, 54:24, 57:8, 70:22, 71:24, 80:18, 81:22
**section** [4] - 72:10, 72:18, 73:4, 89:6
**sections** [2] - 5:11, 42:20
**sectors** [1] - 35:21
**Security** [4] - 3:4, 4:9, 42:12, 42:14
**security** [5] - 5:18, 47:11, 47:12, 71:21, 91:1
**SECURITY** [1] - 1:6
**see** [14] - 18:8, 24:17, 25:16, 34:5, 37:25, 42:10, 42:13, 45:7, 75:18, 80:9, 82:18, 89:5, 91:23
**seek** [4] - 69:23, 78:15, 81:16, 88:10
**seeking** [7] - 18:6, 35:3, 68:25, 78:17, 78:25, 80:2, 89:19
**seeks** [1] - 47:12
**seem** [1] - 84:23
**sees** [1] - 51:10
**segments** [1] - 66:15
**segue** [1] - 40:25
**seize** [1] - 27:18
**selection** [2] - 34:17, 83:25
**selling** [1] - 57:12
**SENIOR** [1] - 1:9
**sense** [4] - 76:25, 80:8, 83:4, 89:25
**sent** [1] - 13:25
**sentence** [2] - 60:14, 78:7
**separate** [4] - 58:12, 78:21, 84:22, 84:23
**separately** [2] - 85:1, 85:15
**separation** [4] - 57:24, 58:8, 58:13, 76:3
**September** [3] - 4:12, 9:17, 11:13
**series** [2] - 6:12, 62:14
**seriously** [2] - 73:12, 88:13
**serve** [1] - 34:25
**serves** [1] - 94:3
**service** [2] - 58:11, 60:14
**services** [3] - 49:7, 60:4, 60:6
**serving** [1] - 45:24
**set** [17] - 4:20, 11:21, 13:20, 16:11, 25:21,

39:19, 47:9, 49:5, 49:22, 59:2, 60:4, 60:19, 64:12, 64:17, 65:5, 72:8, 88:16
**sets** [1] - 24:14
**setting** [4] - 14:3, 17:11, 49:24, 72:2
**several** [5] - 19:17, 28:16, 72:5, 79:14, 93:23
**shall** [6] - 1:23, 2:10, 34:7, 37:1, 49:25, 96:8
**shalt** [1] - 46:8
**shape** [1] - 64:9
**share** [4] - 24:23, 43:10, 45:21, 68:9
**Shen** [4] - 19:15, 21:2, 21:22, 70:8
**Shen's** [1] - 20:22
**shift** [2] - 53:3, 54:5
**shoring** [1] - 44:16
**shorthand** [1] - 2:14
**shortly** [1] - 12:5
**show** [5] - 38:25, 48:25, 59:3, 61:12, 70:13
**showing** [2] - 17:6, 32:15
**shows** [2] - 29:1, 95:2
**shutdown** [1] - 7:3
**shy** [1] - 60:11
**sic** [4] - 5:12, 52:15, 63:14, 88:3
**side** [2] - 8:10, 91:12
**sides** [2] - 4:16, 9:7
**sign** [1] - 44:23
**signatory** [3] - 1:25, 2:12, 96:10
**significant** [6] - 13:15, 20:3, 22:7, 28:3, 41:8, 80:17
**significantly** [1] - 69:15
**silent** [1] - 50:2
**silently** [1] - 95:4
**similar** [5] - 37:24, 44:9, 44:14, 60:14, 84:7
**similarly** [1] - 85:8
**simple** [1] - 35:12
**simply** [4] - 34:8, 49:10, 51:16, 95:2
**simultaneously** [2] - 25:8, 25:12
**situations** [1] - 74:7
**skill** [1] - 65:4
**skilled** [1] - 25:8
**Skinner** [9] - 47:23, 50:8, 58:20, 75:16,

75:23, 76:4, 76:12
**slightly** [1] - 16:5
**slow** [1] - 60:7
**small** [1] - 92:14
**so-called** [3] - 34:21, 35:18, 84:4
**solely** [1] - 18:15
**solved** [2] - 63:3, 63:19
**solving** [1] - 33:12
**someone** [1] - 54:11
**somewhere** [2] - 51:14, 91:15
**sorry** [1] - 60:9
**sort** [36] - 13:25, 14:22, 37:24, 38:6, 43:4, 43:19, 44:1, 46:8, 46:19, 47:21, 48:1, 48:23, 50:17, 50:23, 54:13, 56:18, 57:13, 61:4, 61:5, 61:6, 62:11, 67:10, 68:11, 71:10, 76:6, 78:13, 83:7, 83:16, 85:21, 86:1, 86:11, 86:24, 87:22, 89:24, 90:1, 91:23
**sorts** [4] - 44:22, 50:10, 51:16, 57:9
**sought** [1] - 27:11
**sound** [1] - 82:11
**space** [1] - 63:3
**speaks** [1] - 76:4
**special** [1] - 67:10
**specialized** [3] - 19:10, 66:3, 87:25
**specialty** [1] - 19:11
**specific** [10] - 8:12, 15:10, 25:17, 34:14, 41:6, 49:18, 50:22, 73:22, 81:8, 81:10
**specifically** [4] - 26:25, 27:1, 46:25, 72:6
**specifics** [1] - 73:13
**speculated** [1] - 45:9
**speculative** [2] - 69:21, 70:15
**spend** [2] - 29:11, 36:21
**spent** [1] - 6:17
**sponsorship** [1] - 90:1
**sponsorships** [1] - 90:3
**squarely** [1] - 86:6
**staff** [1] - 28:19
**stake** [1] - 5:1
**standards** [2] - 16:8, 64:18

**standing** [24] - 13:2, 16:18, 16:20, 17:22, 18:10, 18:11, 18:12, 18:14, 18:18, 20:6, 22:3, 22:19, 23:25, 24:4, 36:23, 69:5, 69:6, 69:8, 69:9, 69:13, 70:1, 70:3, 70:12
**start** [15] - 3:8, 6:21, 9:19, 10:2, 23:18, 36:5, 44:1, 50:20, 53:16, 59:16, 68:3, 81:25, 84:21, 91:12, 93:3
**started** [1] - 51:19
**starting** [4] - 32:3, 50:7, 50:9, 56:25
**starts** [3] - 24:13, 39:13, 41:25
**State** [2] - 4:9, 21:23
**state** [4] - 34:19, 34:20, 84:2, 84:3
**State's** [1] - 5:18
**statement** [11] - 30:18, 37:7, 47:23, 48:19, 58:22, 59:17, 59:18, 77:19, 83:22, 87:23
**States** [41] - 2:3, 3:3, 3:4, 3:11, 3:24, 5:15, 10:22, 11:5, 11:9, 11:20, 11:24, 12:4, 12:9, 12:14, 12:21, 13:5, 23:20, 26:8, 37:3, 39:15, 40:20, 44:8, 44:11, 44:13, 46:9, 48:11, 51:3, 52:3, 53:1, 53:5, 53:22, 54:1, 54:6, 54:17, 63:9, 80:22, 81:15, 82:9, 88:1, 89:9, 89:10
**states** [6] - 34:21, 35:18, 35:19, 43:16, 84:4
**STATES** [5] - 1:1, 1:3, 1:5, 1:9, 1:11
**statistics** [9] - 24:18, 25:17, 25:21, 26:1, 26:6, 26:14, 26:18, 47:9, 66:9
**status** [2] - 10:10, 22:12
**statute** [16] - 37:12, 40:11, 46:9, 49:3, 49:9, 50:16, 51:10, 53:9, 59:8, 63:23, 64:10, 66:24, 72:2, 72:18, 75:12, 80:10
**statutes** [12] - 15:24,

14

16:1, 45:8, 45:20, 46:2, 50:5, 50:16, 50:19, 56:13, 62:6, 64:2, 94:19
**statutory** [8] - 15:6, 36:22, 38:10, 38:11, 39:11, 39:24, 49:19, 58:11
**stay** [2] - 68:20, 90:19
**stays** [2] - 74:2, 74:12
**STEM** [1] - 24:22
**stenographic** [1] - 96:5
**step** [1] - 41:21
**stepped** [1] - 63:3
**steps** [1] - 36:18
**sticking** [1] - 32:10
**still** [8] - 23:14, 39:23, 40:5, 68:17, 72:24, 88:9, 88:10, 90:7
**stipulated** [5] - 34:15, 34:17, 43:12, 84:8, 84:11
**stipulation** [5] - 34:11, 34:13, 34:22, 83:23, 84:5
**stopping** [1] - 54:11
**straight** [1] - 13:10
**straight-up** [1] - 13:10
**straightforward** [2] - 55:2, 94:17
**strange** [1] - 61:7
**Street** [1] - 1:13
**strongest** [1] - 24:8
**strongly** [1] - 66:14
**structure** [1] - 47:17
**structured** [1] - 66:21
**student** [1] - 12:20
**students** [2] - 67:9, 88:18
**studies** [2] - 15:22, 16:3
**study** [1] - 25:1
**studying** [1] - 12:20
**style** [1] - 39:9
**subject** [25] - 10:12, 10:23, 11:2, 11:25, 12:22, 13:2, 16:24, 17:2, 17:4, 18:17, 18:21, 19:2, 19:13, 19:24, 21:15, 21:21, 23:2, 23:3, 23:15, 37:4, 68:6, 69:14, 76:1, 88:11, 90:3
**submit** [1] - 19:25
**submitted** [1] - 25:16
**subparts** [1] - 39:5
**Subsection** [4] - 72:6, 72:11, 72:16, 73:4
**subsection** [2] -

72:12, 73:3
**subsequent** [2] - 10:25, 12:19
**subset** [1] - 79:2
**substantial** [1] - 19:16
**substantially** [1] - 37:23
**substantive** [2] - 51:17, 52:11
**succeed** [1] - 74:3
**sudden** [1] - 24:3
**suddenly** [1] - 90:6
**sue** [1] - 18:12
**sued** [1] - 4:8
**sufficient** [1] - 64:21
**sufficiently** [1] - 38:14
**suggest** [3] - 25:23, 66:23, 95:3
**suggestion** [1] - 92:15
**suit** [1] - 70:11
**Suite** [2] - 1:19, 2:4
**summary** [4] - 4:16, 4:19, 4:23, 8:2
**summer** [1] - 23:18
**supplement** [1] - 73:20
**supplemented** [1] - 11:14
**supplementing** [1] - 88:12
**support** [1] - 36:16
**supportive** [1] - 24:18
**suppose** [1] - 54:15
**supposed** [2] - 13:22, 74:12
**Supreme** [17] - 37:22, 38:3, 38:9, 47:22, 48:9, 62:7, 62:10, 67:6, 73:19, 75:11, 76:16, 80:11, 80:24, 81:5, 83:18, 83:19, 87:4
**surefire** [1] - 44:23
**surprises** [1] - 9:10
**surprising** [1] - 38:23
**suspend** [7] - 5:13, 40:13, 40:14, 40:20, 79:2, 79:21, 81:24
**suspended** [2] - 78:5, 80:3
**suspenders** [1] - 58:15
**suspension** [15] - 74:9, 74:10, 77:5, 77:12, 77:13, 77:15, 77:19, 77:25, 79:23, 80:1, 80:4, 88:15, 91:5, 91:22, 91:25
**suspensions** [2] - 76:20, 77:6

**sweeping** [1] - 87:2
**system** [4] - 17:5, 28:9, 29:18, 66:24
**systemic** [1] - 5:17
**systems** [1] - 29:25

## T

**talks** [1] - 72:11
**tango** [1] - 90:9
**tap** [1] - 49:18
**targeting** [4] - 36:2, 36:5, 52:25
**tariff** [1] - 76:9
**Tate** [1] - 92:12
**tax** [6] - 47:25, 57:4, 75:19, 76:2, 76:8
**taxes** [1] - 57:18
**taxing** [2] - 76:7, 76:13
**tech** [2] - 25:7, 25:9
**technically** [1] - 90:11
**temporary** [4] - 74:9, 81:4, 87:24
**tend** [1] - 6:7
**tends** [2] - 34:19, 84:2
**tens** [1] - 20:23
**term** [1] - 65:17
**termination** [2] - 34:18, 83:25
**terms** [10] - 14:18, 32:15, 33:19, 34:7, 38:8, 39:15, 65:18, 70:1, 80:2, 80:7
**text** [7] - 46:18, 50:18, 50:24, 59:18, 62:25, 64:21, 93:14
**textual** [4] - 48:6, 50:22, 64:20, 95:6
**THE** [143] - 1:1, 1:3, 1:8, 2:2, 3:2, 3:12, 3:16, 3:21, 3:25, 4:4, 6:12, 6:23, 7:7, 7:20, 7:23, 8:9, 8:24, 9:4, 9:15, 11:4, 11:12, 11:18, 12:13, 12:20, 13:1, 13:8, 13:15, 13:25, 14:12, 15:5, 15:10, 15:20, 16:16, 16:22, 18:7, 18:22, 19:1, 19:5, 19:12, 19:20, 19:23, 20:14, 20:25, 21:12, 21:23, 22:2, 22:7, 22:10, 22:17, 22:22, 24:8, 24:13, 26:13, 27:2, 27:13, 29:7, 30:2, 30:5, 30:17, 31:22, 32:25, 33:2, 33:7, 33:17, 33:24, 34:10,

35:12, 35:14, 35:17, 35:23, 36:9, 36:13, 37:20, 38:9, 38:18, 39:10, 40:10, 41:2, 41:10, 41:12, 41:15, 42:5, 42:8, 43:10, 44:10, 45:4, 45:11, 45:17, 46:22, 47:16, 49:3, 49:21, 51:18, 52:16, 53:11, 55:3, 55:7, 55:20, 56:5, 56:22, 57:20, 58:7, 59:12, 60:7, 60:11, 62:2, 62:9, 64:5, 64:23, 65:3, 65:7, 65:15, 66:6, 67:23, 68:3, 69:4, 70:19, 71:22, 74:14, 75:4, 75:15, 75:23, 77:17, 77:23, 78:6, 79:3, 79:12, 79:21, 80:16, 81:20, 82:18, 83:22, 84:13, 85:2, 86:20, 87:10, 87:14, 89:15, 91:7, 91:9, 93:18, 94:8, 95:17
**themselves** [3] - 8:13, 79:4, 90:15
**theory** [3] - 44:4, 54:9, 71:5
**thereafter** [1] - 12:5
**thereby** [1] - 93:7
**therefore** [2] - 42:24, 89:18
**thinking** [2] - 68:2, 69:25
**thinks** [1] - 26:20
**third** [4] - 40:15, 61:20, 63:1, 64:14
**thou** [1] - 46:8
**thou-shalt-not-enter** [1] - 46:8
**thousands** [5] - 20:23, 25:8, 47:10, 66:10
**three** [6] - 28:24, 32:11, 40:12, 52:23, 61:16, 94:6
**three-and-a-half-hour** [1] - 28:24
**threshold** [4] - 5:20, 64:18, 85:4, 92:9
**throughout** [1] - 58:21
**throw** [2] - 27:6, 60:9
**thumb** [1] - 53:25
**Tiberius** [1] - 4:3
**TIBERIUS** [1] - 2:3
**tiberius.davis@ usdoj.gov** [1] - 2:6
**timing** [1] - 8:12
**title** [1] - 39:12

**today** [6] - 4:4, 4:24, 7:18, 8:18, 23:8, 26:11
**together** [2] - 25:11, 53:7
**took** [2] - 44:4, 54:9
**top** [2] - 59:10, 74:10
**Torie** [1] - 94:1
**torts** [1] - 62:9
**total** [1] - 17:2
**totaling** [1] - 25:11
**touch** [1] - 25:24
**touched** [2] - 56:25, 81:17
**towards** [1] - 49:23
**traditionally** [1] - 21:18
**train** [3] - 27:21, 53:15, 88:6
**training** [6] - 27:17, 29:19, 67:12, 67:17, 67:21, 88:7
**transcript** [9] - 1:23, 1:24, 2:10, 2:11, 96:5, 96:6, 96:9
**Transcript** [1] - 2:14
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 2:14
**travel** [4] - 12:4, 39:6, 39:8, 77:12
**Travel** [1] - 39:12
**traveling** [1] - 11:23
**travels** [1] - 11:5
**Treasury** [1] - 57:7
**trouble** [1] - 17:5
**true** [6] - 17:18, 33:15, 79:19, 93:25, 96:4, 96:5
**truly** [2] - 15:18, 91:17
**try** [5] - 68:1, 68:2, 80:7, 85:25, 90:14
**trying** [5] - 23:19, 33:16, 78:15, 87:15, 93:16
**turn** [7] - 13:10, 18:1, 29:7, 36:9, 40:10, 41:5, 67:23
**turning** [1] - 25:23
**turns** [3] - 17:25, 52:16, 62:3
**twice** [1] - 62:23
**two** [22] - 4:10, 5:1, 5:5, 5:11, 10:23, 34:11, 34:13, 39:3, 44:5, 45:8, 50:3, 59:12, 60:1, 62:5, 71:9, 75:17, 80:21, 83:23, 87:21, 90:8, 91:17, 93:21

15

**type** [2] - 68:19, 93:2
**types** [1] - 73:5
**typically** [1] - 76:8

## U

**U.S** [10] - 4:14, 21:19, 35:21, 37:22, 46:13, 46:14, 46:15, 48:9, 52:12, 53:6
**U.S.C** [5] - 36:16, 41:19, 70:22, 71:24, 80:18
**ultimate** [1] - 89:7
**ultimately** [1] - 18:6
**ultra** [11] - 5:3, 5:10, 35:24, 36:4, 55:9, 56:6, 57:23, 58:9, 69:10, 85:17, 92:23
**unable** [1] - 31:17
**unauthorized** [1] - 56:11
**uncertainty** [2] - 24:2, 70:20
**unchecked** [2] - 38:6, 38:22
**unclear** [1] - 10:21
**unconstitutional** [1] - 57:24
**undefined** [1] - 52:4
**under** [40] - 5:5, 5:23, 7:9, 14:9, 19:25, 23:23, 30:3, 32:9, 32:12, 33:18, 37:3, 37:25, 42:17, 44:5, 45:12, 50:3, 50:4, 50:16, 50:25, 53:17, 54:10, 54:24, 57:23, 57:24, 59:12, 60:2, 69:10, 71:5, 71:15, 74:3, 74:6, 76:25, 78:6, 80:18, 81:23, 82:21, 85:24, 88:15, 92:4
**undermine** [1] - 27:10
**undermined** [1] - 5:17
**underscores** [2] - 43:4, 43:24
**understood** [4] - 18:13, 21:12, 85:3, 85:9
**unemployment** [1] - 25:4
**unfettered** [1] - 38:6
**unfortunately** [1] - 24:9
**unilateral** [2] - 28:14, 67:1
**unilaterally** [1] - 94:13
**unique** [2] - 90:2,

91:17
**UNITED** [5] - 1:1, 1:3, 1:5, 1:9, 1:11
**United** [42] - 2:3, 3:3, 3:4, 3:11, 3:24, 5:15, 5:18, 10:22, 11:5, 11:9, 11:20, 11:24, 12:4, 12:9, 12:14, 12:21, 13:5, 23:20, 26:8, 37:3, 39:15, 40:20, 44:8, 44:11, 44:13, 46:9, 48:11, 51:3, 52:3, 53:1, 53:5, 53:22, 54:1, 54:6, 54:17, 63:9, 80:22, 81:15, 82:9, 88:1, 89:9, 89:10
**Universities** [3] - 3:15, 3:20, 4:6
**UNIVERSITIES** [1] - 1:17
**universities** [3] - 4:8, 20:17, 29:19
**university** [2] - 43:14, 90:3
**University** [6] - 18:23, 20:1, 20:15, 21:24, 22:10, 31:14
**unlawful** [9] - 14:7, 33:10, 33:12, 35:9, 35:11, 37:1, 43:20, 45:12, 46:2
**unlawfully** [1] - 52:7
**unlawfulness** [2] - 43:23, 56:10
**unless** [6] - 36:25, 44:19, 73:21, 80:3, 80:4, 92:8
**unrestricted** [1] - 89:8
**unreviewable** [1] - 85:8
**unwritten** [1] - 84:25
**up** [15] - 6:18, 8:11, 13:10, 27:21, 41:3, 45:2, 48:16, 53:16, 56:24, 60:20, 72:2, 72:8, 82:18, 85:12, 90:16
**upcoming** [1] - 9:14
**update** [1] - 22:1
**urgency** [3] - 9:13, 23:2, 23:12
**urgent** [2] - 23:15, 23:22
**USCIS** [2] - 59:2, 61:12
**useful** [2] - 15:17, 64:2
**user** [4] - 57:13, 59:21, 61:13

**uses** [5] - 32:6, 49:21, 50:1, 75:8, 82:6

## V

**vacated** [2] - 87:5, 90:21
**valid** [3] - 11:24, 12:15, 13:4
**valuable** [1] - 27:6
**valve** [1] - 87:24
**variability** [1] - 34:7
**varieties** [1] - 49:17
**variety** [1] - 65:12
**various** [2] - 6:10, 30:10
**vast** [1] - 21:17
**Venture** [3] - 17:17, 17:24, 23:24
**verge** [1] - 28:18
**versus** [2] - 21:15, 43:16
**vested** [2] - 46:21, 48:6
**vet** [2] - 63:14, 63:15
**vetting** [2] - 63:11, 73:17
**via** [2] - 59:5, 66:24
**view** [7] - 15:16, 28:8, 43:20, 44:12, 47:7, 47:11, 79:23
**viewed** [1] - 44:7
**views** [1] - 47:5
**vigorously** [1] - 47:18
**violation** [1] - 15:1
**violations** [1] - 58:13
**vires** [11] - 5:3, 5:11, 35:24, 36:4, 55:9, 56:6, 57:24, 58:9, 69:11, 85:17, 92:23
**virtually** [1] - 87:14
**visa** [38] - 4:15, 9:18, 9:22, 9:24, 10:13, 11:4, 11:6, 11:7, 11:24, 11:25, 12:5, 12:15, 12:16, 12:20, 13:3, 13:4, 13:5, 19:19, 24:22, 37:11, 47:7, 49:13, 53:17, 61:21, 63:17, 63:18, 64:3, 68:17, 68:19, 69:20, 78:16, 78:17, 78:25, 81:16, 87:14, 88:15, 88:16
**visas** [13] - 10:14, 17:3, 19:6, 40:21, 44:14, 49:9, 67:14, 67:16, 88:18, 88:20, 90:2, 90:7
**visitor** [1] - 12:5

**void** [3] - 1:24, 2:11, 96:8
**voluminous** [1] - 13:17
**vs** [1] - 1:4

## W

**wage** [2] - 65:9, 89:12
**wages** [5] - 65:4, 65:14, 65:18, 65:23, 89:13
**waiting** [1] - 33:2
**waiver** [30] - 29:12, 29:22, 30:2, 30:12, 31:19, 31:23, 32:1, 32:2, 33:8, 33:20, 34:8, 35:3, 35:6, 42:13, 63:17, 63:18, 81:23, 82:1, 82:23, 83:5, 83:7, 83:10, 83:11, 83:15, 83:17, 83:20, 84:6, 84:20, 85:12
**waivers** [12] - 29:25, 30:10, 30:23, 31:6, 32:6, 32:7, 32:9, 42:6, 42:15, 42:18, 73:17, 82:16
**walk** [1] - 38:4
**walked** [1] - 64:22
**wants** [1] - 66:20
**wartime** [1] - 51:20
**Washington** [5] - 1:6, 1:14, 1:20, 2:5, 31:14
**ways** [4] - 32:13, 32:18, 75:1, 94:23
**website** [1] - 22:13
**Wednesday** [2] - 4:21, 77:18
**week** [2] - 4:17, 8:21
**weighing** [1] - 14:22
**well-encompassed** [1] - 80:10
**whereas** [3] - 23:5, 23:13, 32:2
**WHITFIELD** [1] - 1:12
**whole** [15] - 6:12, 14:1, 24:6, 26:8, 27:7, 29:3, 29:16, 33:12, 39:20, 67:5, 72:18, 75:1, 78:12, 88:21, 93:13
**wide** [2] - 65:12, 82:24
**widely** [1] - 92:25
**win** [2] - 18:6, 24:3
**wise** [1] - 38:11
**wish** [2] - 8:4, 8:17
**wished** [1] - 61:1

**Witkovsky** [1] - 3:23
**WITKOVSKY** [2] - 1:12, 3:22
**Witkovsky-Eldred** [1] - 3:23
**WITKOVSKY-ELDRED** [2] - 1:12, 3:22
**won** [1] - 17:8
**word** [2] - 52:17, 53:24
**words** [4] - 5:4, 32:6, 62:23, 73:18
**worker** [8] - 27:16, 28:20, 28:21, 53:14, 53:17, 53:18, 53:21, 82:9
**worker's** [1] - 82:8
**workers** [22] - 4:14, 5:19, 9:19, 19:10, 19:11, 20:23, 23:16, 24:23, 25:8, 25:9, 29:15, 47:8, 47:9, 54:2, 66:11, 67:11, 67:20, 67:21, 87:24, 89:3, 89:9, 89:12
**workers'** [1] - 89:13
**workforce** [1] - 24:20
**works** [6] - 19:20, 28:9, 55:4, 66:24, 66:25, 73:17
**world** [3] - 29:3, 45:18, 51:9
**worth** [1] - 86:22
**wrecking** [3] - 61:22, 62:4, 62:5
**Wright** [1] - 34:16
**writing** [1] - 8:7
**written** [3] - 15:7, 84:17, 84:24
**wrote** [1] - 15:24

## Y

**year** [4] - 23:17, 81:6, 88:5, 88:10
**Year's** [1] - 9:1
**years** [3] - 20:24, 24:25, 44:18
**yesterday** [1] - 4:21
**York** [2] - 1:19, 25:2
**you-all** [2] - 6:16, 9:23
**Youngstown** [1] - 71:15
**yourselves** [1] - 3:7

## Z

**Zach** [2] - 3:14, 3:16
**ZACHARY** [1] - 1:18

**zschauf@jenner.
com** [1] - 1:21